

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

JJD:LTG/JLG  
F. #2018R00279

*610 Federal Plaza*
*Central Islip, New York 11722*

July 31, 2019

**Filed Under Seal**

By Hand

The Honorable Joan M. Azrack
United States District Judge
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

F I L E D
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ AUG 01 2019 ★

LONG ISLAND OFFICE

Re: United States v. Christopher McPartland and Thomas J. Spota
Criminal Docket No. 17-587 (JMA)

Dear Judge Azrack:

We write on behalf of the Government in the above captioned matter, with respect to one of the Government's anticipated trial witnesses, James Hickey ("Hickey"). The Government is in possession of medical records pertaining to Hickey's two hospitalizations – one in August 2013 and one in October 2015 – at Huntington Hospital in Huntington, New York. The information contained in these medical records is set forth in detail below, in substance and in relevant part.

By this letter, the Government respectfully submits that the information set forth herein constitutes sufficient disclosure to the defense pursuant to *Giglio v. United States*, 405 U.S. 150, 154 (1972), and its progeny, and pursuant to the Jencks Act, 18 U.S.C. § 3500, for Hickey. Therefore, the disclosure of the medical records themselves is not required. Furthermore, for the reasons described below, the Government respectfully requests that this Court issue an order precluding the defense from introducing any evidence of, or conducting cross-examination about, the facts and circumstances of Hickey's October 2015 hospitalization and his related medical conditions at that time. Finally, in order for the Court to properly assess the Government's disclosure and consider its requested order, the Government respectfully requests that this Court review these medical records *in camera*. *See Pennsylvania v. Ritchie*, 480 U.S. 39, 61 (1987) (where psychiatric, investigative or medical information is privileged or confidential, it is to be turned over to the trial court for

*in camera* review to balance the needs of the defendant and the state or individual's need to keep those records private).

The enclosed materials constitute all of the medical records presently in the Government's possession pertaining to this witness.[1]

I. Hickey's August 2013 Hospitalization

On August 24, 2013, Hickey was admitted to Huntington Hospital for abdominal pain and vomiting. According to the Emergency Department ("ED") records, Hickey reported "binge drinking" for two months, and drinking "heavily" since February 2013. Hickey reported drinking at least one bottle of wine and up to a half-bottle of vodka daily, but stated that he had not drunk anything since the prior afternoon (*i.e.*, August 23). Hickey complained of pain, nausea, and "constant vomiting," and indeed, reportedly vomited "frequently" while in the ED. The records also indicate that Hickey felt weak, tremulous, shaky, and anxious, and that he suffered chills but no fever. Hickey was administered intravenous ("IV") fluids, along with Ativan, Zofran, and morphine. He was subsequently admitted to the hospital.

Hickey was diagnosed with alcohol-induced acute pancreatitis, alcohol dependency abuse, and gastroesophageal reflux disease ("GERD"). He was treated with aggressive IV fluid hydration, and was given Ativan as part of the hospital's alcoholism withdrawal protocol, which he tapered off prior to being discharged. Hickey refused inpatient rehab for alcoholism, because he reportedly planned to follow up on an outpatient basis.[2] Hickey was discharged from the hospital five days later, on August 29, 2013. He was prescribed Prilosec (Omeprazole) for the treatment of his GERD, and Tylenol (Acetaminophen) as needed for pain. Hickey was instructed to make a follow-up appointment with a gastroenterologist, and to stay hydrated and abstain from alcohol. The

---

[1] At the request of defense counsel, the Government has sought, via subpoena *duces tecum*, additional hospitalization and medical records for this witness, but has received no other records. A representative of the Stony Brook University Hospital System has informed the Government, verbally, that Hickey has been seen as a patient at certain out-patient practices, in particular: (a) in 1998, Hickey saw a dermatologist affiliated with Stony Brook; (b) in 1999, Hickey saw an ophthalmologist affiliated with Stony Brook; and (c) in 2002, Hickey saw a gastroenterologist affiliated with Stony Brook. These medical services pre-date the crimes charged in the Indictment in this matter – the subject of Hickey's anticipated testimony – by a decade or more, and have no other relevance to this witness's credibility, anticipated testimony, or ability to testify. *See* Fed. R. Evid. 611(b); *United States v. Bari*, 750 F.2d 1169, 1179 (2d Cir. 1984), cert. denied, 472 U.S. 1019 (1985). Therefore, the Government submits that cross-examination of the witness with respect to these medical treatments, which will naturally lie well beyond the scope of the witness's direct testimony, is unwarranted.

[2] Hickey did not, ultimately, seek further medical treatment for alcohol abuse.

2

records pertaining to this hospitalization are enclosed herewith as Exhibit A, and are stamped Hickey Medical 00000001 through Hickey Medical 00000310, for the Court's review.

II. Hickey's October 2015 Hospitalization

On October 22, 2015, Hickey was admitted to Huntington Hospital for confusion (clinically, "fluctuating and altered mental status"), agitation, hypertensive disorder, and a possible transient cerebral ischemia attack ("TIA"). According to his Admission History Assessment, Hickey reported having slurred speech and feeling off-balance beginning on October 21. He reportedly had difficulty remembering what day it was that morning, and after a "normal" day at work at his "stressful" job, had trouble navigating his car home. He also could not recall the teams that had played in a baseball game he watched only four hours prior to his arrival in the ED. He reported that his "boss" noted his slurred speech and dizziness with unsteady balance that day at work; and that his wife observed him to be confused, and heard him talking to his son who was not present at the time. Hickey indicated that he had not consumed alcohol for two years, but disclosed his past issues with alcoholism and his prior hospitalization, discussed above. The records also indicate that Hickey's wife reported that Hickey "has been under a tremendous amount of stress at work, sleeping very few hours because of work, and ... [recently] has been paranoid at times." It was further noted that Hickey had no past psychiatric history.

According to a Hospitalist Blank Brief Note, on October 22, Hickey was found in the hospital hallway "severely agitated, screaming at a family member." He was reportedly physically restrained by house staff, and was noted to be having auditory and visual hallucinations.

According to a Nursing Progress Note, on October 23, Hickey pulled out his IV, and was "screaming about a girl who is in danger." Hospital staff attempted to reorient him, but Hickey removed his gown and ran towards the elevators, resulting in a "Code Gray" (Combative Person) being called. Hickey was described as being confused, disoriented, diaphoretic, and increasingly agitated and violent. He was given Haldol (Haloperidol), but continued to hallucinate, and after a second Code Grey was called, he was placed in four-point restraints. Hickey was given a Precedex (Dexmedetomidine) drip and transferred to the Cardiac/Coronary Care Unit ("CCU") for sedation and close observation.

Later that day, Hickey was described as awake and cooperative, and was evaluated by the psychiatric attending at the hospital. The hospital's Assessment and Plan as of October 24 indicated that Hickey's treating physicians were seeking to rule out "all organic causes before considering a psychiatric diagnosis." The records indicate that his wife reported that Hickey had greatly improved after finally sleeping that night, and opined that his condition may have been brought on by chronic sleep deprivation due to "severe work stress."

According to a Progress Note, dated October 26, Hickey was alert and oriented, and indicated that he had slept well and was feeling much better. As was expected by medical staff, he could not recall all the details of what occurred while he was delirious.

3

Hickey indicated that he had been drinking five to six large cups of coffee daily to stay awake, and had some racing thoughts, but that he was "going through a life transition" and was still deciding what to do post-retirement.

This same Progress Note of October 26 contains a collateral report from Hickey's wife, under the heading "History of Present Illness." According to this report, Hickey's wife advised that Hickey is a Suffolk County Police Department detective, whose work has been "very stressful" because "they reopened a case and co workers have been issued subpoenas." As reported by Hickey's wife, Hickey had "slept for less than 10 hours last week due to increased hours at work, and fears of getting a subpoena himself." According to his wife, Hickey began having audio and visual hallucinations of people outside his house, who he believed were "out to get him." Furthermore, according to Mrs. Hickey, Hickey's conversations became "loose" and his answers "inappropriate;" and when his speech began to slur, he was concerned that he was having a stroke, which prompted their visit to the ED. His wife further reported that, during the course of his hospitalization, Hickey had intervals of lucidity and orientation, in between episodes of confusion. One evening at the hospital, according to Mrs. Hickey, Hickey had auditory and visual hallucinations of children eating ice cream, and believed he was selling them ice cream. His wife further reported that, ever since his last detox two years ago (described above), Hickey "had been having some mild memory impairment that does not seem to be progressing." She further observed, according to this report, that he "had more difficulty multitasking and remembering schedules."

Hickey was ultimately diagnosed with a "transient cerebral ischemic attack," which is commonly defined as a brief episode of neurological dysfunction caused by loss of blood flow (ischemia) in the brain, spinal cord, or retina, without tissue death (infarction). After four days of hospitalization, Hickey was discharged on October 26, 2015. He was described as "much improved, alert and oriented;" and a determination was made that he "does not need psych admission and is cleared psychiatrically." Hickey was instructed to "sleep better," and to follow up with a psychiatrist "for management of stress and anxiety." Hickey was prescribed Amlodipine and Losartan for high blood pressure and hypertension; Mirtazapine for insomnia; and potassium chloride for low potassium. The records pertaining to this hospitalization are enclosed herewith as Exhibit B, and are stamped Hickey Medical 00000311 through Hickey Medical 00000770, for the Court's review.

III. Analysis

It is axiomatic that the Sixth Amendment guarantees a defendant the right to cross-examine the witnesses against him at a criminal trial. *See, e.g., Delaware v. Van Arsdall*, 475 U.S. 673, 678-79 (1986); *United States v. Vitale*, 459 F.3d 190, 195 (2d Cir. 2006). Nonetheless, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on ... cross-examination based on concerns about, among other things, harassment, prejudice, [and] confusion of the issues." *Van Arsdall*, 475 U.S. at 679. "Cross-examination is not improperly curtailed if the jury is in possession of facts sufficient to make a 'discriminating appraisal' of the particular witness's credibility."

4

*United States v. Roldan–Zapata*, 916 F.2d 795, 806 (2d Cir. 1990) (quoting *United States v. Singh*, 628 F.2d 758, 763 (2d Cir.), cert. denied, 449 U.S. 1034 (1980)), cert. denied, 499 U.S. 940 (1991). Indeed, with respect to a witness's medical or psychological history, the Court has broad discretion to limit such evidence if it determines that the probative value of the evidence is outweighed by its potential for unfair prejudice, confusion of the issues, or waste of time. *See* Fed. R. Evid. 403; *Chnapkova v. Koh*, 985 F.2d 79, 81 (2d Cir. 1993); *United States v. Sasso*, 59 F.3d 341, 347 (2d Cir. 1995); *United States v. Crowley*, 318 F.3d 401, 417 (2d. Cir. 2003), cert. denied, 540 U.S. 894; *Vitale*, 459 F.3d at 195 (a trial judge may "impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant."). The Court's decisions on these questions will not be overturned in the absence of an abuse of discretion. *See, e.g., Crowley*, 318 F.3d at 417; *Singh*, 628 F.2d at 763.

With respect to Hickey's August 2013 hospitalization, the Government anticipates that Hickey will testify, to some degree, about this incident during direct examination, as the circumstances surrounding his alcohol abuse during the 2013 time-period are relevant, significant, and indeed, are directly related to and occurring during, the charged offenses. Although it is anticipated that Hickey will confirm, on the record at trial, that his excessive drinking had no effect on his ability to perceive or recall events, the Government is not seeking to limit appropriate cross-examination on this topic.

With respect to Hickey's October 2015 hospitalization, the Government does not intend to elicit testimony from Hickey concerning this incident. The subject matter of Hickey's anticipated testimony during direct examination will conclude, temporally, with events occurring *prior* to the onset of Hickey's symptoms which resulted in his October 2015 hospitalization. As such, the introduction of evidence of, and conducting cross-examination about, Hickey's medical conditions at this time, including the fact and circumstances of his hospitalization, should be precluded.

As an initial matter, the records related to Hickey's October 2015 hospitalization reveal unequivocally that his condition was entirely attributable to a *physical* health issue – that is, the loss of blood flow to critical areas of his body – and not to any mental health, psychiatric, or psychological issue. Permitting the defense to use evidence of Hickey's condition, which manifested as a psychiatric/neurological issue, would cause nothing but confusion, when, in fact, Hickey was medically cleared with no psychiatric or psychological diagnosis.

Furthermore, a review of these same records provides absolutely no basis to conclude that Hickey's medical conditions and treatment in October 2015 had any effect on his "ability to perceive or to recall events or to testify accurately" about the events at issue in this matter, all of which predate these conditions. *United States v. Dupree*, 833 F. Supp. 2d 255, 264-65 (E.D.N.Y. 2011) (Matsumoto, J.); *see also United States v. Glover*, 588 F.2d 876, 878 (2d Cir. 1978). Although Hickey's medical condition was brought on by chronic lack of sleep and stress, which was arguably a direct result of the pressure put upon Hickey

5

by the defendants and James Burke to continue to obstruct justice, the Government intends to forgo this argument,[3] and conclude Hickey's narrative on direct examination prior to the time-frame of this hospitalization.[4] Critically, this physical manifestation of the stress and pressure Hickey felt occurred in a finite period of time *after* the events about which Hickey is expected to testify; and significantly, as noted above, were ultimately found to have *no* underlying psychiatric or psychological causes. Therefore, there is no conceivable probative value in this line of cross-examination, which should therefore be precluded.

Indeed, these medical records are irrelevant to the issues at trial, and have no bearing on Hickey's ability to testify accurately. Even assuming *arguendo* that Hickey's medical conditions have any probative value at all, this limited probative value would be substantially outweighed by the clear danger of unfair prejudice to the witness and confusion of the issues. *See* Fed. R. Evid. 403. The defense cannot be permitted to argue or suggest that Hickey was suffering from any mental health issues when the medical records and clinical diagnoses do not bear this out.

Therefore, the Government respectfully requests that this Court issue an order precluding the defense from introducing any evidence of, or conducting cross-examination about, the facts and circumstances of Hickey's October 2015 hospitalization and his related medical conditions during that time. The Government further respectfully submits that, by this letter, it has provided sufficient disclosure to the defense of Hickey's medical conditions and treatments, such that the additional disclosure of the medical records themselves is unnecessary. Finally, the Government respectfully requests that this letter be filed under

---

[3] To the extent the Court allows the defense to introduce evidence of Hickey's hospitalization in October 2015, including during cross-examination, the Government respectfully reserves the right to elicit this information on direct and/or redirect examination and make corresponding arguments to the jury.

[4] During direct examination, the Government does, however, intend to confirm with Hickey the fact of his receipt of a federal subpoena, and to explore his subsequent cooperation with the Government and guilty plea, all of which occurred after this October 2015 hospitalization.

seal, as it discloses sensitive and personal medical information concerning a Government witness whose identity has not yet been made public.[5]

>	Respectfully submitted,
>
>	RICHARD P. DONOGHUE
>	United States Attorney
>
> By:	/s/
>	John J. Durham
>	Lara Treinis Gatz
>	Justina L. Geraci
>	Assistant U.S. Attorneys
>	(631) 715-7851 /-7913 /-7835

Enclosures.

cc:   All Counsel of Record (By E-mail, without enclosures)

---

[5] This information is being furnished to the defense pursuant to the parties' March 29, 2019 Protective Order.