

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

NB;LTG:JLG:MRM
F. #2015R01885

*610 Federal Plaza*
*Central Islip, New York 11722*

October 18, 2019

By Hand and ECF

**TO BE FILED UNDER SEAL**

The Honorable Joan M. Azrack
United States District Judge
United States District Court
Eastern District of New York
920 Federal Plaza
Central Islip, New York 11722

Re: United States v. Christopher McPartland and Thomas J. Spota
Criminal Docket No. 17-587 (JMA)

Dear Jude Azrack:

The government respectfully submits this motion *in limine* to admit at trial evidence of the defendants' conduct in connection with a judicially-authorized wiretap and related investigation of former Suffolk County Police Department ("SCPD") Detective John Oliva, ("Oliva") which was conducted by the defendants in their roles as members of the Suffolk County District Attorney's Office ("SCDAO") (hereinafter, the investigation and wiretap will be referred to collectively as "the Oliva Investigation"). As more fully set forth below, the government intends to offer evidence related to the Oliva Investigation at trial for a number of purposes, including as: (1) direct evidence of the charged conspiracy; (2) to show the relationships of mutual trust between the defendants Thomas J. Spota and Christopher McPartland and certain co-conspirators, including James Burke; and/or (3) evidence of other acts and activity by defendants, pursuant to Rule 404(b) of the Federal Rules of Evidence, which constitutes proof of the defendants' motive, opportunity, intent, preparation, plan, knowledge, identity, and absence of mistake or accident.

## I. Background

In 2012, Oliva was assigned to the Long Island Gang Task Force ("LIGTF") comprising of various state and federal law enforcement agencies. In September 2012, then Chief of Department James Burke removed Oliva from the LIGTF while simultaneously removing other detectives from other task forces. Oliva complained bitterly about his removal and openly challenged and badmouthed Burke. Oliva's conduct was soon reported to Burke who became enraged. Then Oliva, believing that he was wrongly removed from the LIGTF,

over time, secretly obtained police documents concerning gang activity and then leaked them to Tanya Lopez, a reporter from Newsday, in a misguided and illegal attempt to demonstrate how his removal may have caused a spike in gang violence. These leaks were a crime, as Oliva stole the documents in violation of New York State Law. The leaks were also very embarrassing to Burke and the SCPD.

Witnesses will testify that in December 2013, when Burke was advised that a federal investigation of his conduct in the Loeb matter was being closed, his first order of business was to find a way to "fuck John Oliva."

Then, in or about early 2014, SCPD Detective John Cahill audited the SCPD computer system and ultimately identified Oliva as the leaker based upon Oliva's access to the certain documents (to which he had no business accessing) that contained the exact information leaked to Newsday. Rather than handle this matter administratively, or arresting Oliva once his identity was discovered, Burke and McPartland chose to investigate the matter via a four-month wire-tap investigation, culminating in Oliva's arrest, prosecution and guilty plea on September 9, 2014.

## II. Notice of Intent to Offer Evidence of the Oliva Investigation at Trial

On or about March 11, 2019, the government provided the defendants with a notice of intent to offer evidence at trial related to the Oliva Investigation. In that notice, the government advised the defendants of their intent to offer evidence at trial suggesting that the defendants "[i]nappropriately used court-ordered wire interceptions for personal reasons, including at the behest of Burke, and/or to protect Burke, including the inappropriately monitored and prolonged interception of SCPD Detective John Oliva's cellular telephone, from in or about March 2014 through in or about June 2014, in order to gain information concerning one or more federal investigations, including the investigation into Burke's civil rights violations." See Government's 404b Notice, dated March 11, 2019.[1]

Thereafter, the government further refined the description of the information it intended to offer regarding the Oliva Investigation. On October 8, 2019, in an email to counsel, the government advised the defendants that "the government does not intend to elicit testimony that the wiretap of the telephone of John Oliva was improperly obtained, improperly monitored or improperly extended." See Government's Email to Counsel, attached as Exhibit B to the Defendants' Joint Letter to the Court, dated October 10, 2019. In that email, the government provided the defendants with a list of the specific types of evidence that the government did intend to offer related to the Oliva Investigation. A copy of that list is reproduced here:

---

[1] The government provided a copy of this notice to the Court at its request on October 16, 2019.

1. At the time that the investigation was commenced, Oliva was described by Burke as an "enemy," a designation about which the defendants were aware and concurred;

2. During the investigation the defendants showed an unusual interest in the intercepted conversations of Oliva, including personally reviewing and monitoring calls in the wire room;

3. Individuals involved in the investigation believed the wiretap, while legally obtained and monitored, was unnecessary in light of other evidence of Oliva's guilt and believed it was a vehicle to gather information helpful to James Burke;

4. During the investigation, defendant Spota expressed an interest in attempting to obtain a warrant to search the phone of Newsday report Tania Lopez, another known "enemy" of James Burke;

5. Defendant McPartland made reference to John Oliva as an example of what happened to people (police officers) who were "enemies" of the defendants and their coconspirators;

6. Police Officers and coconspirators perceived the prosecution of John Oliva as Burke utilizing his relationship with Spota and McPartland to help Burke dispose of his "enemies."

Indeed, consistent with the foregoing, multiple witnesses will testify that, at the time the Oliva Investigation was initiated, the defendants were aware that Oliva was considered by their coconspirator, James Burke, to be an "enemy" and that the defendants viewed Oliva as an enemy as well, because an enemy of James Burke was an enemy of McPartland and Spota.[2] The government anticipates calling multiple witnesses, who will testify that they were physically present in the wire room while the wire-tap of Oliva's phone was being monitored. Those witnesses will also testify that they observed each of the defendants enter the wire room on multiple occasions; that each of the defendants personally reviewed calls intercepted by the wire-tap; and, in some instances, actually monitored live calls as they were being intercepted. These witnesses will also testify that defendant Spota's actions in this regard were highly unusual given his position as the District Attorney and head of the office, and his typical lack of hands-on involvement in ongoing investigations. In addition, the government anticipates that several witnesses will state that there were more prudent, obvious, and faster ways to address Oliva's illegal conduct, which did not require a several

---

[2] This belief is critical to the state of mind of several coconspirators because they will testify that they knew that crossing Burke was crossing McPartland and Spota, thus, refusing to participate in the cover up of Burke's assault of Loeb would ensure retaliation from all three.

months' long wire-tap. At least one witness is expected to testify that he/she was personally present for a conversation in which defendant McPartland told the monitors of the wire-tap, in substance and in part, to pay attention to specific individuals, other than Oliva, in an effort to gain "intelligence" on those individuals. Other witnesses will identify the individuals highlighted by defendant McPartland as individuals who were widely and openly known as "enemies" of James Burke. At least one witness is expected to testify that, while monitoring calls on the Oliva wire, defendant McPartland was in regular phone contact with James Burke, updating him on the substance of the wire. Finally, multiple witnesses are expected to testify about a January 2014 meeting of the SCPD and SCDAO related to the Oliva Investigation during which meeting defendant Spota indicated, in substance, a desire to obtain information about the phone usage of Tania Lopez, a member of the media and an employee of Newsday, in order to find out her sources of information. Defendant Spota's position in this regard was surprising, as while it is a crime to take police department reports and leak them to the press, it is not a crime for a reporter to publish such information. Further proof that an enemy of James Burke is an enemy of defendant Spota.

In addition to the foregoing, all of which is related to the investigation and administration of the Oliva wire, the Oliva Investigation itself became a tool of the defendants and their coconspirators which they utilized to further the conspiracy. Indeed, at least one witness will testify that defendant McPartland affirmatively used a reference to John Oliva as a threat of what would happen to those who do not fall in line with the members of the conspiracy. Simply put, McPartland told a coconspirator that if the witnesses to the Loeb assault did not keep their mouths' shut, they could expect retaliation and then McPartland said, "look at what happened to John Oliva." Furthermore, several witnesses are expected to testify that, in the wake of the Oliva Investigation, there was a clear understanding within the SCPD of what it meant to be "Oliva'd" or "John Oliva'd," that is, what the consequences of crossing the defendants and James Burke could be; namely, a targeted, retaliatory and over-the-top investigation and prosecution. The witnesses will testify that they understood Oliva had done wrong, but they also understood that the manner and methods brought to bear against Oliva were done to send a message to all officers – either you are with us or against us. "Us" being Burke, McPartland and Spota, the three most powerful people in Suffolk County.

### III. Applicable Law

Federal Rule of Evidence 404(b) provides that:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident…Fed.R.Evid. 404(b).

The Second Circuit follows an inclusionary rule, "allowing the admission of such evidence for any purpose other than to show a defendant's criminal propensity, as long as the evidence is relevant and satisfies the probative-prejudice balancing test of Rule 403 of the Federal Rules of Evidence." United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000) (citing United States v. Inserra, 34 F.3d 83, 89 (2d Cir. 1994)); see also, United States v. Mickens, 926 F.2d 1323, 1328 (2d Cir. 1991) (internal citations and quotations omitted).[3] A district court has wide discretion in making this determination. United States v. Inserra, 34 F.3d at 89. Federal Rule of Evidence 403 provides that: "[a] court may exclude relevant evidence if its probative value is substantially outweighed by the danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed.R.Evid. 403.

"To be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency." United States v. Gonzalez, 110 F.3d 936, 941 (2d Cir. 1997). A trial court "may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the indictment. Background evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed." United States v. Coonan, 938 F.2d 1553, 1561 (2d Cir. 1991).

Furthermore, it is well settled "evidence of uncharged criminal activity is not considered other crimes evidence under Fed.R.Evid. 404(b) if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." United States v. Gonzalez, 110 F.3d at 942 (quoting United States v. Towne, 870 F.2d 880, 886 (2d Cir. 1989) (internal quotations omitted)).

## IV.   Analysis

Here, the evidence relating to the Oliva Investigation is not other crimes evidence pursuant to 404(b) as none of the evidence that the government seeks to offer regarding the Oliva Investigation is *per se* criminal conduct. Rather, the evidence relating to the Oliva Investigation is direct evidence of the charged offense, as it is inextricably intertwined with the evidence regarding the offenses charged in the Indictment. Indeed, the charged offenses describe conduct engaged in by the defendants between 2012 and the filing of the indictment in 2017 designed to obstruct a federal investigation of the assault of Christopher Loeb. While the Oliva Investigation targeted illegal conduct committed by Oliva, the actions of the defendants in connection with the Oliva Investigation constitutes a series of

---

[3]     A court should provide an appropriate limiting instruction to the jury, should a defendant request one. United States v. Mickens, 926 F.2d at 1329; see also, Huddleston v. United States, 485 U.S. 681, 691-92 (1988).

5

transactions designed to simultaneously obstruct the federal investigation and send a message to the police officers – that crossing James Burke has consequences so keep your mouth shut

As the trial testimony and other evidence will show, the defendants sought to use the Oliva Investigation for a dual purpose - to gather information on individuals the defendants suspected of working against Burke – while gathering cumulative evidence against Oliva. Further, the Oliva Investigation is obviously inextricably intertwined with the evidence of the charged offenses, as defendant McPartland used reference to the Oliva Investigation as a threat to others in an effort to dissuade witnesses from testifying against Burke. The jury will not understand McPartland's threat, or the context in which the threat was made, without learning about the import of the Oliva Investigation. Similarly, the Oliva Investigation is necessary to complete the story of the crimes on trial, as it was a factor that affected several witnesses' state of mind as each were aware of how the defendants and Burke treated Oliva and it affected their decision not to cooperate with the federal investigation. In short, the defendants used the Oliva Investigation as a tool in their obstruction conspiracy.

Were the Court to find that the evidence the government seeks to offer regarding the Oliva Investigation constituted other crimes evidence for the purposes of Fed.R.Evid. 404(b), and not direct evidence, this evidence clearly meets the requirements for admissibility under Rule 404(b).

First, each type of evidence that the government seeks to offer would be admitted for a purpose other than bad character or propensity. All of the evidence the government seeks to offer, except for the police officers perception of the Oliva Investigation, demonstrate the intent of the defendants during the time frame of the charged offenses. The defendants' actions in connection with the Oliva Investigation clearly demonstrates their intent to assist James Burke in covering up his crimes. Regarding the witnesses' perception of the Oliva Investigation, this evidence is offered to explain the actions, or in most instances, the inactions of certain witnesses. Several witnesses are expected to testify that Oliva Investigation reinforced in their minds that opponents of James Burke would face not only the wrath of Burke, but also the defendants and the power of the Suffolk County District Attorney's Office.

Next, the evidence the government seeks to offer is clearly relevant as it tends to prove the government's case by establishing the intent and state of mind of the defendants during relevant time periods, *i.e.* during the timeframe of the charged conspiracy. The evidence of the Oliva Investigation also helps to provide the jury with context and background to the environment in which various witnesses operated during times relevant to the crimes charged.

Finally, the probative value of this 404(b) evidence is not substantially outweighed by the danger of unfair prejudice to the defendant. The Second Circuit has stated repeatedly that Rule 403 favors the admission of evidence where the other act evidence "did not involve conduct more serious that the charged crime[s]." United States v. Williams, 205 F.3d 23, 33-34 (2d Cir. 2000). Here, the defendants' actions to aid a co-conspirator at a time when a cover up of that co-conspirator's criminal actions was ongoing are clearly probative.

6

At the same time, there is no risk of unfair prejudice from this evidence being admitted as there is no inherent criminality in the evidence related to the Oliva Investigation, which therefore does not involve any conduct more serious or salacious than the charged crimes.

**V.      Conclusion**

For the foregoing reasons, the government respectfully requests that the Court grant the government's motion to admit the above-described evidence related to the Oliva Investigation, either as direct evidence or pursuant to Rule 404(b).

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By:   /s/
Nicole Boeckmann
Lara Treinis Gatz
Justina L. Geraci
Michael R. Maffei
Assistant U.S. Attorneys
(631) 715-7855/7913/7835/7890

cc:     Larry Krantz, Esq. (via email)
        Alan Vinegrad, Esq. (via email)