UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- against -

CHRISTOPHER MCPARTLAND and
THOMAS J. SPOTA,

                                    Defendants.

No. 2:17-cr-0587 (JMA)

**DECLARATION OF ALAN VINEGRAD IN SUPPORT OF
THE ISSUANCE OF RULE 17(C) SUBPOENA TO EDWARD SAPONE, ESQ.**

ALAN VINEGRAD hereby declares as follows:

1.  I am counsel to the defendant Thomas J. Spota in the above-captioned action.  I submit this declaration in support of an application, pursuant to Rule 17(c) of the Federal Rules of Criminal Procedure, for issuance of a pre-trial subpoena to Edward Sapone, Esq., counsel to former Suffolk County Police Department ("SCPD") Lieutenant James Hickey.

2.  The subpoena (a copy of which is annexed hereto as Exhibit A) seeks production of all materials (such as notes, memoranda, and electronic recordings) prepared by or at the direction of Sapone reflecting the substance of (1) statements made by Hickey to any representative of the Department of Justice or Federal Bureau of Investigation ("FBI") (collectively, the "government"), and (2) statements made by Sapone to the government or by the government to Sapone concerning Hickey, for the time periods specified in the subpoena.

3.  The discovery and § 3500 materials produced in this case fully support the defendants' need for the materials requested in the subpoena.  As an initial matter, the discovery and § 3500 materials make clear that Hickey will be a key witness—indeed, _the_ key witness—at trial.  The discovery and § 3500 materials also support that there is reason to question Hickey's truthfulness,

accuracy, and credibility. Finally, the discovery and § 3500 materials reflect that the government's documentation of its meetings with Hickey is materially under-inclusive—potentially for the purpose of gaining an unfair tactical advantage.

4. For these reasons and those below, the materials sought by the subpoena are highly relevant to Mr. McPartland's and Mr. Spota's defense, including their ability to challenge Hickey's testimony at trial. A Rule 17(c) subpoena is therefore an appropriate mechanism to secure the production of this information prior to trial.

### *Background*

5. As set forth in the defendants' prior briefing relating to Hickey's hospital records, *see* Doc. No. 99 at 4–9, Hickey was the Commanding Officer of the SCPD's Criminal Intelligence Squad at the time former Suffolk County Chief of Department James Burke assaulted Christopher Loeb. Hickey supervised the officers who, along with Burke, participated in or were present at the assault, and conspired with his subordinates and Burke to cover up the assault. Hickey was eventually charged with, and pled guilty to, conspiracy to obstruct justice and agreed to cooperate. *See* Gov't Exs. 3500-JH-3 (cooperation agreement), 3500-JH-4 (plea form), 3500-JH-5 (plea transcript).

6. The discovery and § 3500 materials produced in this case reflect that Hickey claims he attended several meetings at which Mr. McPartland and/or Mr. Spota allegedly made statements that evidenced their participation in the cover-up—including (by the government's own account) a key meeting for which Hickey is the only government witness. In addition, Hickey has claimed that the defendants made comments to him during the alleged conspiracy concerning the cover-up—the majority of which only Hickey will testify to. Simply put, Hickey's testimony is

sufficiently central to the government's case that the jury's view of his credibility may be determinative of the verdict.

7. As a result, there is no doubt that Hickey will testify in the prosecution's case-in-chief as the principal cooperating witness against the defendants—and that the consistency of his statements to the government (or lack thereof), other damaging statements made by Hickey to the government, and any threats or promises made by the government to Hickey, all may be pivotal to the outcome of this case. Moreover, based on the materials produced to the defendants, there is ample reason to believe that such inconsistent and/or impeaching statements, threats, and promises were made, and that the materials requested in the subpoena are the _only_ source for the defendants to obtain this information.

### *Hickey's Statements to the Government*

8. Hickey received his first grand jury subpoena in this matter on October 30, 2015 (less than one week after his release from a four-day stay in the hospital, when he was diagnosed with (among other conditions) delirium). By that time, two of the officers involved in the Loeb assault with Burke had testified before the grand jury—offering damning testimony as to Burke and Hickey, but not as to Mr. McPartland or Mr. Spota. One month later, on December 1, 2015, Hickey received a second grand jury subpoena and his counsel, Sapone, met with the government to provide an attorney proffer on Hickey's behalf. Hickey finally met with the government on December 4, 2015, and received a third grand jury subpoena that same day. Hickey subsequently met with the government three more times in December 2015—December 7, 10, and 15—before pleading guilty on January 15, 2016. Since his plea, the government has interviewed Hickey at least 11 more times.

9.   Given the timing of Hickey's cooperation, there is a substantial likelihood that Hickey believed or was in fact told that in order to obtain a cooperation agreement he would have to provide inculpatory information concerning individuals who had not yet been implicated in the cover-up, including Mr. McPartland and Mr. Spota.  Hickey's history also makes plain that he may have been willing to succumb to such express or implicit pressure and provided such information, even if false.  For example, in 1990, after beating a suspect until he confessed to a burglary, Hickey committed perjury at a suppression hearing by denying the beating occurred—prompting the court to excoriate Hickey and the other officers involved for their "profoundly disturbing" and "incredible" testimony, and to dismiss the indictment as a result.  The SCPD Internal Affairs Bureau ("IAB") also concluded that Hickey "knowingly made false verbal communications" during the hearing and in IAB interviews concerning the same incident.  In addition, Hickey's first meeting with the government came just over one month after his discharge from the hospital for, among other conditions, "delirium"—which Hickey manifested through vivid auditory and visual hallucinations and becoming so uncontrollable that he required anti-psychotic medication and four-point restraints.  Given Hickey's mental state at the time, and his susceptibility to pressure, the likelihood of falsehoods or inconsistencies is plainly magnified.  Each of these factors suggest that Hickey may have been willing to provide materially false or inconsistent statements to the government during the course of his cooperation.

10.   The government's own documentation of these meetings further supports the requested relief.  Specifically, though the government produced memoranda and handwritten notes concerning each of the foregoing meetings with Hickey, the defendants have identified several instances in which the government omitted material information from its memoranda that are contained in the handwritten notes.  This strongly suggests that the government's documentation

does not fully or accurately reflect Hickey's statements, making review of Sapone's account of Hickey's statements all the more critical to the defense.

11. For example, during one interview, the government recorded the names of four women in its handwritten notes, memorializing, *inter alia*, that one woman was Hickey's secretary, another worked in a salon and massage parlor, and another was associated with a church's youth ministry. *See* Ex. B (Gov't Ex. 3500-JH-34; relevant portion highlighted). The defendants have learned, through multiple sources of information, that Hickey carried on extramarital sexual relationships with each of these women. But, inexplicably, there is <u>no</u> mention of this information in the government's memorandum of that interview. *See id.* (Gov't Ex. 3500-JH-33). Similarly, the government recorded "Hosp – 2013" and "drunk" in its handwritten notes of the interview. *See id.* (Gov't Ex. 3500-JH-34; relevant portion highlighted). As the Court and the defendants have learned—based on the compelled disclosure of Hickey's hospital records—Hickey was hospitalized in 2013 following a several-month-long alcohol binge. But, inexplicably again, there is <u>no</u> mention of Hickey's hospitalization or severe alcohol abuse in the government's memorandum of that interview. *See id.* (Gov't Ex. 3500-JH-33).

12. The absence of such patently material information from the government's memoranda raises the specter that equally materially information may be missing from the government's handwritten notes. And the defendants have reason to believe that such omissions in fact occurred. For example, in a recent interview memorandum, the government recorded the dates of Hickey's 2015 hospitalization, but wrote that "[t]here were no other notes taken at this time." *See* Ex. C (Gov't Ex. 3500-JH-36; relevant portion highlighted). Only the dates of Hickey's hospitalization are included in the handwritten notes. *See id.* (Gov't Ex. 3500-JH-37; relevant portion highlighted). This interview took place on September 23, 2019—the government's first interview

of Hickey (to the defendants' knowledge) that occurred after the government was compelled to disclose Hickey's medical records. *See id.* There is <u>no</u> other discussion of Hickey's 2015 hospitalization in Hickey's § 3500 material, save for his misrepresentation in his first meeting with the government (before either the government or the defense obtained his hospital records) that he had been hospitalized only for a "minor stroke." It strains credulity that the government would discuss the dates of Hickey's hospitalization with him (dates that were already known to the government) without <u>any</u> questions concerning his diagnosis of delirium, his violent outbursts, his memory loss, or vivid visual and auditory hallucinations—all information that, at least according to the materials produced by the government to the defendants—Hickey had never previously shared with the government. The simpler explanation is that the government (again, most disturbingly) simply did not take notes of these material exchanges with Hickey.

13. Based on these facts, it is plain that the defense cannot rely on the government's documentation of its exchanges with Hickey to provide a complete and accurate account of Hickey's statements to the government.

### ***Sapone's Discussions with the Government***

14. These facts also support that materials reflecting Sapone's own exchanges with the government may contain information that is critical to challenging Hickey's credibility. Yet the government has not produced *any* materials reflecting the content of these exchanges. Sapone's records thus appear to be the <u>only</u> source of this critical information.

15. The government has represented to the defense that it met with Sapone for an attorney proffer concerning Hickey on December 1, 2015, but that it has <u>no notes</u> of the proffer. That is troubling in the extreme, for two reasons. First, the Second Circuit has made clear that notes of an attorney proffer may contain critical *Brady/Giglio* material. *See United States v. Triumph Capital*

*Grp., Inc.*, 544 F.3d 149, 161–65 (2d Cir. 2008) (vacating conviction on the ground that the government failed to produce attorney proffer notes prior to trial that reflected inconsistencies with the witness's subsequent statements). The Department of Justice's own discovery policy suggests that prosecutors should review and produce notes of attorney proffers for that very reason. *See* David W. Ogden, Dep. Atty. Gen., *Memorandum: Guidance for Prosecutors Regarding Criminal Discovery* (Jan. 4, 2010) (directing prosecutors that "[a]ll potential *Giglio* information known by or in the possession of the prosecution team relating to non-law enforcement witnesses should be gathered and reviewed," including "[p]rior inconsistent statements (possibly including inconsistent attorney proffers . . . )" and that "copies [should be] made of relevant portions for discovery purposes"). The government's decision to flout the safeguard of documenting Sapone's attorney proffer—especially for a critical witness such as Hickey—suggests an insensitivity to its obligations under *Brady* and *Giglio*.

16. Second, and more fundamentally, there is a substantial likelihood that Sapone's proffer contained *Brady/Giglio* material that the government is required to produce, even in the absence of contemporaneous documentation of the proffer. *See United States v. Rodriguez*, 496 F.3d 221, 226 (2d Cir. 2007) ("The obligation to disclose information covered by the *Brady* and *Giglio* rules exists without regard to whether that information has been recorded in tangible form."). As noted above, there are numerous reasons to believe that Hickey molded his account of the events in this case, either as a result of his impaired mental state, or in order to secure a cooperation agreement with the government—or both. To the extent such an evolution occurred, it would most likely be captured in the gap between Sapone's proffer and Hickey's initial government interviews. But because the government did not take notes of the proffer—against all reasonable judgment—the

defendants are compelled to rely on Sapone's records of his proffer to determine whether any such critical inconsistencies occurred.

17.   In addition, the chronology of Hickey's cooperation with the government makes it highly likely that Sapone and the government engaged in material conversations in the early stages of Hickey's cooperation regarding the level of cooperation the government would require from Hickey to merit a cooperation agreement—including whether Hickey would be required to provide inculpatory information concerning individuals who had not yet been implicated in the cover-up, such as Mr. McPartland and Mr. Spota.

18.   As outlined above, Hickey received his first grand jury subpoena on October 30, 2015 and Sapone provided an attorney proffer to the government on December 1, 2015.  It is highly likely that Sapone engaged in conversations with the government concerning the nature and extent of Hickey's potential cooperation in the intervening month; indeed, such discussions between the government and a potential cooperator's attorney are routine.  If the government made any threats or promises to Sapone during this period (or at any time prior to Hickey's receipt of a cooperation agreement) concerning Hickey's cooperation, those statements could be fundamental to the jury's view of Hickey's credibility, and as a result, fundamental to the defense.  But the government has not produced any such material.  Thus, it is likely that, if such statements were made, they are <u>only</u> reflected in Sapone's notes—making his notes a potentially critical source of *Brady/Giglio* material for the defense.  *See Triumph Capital Grp.*, 544 F.3d at 163 (noting that a witness's inconsistent statements, offered in an attorney proffer, may be relied on to argue that the witness "initially authorized his attorney to tell the truth, which inculpated others and exculpated [the defendant], but that once he began to cooperate with the government he fabricated a new,

inculpatory version of his dealings with [the defendant] to enhance the value of his cooperation and his expected reward").

### ***Applicable Law***

19.   Based on the foregoing information, the defendants cannot rely on the government's documentation to fully reflect information that is material to challenging Hickey's credibility. Instead, the defendants must look to Sapone's materials—and the defendants are therefore entitled to the issuance of a subpoena for those materials.  *See United States v. Nixon*, 418 U.S. 683, 700 (1974) (stating that 17(c) subpoenas are appropriate when the information sought is relevant and admissible, and the subpoena seeks specific materials); *United States v. Rivera*, No. 13-CR-149 KAM, 2015 WL 1540517, at *4 n.1 ("This court agrees with the other district courts in the Second Circuit that the *Nixon* standard governs third-party subpoenas issued by the defense.").

20.   First, the subpoena seeks materials that are highly relevant to the defense.   The defendants seek statements made by the key cooperating witness and his attorney to the government, and statements made by the government to them, about the alleged obstruction at the heart of this case.   The likelihood that these materials reflect inconsistencies between the witness's accounts, and any threats or promises made by the government to induce his accounts, make the materials highly relevant to the defense.   A number of courts in this circuit have reached just that conclusion when assessing similar requests.   *See, e.g.*, *United States v. Marcus Schloss & Co.*, No. 88-CR-796 (CSH), 1989 WL 62729, at *3–4 (S.D.N.Y. June 5, 1989) (holding that "exploring possible areas of impeachment" required that defense counsel be permitted "to examine the notes of interviews with prosecutors or government agents kept by attorneys for an important government witness" because "[p]ossible inconsistencies or contradictions are of obvious interest to the defendant, considering the centrality of [the witness's] role in the case against [the

defendant], and the crucial issue of [his] credibility"); *United States v. Weissman*, No. 94-CR-760 (CSH), 1995 WL 244522, at *13 (S.D.N.Y. Apr. 26, 1995) (permitting defendant to inspect counsel's notes).

21.    Second, the subpoena seeks information that is admissible at trial—specifically, statements that may be used for the purpose of impeachment.  *See United States v. James*, No. 02-CR-0778 (SJ), 2007 WL 914242, at *29 (E.D.N.Y. Mar. 21, 2007) ("Rule 17(c) permits a defendant to subpoena materials that may be used to impeach a witness for the prosecution." (citation omitted)); *In re Irving*, 600 F.2d 1027, 1034–37 and n.9 (2d Cir. 1979) (finding it was not an abuse of discretion to issue a Rule 17(c) for impeachment material); *United States v. Forbes*, No. 3:02-CR-00264 (AWT), 2005 WL 8146351 at *5 (D. Conn. Oct. 28, 2005) ("*Nixon* did not create a bar to pretrial production of impeachment material . . . .").

22.    In this regard, there is no need to delay the inspection of the subpoenaed materials until "when and if" Hickey testifies. *Cf. James*, 2007 WL 914242, at *29.   While admissibility determinations with respect to impeachment material often are not made until the witness testifies at trial, "where it is known with certainty before trial that the witness will be called to testify, the admissibility determination, within the meaning of *Nixon*, can properly be made before trial, and the statements accordingly may be considered evidentiary."  *United States v. King*, 194 F.R.D. 569, 574 (E.D. Va. 2000); *see also United States v. LaRouche Campaign*, 841 F.2d 1176, 1179–80 (1st Cir. 1988) (upholding order requiring pre-trial production of prior statements made by key government witness, in part, because it was "uncontroverted that [the witness] would be a key witness" and the witness's statements were extensive and "likely covered a wide range of subject matter").  As the Court has implicitly recognized in granting the defendants' prior request for a

Rule 17(c) subpoena relating to Hickey, there is simply no dispute that Hickey will be a pivotal witness at trial.

23. Third, the subpoena seeks specific information. "A request is considered sufficiently specific where it states with reasonable particularity the subjects to which the documents relate and limits documents to a reasonable period of time." *United States v. RW Prof'l Leasing Servs. Corp.*, 228 F.R.D. 158, 164 (E.D.N.Y. 2005). The subpoena identifies the specific witness as well as specific meetings and specific dates to which it relates, and therefore satisfies the specificity requirement.

24. The defendants' request is also not barred by attorney-client privilege or work product protection. While "[a] defense attorney's conversations with his client are protected by the attorney-client privilege," "interviews with government attorneys do not implicate" this privilege. *Schloss*, 1989 WL 62729, at *4. Plainly, because Hickey's interviews and Sapone's discussions were with the government, and were not confined to the attorney-client relationship, the attorney-client privilege does not apply.

25. Nor is the request barred by the protection afforded to attorney work product. Mere transcriptions of statements—like those sought here—do not merit heightened opinion work product protection, even if the notes are not verbatim transcripts. *See Rigas v. United States*, No. 11-CV-6964 (KMW), 2016 WL 4486187, at *2–3 (S.D.N.Y. Aug. 24, 2016). Thus, Sapone's notes may—at most—merit fact work product protection; but that protection is not absolute—it must give way where other considerations, such as the defendants' substantial need for the materials, are present. *See, e.g.*, *SEC v. NIR Group, LLC*, 283 F.R.D. 127, 135 (E.D.N.Y. 2012) (citing *In re John Doe Corp.*, 675 F.2d 482, 493 (2d Cir. 1982)); *Weissman*, 1995 WL 244522, at *10; *Schloss*, 1989 WL 62729, at *3. Those considerations are plainly present here. Indeed, there

could hardly be a greater need for the requested materials—the verdict in this case may hinge on information present in the requested materials, and the defendants have no other source for these materials in light of the government's deficient documentation. In addition, any documents reflecting Hickey's or Sapone's statements to the government, or the government's statements to Sapone, may be reviewed for redactions of attorney opinions or impressions prior to production. *See Schloss*, 1989 WL 62729, at *4. And there is no risk that disclosure would prejudice Hickey. Whatever damaging information may be reflected in the requested materials is already known to the government—since the government was a party to each of the exchanges it had with Hickey and his lawyer. There is therefore no risk of additional criminal charges that might otherwise merit work product protection. *See, e.g.*, *Weissman*, 1995 WL 244522, at *14 (finding disclosure of documents reflecting witness's statements to government was not prejudicial because the prosecution was necessarily familiar with substance of the statements).

26. For all these reasons, the requested subpoena should be issued to Sapone.

27. Finally, we are submitting this request <u>ex parte</u> and <u>in camera</u> for two reasons. First, much of the information herein is based on materials provided by the government pursuant to the confidentiality order entered in this case. Second, this application reveals information that is relevant to the defense's anticipated strategy at trial—information that the government has no right to be privy to, at this or any other stage of the proceeding prior to cross-examination of its witness at trial. For the latter reason, we respectfully request that this declaration <u>not</u> be disclosed to the government or any other person.

Executed on October 21, 2019, at New York, New York.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

ALAN VINEGRAD