

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

LTG
F. #2018R00279

*610 Federal Plaza*
*Central Islip, New York 11722*

October 21, 2019

**To Be Filed Under Seal**
The Honorable Joan M. Azrack
United States District Judge
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

      Re:    United States v. Christopher McPartland, et ano.
                Criminal Docket No. 17-587 (JMA)

Dear Judge Azrack:

      By this letter, the government moves for preclusion of the proposed testimony of defense expert Dr. Alan Jacobs ("Jacobs") concerning: (1) the meaning of various aspects of the 2013 and 2015 medical records of James Hickey ("Hickey"); (2) Jacobs's disagreement with the diagnosis of the medical experts who treated Hickey in 2015, that Hickey suffered a Transient Ischemic Attack ("TIA")[1]; (3) a description of Wernicke's Encephalopathy ("WE")[2] and its effects, as well as Jacobs's diagnosis, four years after the medical event, that in 2015 Hickey suffered from WE, which diagnosis was derived solely from a review of Hickey's medical records; (4) the general effects of alcohol and alcoholism on memory, as well as the likely effects of alcohol on Hickey's memory, cognition and brain function; and (5) Delerium's inclusion in the DSM to suggest Hickey was suffering from a mental health issue when he was not. This testimony should be precluded because there is an insufficient basis of knowledge upon which this expert has relied to form his opinion, and therefore it is speculative. Moreover, much of the expert witness' testimony concerns issues well within the ken of the average juror, and therefore it will only serve to usurp the role of the jury and cause unnecessary confusion and complication of straightforward issues. Finally, the expert testimony would be used to opine on the credibility of a witness, which is impermissible.

---

    [1] A TIA, often called a mini-stroke, is usually caused by a temporary blockage of blood flow to the brain. See generally https://medical-dictionary.thefreedictionary.com/TIA

    [2] WE is a neurological disorder due to a thiamine deficiency characterized by confusion, apathy, drowsiness, gait imbalance and an oscillating motion of the eyes. See generally https://medical-dictionary.thefreedictionary.com/Wernicke%27s+encephalopathy

I.     THE HOSPITALIZATIONS

   A.     Hickey's August 2013 Hospitalization

On August 24, 2013, Hickey was admitted to Huntington Hospital for abdominal pain and vomiting. Hickey Medical Records ("HM") at 297-298.[3] According to the Emergency Department records, Hickey reported "binge drinking" for two months, and drinking "heavily" since February 2013. HM at 9. Hickey also reported drinking at least one bottle of wine and up to a half-bottle of vodka daily, but stated that he had not drunk anything since the prior afternoon (*i.e.*, August 23). Id. Hickey reported he had been drinking "on and off…a good part of his life, but more excessively in the last one year." HM at 26.

Hickey was ultimately diagnosed with alcohol-induced acute pancreatitis, alcohol dependency abuse, and gastro esophageal reflux disease ("GERD"). HM at 4. On August 29, 2013, Hickey was discharged from the hospital. Id.

   B.     Hickey's October 2015 Hospitalization

On October 22, 2015, Hickey was admitted to Huntington Hospital for confusion (clinically, "fluctuating and altered mental status"), agitation, hypertensive disorder, and a possible TIA. HM at 590-592. Hickey reported having slurred speech and feeling off-balance beginning on October 21. HM at 617. He reportedly had difficulty remembering what day it was that morning, and after a "normal" day at work at his "stressful" job, had trouble navigating his car home. Id. Hickey reported that he had not consumed alcohol for two years, but disclosed his past issues with alcohol and his prior hospitalization in 2013. HM at 694. Hickey's wife reported that "he is a SCPD detective" and that "his work has been very stressful as they reopened a case and co-workers have been issued subpoenas." Id. She further reported that Hickey slept for "less than 10 hours last week due to increased hours at work and fear of getting a subpoena himself." Id. It was further noted that Hickey had no past psychiatric history. Id.

According to a Progress Note, dated October 26, Hickey was alert and oriented, and indicated that he had slept well and was feeling much better. HM at 661. As was expected by medical staff, he could not recall all the details of what occurred while he was delirious. Id. Hickey indicated that he had been drinking five to six large cups of coffee daily to stay awake, and had some racing thoughts, but that he was "going through a life transition" and was still deciding what to do post-retirement. Id.

Hickey was ultimately diagnosed with suffering from a TIA and confusion due to an altered mental state. HM at 577-578. After four days of hospitalization, Hickey was

---

[3] HM refers to the medical records of James Hickey that were submitted to the Court *in camera* on July 31, 2019, and produced to the defense, at the Court's direction, on August 8, 2019.

discharged on October 26, 2015. He was described as "much improved, alert and oriented" and the treating psychiatrist, opined that he "d[id] not need psych admission and is cleared psychiatrically." HM at 665. Finally, Hickey was instructed to "sleep better," and to follow up with a psychiatrist "for management of stress and anxiety." HM at 578.

II. LAW

Federal Rule of Evidence 702 governs testimony by expert witnesses. The rule provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

The Supreme Court in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), held that the trial judge is responsible for "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Id. at 597. In determining the admissibility of expert testimony, "it is the proponent's burden under Daubert to establish admissibility, rather than the opponent's burden to establish inadmissibility." United States v. Morgan, 53 F. Supp. 3d 732, 740 (S.D.N.Y. 2014).

Moreover, even after a determination has been made that a witness is qualified to testify as to a particular matter, and that the opinion is based upon reliable data and methodology, the district court is required to make a third inquiry; that is whether the expert's testimony will assist the trier of fact in understanding the evidence or determining a fact in issue. Fed. R. Evid. 702(a). When the issue is one that the average juror is capable of understanding on his or her own, the trier of fact needs no assistance, thus no "expert" testimony is required. United States v. Mejia, 545 F.3d 179, 194 (2d Cir. 2008). See also Washington v. Schriver, 255 F.3d 45 (2d Cir. 2001)(defendant's habeas petition denied as trial court's refusal to allow expert testimony on children's memory and susceptibility was properly denied as issues were well within the knowledge of the average juror; were offered to comment on the witness's credibility, an area in which the jury has the exclusive duty to evaluate; the testimony was "soft scientific testimony at best" and no foundation had been laid showing that suggestive questions were even asked). Finally, a district court may commit manifest error by admitting expert testimony where the subject matter of the expert's testimony is not beyond the ken of the average juror. United States v. Locascio, 6 F.3d at 924, 936 (2d Cir 1993).

In addition to excluding expert testimony on issues well within the ken of the average juror, trial courts also exclude expert testimony when the proffered evidence will usurp the role of the jury. See generally United States v. Duncan, 42 F.3d 97, 101 (2d Cir. 1994). For example, "an expert may not intrude on the jury's role in assessing credibility." United States v. Lumpkin, 192 F.3d 280, 289 (2d Cir. 1999)(expert testimony that opined that a witness's confident demeanor during testimony does not equal accuracy in the identification context was an impermissible use of expert testimony as it touched on credibility); United Stated v. Cruz, 981 F.2d 659, 663 (2d Cir. 1992)(expert witness testimony used to bolster another witness's testimony is an impermissible use of expert testimony). See also United States v. Richter, 826 F.2d 206, 208 (2d Cir. 1987)(determinations of credibility are for the jury not for witnesses). Critically, even expert witnesses possessed of medical knowledge and skills that relate directly to credibility may not state an opinion as to whether another witness is credible. United States v. Azure, 801 F.2d 336, 340-41 (8th Cir. 1986).

III. ARGUMENT

    A. The Expert Notice is Insufficient

Even a cursory review of the defendants' expert notice reveals that it is utterly devoid of any real description of the basis of knowledge upon which Jacob's bases his multitude of opinions. It simply provides that Jacobs is a neuroendocrinologist[4], and states his opinions in a conclusory fashion. The notice does not articulate the principles and methods upon which Jacobs relied or how he applied the principles and methods to the facts of this case. The notice is merely a list of the topics about which Jacobs is expected to testify, all apparently based upon his review of Hickey's medical records and his "background, education and experience" as outlined in his Curriculum Vitae ("CV"). Nowhere in Jacobs's lengthy CV does it reveal any specific expertise on alcohol's effects on memory or the brain or even if he has ever studied such effects. Moreover, to the extent that Jacobs has relied on a treatise or study in this regard, it is not included in the notice. In sum, the government is left to guess upon what principles and methods Jacobs has relied to form his opinions.

---

    [4] Neuroendocrinology is the branch of biology (specifically of physiology) which studies the interaction between the nervous system and the endocrine system, that is how the brain regulates the hormonal activity in the body. See generally https://medical-dictionary.thefreedictionary.com/neuroendocrinology

B.  No Relevance to "Certain Aspects" of the 2013 and 2015 Medical Records of James Hickey

Jacobs proposed to discuss with the jury:

"the meaning and significance of <u>various</u> aspects of Hickey's medical records from 2013 and 2015, including but not limited to his symptoms and signs documented by physicians on admission, patient history, symptoms and signs during hospitalization, diagnoses, tests performed, incidents while hospitalized, treatments and medications he received and other procedures employed while hospitalized and discharges instructions."

Again, the expert notice fails to offer any basis for the selective admission of "various aspects" of Hickey's records or why this testimony would be relevant to any of the issues on trial in this matter. The only inference to be drawn is that the proposed testimony would be used to suggest (improperly) that Hickey's alcohol problems (2013) and medical problems (2015) affected his ability to perceive events as they occurred and affected his recall of events or memory.

First, the medical records do not contain any evidence that Hickey was suffering from memory loss or that his drinking or physical health affected his ability to perceive events as they were occurring. Thus, allowing the expert to draw such a conclusion would be misleading the jury. Permitting this testimony would also improperly allow the expert to opine about Hickey's credibility; with no basis for of knowledge for the opinion, (i.e. Hickey cannot possibly be telling the truth about the events he testified about as he has significant problems with his memory). The government acknowledges that these issues (memory and ability to perceive events) are proper areas of cross-examination. However, a scattershot review of "various aspects" of the meaning and significance of Hickey's hospital record, by an individual that never treated the witness, goes well-beyond probing Hickey's perception, memory, and ability to recall. In essence, this becomes a mini-trial about Hickey's health, hospitalizations and medical care, issues far removed from the questions the jury is asked to resolve. Notably, this expert has never examined, interviewed or even met Hickey. Whatever conclusions this expert has drawn are based wholly upon a review of medical records of two five-day hospitalizations occurring at least four years ago, thus, they have no probative value. The defense offers this speculative testimony for the improper purpose of suggesting that Hickey had or has memory problems, while citing absolutely no basis for the opinion, and without any support from the medical records.

It is important to recognize that these issues are not so complicated as to warrant expert testimony. The question is did Hickey's drinking in 2013 and physical health problems in 2015 affect his ability to perceive events as they were occurring or recall past events? These issues are properly explored with the witness on cross-examination and, more to the point, not beyond the ken of an average juror. This is simply an attempt to have expert opine on the credibility of one of the government's key witnesses with no basis in fact. It is essentially a credibility argument disguised as expert testimony. In sum, this testimony should be precluded

5

as it is improper, will not assist the trier of fact, will usurp the role of the jury and confuse and unnecessarily complicate a straightforward issue well within the ken of the average juror

      C.      <u>No Mental Health Issues are Alleged, Thus Preclusion of this Argument is Warranted and Removal of Question 45 from the Jury Questionnaire is Appropriate</u>

While the expert notice suggests that Jacobs agrees with the treating physicians' 2015 diagnosis of delirium, and further asserts that delirium is listed as a diagnosis in the DSM, absent from the notice is any suggestion that Jacobs will opine that Hickey was mentally ill or suffering from a mental health issue. This was not an oversight. None of the treating medical professionals diagnosed Hickey with a mental health issue; thus, to suggest otherwise would be false. To the contrary, a psychiatrist, Dr. Nina Greif, consulted with Hickey in order to rule out mental health issues as the cause of Hickey's symptoms. Ultimately, Dr. Greif determined that Hickey was not suffering from a mental illness, but likely suffered from "delirium most likely secondary to sleep deprivation." HM at 665. In fact, Dr. Greif would testify that in her opinion Hickey was not suffering from a mental disease or mental illness, rather a lack of sleep and stress, which caused delirium. Finally, Dr. Greif would testify that, although delirium appears in the DSM, it is not a mental illness but a transient effect caused by any number of factors. In sum, irrespective of the expert testimony issue, the defense must be precluded from arguing or even suggesting that Hickey was suffering from a mental health issue as this is simply untrue, and, as a consequence, question 45 on the proposed jury questionnaire should be stricken as irrelevant because none of the witnesses that will be called at trial have mental health issues.

      D.      <u>No Evidence of Memory Loss or Wernicke's Encephalopathy ("WE")</u>

In the expert notice, the defense expert repeatedly suggests that Hickey is suffering from memory loss and memory issues, without providing any medical basis for this opinion. Neither the 2013 nor the 2015 medical records diagnose Hickey with any form of memory loss or other disorder affecting long term or short term memory. In an effort to achieve the desired result, i.e. to argue that Hickey's memory is poor, Jacobs claims that, in his medical opinion, Hickey was suffering from WE in 2015, which involves "a gross impairment of memory and cognition…" In other words, the defense expert, who has never examined Hickey, is expected to testify that the treating physicians misdiagnosed Hickey with a TIA, when he was really suffering from WE, and that, because Hickey was actually suffering from WE, he had a significant memory impairment. However, there is simply no evidence to support this diagnosis, made four years after the events, and without the benefit of examining the patient. Moreover, the defense provides no basis for this this conclusion, which is contradicted by the medical records and would, in fact, be refuted by the treating physicians, including the neurologist who treated Hickey, Dr. Shalini Patcha. Again, issues of memory and ability to perceive are properly explored with the witness on cross-examination and, more to the point, not beyond the ken of an average juror. This is clumsy and obvious attempt by the defense to create a brand new medical diagnosis four years after Hickey was hospitalized, solely from a review of hospital records, because it is consistent with the defense theory of the

case. It bears repeating, this attempt at creating a memory issue is really a credibility argument disguised as expert witness testimony and therefore should be precluded.

>   E.   The General Effects Of Alcohol And Alcoholism On Memory And The Likely Effects Of Alcohol On Hickey's Memory, Cognition And Brain Function

Finally, the defense offers proposed testimony from Jacobs on the general effects of alcohol on memory and the likely effects on Hickey's memory, cognition and brain function. First, a layperson understands that alcohol can have an effect on memory. Expert testimony in this regard is unnecessary and improper, as it is not beyond the ken of the average juror. Second, this proposed testimony is poorly veiled attempt to opine on credibility, once again usurping the jury's role as the fact finder and thus should be precluded.

Moreover, the defense also proposes to offer expert testimony about the *"likely"* effects on alcohol consumption on Hickey's memory, cognition and brain function. The use of the word *"likely"* is revealing. What the defense is admitting is that Jacobs is guessing at what effects, if any, consuming alcohol had on Hickey's memory. Jacobs cannot say for certain if there were any effects because he has based the sum of his testimony on two sets of hospital records, having never examined or spoken to Hickey. Thus, Jacobs has insufficient facts, and therefore no ability to form an opinion that is based upon reliable principles and methods. The alleged expert's acknowledgement that these are "likely" effects demonstrates that his opinion is simply a guess or speculation and therefore not a reliable opinion. Accordingly, any testimony on this issue would violate Rule 702 as it is sheer speculation and therefore must be precluded.

## IV.   CONCLUSION

In conclusion, the Court should preclude the proposed testimony of Jacobs as it does not meet the criteria under Rule 702, is improper, not relevant, concern issues well within the ken of the average juror, and will usurp the role of the jury and cause unnecessary confusion and complication of straightforward issues.

Thank you for your consideration.

>   Respectfully submitted,
>
>   RICHARD P. DONOGHUE
>   United States Attorney
>
> By:   _____/s/_____
>   Lara Treinis Gatz
>   Nicole Boeckmann
>   Justina L. Geraci
>   Michael R. Maffei
>   Assistant U.S. Attorneys

cc:   All Counsel of Record