

Larry H. Krantz
Marjorie E. Berman

Hugh D. Sandler
*Counsel*

Nicolas J. Rovner

*Of Counsel*
Lisa A. Cahill
Wendy Gerstmann Powell

*Writer's E-mail*
lkrantz@krantzberman.com

**TO BE FILED UNDER SEAL**

October 29, 2019

By ECF and E-mail

The Honorable Joan M. Azrack
United States District Judge
Eastern District of New York
944 Federal Plaza
Central Islip, NY 11722

Re: United States v. Christopher McPartland, et al., 17-cr-0587 (JMA)

Dear Judge Azrack:

This letter is submitted on behalf of defendant Christopher McPartland, to address an evidentiary issue that applies only to him.

### Evidence of the D'Orazio Loan to Mr. McPartland Should Be Excluded

As yet another part of its "kitchen sink" approach to this case, the government has informed the defense that it intends to introduce at trial evidence of a $25,000 loan that Mr. McPartland sought, and subsequently received, from Anthony D'Orazio – a lifelong friend of Burke's who also socialized with Mr. McPartland. The loan was made on approximately February 26, 2016 (*see* 003051), in order to defray some of the costs of Mr. McPartland's legal fees in connection with this case (the "D'Orazio Loan"). The loan was made after Mr. McPartland received a "target letter" from the U.S. Attorney's Office ("USAO") for the Eastern District of New York ("EDNY") in December 2015, which, in turn, required him to retain counsel and incur significant legal fees that he could not afford. CM 1-04. The loan also came after Burke's arrest in December 2015 and on approximately the same day as Burke's guilty plea.

NY: 1216318-2

747 Third Avenue   32nd Floor   New York, New York 10017-2803   Telephone 212.661.0009   Fax 212.355.5009
140 Grand Street   Suite 705   White Plains, New York 10601-4831   Telephone 914.949.3909
www.krantzberman.com

Since any alleged conspiracy to "protect Burke" was plainly over by then, there can be no valid claim that it was in furtherance of the conspiracy alleged in the indictment. Moreover, the government acknowledges that the loan does not constitute 404(b) evidence, as there was nothing unlawful or improper about it. Indeed, Mr. McPartland fully disclosed the loan in his year-end disclosure statement to Suffolk County. Nonetheless, the government claims that it is admissible either as "direct evidence of the charged conspiracy" or to show "the relationships of mutual trust between the defendants [and Burke]." Government Letter dated October 24, 2019 ("Gov't Ltr."), at n.1. The government is wrong.

**Procedural Posture**

The government originally included allegations regarding the D'Orazio Loan in its 404(b) notice, dated March 11, 2019. That disclosure consisted of three sentences: Mr. McPartland "[r]equested a loan of approximately $25,000 from Burke, in order to pay legal fees. This request was communicated to Burke by others, in February 2016, while Burke was incarcerated at the Metropolitan Detention Center [] in Brooklyn. Burke subsequently caused $25,000 in cash to be delivered to [Mr.] McPartland."[1] We assumed that the government would include detailed evidence of that loan, and theories of admissibility, in its 404(b) motion, filed with the Court on October 24, 2019, and anticipated that we would respond appropriately to that more fulsome disclosure. However, the government chose not to include these allegations in its 404(b) motion, stating in that document that it conceded certain evidence (including evidence of the loan) was not admissible under 404(b), but urging instead (in one sentence) that the evidence

---

[1] In fact, no 3500 material provided to date, or government exhibits disclosed to date, substantiates the government's allegation that Mr. McPartland requested the loan "from Burke." As the 3500 material makes plain, he asked D'Orazio for the loan and was not privy to D'Orazio's conversations with Burke, as more fully described below.

was admissible as "direct evidence" of the conspiracy and/or as proof of the "mutual relationships of trust" among the coconspirators. *Id.*

Because we believed that the government was going to be including this issue in its 404(b) motion, we did not address it in our initial *in limine* motions, filed on October 24, 2019. Now that it is clear the government is not moving to admit the evidence under Rule 404(b), we respectfully move *in limine* to preclude that evidence.

A. ***Relevant Background***

In December 2015, at or around the time of Burke's arrest, Mr. McPartland received a letter from the USAO for the EDNY advising him that he was a "target" of a grand jury investigation. CM 1 – 04. This "target letter" to Mr. McPartland is a proposed exhibit on the government's exhibit list. Because of his receipt of that letter, Mr. McPartland had to hire counsel, and began incurring extensive legal fees. As a lifelong public servant, those fees quickly became onerous, and he was unable to meet the financial demands being imposed on him. After exhausting multiple other options, in February 2016, Mr. McPartland approached an acquaintance of his, Anthony D'Orazio, and asked if he would be willing to give Mr. McPartland a $25,000 loan. Mr. McPartland knew D'Orazio through Burke, as Burke and D'Orazio had been childhood friends. D'Orazio socialized on occasion with Burke and Mr. McPartland. According to the 3500 material, D'Orazio described the event and the ensuing loan in great detail, as follows:

> On or about February 16, 2016, . . . he received a phone call from McPartland. . . . McPartland asked him if they could meet stating that he needed a shoulder to cry on. Within a couple of days they met at the bar of [a restaurant]. McPartland told D'Orazio that he was not doing well. He had gotten embroiled in the Loeb investigation and confirmed that he had received a "target letter." He furthered that it was all bullshit and that he was innocent. . . . McPartland claimed that . . . he would be vindicated.

McPartland then asked D'Orazio for a loan of $25,000 that he needed to give to his attorney. . . . D'Orazio was stunned by the request. McPartland told him that he had previously asked others for money and he had borrowed money from family members, relatives, friends and co-workers and that D'Orazio was his last resort. It was clear to D'Orazio that the others had helped him (McPartland) as much as they could. McPartland furthered that he had already taken a second mortgage on his house to pay his daughters' college tuition bills and that he was at wit's end as far as his finances were concerned.

When he told McPartland that he was not in a situation to help him, he (McPartland) started to cry. McPartland told him that he would sign a promissory note and pay him back. He told McPartland that he would think about it. . . .

A couple of days later D'Orazio visited Burke at the MDC. . . . During this visit, . . . D'Orazio told Burke of McPartland's approaching him (D'Orazio) for a loan of $25,000 to be used as payment for his (McPartland's) attorney. D'Orazio, who had $25,000 but didn't want to give it to McPartland, told Burke that it was a lot of money and that McPartland was his (Burke's) friend. Burke was surprised at McPartland's request and stated that he (McPartland) must be desperate. Burke thought about it for a few minutes, may have said that he would try and help McPartland, and then told D'Orazio that when he sees McPartland to tell him not to worry, that he (D'Orazio) will get him the money. Burke said that he would provide the $25,000. Burke's brothers were present during this visit. . . .

Four or five days after that MDC visit with Burke, D'Orazio received a phone call from John Toal [Burke's half-brother] who had been present at the MDC], who was also Burke's Power of Attorney. Toal said that Burke wanted to help McPartland and he (Toal) was going to give him the $25,000. Within days Toal again called D'Orazio and instructed him to meet Toal at that TD Bank branch in Centereach, NY located at the intersection of Jericho Turnpike and Hawkins Road. They met outside of the bank, entered it together and proceeded to the safety deposit box area. D'Orazio observed that inside the safety deposit box were two bags with envelopes containing some paperwork and cash. Drawing from several envelopes, Toal counted out $25,000 in one hundred dollar bills and placed the bills in one envelope. Additional cash remained in the safety deposit box. D'Orazio knew that the cash he just obtained from the safety deposit box did not

4

> belong to Burke. D'Orazio learned that when the Burke family cleaned out their ailing mother's house they found a quantity of cash which was later moved to that safety deposit box. . . .
>
> D'Orazio left the bank and went home with the cash. He called McPartland the next day or so and they again met at [a restaurant] but they did not go inside. Upon his arrival McPartland entered D'Orazio's car. D'Orazio gave McPartland the cash. McPartland seemed surprised at cash. McPartland said thank you and got emotional. D'Orazio told him "Don't thank me I'm not the only one to thank". McPartland put his hands up as if to say he didn't want to know who else was involved in giving him the $25,000. D'Orazio did not mention Burke's name. While in D'Orazio's car McPartland took D'Orazio's mailing address and told him that he would mail him a promissory note for the $25,000. Shortly after McPartland left, D'Orazio called McPartland and told him to just drop the promissory note in D'Orazio's mailbox and not mail it. D'Orazio never received the promissory note.

Gov't Ex. 3500-AD-1, at 4-5.

After receiving the loan, Mr. McPartland used the bulk of the funds to pay his outstanding attorney's fees. The government's exhibit list includes invoices from Mr. McPartland's attorneys, as well as payment records from the law firm and bank records of Mr. McPartland, to show these payments. Mr. McPartland fully disclosed the loan on his Suffolk County annual disclosure form, annexed as Exhibit A hereto, long before there was any inquiry from the government concerning the loan.

The government's witness list includes D'Orazio, Toal and another of Burke's brothers who was present at the MDC, George Burke. It also includes one or more agents who executed a search warrant on the safety deposit box, on or about April 26, 2017 (long after the loan), as well as photos showing that money was still in that box on that date (a fact of no relevance here whatsoever). *See* 000621-43.

5

### B. The D'Orazio Loan Does Not Constitute Direct Evidence of the Charged Crimes

The government does not – and cannot — claim that there was anything unlawful about the D'Orazio loan. Nor can it claim that it was a "wrong" of any kind. Indeed, the government does not contest that the loan was sought in good faith to pay attorney's fees, and was used for that purpose. Moreover, it was properly disclosed by Mr. McPartland, as noted above.

Nonetheless, while the government concedes that Rule 404(b) is inapplicable, it contends that evidence of the loan is admissible as "direct evidence of the charged conspiracy" and/or to show "the relationships of mutual trust between the defendants [and Burke]." Gov't Ltr. n.1. These arguments are illogical and meritless. The evidence should be excluded.

*First*, the loan cannot be direct evidence of the conspiracy because it took place after the conspiracy was over. Moreover, the loan sheds no probative light on Mr. McPartland's prior conduct, during the period in which he allegedly engaged in obstructive conduct. We explain below.

Although the Indictment is dated October 25, 2017, and alleges that the conspiracy existed "between December 2012 and the date of this Indictment," Indictment, p.3, based on our review of the 3500 material there is nothing contained in the government's proof to establish or even suggest that any conspiratorial conduct occurred after Burke's arrest in December 2015. Indeed, since the alleged purpose of the conspiracy was to "conceal Burke's role in the assault and to obstruct and attempt to obstruct the Federal Investigation to protect Burke," *id.,* the conspiracy by definition ended by the time of Burke's guilty plea, *at which time he admitted the assault and cover-up in open court.* By then, there could not be any point in trying to "protect Burke" by covering up the Loeb assault.

6

Accordingly, since the D'Orazio Loan took place *after* the conspiracy had ended, it simply cannot constitute conduct in furtherance of that conspiracy – and the government does not appear to allege otherwise. Moreover, since the loan was entirely lawful and used to defray legal fees, it proves nothing as to Mr. McPartland's alleged past conspiratorial conduct. Indeed, the loan makes it no more or less likely that Mr. McPartland had been a co-conspirator with Burke. Either way, Burke may well have felt an obligation to Mr. McPartland because Burke was – to a large extent – the cause of Mr. McPartland's legal problems. Thus, the loan evidence cannot logically be "direct proof" of the conspiracy, as claimed by the government.

Likewise, the loan is not relevant to establish the "relationships of trust" among co-conspirators. Yet again, the timing for such proof is backwards, since the conspiracy was over by the time of the loan. Surely, acts of "trust" *after* the conspiracy cannot affect one's state of mind *during* the conspiracy. Moreover, the law governing the admission of evidence on this basis demonstrates that the doctrine is applicable only when there are alleged *prior* acts of wrongdoing, which prior acts help explain the genesis or evolution of the charged conspiratorial conduct.[2] This doctrine is plainly inapplicable here because there are no *prior* acts of "trust" at

---

[2] *See, e.g.*, *United States v. Diaz*, 176 F.3d 52, 79–80 (2d Cir. 1999) (finding that evidence of prior drug dealing "informed the jury . . . how illegal relationships and mutual trust developed between co-conspirators"); *United States v. Araujo*, 79 F.3d 7, 8 (2d Cir. 1996) (finding that the defendant's statement to a witness that she had been a drug courier before was admissible to demonstrate a relationship of trust between the two that explained why the witness allowed the defendant to participate in a drug pick-up); *United States v. Pascarella*, 84 F.3d 61, 72 (2d Cir. 1996) (finding no abuse of discretion when the trial court "permitted the government to introduce evidence of [the defendant's] past [illegal] gambling dealings with some of the co-conspirators to enable the government to 'establish the basis of a trust relationship'"); *United States v. Rosa*, 11 F.3d 315, 334 (2d Cir. 1993) ("[T]he evidence of Rosa's prior dealings with Melendez [car thefts and drug dealings] was properly admitted to explain how the illegal relationship between the two had developed[.]"); *United States v. Lasanta*, 978 F.2d 1300, 1307 (2d Cir. 1992) (affirming decision to admit evidence of prior drug dealing to explain "how the co-conspirators came to interact with each other, and [to render] more plausible their joint participation in the heroin and cocaine conspiracies charged in the indictment" (citation omitted)); *United States v. Pitre*, 960 F.2d 1112, 1119 (2d Cir. 1992) (finding that evidence of prior narcotics transactions provided relevant background information to explain relationship among alleged co-conspirators); *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990) ("The pre-existing drug-trafficking relationship between [the co-conspirators] furthered the jury's understanding of how the instant transaction came about and their role in it."); *United States v. Brennan*, 798 F.2d 581, 590 (2d Cir. 1986) ("[E]vidence of corruption of

all, because the loan was not unlawful, and because it does not help to explain the genesis of the relationship between Mr. McPartland and Burke or the genesis of the alleged conspiracy. For all of these reasons, the evidence must be excluded.

C.     *The Evidence Is Unfairly Prejudicial Under Rule 403*

Not only is the D'Orazio Loan evidence irrelevant, but any slight relevance is substantially outweighed by the danger of unfair prejudice, confusion and waste of time. As noted above, there is nothing illegal or wrongful about Mr. McPartland seeking to obtain a loan to defray the costs of his attorney's fees. Yet, admission of this evidence will expose the jury to a host of facts and concepts that will potentially confuse them or otherwise inure unfairly to Mr. McPartland's detriment. For example, the jury will learn that Mr. McPartland received a "target letter" in December 2015. Having no familiarity with such a letter, a juror could infer guilt from that alone, since it is a logical assumption that such letters are not sent to the innocent. Moreover, the jury will be exposed to the fact that Mr. McPartland hired a lawyer in December 2015, and paid that lawyer's fees. Jurors might believe that the mere act of hiring a lawyer at that time is proof of guilt. Moreover, having no familiarity with the cost of legal representation, the jury could infer guilt by virtue of the amount of legal fees incurred. Next, the jury could unfairly infer guilt because Burke, through D'Orazio, chose to conduct the transaction in cash – an aspect of the transaction that was not requested by Mr. McPartland. Further, jurors may form unfair negative views about Mr. McPartland because he was willing to accept that cash. Additionally, the jury could unfairly tar Mr. McPartland with the fact that – unbeknownst to him – the money Burke gave to D'Orazio apparently belonged to Burke's mother, and he may not

---

the Pastore case . . . helped explain to the jury how the illegal relationship between Brennan and Bruno developed[.]").

8

NY: 1216587-1

have sought her permission to use it. Such a negative inference would surely be unfairly prejudicial. Moreover, to the extent that the government seeks to admit evidence that it conducted a secret search of the safety deposit box (pursuant to warrant) in 2017 (long after the loan), this evidence has no conceivable relevance and will be unfairly prejudicial, as it will suggest that the government used sophisticated means to detect the loan – when in fact it was no secret at all. Indeed, what location the cash came from is utterly irrelevant to any fact at issue.

Aside from the danger of confusion and unfair prejudice, there is also a likelihood that this issue will unduly delay the proceedings. Indeed, the government is planning to call three witnesses on the subject, and the defense would be forced to engage in a mini-trial to establish that the D'Orazio Loan was perfectly proper, and to rebut all of the potentially unfair inferences that the jury might be tempted to draw. In short, the prejudicial impact of this mini-trial far outweighs any conceivable probative value of the proffered evidence. Accordingly, it should be excluded under Rule 403.

D. *If Evidence of the D'Orazio Loan is Admitted at Trial, Evidence of Mr. McPartland's Financial Condition Must Also Be Admitted*

Should the Court find that evidence of the D'Orazio loan is admissible, Mr. McPartland's right to present a complete defense warrants that he be able to introduce evidence of his financial need at the time of the loan. Simply put, the government cannot use Mr. McPartland's financial condition as a sword, but then shield the jury from the reason why Mr. McPartland had to make the loan request in the first place. Specifically, Mr. McPartland should be able to offer evidence as to his financial wherewithal at the time of the loan request, his efforts to secure money elsewhere (including through home equity loan applications and requests to friends and family), and the heavy burden of his expenses to support his family. It is critical that the jury be permitted to hear this evidence to establish that, contrary to any claim that Mr. McPartland

9

sought financial assistance for any untoward purpose, his having done so was borne out of financial need.

Respectfully submitted,

Larry Krantz

Enclosure

cc:     Counsel for the government (w/enclosure)