

Larry H. Krantz
Marjorie E. Berman

Hugh D. Sandler
*Counsel*

Nicolas J. Rovner

**TO BE FILED UNDER SEAL**

*Of Counsel*
Lisa A. Cahill
Wendy Gerstmann Powell

*Writer's E-mail*
lkrantz@krantzberman.com

October 29, 2019

By ECF and E-mail

The Honorable Joan M. Azrack
United States District Judge
Eastern District of New York
944 Federal Plaza
Central Islip, NY 11722

    Re: <u>United States v. Christopher McPartland, et al., 17-cr-0587 (JMA)</u>

Dear Judge Azrack:

  We write in response to the government's letter motion dated October 21, 2019 ("Gov't Letter"), seeking to exclude the defense from calling Dr. Alan Jacobs as an expert witness at trial.

  The Court has previously scheduled a *Daubert* hearing on this issue for November 5, 2019. We write to address the arguments set forth in the government's letter, and also to request that (1) the government provide Rule 16 expert disclosure as to three new doctors who were added to the government's witness list just last week, on October 23, 2019, and (2) the Court expand the *Daubert* hearing to include these newly-disclosed government witnesses. Specifically, the government has added three of the physicians who treated James Hickey during his hospitalization in October 2015. The government has acknowledged that these witnesses will be providing both fact and expert testimony, but has failed to provide to the defense with the required Rule 16 expert disclosures. Instead, it has simply stated that "these opinions are reflected in the medical records." Obviously, this disclosure is inadequate. Moreover, since these witnesses will likely be offering expert opinions on many of the same subjects as will Dr. Jacobs – indeed, they will apparently be rebutting Dr. Jacobs' testimony – those witnesses should be included in the *Daubert* hearing so that their proposed testimony will be tested by the same standards as will the testimony of Dr. Jacobs.

### I. The Government's Motion to Exclude the Testimony of Dr. Jacobs Should be Denied

  The government moves to exclude Dr. Jacobs' testimony on the grounds that (1) the defense's Rule 16 disclosure is inadequate, (2) "there is an insufficient basis of knowledge upon which this expert has relied to form his opinion," principally because he has not examined Hickey, and therefore it is "speculative," (3) the subject matter of much of his testimony is "well within the ken of the average juror, and therefore will only serve to usurp the role of the jury and cause unnecessary confusion and complication of straightforward issues," and (4) the expert will

NY: 1216602-1

747 Third Avenue 32nd Floor New York, New York 10017-2803 Telephone 212.661.0009 Fax 212.355.5009
140 Grand Street Suite 705 White Plains, New York 10601-4831 Telephone 914.949.3909
www.krantzberman.com

impermissibly "opine on the credibility of a witness." Gov't Letter at p.1. These arguments all have no legal basis and should be denied, following the Court-ordered *Daubert* hearing.

### A. The Government's Recitation of the "Facts" Is Materially Incomplete

Ever since the defense asked the government to produce information and records concerning Hickey's two hospitalizations, it has minimized and mis-described the relevant events. Indeed, after misrepresenting the nature of the records to the defense for months, it turned to misstating and understating the facts contained in the hospital records in every submission it has made to the Court on this issue. This submission is no different.

The government purports in its letter to set forth the "facts" of Hickey's 2015 hospitalization. However, its description of that hospitalization omits most of the most critical facts. The government's latest letter discusses only a sample of the symptoms Hickey suffered from early on the day of admission (October 22) – leaving out everything recorded in the records as to what happened for several days before his admission. It then jumps from the events in the early morning hours of October 22 *to the day of discharge* (October 26, 2019), omitting everything that happened in the hospital in-between. Lastly, it entirely omits the diagnosis of delirium and the instructions given to Hickey upon his discharge from the hospital (instructions that he ignored). Specifically, the government omits the following critical facts in its "summary" of the October 2015 hospitalization:

- For at least four days prior to his admission, Hickey was experiencing visual and auditory hallucinations, delusions and paranoia. For example, he imagined people outside of his home whom he thought were "out to get him"; he supposedly saw his son in his living room and was talking to him, although he was not there; he became lost on his way home from work; and his conversations became "loose and his answers inappropriate." Hickey Medical ("HM") 699.

- On arrival at the hospital at 1:26 A.M. on October 22, he was found to have (a) "[h]orizontal nystagmus," HM 584, which is an abnormal eye movement, (b) "limb ataxia, HM 714, which is a "gait disturbance," HM 350 and 589, and (c) confusion, HM 584. (According to the summary of Dr. Jacobs' opinions, attached as Exhibit A to this letter, these are the classic triad of symptoms supporting a diagnosis of Wernicke's Encephalopathy.)

- On arrival, Hickey also suffered from a tremor, limited "cognitive ability," HM 382, 520, and "mild visual hallucinations and periods of disorganized thinking." HM 393.

- After admission to the hospital, at 8:10 P.M. on October 22, Hickey was found "severely agitated, [and] screaming at a family member." HM 605-06. He was observed to be having hallucinations and was placed in bed and physically restrained. *Id.* He was observed to be biting, scratching, verbally abusive, combative, yelling, restless, and threatening to himself and others. HM 544.

2

Hickey pulled out his IV while his wife was by his bedside, and was "screaming about a girl who is in danger." HM 591. Hospital staff attempted to reorient him, but Hickey removed his gown and ran towards the elevators, resulting in a "Code Gray" (Combative Person) being called. *Id.* He was stopped by staff and returned to the unit, when he was given emergency medications and was put on 1:1 monitoring. *Id.* Another dose of Haldol [an anti-psychotic medication] was administered, but Hickey was increasingly agitated and becoming violent. *Id.* Another Code Gray was called. *Id.* Hickey was disoriented, and the doctors came to assess him. An additional dose of Haldol was given, and Hickey became diaphoretic [profuse sweating], violent, and continued to hallucinate. *Id.* Hickey continued to be agitated, confused, and violent; and four-point restraints were placed on him at 11:30 P.M.

- On October 23, Hickey was evaluated by a psychiatrist. According to that report:

"P[atien]t's medical workup is negative so far, including CT and MRI of the brain. Pt became increasingly agitated on the floor, pulled out his IVs and ran out of his room. He required sedation. . . . [Sedation] was [discontinued] this am to allow for psych evaluation. Upon interview pt was sedated, unable to answer questions. The following is collateral from his wife. Wife reports that patient is a SCPD detective and that his work has been very stressful as they reopened a case and coworkers have been issued subpoenas. She reports that he slept for less than 10 hours last week due to increased hours at work, and fears of getting a subpoena himself." HM 699. "Presentation most consistent with delirium, possibly secondary to sleep deprivation. . . . HM 697. "Thought content Delusional . . . suspiciousness and paranoia that others are out to get him. He claims it's due to the nature of his work (a detective); Not obsessed; Hallucinates; . . . Pt has been having [audio and visual hallucinations] periodically during his stay. . . . Judgement: Fair, limited; Insight: limited; Memory: 0/3 on three item recall." HM 697.

- On October 24 and 25, Hickey was "much improved and this may have been due to severe sleep deprivation in the setting of severe stress as all workup has been negative so far." HM 641.

- On October 25, there were no significant reported events. HM 651.

- On October 26, Hickey was again seen by the psychiatrist. According to the records of that visit, "P[atien]t reports having slept well and feeling much better. Affect improved with no irritability present. Pt does not recall all the details of while he was delirious, which is to be expected. He states that he was drinking 5-6 large cups of coffee to stay awake, there was increase in energy and some racing thoughts. . . . Pt is going through a life transition and still deciding what to do after retirement. . . . Pt has no past psychiatric history apart from etoh [alcohol] dependence. . . . A. Presentation most consistent with delirium, most

3

> likely secondary to sleep deprivation. . . . Diagnosis: AXIS I: Delirium. . . . "
> HM 661, 665.

- Hickey was discharged at 1:12 PM on October 26. HM 503. He received a diagnosis of "transient cerebral ischemic attack," HM 311–12, and "altered mental status," HM 316–17; Hickey was instructed to "sleep better" and follow up with a psychiatrist "for management of stress and anxiety." HM 316. The records state that "Psych has cleared pt for discharge" but "will need psych f/u, as per wife she will get him appt." HM 675. Hickey was "cleared for home and urged [] to return to work after output psych eval only and only with light desk duty if possible till retirement in January due to severe stress as this may have been all stress induced." HM 675. He was instructed to follow up with Dr. Joshua Klein in 4-7 days [internist/cardiologist]; Shalini Patcha [neurologist] in 1-2 weeks; and psychiatry in 1-2 weeks. HM 579.

Based on the facts set forth above, the government's truncated description of Hickey's 2015 hospitalization is materially incomplete. Once the full record of Hickey's 2015 hospitalization is considered, it becomes clear that the government's specific arguments for excluding the testimony of Dr. Jacobs cannot withstand scrutiny.

### B.   The Defense's Expert Notice is Sufficient

The government seeks to preclude Dr. Jacobs' testimony by claiming that the defense's expert notice is insufficient. To the contrary, the notice fully satisfies the requirements of Federal Rule of Criminal Procedure 16.

The government begins by complaining that the notice identifies Dr. Jacobs only as a "neuroendocrinologist," which the government proceeds to define as the study of "the interaction between the nervous system and the endocrine system." However, the defense's expert disclosure makes no reference to Dr. Jacobs as a neuroendocrinologist, and instead refers to Dr. Jacobs' detailed C.V. for a description of all of his qualifications. A review of that C.V. reveals that he is also an eminently qualified neurologist, with a sub-specialty in behavioral neurology (which includes the study of memory):

- He has been a neurologist since completing his neurological residency in 1993.
- He was a Fellow in Behavioral neurology.
- He is a Diplomat of the American Board of Psychiatry and Neurology.
- He was an Instructor of Neurology at Harvard Medical School, and an Assistant Professor of Neurology at Weill Medical College of Cornell.
- He is currently and Assistant Professor of Neurology at SUNY/Downstate Medical Center.
- He has been an attending Neurologist at four hospitals, over 12 years.
- He is a Member of the American Academy of Neurology.

- He is a Member of the Association for Research in Nervous and Mental Disease.
- He is a Member of the Cognitive and Behavioral Neurological Society.
- He has been an attending Behavioral Neurologist at a hospital and a memory disorder center.
- He has been the Assistant Director at the Cornell Neurobehavior and Memory Disorders Program.
- He has been a Member of the Division of Behavioral and Cognitive Neurology, Alzheimer's Disease and Memory Disorders Center at University Hospital of Brooklyn.

The government also complains that the expert notice "is merely a list of the topics about which Jacobs is expected to testify, all apparently based upon his review of Hickey's medical records and his 'background, education and experience' as outlined in his Curriculum Vitae ("CV")." Gov't Letter at p. 4. However, even a cursory reading of the expert disclosure reveals that this is not true. Rather, the disclosure sets forth the opinions he has reached and why. For example, the summary includes the following opinions:

As to the 2015 hospitalization, Dr. Jacobs will opine that:

- "a Transient-Ischemic Attack ("TIA"), . . . lasts at most 24 hours and does not cause delirium, or acute confusional states, absent specific medical findings that are not present in James Hickey's medical records;"

- "the acute or sub-acute symptoms and signs James Hickey experienced in October 2015 (both prior to and during his hospitalization), including hallucinations, confusion, delirium, altered mental state, and related problems with memory, cognition and behavior, were not attributable to a TIA;"

- "at the time of James Hickey's hospitalization in October 2015, he likely suffered from a neurological disorder known as Wernicke's Encephalopathy. This diagnosis is likely given that the medical records document a specific eye movement disorder (nystagmus), gait imbalance (ataxia) and an acute confusional state (delirium). He will opine that these constitute the classic diagnostic triad of signs indicating a clinical diagnosis of Wernicke's Encephalopathy;" and

- "that Wernicke's Encephalopathy is most commonly caused by chronic alcohol abuse. The reason for this linkage is that chronic alcohol abuse can lead to both a nutritional deficiency of thiamine and a reduced ability of the brain to cope with that deficiency."

These and other statements in the summary clearly provide the opinions to which Dr. Jacobs will testify and, as noted in the defense disclosure, this will be "based on his background, education and experience, as well as his review of James Hickey's medical records for his two

5

hospitalizations." Exhibit A, at p.1. Moreover, while Dr. Jacobs rendered his opinions based on his background, education, experience, and general familiarity with the medical literature on the subjects of his opinions, he has also identified medical journals or treatises that support his conclusions, the citations for which are being provided to the government today. This disclosure is plainly sufficient.

### C. The Opinions to Be Offered By Dr. Jacobs Are Highly Relevant

The government next complains that Dr. Jacobs' testimony concerning Hickey's medical records will not be "relevant" because it "will be used to suggest (improperly) that Hickey's alcohol problems (2013) and medical problems (2015) affected his ability to perceive events as they occurred and affected his recall of events or memory." Gov't Letter at p. 5. The government bases this argument on its assertions that "the medical records do not contain any evidence that Hickey was suffering from memory loss or that his drinking or physical health affected his ability to perceive events as they were occurring." *Id.* These statements are belied by the very records the government purports to summarize.

As the government acknowledges, the 2013 records show that between at least February 2013 and August 2013 (a highly relevant period of the alleged conspiracy), Hickey was consuming "at least one bottle of wine and up to a half-bottle of vodka daily." Gov't Letter, p.2. The government's suggestion that this admitted level of alcohol consumption, on a daily basis, had no effect on Hickey's ability to perceive or recall events strains credulity. Moreover, the 2015 medical records state that Hickey had a "history of memory impairment" and that his wife reported that, over the two years immediately preceding the hospitalization, she noticed that he suffered from "mild memory impairment" and that "he had more difficulty multitasking and remembering schedules." HM 699. Thus, the government's statement that the records show no indication of "memory loss" is simply false.

The 2015 records also document several days of audio and visual hallucinations, confusion, delusions, paranoia, and delirium. And given the temporal proximity of the 2015 hospitalization to key events immediately preceding it, and to Hickey's proffers with the government shortly following it, the government's argument that Dr. Jacobs' expert opinion as to the events of this hospitalization are "irrelevant" is baseless.

### D. Dr. Jacobs' Opinions Are Not Speculative

The government next contends that Dr. Jacobs' opinions are inadmissible because he has never examined Hickey, is relying solely on a review of the medical records, and will use the term "likely" in expressing one or more of his opinions. Gov't Letter at p.6. The government goes so far as to offer its own "expert" opinion that "there is simply no evidence to support this diagnosis, made four years after the events, and without the benefit of examining the patient." *Id.* These arguments are baseless, as medical testimony based on hospital records is wholly proper and commonplace, and the use of the term "likely" plainly meets the standard for admissibility. Moreover, the government can hardly rely on its own expertise in the area of neurology to preclude the defense expert from testifying on this subject.

The fact that Dr. Jacobs will be testifying based on his review of hospital records mirrors what happens in medical malpractice (and other) cases on a daily basis in courts throughout the

6

country. Indeed, doctors themselves routinely prove diagnoses (or second opinions) based on a review of medical records alone. Dr. Jacobs will confirm in his testimony that this practice of providing a medical opinion based on medical records is customary and appropriate, and that there would in fact be little to gain by examining Hickey four years after the fact. Moreover, the government has never suggested that Hickey would make himself available for such an examination. Indeed, if he will, we would immediately schedule a time for him to be examined by Dr. Jacobs, for whatever probative value (if any) such an examination may have.

The government also contends that because Dr. Jacobs uses the term "likely" as to some of his opinions, this "demonstrates that his opinion is simply a guess or speculation and therefore not a reliable opinion." Gov't Letter at p.7. This argument is specious. Rule 401 defines "relevant evidence" as any evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Moreover, the definition of a "preponderance of the evidence" – the standard for every civil trial – is "to prove that the fact is more likely true than not." *Fischl v. Armitrage,* 128 F.3d 50, 55 (2d Cir. 1997). According to the government's theory, Rule 401 and the civil preponderance standard are inviting sheer "guesswork" and "speculation." To state that proposition is to demonstrate its absurdity.

### E. The Proffered Expert Testimony Is Not Within the Ken of the Average Juror And Does Not Invade the Province of the Jury

The government also contends that Dr. Jacobs' proposed testimony – as to the effects of alcohol on memory – are not "beyond the ken of the average juror" since "a layperson understands that alcohol can have an effect on memory." Gov't Letter at p.7. This argument is unavailing.

While it is true that a layperson may understand the effect of an isolated episode of drunkenness, it is plainly beyond the ken of an average juror to understand the medical effects on the brain and memory from the facts presented here – namely, Hickey's consumption of a bottle of wine and half a bottle of vodka every day, for at least several months, following a lifetime of alcohol consumption. Very few (if any) jurors will have had any experience with that level of alcohol abuse, and it is entirely appropriate to call an expert to explain the medical consequences of that level of consumption. Thus, it is entirely appropriate for Dr. Jacobs to testify as to

> the effects of alcohol and alcoholism on memory, cognition and brain function generally, as well as his opinion as to how these general principles apply to the likely effects on James Hickey's memory, cognition and brain function, given his history of lifelong alcohol consumption including the quantities of alcohol he consumed for the time periods indicated in the hospital records. This includes alcohol's known dose-dependent toxicity and adverse effects on brain cells and brain function.

Finally, the government claims that Dr. Jacobs' testimony will invade the province of the jury because he will "opine on the credibility" of Hickey. This argument is not relevant because the defense has no intention of eliciting such testimony from Dr. Jacobs.

For all of these reasons, the government's motion to exclude Dr. Jacobs' testimony should be denied.

7

## II. The Government's Three New Expert Witnesses Should be Added to the *Daubert* Hearing

On October 23, 2019, the government added three treating physicians from Hickey's 2015 hospitalization to its witness list: Dr. Nina Greif (a psychiatrist); Dr. Vinu Kurian (an internist) and Dr. Shalini Patcha (a neurologist). When the defense asked for expert disclosure pursuant to Rule 16, the government stated by e-mail dated October 23, 2019:

> We consider the treating physicians to be fact witnesses, however, to the extent that any of these medical professionals provide an opinion at trial, these opinions are reflected in the medical records. We will provide their CVs to you later this week. And, if for some reason it's unclear, theses witnesses will testify about their treatment and diagnosis of James Hickey between October 22, 2015 and October 26, 2015. Please consider this the government's "expert notice."

Needless to say, this "expert disclosure" falls far short of the requirements of Rule 16, and far short of what the defense provided to the government as Rule 16 expert disclosure. (And the government has still not provided CVs for any of them, despite their promise to do so last week.) Thus the government should be required to supplement its expert disclosure accordingly and promptly.

Indeed, it is clear that these three new witnesses will be doing more than testifying to what is contained in the medical records. The government's letter discloses that Dr. Greif (a psychiatrist) and Dr. Shalini Patcha (a neurologist) will disagree with certain of Dr. Jacobs' opinions. Gov't Letter at p.6. Obviously, the defense is entitled to a summary of what those expert opinions will be, and the bases for them. As to the third doctor on the government's list, Dr. Kurian, the government has offered no disclosure whatsoever as to what his testimony will be. The defense is entitled to Rule 16 disclosure for Dr. Kurian as well.

Finally, since the Court has scheduled a *Daubert* hearing with respect to Dr. Jacobs, we respectfully seek the same opportunity with respect to the government's three new experts. Indeed, having all of the experts testify will allow the Court to receive the benefit of a full exposition of the medical issues as to Hickey's two hospitalizations and will assist the Court in determining what should, or should not, be admitted in evidence at trial on these issues. Accordingly, we respectfully request that the three new doctors be added to the *Daubert* hearing. Should the Court agree, we request that the government be ordered to make these witnesses available. Alternatively, we are prepared to subpoena the witnesses, if that is necessary.

Respectfully submitted,

Larry Krantz

Enclosure

cc:   Counsel for the government (w/enclosure)