

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

NB:LTG:JLG:MRM
F. #2018R00279

*610 Federal Plaza*
*Central Islip, New York 11722*

November 3, 2019

By Hand and ECF

**TO BE FILED UNDER SEAL**

The Honorable Joan M. Azrack
United States District Judge
United States District Court
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

      Re:   United States v. Christopher McPartland and Thomas J. Spota
                Criminal Docket No. 17-587 (JMA)

Dear Judge Azrack:

      The government respectfully submits this letter in opposition to defendant McPartland's motion *in limine* to exclude from trial evidence of the defendant, Christopher McPartland, seeking out and ultimately receiving a $25,000 cash loan (the "Loan"), to pay for his legal defense, from co-conspirator James Burke ("Burke"), via Burke's long-time friend Anthony D'Orazio (D'Orazio"). As more fully set forth below, the government intends to offer highly relevant and probative direct evidence pertaining to the Loan, because this evidence consists of actions taken in furtherance of the conspiracy; it completes the story of the crimes charged in the indictment; and it demonstrates the extremely close relationship of trust between defendant McPartland and co-conspirator Burke during the relevant time period.

      **I.**    **Background**

      D'Orazio has known Burke, the former Chief of the Suffolk County Police Department, since they attended Smithtown East High School together in the late 1970s. At some point in approximately 2007, Burke introduced D'Orazio to defendant McPartland. According to D'Orazio, in the approximately eight years since they met, D'Orazio and McPartland have socialized together on only five or six occasions, and always with Burke present. Following Burke's arrest in December 2015, D'Orazio visited Burke at the Metropolitan Detention Center ("MDC"), where Burke was incarcerated, from time to time, usually with a member of Burke's family.

On February 18, 2016, D'Orazio received what he has described, in substance, as an out-of-the-blue phone call from defendant McPartland, who was seeking to meet with him. Per D'Orazio, and as supported by his phone records, this was the first time D'Orazio ever recalled McPartland calling him on the phone. In fact, McPartland did not even have D'Orazio's phone number – in order to obtain it, McPartland had to contact another friend of Burke's, who McPartland knew from the Suffolk County Police Department.

During this phone call, D'Orazio agreed to meet with McPartland. The two met at the Golden Dynasty ("Golden Dynasty") restaurant in St. James. During the meeting, defendant McPartland asked D'Orazio if he would loan him $25,000 to aid defendant McPartland in paying his legal defense fees. Defendant McPartland promised that if D'Orazio made the Loan, McPartland would provide a promissory note and pay him back. According to D'Orazio, he was stunned by this request, as the two were only acquaintances. D'Orazio was uncertain how to handle this, so he discussed the matter with Burke's half-brother, John Toal ("Toal"), who had been placed in charge of handling Burke's finances while he was incarcerated. The two men decided this should be brought to Burke's attention.

Following the request, and just one day prior to visiting Burke in jail, on February 24, 2016, Toal removed cash and jewelry from a safe deposit box he held jointly with Burke at a TD Bank in St. James ("Safe Deposit Box 1"). He then met D'Orazio at a different TD Bank located in Centereach, and they opened a new safe deposit box in both Toal's and D'Orazio's names, but *not* in Burke's name ("Safe Deposit Box 2").[1] Toal placed most of the contents of Safe Deposit Box 1 into Safe Deposit Box 2.

The following day (February 25, 2016), D'Orazio, Toal and Burke's two other brothers visited Burke at the MDC. During the visit, D'Orazio advised Burke of McPartland's request for the Loan. D'Orazio told Burke that, although he had the money himself, he did not want to provide the Loan to defendant McPartland, as McPartland was Burke's friend, not his. Burke told D'Orazio to inform defendant McPartland, in substance, not to worry; and further instructed D'Orazio to tell McPartland that D'Orazio would get him the money. Burke then directed D'Orazio and Toal to remove the $25,000 that had previously been in his safe deposit box (*i.e.*, Safe Deposit Box 1), and provide McPartland the funds.[2]

Four days later, on February 29, 2016, D'Orazio and Toal went to the TD Bank in Centereach and removed $25,000 in cash from Safe Deposit Box 2 – *i.e.*, the box held jointly in Toal and D'Orazio's names, but which contained Burke's cash. D'Orazio then contacted defendant McPartland and arranged, once again, to meet at Golden Dynasty.

---

[1] Toal and D'Orazio both assert that Burke had previously requested that they open Safe Deposit Box 2, so that D'Orazio could access the box in the event something happened to Toal while Burke was in jail.

[2] The following day (February 26, 2016), Burke pleaded guilty in federal court.

2

In the parking lot of Golden Dynasty, defendant McPartland entered D'Orazio's car, at which time D'Orazio provided McPartland with $25,000 cash. Defendant McPartland began to thank D'Orazio, but D'Orazio informed defendant McPartland, in substance, that there were more people to thank for the Loan than him. According to D'Orazio, defendant McPartland then held both of his hands up, in a gesture indicating that he did not want to hear anything further about the source of the Loan or the people to thank for it. Defendant McPartland then stated that he would mail D'Orazio a promissory note for the Loan. D'Orazio told defendant McPartland to drop the promissory note in his mail box. As of the date of this writing, D'Orazio still has not received a promissory note from defendant McPartland. Moreover, according to D'Orazio, a promissory note from McPartland to him would have been a "joke," because it should be given to Burke or even to Toal instead.

During his meetings with the government in February and March 2017, D'Orazio disclosed the existence of the Loan and the circumstances surrounding it, as recounted in substance above.[3] This information is consistent with information provided by other witnesses, including Toal; with the records pertaining to Safe Deposit Box 2; and with the phone records.

As set forth below, defendant McPartland's claims that evidence of the Loan is irrelevant and unfairly prejudicial are without merit. Therefore, the defendant's motion to exclude evidence of the Loan should be denied.

## II. Applicable Law

Federal Rule of Evidence 401 provides the test for determining if evidence is relevant. Rule 401 provides, in relevant part, that: "Evidence is relevant if: (a) it has a tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." The Second Circuit has repeatedly noted that the threshold for evidence to be deemed relevant is "very low." United States v. White, 692 F.3d 235, 246 (2012) (quoting United States v. Al-Moayad, 545 F.3d 139, 176 (2d Cir. 2008). "To be relevant, evidence need not be sufficient by itself to prove a fact in

---

[3] The defendant's motion papers contain a glaring factual inaccuracy. Defendant McPartland claims that the Loan was disclosed by defendant McPartland on a financial disclosure "long before" any inquiry from the government concerning the Loan. That disclosure form, Exhibit A to the defendant's motion papers, was signed and notarized May 15, 2017 – over two and a half months after D'Orazio disclosed the existence of the Loan to the government, and the government thereafter began investigating the Loan. Indeed, on April 26, 2017 – *prior* to the disclosure form being completed – members of federal law enforcement executed a search and seizure warrant on the safe deposit box of Burke's from which Toal and D'Orazio obtained the cash for the Loan. Moreover, according to D'Orazio, he told Burke the fact that he had disclosed the Loan to the government shortly after his meeting with the government in February 2017.

issue, much less to prove it beyond a reasonable doubt." United States v. Abu-Jihaad, 630 F.3d 102, 132 (2d Cir. 2010), *cert denied*, 564 U.S. 1040 (2011). To pass the threshold inquiry of relevance, evidence need not directly establish a fact in issue. "[S]o long as a chain of inferences leads the trier of fact to conclude that the proffered submission affects the mix of material information, the evidence cannot be excluded at the threshold relevance inquiry." United States v. Quattrone, 441 F.3d 153, 188 (2d Cir. 2006).

Federal Rule of Evidence 403 provides that: "[a] court may exclude relevant evidence if its probative value is substantially outweighed by the danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

Evidence of uncharged conduct or other acts is not considered "'other crimes'" evidence, and therefore not subject to Rule 404(b) analysis, "if it 'arose out of the same transaction or series of transactions as the charged offense, if it [is] inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime [on] trial.'" United States v. Towne, 870 F.2d 880, 886 (2d Cir. 1989) (citation omitted). This type of evidence need not "directly establish an element of the offense charged;" rather, it can "provide background" for the alleged events, and may be admitted to show "the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed." United States v. Coonan, 938 F.2d 1553, 1561 (2d Cir. 1991) (citation omitted). Indeed, courts regularly admit evidence of "other acts" if it will help to explain the mutual trust that existed between co-conspirators. See United States v. Rosa, 11 F.3d 315, 334 (2d Cir. 1993), *cert denied*, 511 U.S. 1042 (1994); see also, United States v. Pipola, 83 F.3d 556, 566 (2d Cir. 1996); and United States v. Pascarella, 84 F.3d 61, 72 (2d Cir. 1996).

### III. Analysis

Evidence of the Loan is clearly admissible as direct evidence of the charges against McPartland. The Loan, which was requested and provided during the timeframe of the charged conspiracy, is, quite literally, evidence of one co-conspirator paying another co-conspirator's legal defense fees, which were being incurred because of the ongoing investigation into the same conspiracy. Because the evidence consists of actions "done in furtherance of the alleged conspiracy," the actions are not "'other' act[s] within the meaning of Rule 404(b)." United States v. Concepcion, 983 F.2d 369, 392 (2d Cir. 1992). This direct evidence also helps explain the relationship and interaction between defendant McPartland and co-conspirator Burke. See United States v. Mercado, 573 F.3d 138, 141 (2d Cir. 2009) (affirming admission of evidence that explained development of relationship between co-conspirators).

4

The defendant's claim that the evidence of the Loan cannot be direct evidence of the charged conspiracy because the conspiracy had ended when Burke pleaded guilty is simply belied by the facts. The conspiracy to obstruct the initial federal investigation of the assault of Christopher Loeb by James Burke and to continue to obstruct the subsequent investigation into obstruction of justice remained ongoing after Burke's arrest and conviction, and is charged accordingly in the Indictment as continuing into in or about 2017. See United States v. Cruz, 797 F.2d 90, 98 (2d Cir. 1986) (holding that, although Cruz's arrest terminated his active participation in the conspiracy, it did not terminate the conspiracy itself or [a co-conspirator's] participation therein. "Indeed, we have held that a conspirator who has been arrested remains responsible for acts committed in furtherance of the conspiracy by co-conspirators who are still at large.").

The evidence which the government seeks to offer about the Loan is highly relevant and probative for a number of reasons. Primarily, it is an act done in furtherance of the obstruction of justice conspiracy. The timing and nature of the Loan is significant in this respect. A co-conspirator (Burke) was recently arrested and incarcerated in connection with the obstruction conspiracy; then, defendant McPartland received a so-called "target letter" in connection with his involvement in that same ongoing conspiracy; and, in light of the fact that the conspiracy centered around protecting Burke, as a way of repaying his co-conspirator (McPartland) for his efforts, Burke loaned him money for his legal defense and pleaded guilty immediately thereafter. The clandestine nature of the Loan further supports this conclusion. McPartland did not ask Burke directly for money for his legal defense, but it was clear that in asking an individual who he barely knew – but who happened to be one of Burke's closest friends and in charge of his finances – for thousands of dollars, he was effectively asking Burke. Indeed, McPartland's physical actions – his holding up his hands, stopping D'Orazio from telling him what he was about to; that the money came from Burke – also support this conclusion.

Additionally, the evidence surrounding the Loan demonstrates the close relationship between defendant McPartland and Burke. The amount of money requested here is not insignificant, and the need for the money was clear up front – it was for McPartland's legal defense. During a time at which Burke had lost his own job, was incarcerated (with little prospects of making more money in jail), and was still paying his own legal defense team, the fact that he provided McPartland such a significant sum of cash for *his* legal defense demonstrates just how close their relationship really was. By the same token, the fact that McPartland requested this money from Burke indirectly, and that Burke provided the money to McPartland via a second safe deposit box which did not bear Burke's name, shows that McPartland and Burke were trying to distance themselves from one another during this critical time period. As defense counsel has noted, there is nothing *per se* illegal

5

about the Loan; and yet, both Burke and McPartland went to great lengths to conceal the fact that McPartland's legal defense is being paid for by his co-conspirator, Burke.

The probative value of this evidence is not substantially outweighed by the danger of unfair prejudice to the defendant. Here, Burke's actions to aid his co-conspirator McPartland in funding his legal defense – which became necessary *because* of Burke's actions and McPartland's role in trying to protect Burke – demonstrates just how close the personal relationship was between Burke and McPartland. Even the manner by which the request was made – through a casual acquaintance, who is a close friend of Burke's – demonstrates the closeness of their relationship. In essence, Burke did not even need to hear McPartland make the request directly; he provided a tremendous sum of cash immediately after hearing second-hand of McPartland's need for it. Burke and McPartland turn to one another in times of need, financially or otherwise, during the course of this conspiracy. Accordingly, this evidence is highly relevant and critical to proving the relationship of mutual trust between the co-conspirators.

Not only is the evidence related to the Loan highly probative for the reasons stated above, but there is no risk of unfair prejudice from evidence of the Loan being offered at trial. There are no negative connotations associated with a loan of money between friends. Here, while the manner in which the Loan is made is highly unorthodox, there is nothing about the evidence of the Loan *prima facie* that would unfairly prejudice the defendant.

Finally, defendant McPartland argues that if the Court allows the evidence of the Loan, that evidence of his financial strife should also be admitted into evidence. First, evidence that McPartland needed money to pay for a defense lawyer would already be in evidence, through the testimony of D'Orazio. The government anticipates that D'Orazio will discuss the fact that McPartland told him that he needed money to a pay for his defense lawyer when requesting the Loan. Any further testimony or evidence would be cumulative and irrelevant, and should be precluded. Second, should McPartland chose to testify on his own behalf, the government acknowledges that he could explain more fully, and introduce additional evidence, as to why he borrowed $25,000 from Burke.

### IV. **Conclusion**

For the foregoing reasons, the government respectfully submits that defendant McPartland's motion to exclude evidence of the Loan should be denied in its entirety.

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By:     /s/
Nicole Boeckmann
Lara Treinis Gatz
Justina L. Geraci
Michael R. Maffei
Assistant U.S. Attorneys
(631) 715-7855/7913/7835/7890

cc:     Larry Krantz, Esq. (via email)
         Alan Vinegrad, Esq. (via email)