[The following transpired at 10:15 a.m.]

THE COURT: Are you ready to proceed, Mr. Condon?

MR. CONDON: Yes, Your Honor.

THE COURT: Are you ready to proceed, Mr. Ahern?

MR. AHERN: Yes, Your Honor.

THE COURT: As I indicated to you last week, I am now to place my decision on the record after the hearing. Of course, this Court conducted both a Dunaway hearing and a Huntley hearing on the application of the defendant and with the consent of the People.

The following constitutes a decision of the Court: This Court has been handed a very troublesome and disturbing scenario in deciding whether there was sufficient probable to arrest this defendant on December 10th, 1990 for the following reasons:

1) The defendant, if convicted of these crimes, would in all likelihood be a persistent felony offender facing life in

prison.

2) The defendant probably committed at least one of these burglaries, if not all of them.

3) There are many inconsistencies in the defendant's story. And the Court does not fully credit his testimony.

But, 4), more troubling and dispositive of the issues in this case, the arresting officers, Hickey and Crowley, are even less credible than the defendant, and they engaged in a pattern of conduct which offends the sensibility of this court, and was violative of his constitutional rights.

The following constitutes the Court's finding of fact:

On December 10th, 1990, sometime in the morning of that day, Police Officers Hickey and Crowley were on routine patrol in the Wyandanch area in sector car 102. They were traveling westbound on Long Island Avenue in the vicinity of Grand Boulevard and Straight Path, not far from two houses which they allege are known for illegal activities;

that is, the marketing of illegal drugs,
alcoholic beverages and the fencing of sto-
len property.

They claim that they observed a black
male, the defendant, walking in broad day-
light in front of their marked police vehi-
cle carrying a white pillowcase with a piece
of stereo equipment protruding from the bag.
Although the pillowcase which was received
in evidence is substantially larger than the
stereo cassette pack which was likewise
received in evidence.

According to them, the defendant fit
the description of a black male who had been
chased by the victim of a burglary on Decem-
ber 2nd, 1990 at 1683 Straight Path,
Wyandanch. That subject was described as a
black male, twenty-six to thirty years of
age, five foot ten inches tall, one hundred
and fifty-five to one hundred sixty pounds,
light skinned, close cropped Afro, acne
complexion, scars on his lower right lip and
left eyebrow, and wearing a green vinyl
aviator jacket.

It is significant that on the date of the arrest the defendant had a fully formed goatee and mustache which was not mentioned by the complainant of the burglary which had taken place eight days before. And although the officers claimed that they could see one on that day, the defendant does not have a scar on his lower right lip. Although he does have a scar in his eyebrow which is barely discernable except through close examination.

Furthermore, although Police Officer Crowley testified that the prior description included missing or protruding teeth which fit the physical characteristics of the defendant, there was no such description provided by the homeowner. In fact, those characteristics, like the mustache and goatee, are the most prominent facial characteristics of the defendant. Other than the fact that he is black and -- the section of Wyandanch, that section of Wyandanch is a predominantly black community. Neverthe-less, the officers made a decision to stop

the defendant and to question him.

He was first asked where he was going.
The response which this court is asked to
believe was virtually incriminating.  Quote:
Toward the bootlegger on Elm Street, un-
quote, or words to that effect.  He was then
asked his name.  And he hesitated or stam-
mered before giving his correct name.

When he was asked where he lived, he
could not give them a house number, but gave
them a house on North 15th Street which they
were familiar with.  That is the Tatum resi-
dence.

He was then asked what was in the bag.
And he told them that it was a V.C.R.  And
agreed to show them the contents of the
pillowcase.  Although both officers say they
could parts of the stereo equipment which
was protruding from the bag.

When asked whether it was his, they
said the defendant said it was.  And he said
a friend had given it to him.  At that point
they said he was told he was going to be
detained.  The defendant, they say, was very

cooperative. To the extent right then and
there he admitted he had gotten it on the
previous day during the course of a bur-
glary. At that point this very cooperative
suspect elected to run from the officers.
And he was tackled in the street about fif-
teen feet away.

The Officers observed a slight scratch
on his nose. And he was placed under arrest
and moved into the rear of the police vehi-
cle. This entire encounter lasted less than
ten minutes.

Despite the fact that the defendant was
for all intents and purposes under arrest at
that time, the police officers, without
notifying the precinct, elected to take the
defendant on a grand tour of the Deer Park
and Wyandanch communities to three different
homes which the defendant allegedly told
them he had burglarized. They say the
defendant directed them to at least two of
these locations. And at the Tatum house
they recovered a leaf blower which the de-
fendant had placed under a Christmas tree.

A leaf blower had been taken from one of these homes. But the leaf blower which they recovered does not match the description of the leaf blower which was taken from the home which had been burglarized.

At two of the locations one of the officers exited the vehicle to talk to civilian witnesses while the defendant remained handcuffed in the police vehicle. At the Tatum residence the defendant was identified by Mrs. Tatum. Although the Tatum residence was not one of the homes that was allegedly burglarized.

At 11:32 a.m. the officers responded to the First Precinct with the defendant under arrest, at least forty-seven minutes after they first encountered the defendant in the street. He was then turned over to the First Squad Detectives to be questioned in connection with various burglaries.

During the course of the questioning, which lasted until 4:30 p.m., the defendant gave four separate signed written confessions, and what's been characterized as

resisting arrest photographs were taken of
his face, mouth, teeth, hands and wrists,
which all showed signs of recent trauma.

The defendant's version of what hap-
pened on the morning of December 10th, 1990
is greatly at variance with the version of
the uniformed officers. He said he encoun-
tered the police officers in broad daylight
at Woodland and Grand Boulevard in
Wyandanch, when they came up behind him in a
police car. He was going to his friend's
house he says. He was stopped and he was
asked what he had in the pillowcase. He
responded that it was amplifier which was
his. And that he was going to Bobby Tatum's
house. Police Officer Hickey then accused
him of a burglary on North 15th Street, a
house which Hickey said was owned by a black
ex-cop. He told him that he had seen him
outside that house. But that he had not
arrested him. They referred to themselves
as Ratman and Fatman. And said quote:
Today's your lucky day. We're going to whip
your ass, unquote.

He was then grabbed. And the stereo
equipment was placed on the trunk of the
car. The defendant was handcuffed and
placed in back of the car. He was told that
he was lying when he told them that they had
the wrong person. Hickey was angry and
threatened to beat the defendant. He was
driven to a truck parking lot where the
officers engaged some men in conversation
who could not identify the defendant. Hick-
ey was now really upset according to the
defendant.

He was then driven to the municipal
parking lot in Wyandench at the Long Island
Railroad Station, where the police vehicle
was parked between two parked vehicles at
the back of the lot. He was given one more
chance to tell the truth before he was
punched in the face by Officer Hickey, says
the defendant, who continued to hit him in
the face, stomach and ribs. He was hit on
the right side of his mouth with an instru-
ment which he described as a blackjack. And
his teeth became quote, real loose, unquote.

Hickey then took out a needle nose pliers
from the glove compartment and said that he
was going to remove the defendant's teeth.
Instead, according to the defendant, he
puncture his knuckle with the pliers after
pulling up tight on the handcuffs.

The photographs of the defendant clear-
ly show an injury to his upper lip and gums,
around his two upper incisors, which fell
out of his mouth about two days later.

The photos also reveal an apparent
puncture wound above his knuckle and swell-
ing of both hands which was more likely the
result of excessive pressure to his wrists
from handcuffs.

Less than two weeks later there was a
complete loss of feeling in the left radial
nerve which is consistent with handcuff
neuropathy. Such a swelling in the hands
and change in color would be the result of
more than thirty or forty minutes of signif-
icant compression to the wrists. It is no
coincidence that the defendant was in their
custody, that is the custody of Hickey and





861

Crowley, for at least forty-seven minutes
that morning.

His version of what happened thereafter
is somewhat consistent with the police ver-
sion. Although he contends that a male
civilian at a residence in Deer Park was
invited into the police vehicle to engage
the defendant in conversation about a bur-
glary at his house.

On the trip to the precinct they
threatened to beat him again if he com-
plained about what had happened, or if they
had to take him to the hospital. Although
police records in the form of the police
activity log indicated that the defendant
made no complaints about his physical condi-
tion, he claims that he told Detective
Schreiber what they had done to him. The
response to which was a revisit by Officer
Hickey in the interview room who threatened
to beat him once again, .

Although resisting arrest photographs
were taken by the investigating detectives,
and the defendant clearly sustained visible

fresh injuries to his hands which were cut,
and to his mouth, Detective-Sergeant Burke,
who was supervising the investigating detec-
tives, made no note or report of the fact
that the defendant reported in response to
his questioning that he had recently had a
scuffle with someone else. In fact, the
entire investigation is devoid of contempo-
raneous notes or memoranda save the
conclusory police reports which were made
after the fact.

The following constitutes the court's
conclusions of law:

Although the People correctly point out
that it is the defendant who bears the ulti-
mate burden of proving that the evidence
should not be used against him, it is the
People who in the first instance must show
that the police conduct was reasonable; that
is, the People have the evidentiary burden
of going forward in the first instance to
demonstrate the legality of the police con-
duct. In that regard, therefor, the testi-
mony of the first two officers who encoun-

tered the defendant must be credible and must not have the appearance of having been patently tailored to overcome constitutional objectives. For that I cite People against Smith, 77 App Div 2d 544, citing several Court of Appeals cases such as Malinsky, Whitehurst and Berrios.

The testimony of Officers Hickey and Crowley is simply not credible in this case. Their version of the events of December 10th, 1990 does not comport with the physical evidence which is before this Court. While the testimony of the defendant is likewise not given full credence by the Court, his lack of credibility if not fatal to his application.

It is the troublesome incredible police testimony which strikes a fatal blow to the heart of the People's case. While the police should be accorded great latitude in dealing with those situations with which they are confronted, it should not be at the expense of our most cherished and fundamental rights, which rights are afforded no

less to prior felons and criminals than to
our most law-abiding citizens. Whenever a
street encounter amounts to a seizure, it
must pass constitutional muster. And there
I'm paraphrasing Judge Wachtler in People
against Cantor, 36 NY 2d 106. Before a
person may be stopped in a public place, a
police officer must have reasonable suspi-
cion that such person is committing, has
committed or is about to commit a crime.
Reasonable suspicion is the amount of knowl-
edge sufficient to induce an ordinary pru-
dent and cautious person under the circum-
stances to believe criminal activity is at
hand. The officer must be able to articu-
late specific facts which, along with other
logical deductions, justifies such intrusive
conduct.

As much as this Court wants to give
credence to police testimony, especially
where the police activity involved may have
hit pay dirt in the form of the arrest of a
person who may have been responsible for at
least one house burglary, the facts of this

case cry out for a dismissal of the indict-
ment for lack of probable cause. The testi-
mony of the two arresting officers does not
pass the test of logic and common sense.
Moreover, this court is extremely troubled
by the past record of these two uniformed
officers who have worked together as a team
for some time in the First Precinct. So
much so that they have been doved street
names presumably descriptive of their police
activities, Ratman and Fatman.

This court simply cannot accept the
police version of what happened in broad
daylight in the streets of Wyandanch on
December 10th, 1990. While the officers
have attempted to choreograph their activity
to meet constitutional requirements, the
simple fact remains that the person they
stopped on that morning, because of their
aroused suspicions, was merely a nonspecific
black male carrying a white cloth sack over
his shoulder about five foot ten inches in
height, thin build, in his late twenties or
early thirties. The most noticeable physi-

cal characteristics of the defendant, other
than the fact he was black, a fully formed
mustache and goatee, did not even enter into
the equation. God only knows how many black
males fit that description in Wyandanch on
the morning of December 10th, 1990.

Furthermore, in a period of less than
three years there were no less than eighteen
civilian complaints lodged against one or
both of these police officers, some of which
claim the very conduct which has been al-
leged by this defendant in these proceed-
ings.

[32] While the Officers either deny these
allegations or any knowledge of them, this
Court cannot help but consider them in as-
sessing the credibility of these two offi-
cers. Especially where the defendant is a
black man who claims to have been beaten by
them with physical evidence to support such
conduct, such as lost teeth, swollen hands,
open wounds and loss of sensation resulting
from nerve damage in the wrist area, and the
civilian complaints in the eighteen other

complaints with likewise virtually always
black persons who are allegedly referred to
as niggers or black son of a bitch.  And
where there were complaints, as in this
case, of beatings to the face and head,
threats of physical force and violence, and
excessive force in the use of handcuffs.
And on two occasions, as in this case, the
complainant was allegedly injured when he
was fleeing with the officers in pursuit.

There is a temptation, after reviewing
the stipulation entered into the record, to
jump to the conclusion that these two offi-
cers have a propensity to terrorize and
assault black suspects.  The law prohibits
me from reaching such a conclusion. But, at
the very least, the pattern and number of
complaints during a relatively short period
of time, despite the fact that internal
police investigations call them unfounded,
reflects poorly upon their credibility as
witnesses in this court.  A trial court,
unlike an appeals court, does not deal in
abstract justice.  It does not reach its

conclusions from a sterile printed record.
I have had the opportunity to observe and to
listen to each of these witnesses under
oath. I have also had the opportunity to
question the witnesses myself and to absorb
their individual responses to counsel's
questions and the questions of this court.

What I heard in response thereto was
profoundly disturbing. And those feelings
extend no less to the testimony of the de-
tectives and their supervisor than to the
two uniform officers. There was a striking
lack of humanity displayed by the manner
which this injured person, despite his sta-
tus as a suspect, was treated. To para-
phrase the defendant, he is a human being.
He is not a dog. And he should have been
treated as such.

In the light of his medical record and
dental history, this court cannot conceive
of this particular defendant refusing medi-
cal treatment or transportation to a hospi-
tal. Nor does this court believe for one
minute that the defendant told Detective-

Sergeant Burks that his injuries were caused
by a scuffle with some unknown person.
These police were doing everything in their
power to document the defendant's attempt to
flee the arresting officers with injuries
resulting from their physical -- from their
physically effectuating an arrest in the
middle of the street. Yet the detective-
sergeant did not write one note or report
the defendant's explanation of his injuries.
Common sense dictates otherwise. If this
defendant had blamed his injuries upon some
nonspecific scuffle, there is no question
but that such explanation would have been
pursued and fully documented by the investi-
gating team. To have done less would have
been police malpractice. It just doesn't
happen that way.

Furthermore, this court cannot accept
the story that these two uniform officers,
operating as a team in a sector car in what
the People have described as a high crime
area, would leave their sector no less --
for no less than thirty-seven minutes, but

probably longer than that, without advising
the precinct that they had vacated their
area of responsibility with a suspect in
custody to travel to various locations in
Deer Park and Wyandanch. And that is simply
not credible. This court is convinced that
the First Precinct and the adjacent sector
cars, as well as the road sergeant, had to
know that the officers had vacated their
sector. Unfortunately, although counsel
called for the preservation of tapes of all
radio and/or telephonic transmissions in
regard to this case from that morning, the
police on their own chose only to preserve
tapes documenting the period from 11:24 a.m.
forward, the time that the officers went
code thirty-two. That is, returning to
precinct.

This court will never know what was
being transmitted by those officers or by
their command from the time that they first
confronted the defendant and placed him
under arrest. A Suffolk County Police Offi-
cer simply does not place a suspect under

arrest and transport him to other locations
without keeping his command abreast of the
situation. The real world does not work
that way.

Moreover, this court cannot help but
notice and underscore that Police Officer
Crowley's memo book entries for that day are
devoid of any information except for what
occurred as of 11:24 a.m., some thirty-five
minutes after he claims they placed the
defendant under arrest.

The bottom line is that this court has
no confidence in the case presented by the
prosecution as measured by the testimony of
the arresting officers, the investigating
detective, and the physical and documentary
evidence. While this court recognizes and
considered the various inconsistencies in
the defendant's story, those pale by compar-
ison to the tale which this court has been
asked to accept by the People. While the
arresting officers may have scored on their
hunch in this case, the ends do not justify
the means. And there was insufficient prob-

able cause to stop and subsequently arrest
this defendant. That being the case, it was
not necessary for this court to consider
whether the defendant's purported confes-
sions have been obtained voluntarily or
otherwise.

For all of the foregoing reasons, the
indictment is hereby dismissed. And bail is
exonerated.

This Court stands in recess at this
time.

[The Court recessed to Chambers at
10:35 a.m.]

-oOo-

REPORTER'S CERTIFICATION

I, Anthony L. LaMagna, CSR, RPR, a
Senior Court Reporter, County Court, Suffolk
County, do hereby certify the above 672
pages to be a true, accurate and correct
transcript of the minutes in this matter.