UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

- against -

CHRISTOPHER MCPARTLAND and
THOMAS J. SPOTA,

Defendants.

No. 2:17-cr-0587 (JMA)

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
CHRISTOPHER MCPARTLAND'S MOTION FOR A NEW TRIAL PURSUANT TO
FEDERAL RULE OF CRIMINAL PROCEDURE 33 AND FOR AN EVIDENTIARY
HEARING**

KRANTZ & BERMAN LLP
747 Third Avenue, 32nd Floor
New York, NY 10017
(212) 661-0009

BALLARD SPAHR LLP
1675 Broadway, 19th Floor
New York, NY 10019
(212) 223-0200

*Counsel for Mr. McPartland*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................1

RELEVANT FACTUAL BACKGROUND ........................................................7

    A.    Hickey's Decision to Cooperate and His Meetings with His Attorneys and the Government ...............................................................7

    B.    Hickey's Trial Testimony ..................................................................10

        1.    The February 2013 Meeting..................................................10

        2.    Disclosure of Hallucination History .....................................13

        3.    The Defense Inquiry Concerning Follow-up Visits with Medical Professionals ............................................................14

        4.    The Defense's Efforts to Obtain *Giglio* Material as to Hickey's Seemingly False Trial Testimony.............................16

ARGUMENT ....................................................................................................16

I.    THE GOVERNMENT ELICITED AT TRIAL, AND/OR FAILED TO CORRECT AT TRIAL, TESTIMONY FROM HICKEY THAT IT KNEW OR SHOULD HAVE KNOWN TO BE FALSE..............................................18

    A.    A Preponderance of the Evidence Indicates that Hickey Testified Falsely....................................................................................19

        1.    The Supposed February 2013 Meeting ...................................19

        2.    Hickey's Claim to Have Disclosed the February 2013 Incident at the "Beginning" of His Cooperation .....................................21

        3.    Hickey's Supposed Disclosures to the Government Relating to His Medical History.............................................................22

    B.    The Government Knew or Should Have Known of the Perjury.............24

    C.    Hickey's False Testimony Was Material ...............................................25

    D.    On This Showing, Mr. McPartland is Entitled to an Evidentiary Hearing.............................................................................................27

II.    ANY KNOWING FAILURE BY THE GOVERNMENT TO DISCLOSE HICKEY'S FALSE TESTIMONY AMOUNTS TO A *GIGLIO* VIOLATION ..............28

CONCLUSION.................................................................................................32

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                    **Page(s)**

*Fernandez v. Capra*,
   916 F.3d 215 (2d Cir. 2019)......................................................................................18

*Florez v. United States*,
   No. 07-CV-4965 (CPS), 2009 U.S. Dist. LEXIS 63826 (E.D.N.Y. July 24,
   2009) ..........................................................................................................................27

*Giglio v. United States*,
   405 U.S. 150 (1972)......................................................................................... *passim*

*Graves v. Smith*,
   No. 02-CV-6550, 2012 U.S. Dist. LEXIS 41354 (E.D.N.Y. Mar. 23, 2012),
   *aff'd sub nom Graves v. Phillips*, 531 F. App'x 27 (2d Cir. 2013)........................30

*Kyles v. Whitley*,
   514 U.S. 419 (1995)..................................................................................................29

*Magnotta v. Berry*,
   906 F. Supp. 907 (S.D.N.Y. 1995) ...........................................................................19

*Podlog v. United States*,
   Nos. 97-CV-3292 (JFK), S2-CR-374 (JFK), 2003 U.S. Dist. LEXIS 8904
   (S.D.N.Y. Apr. 22, 2003), *aff'd*, 2005 U.S. App. LEXIS 738 (2d Cir. 2005) ........28

*Reyes v. Ercole*,
   No. 06-CV-5525 (SHS), 2018 U.S. Dist. LEXIS 51595 (S.D.N.Y. Mar. 26,
   2018), *aff'd*, 785 F. App'x 26 (2d Cir. 2019) ........................................................18

*United States v. Aguiar*,
   737 F.3d 251 (2d Cir. 2013)......................................................................................17

*United States v. Agurs*,
   427 U.S. 97 (1976)....................................................................................................30

*United States v. Arroyo*,
   301 F. Supp. 2d 217 (D. Conn. 2004).......................................................................17

*United States v. Avellino*,
   136 F.3d 249 (2d Cir. 1998)......................................................................................30

*United States v. Bagley*,
   473 U.S. 667 (1985)..................................................................................................29

*United States v. Bin Laden*,
    397 F. Supp. 2d 465 (S.D.N.Y. 2005), *aff'd sub nom. In re Terrorist
    Bombings of U.S. Embassies*, 552 F.3d 93 (2008)...............................30

*United States v. Brown*,
    No. 86-CR-738 (CSH), 1987 U.S. Dist. LEXIS 6751 (S.D.N.Y. July 29, 1987)...................27

*United States v. Browne*,
    130 F. Supp. 2d 552 (S.D.N.Y. 2001).......................................................26, 27, 31

*United States v. D'Angelo*,
    No. 02-CR-399 (JG), 2004 U.S. Dist. LEXIS 2239 (E.D.N.Y. Feb. 18, 2004)......................17

*United States v. Feng Ling Liu*,
    No. 12-CR-934 (RA), 2015 U.S. Dist. LEXIS 94899 (S.D.N.Y. July 20,
    2015), *aff'd on other grounds sub nom. United States v. Bandrich*, 636 F.
    App'x 65 (2d Cir. 2016).............................................................17

*United States v. Ferguson*,
    246 F.3d 129 (2d Cir. 2001)........................................................17

*United States v. Helmsley*,
    985 F.2d 1202 (2d Cir. 1993).......................................................18

*United States v. LaGrua*,
    Nos. 98-1323 (L), 98-1568, 1999 U.S. App. LEXIS 12091 (2d Cir. June 11,
    1999) ..............................................................................28

*United States v. McCourty*,
    562 F.3d 458 (2d Cir. 2009)........................................................17

*United States v. Ng Lap Seng*,
    No. 15-CR-706 (VSB), 2018 U.S. Dist. LEXIS 83441 (S.D.N.Y. May 9,
    2018) ..............................................................................18

*United States v. Pavloyianis*,
    996 F.2d 1467 (2d Cir. 1993).......................................................28

*United States v. Payne*,
    63 F.3d 1200 (2d Cir. 1995)........................................................30

*United States v. Petrillo*,
    821 F.2d 85 (2d Cir. 1987).........................................................30

*United States v. Rivas*,
    377 F.3d 195 (2d Cir. 2004)........................................................29

*United States v. Sanchez*,
   969 F.2d 1409 (2d Cir. 1992)........................................................................17

*United States v. Schlesinger*,
   438 F. Supp. 2d 76 (E.D.N.Y. 2006) ..........................................................32

*United States v. Seijo*,
   514 F.2d 1357 (2d Cir. 1975)............................................................28, 29, 30, 31

*United States v. Sessa*,
   Nos. 92-CR-351 (ARR) & 97-CV-2079 (ARR), 2011 U.S. Dist. LEXIS
   (E.D.N.Y. Jan. 25, 2011) ..............................................................................18

*United States v. Sperling*,
   506 F.2d 1323 (2d Cir. 1974)........................................................................30

*United States v. Spinelli*,
   551 F.3d 159 (2d Cir. 2008)..........................................................................29

*United States v. Triumph Capital Grp., Inc.*,
   544 F.3d 149 (2d Cir. 2008)....................................................................17, 29

*United States v. Wallach*,
   935 F.2d 445 (2d Cir. 1991).................................................................. *passim*

*United States v. White*,
   972 F.2d 16 (2d Cir. 1992)............................................................................26

*United States v. Wong*,
   78 F.3d 73 (2d Cir. 1996)........................................................................29, 30

## Other Authorities

Fed. R. Crim. P. Rule 33................................................................... *passim*

## PRELIMINARY STATEMENT

Defendant Christopher McPartland moves for a new trial under Rule 33 of the Federal Rules of Criminal Procedure, and seeks an evidentiary hearing in support of that motion in order to establish: (1) that the government's key cooperating witness, James Hickey, testified falsely as to critical areas of his trial testimony, and (2) that the government knew or should have known that Hickey's testimony was false, given the compelling evidence of that fact.  If the jury had likewise known about that falsity, there is a significant chance that this would have destroyed Hickey's credibility and caused the jury to disregard his testimony. That would have radically changed the strength of the government's case, which rested almost entirely on Hickey's testimony to prove key elements of the charged offenses.  Given the essential role that Hickey's testimony played in this case, coupled with the existing evidence of its falsity and the government's failure to correct that testimony or to disclose its falsity, a hearing is warranted – indeed, mandated – for Mr. McPartland to establish his right to a new trial.[1]

While we are loathe to assert allegations of government misconduct, the evidentiary record establishes compelling reasons to believe that Hickey testified falsely – and that the government knew or should have known that such testimony was false – on four material subjects:

1.     Hickey's claim as to the supposed meeting in February 2013.  Hickey's trial testimony contains a litany of sensational allegations not disclosed in any of his prior interview reports.[2]  For example, Hickey claimed at trial that the defendants had openly discussed with James Burke, in Hickey's presence, "beating the hell" out of Christopher Loeb, and that their goal was to

---

[1]     Defendant Thomas Spota joins in this motion for a new trial.

[2]     All of Hickey's 3500 material, together with Hickey's own handwritten notes and the notes of his attorneys (provided to the defense at trial), may be found as exhibits ("Ex.") A and B, respectively, to the Declaration of Larry H. Krantz, dated February 27, 2020 ("Decl."), accompanying this Memorandum of Law.

"keep Jimmy out of jail."[3]  Despite nearly four years of cooperation and the disclosure of notes from 17 government interviews with Hickey, neither of these allegations appear in any of the Hickey 3500 material.

But even more startling at trial was Hickey's newly minted claim that in February 2013, he witnessed a meeting between Mr. McPartland and Burke, during which Mr. McPartland "coached" Burke as to how he should lie about the Loeb assault (the "February 2013 Meeting"). Needless to say, this was a devastating allegation.  The government dramatically opened on it, describing Mr. McPartland as "the architect of the lies," Tr. 30:14-15, and returned to it during its summation, telling the jury that "McPartland helped create a false narrative in order to cover up Burke's assault of Loeb."  *Id.* at 3284:22-25.

A careful review of the record, however, reveals that this allegation simply cannot possibly be credible. **First**, it is nowhere to be found in the government's production of 302's and Memoranda of Interviews ("MOIs") that span nearly four years of Hickey's cooperation and comprise 17 meetings or conversations with him.  **Second**, it is not referenced in any of Hickey's own notes, created for purposes of his cooperation, and produced to the government and defense counsel after the trial commenced.  **Third**, it is not contained in Hickey's own calendar entries, on which the government otherwise heavily relied for supposed corroboration, which Hickey himself claimed was an authoritative source for meetings and other important dates, and which was prepared in anticipation of his cooperation.  *See* Ex. C.  **Fourth**, the allegation is not contained in Hickey's own attorneys' detailed notes (also turned over to the government and the defense after

---

[3]     *See* Trial Transcript ("Tr.") 1576, 1648, 1988:12-20, 1989:4-16 (Burke repeatedly acknowledged "beating the hell" out of Loeb); 1576, 1592, 1595, 1630, 1989:25-1990:1 (Hickey testified that the defendants and Burke regularly discussed "the need to keep Jimmy out of jail.").

the commencement of trial), prepared to make a proffer to the government at the commencement of Hickey's cooperation. **Fifth**, the allegation is not contained in the government's two search warrant applications in this case, dated September 15, 2016 and April 21, 2017, both of which purport to summarize the key evidence giving rise to probable cause for the warrants. *See* Exs. I, J. **Finally,** the allegation is belied by sworn trial testimony of two Intelligence Squad detectives, Kenneth Bombace and Anthony Leto, that the false narrative used to describe the Loeb assault was conceived in March 2013 at a meeting with Burke *which Mr. McPartland did not attend*.

These omissions are simply stunning, and suggest overwhelmingly that Hickey's testimony in this regard was false. Moreover, these omissions lead inexorably to the question of how the government, in good faith, could have elicited Hickey's testimony in this regard, when Hickey had failed to make that pivotal allegation in nearly four years of pre-trial cooperation. Simply put, the circumstances surrounding Hickey's testimony on this subject raise gravely serious questions about whether Hickey lied during his testimony and whether the government knew or should have known that this testimony was false. For this reason alone, an explanation from the government and an evidentiary hearing (assuming the government disputes the allegations) is essential, in order for Mr. McPartland to establish his right to a new trial.

       2.    <u>Hickey's claim that he disclosed the February 2013 Meeting to the government "at the very beginning" of his cooperation</u>. When challenged on cross-examination as to the fact that he had never made this allegation (as to the February 2013 Meeting) in nearly four years of cooperation, Hickey doubled down and testified that he had, in fact, provided this information to the government at the "very beginning." Tr. 1956:4-8; *see also id.* at 1958:12-22 (testifying that he provided this information "early on" in his cooperation). Given the absence of this allegation in *any* of the notes or memoranda from the 17 government interviews with Hickey, it is simply

unfathomable that Hickey, in fact, made that allegation from the "very beginning," but that the government agents taking contemporaneous and detailed notes of Hickey's interviews simply failed to record it. Nonetheless, the government allowed this testimony to stand, despite the fact that it appears to be utterly false. Yet again, an explanation from the government and an evidentiary hearing (assuming the government disputes the facts) is mandated, in order for Mr. McPartland to establish his right to a new trial.

3.  Hickey's claim that he disclosed his hallucinations to the government at his first meeting, "before they even sat down." When confronted on cross-examination with the hallucinations he suffered in October 2015, Hickey claimed that he had told the government about those hallucinations during his first meeting with the prosecution—indeed, "before we even sat down." *Id.* at 1911:8-14; 1912:4, 1913:24-25. Once again, this testimony is wholly at odds with the report of his first interview with the government – or any other interview report, for that matter – which report contains no reference to such a disclosure. It simply strains credulity that Hickey made such a significant statement to the government, "before they even sat down," but that the statement went unrecorded by the agents taking notes. Hickey's claim is also belied by the fact that for several years – during the investigative and post-indictment phases of the case – the government *denied* to defense counsel that Hickey had suffered from hallucinations or any other form of mental disorder. *See* Decl. at ¶ 16. This claim is also belied by the fact that the government made no attempt to obtain any of Hickey's hospital records until 2019 (at the behest of defense counsel). Accordingly, an explanation from the government and an evidentiary hearing (assuming the government disputes the facts) is mandated, in order for Mr. McPartland to establish his right to a new trial.

4.      Hickey's claim that he had not been asked by the government, prior to trial, about any follow-up medical treatment relating to his October 2015 hospitalization.  Long before the trial commenced, the defense repeatedly sought from the government disclosure of any follow-up medical records of any kind relating to Hickey's October 2015 hospitalization.  When nothing was disclosed, defense counsel contacted the government in August 2019, in order to discuss this subject.  At that time, the government advised the defense, both orally and by confirming e-mail, (a) that it had discussed the defense's request with Hickey directly, (b) that Hickey was "prepared to testify under oath" that he had no follow-up medical visits whatsoever subsequent to October 2015, and (c) that therefore no such records existed.  Ex. F.

Despite this ironclad representation, after the trial commenced, the government turned over to the defense – without any explanation – records of *four* follow-up visits with a doctor who had seen Hickey during his 2015 hospitalization.  Hickey's past mental condition was described in these records as, inter alia, "altered mental status and psychosis with hypertension requiring precedex drip." Ex. D at 20.  When confronted with this discrepancy on cross-examination, Hickey *denied* having ever been asked by the government – prior to trial – whether he had received any follow-up medical care.  This denial was *reinforced* by the government during its redirect examination, wherein it elicited testimony that it had only asked Hickey about subsequent visits to a "psychiatrist or a therapist." Tr. 2150:11-21.  In other words, the government led the jury to believe that Hickey's denial as to having previously been asked about follow-up medical visits was true, when it apparently was not.

Hickey's testimony on this subject is deeply troubling, since it is directly at odds with the government's representation as to what Hickey was "prepared to testify under oath." While the government sought to explain this glaring discrepancy at trial by claiming, at sidebar, that the error

was the government's (and not Hickey's), this explanation is more than difficult to accept, given the record of contemporaneous communications between the government and defense counsel on this subject. It is simply inconceivable that the government, after all of the contentious litigation over the medical records, including multiple requests for follow-up records and a full *Daubert* hearing on the subject, never once asked Hickey – prior to trial – about any follow-up medical care from his October 2015 hospitalization, and then made a mistake when it told defense counsel that it had. Yet, that is what the government asks this Court and the defense to accept, and thereby avoid the otherwise-obvious conclusion that Hickey lied both to the government and to the jury. Accordingly, and with all due respect, an explanation from the government and an evidentiary hearing (assuming the government disputes the facts) is mandated, in order for Mr. McPartland to establish his right to a new trial.[4]

Finally, the government failed to advise defense counsel as to each of these areas of materially false testimony, as required by *Brady, Giglio* and their progeny.

We respectfully submit that any of these issues standing alone would be enough to require relief under Rule 33; together, they present an even more compelling picture of a manifest injustice. The Court should therefore hold an evidentiary hearing to allow the defense a full and fair opportunity to establish its right to a new trial.

---

[4]     Hickey also claimed at trial that he personally disclosed his alcoholism to the government "in the early beginnings of his meetings with them," and "[absolutely I told them before my plea." Tr. 1902:10 – 1903:24. Yet again, the reports of those interview sessions *contain no reference to this whatsoever,* and suggest that Hickey's testimony as to his "early" disclosure of this was also false. To the extent that a hearing is ordered, this subject should also be a proper subject of inquiry.

## RELEVANT FACTUAL BACKGROUND

**A.    Hickey's Decision to Cooperate and His Meetings with His Attorneys and the Government**

Hickey testified that on October 30, 2015, he received a subpoena to testify before the grand jury. Tr. 1761:10-24, 1872:21-24; *see also* Gov't Ex. 2003. Hickey further testified that by the time he had retained counsel in connection with that subpoena, he was aware that key witnesses had already spoken to the government and/or testified before the grand jury, had implicated him, and that "[t]he whole thing, the coverup, it was just over." Tr. 1772:2-23. Armed with this information, according to his attorney's notes (produced to the defense during trial), Hickey was ███████████████████████████████████████████ Ex. B at 8 (3500-JH-46), and directed his counsel to "approach the Government about [his] willingness to cooperate." Tr. 1775:13-14.

Hickey, in preparation for his first meeting with his attorney, recorded three to four pages of "key points" that he wanted to convey. *Id*. at 1770:18-1771:8; Ex. B at 65-68 (3500-JH-57). The evidence shows that Hickey and his attorney thereafter met or otherwise conferred on several occasions over the next few weeks. Tr. 1770:6-8; Ex. B at 2-60 (3500-JH-45—52). Hickey explained at trial that at these meetings, he "tried to detail the last three years of my life up to that point." Tr. 1771:16-17.

Hickey's three to four pages of "key points" contain *no reference* to a meeting with Burke and Mr. McPartland in February 2013, nor do the notes contain any reference to a meeting with Burke and Mr. McPartland where a false narrative for the Loeb assault was conceived or otherwise discussed. Hickey's attorneys' notes similarly contain no such references. On the contrary, one set of Hickey's attorneys' notes reflect that from the date of the Loeb assault until June 25, 2013,

█████████████ Ex. B at 6 (3500-JH-46).  Hickey's calendars also contain no such reference.  *See* Ex. C.

On December 1, 2015, Hickey's attorney gave a detailed proffer to the government.  Tr. 1776:12-14; *see also* Ex. B at 2 (3500-JH-45).  Hickey testified that the purpose of this proffer was "[t]o tell the Government what I had told them and my willingness to cooperate."  Tr. 1776:16-17.  Nowhere in his attorney's detailed outline for the proffer is there any reference whatsoever to a meeting in which Mr. McPartland conceived of or otherwise discussed a false narrative for the Loeb assault, whether in February 2013 or at any other time.

Subsequently, on December 4, 2015, Hickey and his attorney met with the government for the first time.  *See* Ex. D; Ex. A at 3-11 (3500-JH-7).  Hickey agreed to three additional proffer sessions in 2015 and pleaded guilty pursuant to a cooperation agreement on January 15, 2016.  *See* Ex. A (3500-JH-9, -10, -13, -15).  Despite the fact that Mr. McPartland was considered a target of the government's investigation no later than December 2015, when he received a target letter (*see* Tr. 995:15-16), none of Hickey's 302s or MOIs for this time period reflect *any* discussion of *any* meeting among Hickey, Mr. McPartland and Burke concerning what could and/or should be said about Burke's actions vis-à-vis the Loeb assault.  Not a meeting in February 2013, not a meeting in any other time-period.  Nor is there any indication that Hickey disclosed his history of hallucinations.  To the contrary, the *only* reference to his October 2015 hospitalization is from his first proffer session:

████████████████████████████████
████████████████████████████████
███████████████████████████████[5]...

---

[5]  █████████████████████████████████████████████
████████████████████████████

Ex. A at 10 (3500-JH-7).[6]

It was not until October 2017 – nearly two years into his cooperation and after more than 20 hours spent with the government – that Hickey disclosed *for the very first time* an alleged meeting in Burke's office with himself, Burke, Mr. McPartland and William Madigan, to discuss what "the story" of the Loeb assault was going to be. Critically, however, this allegation not only came out of left field – two years into Hickey's cooperation – but Hickey alleged that it occurred at a different time period than he would ultimately testify to at trial, namely September, October or November of 2013. The relevant 302 states, in part, that



\* \* \*

<hr>

9



Ex. A at 61 (3500-JH-30).

Approximately three weeks after this interview session, and following almost two years of investigation, the government obtained an indictment against Mr. McPartland. Thereafter, Hickey met with and spoke by telephone with the government on at least six separate occasions. *See* Ex. E; Ex. A (3500-JH-32—37, 41-43). The various 302s and MOIs of these discussions do not contain any further reference to this supposed meeting in the Fall of 2013 (or at any other time).

**B.     Hickey's Trial Testimony**

**1.     The February 2013 Meeting**

In its direct examination of Hickey, the government – through leading questions – elicited testimony from Hickey that shifted the time-period for his prior recollection of a meeting in the Fall of 2013, to one that took place in February 2013. The relevant portion of the trial transcript is as follows:

> Q:     Sometime in February of 2013, do you recall a meeting in Mr. Burke's office with yourself, Mr. Burke and Mr. McPartland, the defendant, Chris McPartland?
>
> A:     Yes, I do.
>
> Q:     Can you describe that meeting and who said what during this meeting?
>
> A:     Burke and McPartland were trying to come up with a plausible explanation why Burke was at the 4th Precinct. They were discussing [the] possibility of Burke just being there to pop his head in and nothing more.

Q:    Who was saying what?

A:    Burke would propose to McPartland, should I say I wasn't there? You can't say that, McPartland would say. And then they would move on to a plausible explanation would be that they discussed that Burke would just say that he just popped his head in.

Q:    So who was the person making the propositions about what the story would be?

A:    Burke would make the proposition and McPartland would okay it or not.

Q:    Can you give us an example of something that Mr. Burke said and Mr. McPartland's response.

A:    Burke said that, if I just say I just stuck my head in and I just didn't know – and McPartland – I'm sorry. McPartland would say – and you didn't even know if the door was opened or closed.

Q:    Was there discussions about whether or not Mr. Burke could deny being at the precinct at all?

A:    That was the initial – that was the initial point. But it was – Chris immediately said that there were too many people. Too many people saw you. You couldn't say that.

* * *

Q:    Did you discuss further, yourself, the defendant Chris McPartland and Jim Burke, the story about what Mr. Burke could say about his presence at the 4th Precinct on that day?

A:    In February? Yes.

Q:    What else was discussed in February of 2013 between Mr. McPartland, yourself and Mr. Burke.

A:    Like I said, the fact that he was just doing it to – that just to pop his head in, see if he recognized the individual, Loeb.

Q:    Who said that?

A:    McPartland – Burke said it, McPartland okayed it.

11

Q:   So who proposed that Burke say I just popped my head in the room?

A:   Chris proposed it – I'm sorry – Burke proposed it, Chris okayed it.

Q:   When the defendant Chris McPartland is okaying something, what is he saying?

A:   He would do it with a nod of his head. Burke would propose it, Chris would nod his head yes, nod his head no. That's what he did.

Q:   Was there a discussion about whether the door to the interrogation room was open or closed in February of 2013?

A:   Just that it – that it didn't matter. Opened or closed, it didn't matter.

Q:   Who said that?

A:   Burke said it, Chris would say, yes, nod his head like that.

Tr. 1595:20-1599:8.[7]

Hickey was pressed about this brand-new allegation on cross-examination.  He agreed that this accusation, namely that "McPartland was vetting cover stories for Mr. Burke," was an "important one" and "significant."  *Id.* at 1955:20-24, 1956:13-15; 1983:21-23.  When challenged as to when he had first told the government of this allegation, Hickey was adamant that he had shared it with "the government from the very beginning. . . . It was Mr. McPartland who did the progression of theories with Burke, yes, and in front of me, and I told that to the government from

---

[7]   Hickey would subsequently put the alleged meeting in the approximate *February to March* time frame.  Tr. 1983:6-14.  Defendants have reviewed Hickey's March 2013 calendar. Ex. C. There is no reference to a meeting among Hickey, Burke and Mr. McPartland in that calendar either.

the beginning." *Id.* at 1956:4-8.[8]  As to any purported inconsistency between what was (and more importantly, was not) reflected in 302s and MOIs of his 17 proffers with the government, Hickey testified that he had disclosed "two separate meetings in Burke's office with McPartland, one in [the February 2013] timeframe that we're speaking of right now, and one by the Loeb suppression hearings which was a mock cross-examination that McPartland conducted on Burke in my presence." *Id.* at 1984:3-8.

### 2.      Disclosure of Hallucination History

Hickey testified on cross-examination that in his first meeting with the government, he disclosed the fact of his hallucinations in the days leading up to his October 2015 hospitalization. Hickey dramatically and unequivocally placed that alleged disclosure at the outset of the meeting, "before [he and the government] had even sat down." *Id.* at 1911:8-14 ("before we ever sat down, I explained to them . . . that the stress I was under I actually thought I saw people coming out to get me.  So, yes, we discussed that before we even sat down to the table"); *id.* at 1911:17-20 ("[the government] they kn[e]w about my paranoia."); *id.* at 1911:24-12:4 ("Q: So when you testified a few minutes ago that you did not tell them about your hallucinations, that was in error; is that right? . . . A: Yes, I told them before we even sat down"); *id.* at 1913:24-25 ("the United States Government knew all of that [including "that I thought people were coming to get me"] right away before we even sat down").

Significantly, this disclosure is not reflected *anywhere* in Hickey's 3500 material, let alone in the MOI that memorializes his first interview with the government.  Nor is it reflected in any of his attorneys' notes preceding Hickey's cooperation.  Nor is it consistent with the government's

---

[8]      While Hickey later testified on cross-examination that he did not recall when he had provided the information to the government, he insisted that he had at some point and concurred with defense counsel that it was provided "early on."  Tr. at 1958:12-22.

multiple pre-trial representations to defense counsel that Hickey had not suffered from hallucinations. *See* Decl. ¶ 16.

### 3. The Defense Inquiry Concerning Follow-up Visits with Medical Professionals

Issues surrounding Hickey's hospitalizations, the defendants' right to disclosure of the records pertaining to those hospitalizations, and their right to cross-examine Hickey on the subject of these hospitalizations were subjects of extensive pre-trial litigation, including a *Daubert* hearing. One of the subjects discussed on multiple occasions between the government and defense counsel – prior to trial – was whether there were any follow-up medical records related to those hospital records disclosed to the defense by Court order. More specifically, on August 19, 2019, the defense supplemented its multiple prior requests for Hickey's medical records, by making a specific request for "any" follow-up records of his October 2015 hospitalization. *Id.* at ¶ 26. On August 26, 2019, after receiving no response from the government, defense counsel had a telephone conversation with the government to address this issue. As set forth in the accompanying Declaration:

> still deeply concerned about the issue of Hickey's follow-up records, I spoke by phone with an AUSA on the trial team. In that call, I advised her, in substance, that I was very surprised and concerned that there were no follow-up medical records and that I wanted to make it clear that I was asking for medical records of any kind relating to any type of follow-up concerning Hickey's October 2015 hospitalization, whether for physical, mental or psychiatric conditions. I further advised her that I did not want to 'parse words' with her as to what was a mental condition versus a physical condition. The AUSA responded that she understood, that she had spoken to Hickey on the subject, and that he was 'prepared to testify under oath' that no such records existed, because he saw no doctors after October 2015 for any reason (with the possible exception of an eye doctor visit at Stony Brook hospital).

*Id.* at ¶ 28.  This conversation was memorialized by e-mail to the government of the same date, which stated:

> Thank you for speaking with me today.  This will confirm our conversation in which you advised me [that]:
>
> . . . You have spoken with James Hickey and he has confirmed, and is prepared to testify under oath, that other than his two hospitalizations that have been disclosed, for the time period 2013 to the present, he has not seen any medical professionals for any physical, mental, or psychiatric conditions (and therefore there are no records of such).

Ex. F.  The government confirmed the defense's recollection of this conversation by responding, "Yes."  *Id.*[9]

In spite of this representation, after the trial commenced, the government turned over to the defense – without any explanation – records of *four* follow-up visits with a doctor who had seen Hickey during his hospitalization.  Decl. ¶ 33.  On cross-examination, Hickey *denied* that he had ever been asked that question or that he made that statement.  Tr. 1917:20-23.  On redirect examination, the government reinforced Hickey's denial by eliciting testimony that he had only been asked about subsequent visits to a "psychiatrist or a therapist."  *Id.* at 2150:11-21.

In other words, the jury was led to believe that Hickey's denial was true when, in fact, the record suggests that it was not.  At sidebar, the government made the representation that any mistake had been its own:

> What happened was, I asked him, I always – counsel always kept talking about him following up with his psychiatric history.  I asked him if he followed up, just like I did, under oath.  He said he didn't. I was imprecise the way I spoke with him and in the e-mail.  When I was preparing him for trial, he met with the doctor before he met

---

[9]      When defense counsel sought to admit this e-mail exchange into evidence, the government objected, arguing that it was unfair to impeach Hickey with the government's statement.  *See* Tr. 2167:8-14.

> with [Chief] Cameron.  I made him get the records and gave them
> over.  I made a mistake.

*Id.* at 2165:13-21; *see also id.* at 2166:13-14.  Defense counsel responded on the record, "[t]o say [the government] made a mistake is galling to me.  I could not have been more clear.  I wasn't looking for [a] therapist or psychologist, I was looking for anything because I did not want to parse words." *Id.* at 2166:2-6.

### 4.  The Defense's Efforts to Obtain *Giglio* Material as to Hickey's Seemingly False Trial Testimony

On December 3, 2019, concerned that Hickey appeared to have testified falsely at trial (and with Hickey still on the witness stand), defense counsel wrote the government via email:

> Pursuant to *Brady* and its progeny, I request that prior to the continuation of my cross-examination of Mr. Hickey tomorrow, the government advise me of any testimony that Mr. Hickey gave on cross-examination today that it believes to be false.

Ex. G.  The government did not respond.  On December 7, defense counsel again advised the government that,

> to the extent that Hickey claimed in trial testimony to have said things to the gov[ernment] that he in fact did not say, the gov[ernment] would have an obligation to disclose that discrepancy to the defense.  There were many things on cross that seemed to me to fall into this category . . . .

Ex. H.  Still hearing no response, on December 9, defense counsel spoke with the government and asked, based on what appeared to be false testimony from Hickey, whether the government had any *Giglio* disclosure to make as to that testimony.  Decl. ¶ 15.  The government advised the defense that there was none.  *Id.*

## ARGUMENT

Rule 33(a) provides that on motion of the defendant, "the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  The Rule gives

the Court "'broad discretion . . . to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice.'"   *United States v. Ferguson*, 246 F.3d 129, 133 (2d Cir. 2001) (quoting *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992)).   Rule 33 "is not tethered to any particular deficiency," and may be a vehicle for bringing a wide variety of claims to the trial court's attention.  *United States v. Feng Ling Liu*, No. 12-CR-934 (RA), 2015 U.S. Dist. LEXIS 94899, at *20 (S.D.N.Y. July 20, 2015), *aff'd on other grounds sub nom. United States v. Bandrich*, 636 F. App'x 65 (2d Cir. 2016).   Those claims may include (as here) perjury or inaccurate testimony by government witnesses and *Giglio* violations.   *See*, *e.g*., *United States v. D'Angelo*, No. 02-CR-399 (JG), 2004 U.S. Dist. LEXIS 2239, at *46, *97 (E.D.N.Y. Feb. 18, 2004) (granting Rule 33 motion for perjury); *United States v. Arroyo*, 301 F. Supp. 2d 217, 229 (D. Conn. 2004) (granting Rule 33 motion for inaccuracy in testimony); *United States v. Triumph Capital Grp., Inc.*, 544 F.3d 149, 161-65 (2d Cir. 2008) (reversing district court's denial of a Rule 33 motion and ordering a new trial on multiple counts on the basis of a *Giglio* violation).   The defendant bears the burden of proving that he is entitled to a new trial under Rule 33.   *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009).   In resolving a Rule 33 motion, the district court must examine the entire case, take into account all the facts and circumstances, and make an objective evaluation.   *See United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013); *Ferguson*, 246 F.3d at 134.

Mr. McPartland submits that there are two grounds for Rule 33 motion relief on this record. First, the government elicited at trial, and/or failed to correct at trial, testimony from Hickey that appears to have been false, and that it knew or should have known to be false.   Second, the government failed to disclose this false testimony to the defense, as required by *Giglio*. Accordingly, Mr. McPartland respectfully submits that the evidentiary record warrants – indeed mandates – an evidentiary hearing on these issues (to the extent that the government disputes the

facts).  At such a hearing, Mr. McPartland will have an opportunity to establish his right to a new trial.

## I.     THE GOVERNMENT ELICITED AT TRIAL, AND/OR FAILED TO CORRECT AT TRIAL, TESTIMONY FROM HICKEY THAT IT KNEW OR SHOULD HAVE KNOWN TO BE FALSE

It is well settled that to challenge a conviction because of a prosecutor's knowing use of false testimony, a defendant must establish that (1) there was false testimony, (2) the Government knew or should have known that the testimony was false, and (3) there was a "reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Helmsley*, 985 F.2d 1202, 1205-06 (2d Cir. 1993) (citation omitted).  To carry his burden, the defendant need only prove falsity by a preponderance of the evidence.  *United States v. Ng Lap Seng*, No. 15-CR-706 (VSB), 2018 U.S. Dist. LEXIS 83441, at *47 (S.D.N.Y. May 9, 2018); *United States v. Sessa*, Nos. 92-CR-351 (ARR) & 97-CV-2079 (ARR), 2011 U.S. Dist. LEXIS, at *130-31 (E.D.N.Y. Jan. 25, 2011).  Once the defendant has demonstrated that the witness testified falsely, the next question is whether the government knew or should have known of the falsity.  If so, "the conviction must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."  *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991) (internal marks and citations omitted); *see Reyes v. Ercole*, No. 06-CV-5525 (SHS), 2018 U.S. Dist. LEXIS 51595, at *37 (S.D.N.Y. Mar. 26, 2018) ("the 'could have' materiality bar is so low that it has been said to make relief 'virtually automatic' upon a showing that the prosecution knowingly used perjury at trial" (quoting *Wallach*, 935 F.2d at 456)), *aff'd*, 785 F. App'x 26 (2d Cir. 2019).  Accordingly, "if it is established that the government knowingly permitted the introduction of false testimony, reversal is 'virtually automatic.'"  *Wallach*, 935 F.2d at 456 (citations omitted); *see also Fernandez v. Capra*, 916 F.3d 215, 230 (2d Cir. 2019) (citing

"virtually automatic" language approvingly); *Magnotta v. Berry*, 906 F. Supp. 907, 921 (S.D.N.Y. 1995) ("This standard has been liberally interpreted in favor of defendants, and thus 'if it is established that the government knowingly permitted the introduction of false testimony reversal is virtually automatic'" (quoting *Wallach*, 935 F.2d at 456) (internal marks and citation omitted). Moreover, even if the government had no reason to be aware of the witness's perjury, a new trial is still warranted if the perjured testimony was material and, without it, "the defendant would most likely not have been convicted." *Id.* (internal marks and citations omitted).

**A.     A Preponderance of the Evidence Indicates that Hickey Testified Falsely**

**1.     The Supposed February 2013 Meeting**

Hickey's testimony about the February 2013 Meeting was the single most explosive allegation against Mr. McPartland at trial.  It established a direct connection between Mr. McPartland and the false narrative of the Loeb assault as told by Bombace and Leto at trial.  Indeed, the government previewed this testimony in its opening statement, telling the jury that they would hear that Mr. McPartland was the "architect of the lies," Tr. 30:14-15, and returned to this testimony in its summation, telling the jury that "McPartland judged the plausibility of Jimmy Burke's lies and helped create a false narrative in order to cover up Burke's assault of Loeb." *Id.* at 3284:22-25.

But Hickey's testimony, we submit, clearly was false.  For one, it is simply unfathomable that if Hickey actually recalled that Burke and Mr. McPartland had met in February 2013 in order to construct a false narrative of the Loeb assault, Hickey would not have shared that information with the government *immediately,* or at the very least, prior to his guilty plea in January 2016.  Yet, that allegation is wholly absent from the notes and memos of *all 17* of the interview sessions for which the defense was provided with interview reports, which span almost four years.  Nor is it

conceivable that if Hickey actually did share that critical information with the government, it went unrecorded in the reports of those interviews.  Likewise, it makes no sense that – if Hickey's testimony is true – there is similarly no reference to such a meeting in any of Hickey's own notes or calendar entries (which the government otherwise relied on extensively for purported corroboration and when it suited its purposes[10]), in his attorneys' notes, in any government pretrial submission or in either of the government's two search warrant applications in this case (both of which summarize the key evidence against Mr. McPartland).  *See* Decl. at ¶ 13.

Hickey's testimony also does not square with his only recorded prior statement about a similar sounding meeting – which he purports to have remembered in October 2017, *almost two years into his cooperation* – to the effect that a "coaching" meeting took place in the ████ ████████████████████ timeframe, in anticipation of the Loeb suppression hearing.  Ex. A at 61 (3500-JH-30).  The charges in this case were filed approximately three weeks after this revelation from Hickey.

This allegation always lacked credibility, not only because it appeared out of thin air two years into his cooperation, but because multiple witnesses testified at trial that the false narrative

---

[10]     *See, e.g.*, Tr. 3338:11-14 ("These phone records 100 percent bear out Jim Hickey's version of events as does his calendars and every other piece of physical and documentary evidence you've seen in this case"); *id.* at 3339:2-3 ("Hickey remembers that event and it's in his calendar"); 3349:6-7 (government summation: "And, by the way, if you look at Jim Hickey's calendar for that day, you know that he was there."); *id.* at 3359:9-3360:9  (pointing to the calendar as important collaboration generally ("one of the things he did he tried on certain critical events to make calendar entries to help him remember what happens and to document what happens. . . . I submit to you that Mr. Hickey kept these calendars contemporaneously with the events that occurred") and for the June 4, 2015 meeting specifically, *e.g.*, the calendar "is proof positive along with the phone call, the Conway phone call and all the other information you heard about that June 4th meeting"); *id.* at 3377:6-9 ("He didn't have to make up things about other people.  He had them dead to rights.  He had the meetings and the calendar entries and the phone calls"); *id.* at 3529:10-12 ("And you saw [the corroboration], phone calls, calendar entries, witnesses, cell site records").

of the Loeb assault was conceived in *March 2013*, at a meeting where Mr. McPartland was *not* present.  That meeting was described by Bombace and Leto as having been held, together with Burke, for the express purpose of getting their stories straight in anticipation of their meetings with Special Prosecutor Crusco.  *See* Tr. 655:3-658:20; 660:15-661:20; 1219:7-1220:22.  In light of that testimony, it would be nonsensical for Mr. McPartland and Burke to "float[] ideas" to iron out "the story" in the Fall of 2013, when that story had already been locked in by April 2013, when Bombace and Leto met with ADA Crusco.  *Id*. at 655:3-658:20; 660:15-661:20; 1219:7-1220:22. Of course, this fundamental illogic was "cured" at trial by Hickey testifying that the alleged "coaching" meeting occurred in February 2013, *before Bombace, Leto and Burke had met with ADA Crusco.*

On cross-examination, Hickey attempted to explain away this glaring inconsistency by testifying that he had disclosed to the government "two separate meetings in Burke's office with McPartland, one in [the February 2013] timeframe that we're speaking of right now, and one by the Loeb suppression hearings which was a mock cross-examination that McPartland conducted on Burke in my presence," *id.* at 1984:3-8, and that Hickey disclosed the February 2013 Meeting "early on" in his cooperation, *id*. at 1958:19-22.  But it simply strains credulity to suggest that Hickey in fact told the government about these two meetings, but *only one* was memorialized in the October 2017 memorandum of interview.   Accordingly, a preponderance of the evidence clearly establishes that Hickey's testimony about the supposed February 2013 Meeting was false, or at the bare minimum, that the defendant is entitled to a hearing to establish this claim.

## 2.   Hickey's Claim to Have Disclosed the February 2013 Incident at the "Beginning" of His Cooperation

When pressed on cross-examination, Hickey testified that he told the government about the critical February 2013 Meeting "from the very beginning [of his cooperation] … It was Mr.

McPartland who did the progression of theories with Burke, yes, and in front of me, and I told that to the government from the beginning." *Id*. at 1956:4-8.  Yet again, this testimony cannot be squared with the 3500 material, which is utterly silent as to this accusation.  Since such a critical and devastating allegation would surely have been memorialized in a memorandum of interview, the only inference to draw is that Hickey lied when he claimed to have made this allegation to the government "from the beginning," *id*.  Moreover, since the government was an eyewitness to these interviews, the record evidence suggests strongly that the government was aware, or should have been aware, of this falsity.  Accordingly, a hearing is therefore mandated (assuming the government contests these facts), so that Mr. McPartland can establish his right to a new trial.

### 3. Hickey's Supposed Disclosures to the Government Relating to His Medical History

At trial, Hickey testified that he told the government about his hallucinations at the outset of his first meeting with them, indeed, before anyone had even "sat down." *Id*. at 1912:4-6.  Yet again, there is not a single reference in the 3500 material to suggest that this is true.  *See supra*. Moreover, the suggestion that such an important statement would go unrecorded in the interview notes is simply not conceivable, and plainly supports the conclusion that Hickey's testimony in this regard was false, and that the government knew of that falsity.

The same is true with respect to Hickey's testimony that he was not asked by the government, prior to the start of the trial, whether he had any follow-up medical visits subsequent to his release from the hospital in October 2015.  *Id.* at 1917:20-23 ("Q: Is it your testimony that prior to a month from today the Government had never asked you if you had any follow-up visits with any medical providers of any kind? A: That's correct.").  As described above, *supra*, this testimony does not square with the government's pre-trial representation – made both orally and in writing in August 2019 – that Hickey had "confirmed, and is prepared to testify under oath, that

other than his two hospitalizations that have been disclosed, for the time period 2013 to the present, he has not seen any medical professionals for any physical, mental, or psychiatric conditions (and therefore there are no records of such)."  Ex. F; Decl. ¶¶ 28-30.  On re-direct examination, the government attempted to neutralize this subject by asking Hickey whether it had "ask[ed him] questions about whether [he had] seen a psychiatrist or a therapist after [his] 2015 hospitalization." Tr. 2150:10-14.  Hickey testified that this was accurate, and that he had advised the government that no follow-up visits were necessary in this respect because he "felt fine."  *Id.* at 2150:11-21.

Given the government's phone call with defense counsel on August 26, 2019 (in which it stated point blank that it had asked the question of Hickey and he was prepared to testify "under oath" that there was no follow-up medical care), it is simply inconceivable that, in fact, the government *had not* asked that question and that Hickey *had not*, in fact, made that representation to the government.  Moreover, the defense plainly set forth this representation in its opposition to the government's motion *in limine* to preclude any and all cross-examination of Hickey on the subject of his October 2015 hospitalization.  *See* Decl. ¶ 30.  And while the government claimed in a side-bar that it had been "imprecise [in] the way [it] spoke with him and in the e-mail" (Tr. 2165:17-18), this is simply not an adequate explanation, given all that had transpired as to the issue of Hickey's medical records.  Indeed, the government is asking the Court to believe that despite all of the pre-trial litigation over these records and counsel's repeated requests for information about *any* post-hospitalization medical treatment of Hickey, it never once asked Hickey – prior to trial – if he had ever visited a doctor or medical professional as a follow-up to his October 2015 hospitalization.  Under these circumstances, and with all due respect, a hearing is plainly mandated in order to evaluate the credibility of the government as to this allegation.

**B.      The Government Knew or Should Have Known of the Perjury**

Mr. McPartland respectfully submits that the government knew or should have known of the falsity of Hickey's testimony concerning (1) the February 2013 Meeting, (2) when he first disclosed that alleged meeting to the government, (3) when (if ever) he disclosed having had hallucinations to the government, and (4) whether he was asked about follow-up medical treatment prior to trial and responded that none occurred.

The Second Circuit's decision in *Wallach* is instructive.   In that case, one of the government's two key witnesses – whose testimony was "critical to the government" – perjured himself on a collateral matter (here it is anything but collateral) by testifying at trial that he had stopped gambling in the summer of 1988.  935 F.2d at 455.  The defense impeached that testimony on cross-examination by showing that in September and October 1988, the witness had signed markers for $65,000 in gambling chips at an Atlantic City casino; however, the witness testified that he had just converted some of the chips into cash and given others to a friend, but did not gamble with them.  *Id*. at 455-56.  The defense then proffered testimony from a casino employee and written records from the casino showing that the witness had placed bets in October 1988, although the trial court refused to admit that evidence.  *Id*. at 456.

Under these circumstances, the Second Circuit held that the government should have been aware of the witness's perjury.  *Id*. at 457.   "[G]iven the inconsistencies in his statements," the court held, "the government should have been on notice that [its witness] was perjuring himself." *Id*.  Moreover, defense counsel "placed before the government and the court powerful evidence that [the witness] was lying.  Although this information was not formally admitted into evidence, it nonetheless cast a dark shadow on the veracity of [the witness's] statements."  *Id*.  Given those facts, the court "fear[ed] that given the importance of [the witness's] testimony to the case, the

24

prosecutors may have consciously avoided recognizing the obvious – that is, that [the witness] was not telling the truth." *Id.*

Just as in *Wallach*, Hickey's testimony as to all four categories set forth above was not credible on its face.  Moreover, as to the aspects of Hickey's testimony relating to when he had provided certain information to the government, the government was itself an eyewitness – and thus would have been in the best possible position to have known of its falsity.  It bears noting that the government was fully aware of the prior judicial and agency determinations that Hickey had committed perjury, and that Hickey had pleaded guilty in this case to conspiring to obstruct justice – among the many grounds for it to be highly cautious in accepting his word.  Tr. 2004:1-2005:25; 2006:18-23; 2007:12-14; 2007:15-25; 3500-JH-2.  Moreover, he was a cooperating witness whose testimony had to be carefully scrutinized by the government, before presenting it to the jury.  Indeed, the government essentially told the jury to rely on its vetting of Hickey's information, when it argued, in rebuttal summation:

> Do you really think we didn't do our homework? That we would just put him up here to testify against a district attorney without trying to corroborate every single detail of his testimony that was humanly possible?

Tr. at 3529:5-9.  Under these circumstances, a hearing is plainly mandated.

### C.    Hickey's False Testimony Was Material

Just like the witness in *Wallach*, Hickey was "the centerpiece of the government's case." 935 F.2d at 457.  If his perjury had been brought to the jury's attention, as in *Wallach*, "his entire testimony may have been rejected," and the government's case against Mr. McPartland would likely have collapsed.  *Id.*; *see id.* at 455-58 (reversing on undisputed evidence of perjury and where the witness, who lied about the collateral issue of his gambling history, "offered the only testimony that directly linked the defendants with the admittedly illegal conduct" and where the

witness' testimony "was essential to the government's case; indeed he tied all the pieces together"); *see also United States v. Browne*, 130 F. Supp. 2d 552-557 (S.D.N.Y. 2001) (relying "heavily" on *Wallach* and granting a new trial where the "central witness for the government," whose testimony "was the case's keystone," perjured himself on a collateral matter, even where the prosecution team could not possibly have known of the perjury); *United States v. White*, 972 F.2d 16, 21 (2d Cir. 1992) (noting that the Court in *Wallach* reversed, even where the perjured testimony involved a collateral matter, because "the perjured testimony was given by the Government's primary witness, the 'centerpiece of the government's case'" (quoting *Wallach*, 935 F.2d at 457)).

There can be no dispute that Hickey was the government's key witness. In its opening statement, the government told the jury he would be providing direct evidence of the defendants' alleged obstruction.[11] Indeed, Hickey was the *only* witness at trial to provide direct evidence of the charged offenses, by testifying that the defendants allegedly knew Burke had assaulted Loeb and that, by their alleged statements and actions, they endeavored to cover up the assault. The government's rebuttal summation speaks for itself: "Jim Hickey is game over for the defendants. If you believe what Jim Hickey told you in this courtroom, there is no question both of these

---

[11]     *See, e.g.*, Tr. at 37:22-25 (explaining that the jury would hear from Hickey, who was "instructed by Burke and the defendants to make sure that the detectives who witnessed Burke's assault of Loeb kept their mouths shut, stuck to the script, and perpetuated the agreed-upon lies"); *id.* at 38:21-39:5 ("Jim Hickey is going to take you inside the conspiracy, into the inner circle of Burke's friends, confidants [sic] and allies. He's going to bring you right to the people who put Burke in power and who desperately fought to keep there, the defendants. There is no better witness to take you inside the conspiracy than someone like Hickey, precisely because he was the defendants' pick. He's their guy, brought into the conspiracy by them, and trusted to keep the cover-up running smoothly"); *id.* at 41:13-15 (indicating that Hickey was the only source of direct proof of guilt by urging the jury to "see that all this other evidence in this case confirms and supports what Hickey will tell you happened during the course of the conspiracy").

defendants are guilty of each and every single offense in the indictment, without question."  Tr. 3517:22-3518:1.  Indeed, the government in summation pointed to Hickey's testimony about a June 4, 2015 meeting *alone* as direct proof sufficient to convict both defendants on every count in the indictment.  *Id.* at 3360:9-16 ("If you believe that June 4th meeting happened the way Jim Hickey said, the defendants are guilty of all four counts in the indictment, both of them.  If you believe that that event, that June 4, 2015 happened just the way Jim Hickey said, you look at the corroboration in the phone records, if you believe that the defendants are guilty of every single count in the indictment.").

There can similarly be no dispute that the alleged February 2013 Meeting related *directly* to the substantive offenses, and was not collateral.  Hickey's false testimony established the government's theme that Mr. McPartland was the "architect of the lies" and, as a corollary, the architect of the alleged conspiracy altogether.  This puts Mr. McPartland's arguments on even stronger footing than those advanced in *Wallach* and *Browne*, where the testimony at issue concerned only collateral matters.

### D.      On This Showing, Mr. McPartland is Entitled to an Evidentiary Hearing

Based on the existing record, and assuming that the government disputes the key factual issues, a hearing is plainly mandated so that the defense can establish that Hickey testified falsely and that the government knew or should have known of that falsity.  *See Florez v. United States*, No. 07-CV-4965 (CPS), 2009 U.S. Dist. LEXIS 63826, at *36 (E.D.N.Y. July 24, 2009) ("evidentiary hearing is necessary only where a petitioner establishes a 'plausible claim' of perjury"); *United States v. Brown*, No. 86-CR-738 (CSH), 1987 U.S. Dist. LEXIS 6751, at *1 (S.D.N.Y. July 29, 1987) (ordering an evidentiary hearing where the record "suggest[ed] at least the possibility of" perjured testimony by the government's "principal witness"); *see also United*

*States v. Pavloyianis*, 996 F.2d 1467, 1471 (2d Cir. 1993) (where, post-conviction, the prosecution revealed a key witness' perjury, noting that the district court had scheduled a hearing concerning what "the prosecutor knew or should have known" about the witness' "veracity at trial"); *Podlog v. United States*, Nos. 97-CV-3292 (JFK), S2-CR-374 (JFK), 2003 U.S. Dist. LEXIS 8904, at *2 (S.D.N.Y. Apr. 22, 2003) (reflecting evidentiary hearing on Rule 33 motion for new trial "to determine the issue of [the cooperating witness'] alleged perjury"), *aff'd*, 2005 U.S. App. LEXIS 738 (2d Cir. 2005); *United States v. LaGrua*, Nos. 98-1323 (L), 98-1568, 1999 U.S. App. LEXIS 12091, at *13-14 (2d Cir. June 11, 1999) (no error in district court's denial of evidentiary hearing where, *inter alia*, alleged perjured testimony came from a "minor witness" whose "testimony was introduced only to provide partial corroboration for that of other, more important, witnesses").

For similar reasons, an evidentiary hearing is warranted even if the government was not on notice that Hickey gave false testimony. Even under the higher standard that applies in such cases, it is clear that "but for the perjured testimony, [Mr. McPartland] would most likely not have been convicted." *See Wallach*, 935 F.2d at 458-59 ("[D]espite the presence of other impeaching material during the trial[,] the disclosure of the witness' false statement would have had a tremendous impact on the jury's credibility assessment"); *United States v. Seijo*, 514 F.2d 1357, 1364 (2d Cir. 1975) ("The taint of [a witness's] false testimony is not erased because his untruthfulness affects only his credibility as a witness."). Accordingly, a hearing is mandated so that Mr. McPartland can establish falsity, whether or not the government knew of that falsity.

## II.    ANY KNOWING FAILURE BY THE GOVERNMENT TO DISCLOSE HICKEY'S FALSE TESTIMONY AMOUNTS TO A *GIGLIO* VIOLATION

If the government was in fact aware of Hickey's false testimony, its failure to disclose that to the defense is also a *Giglio* violation(s) so prejudicial that a new trial is required. Indeed, there is ample Circuit precedent for granting a Rule 33 motion on *Giglio* violation grounds, particularly

where the violation concerns a critical government witness, as Hickey was here.  *See*, *e.g.*, *Triumph Capital*, 544 F.3d at 161-65 (reversing district court's denial of a Rule 33 motion, and ordering a new trial on multiple counts, where the government failed to disclose an FBI agent's notes of an attorney proffer which revealed a version of events materially inconsistent with the witness' trial testimony); *United States v. Rivas*, 377 F.3d 195, 197, 199 (2d Cir. 2004) (vacating district court's denial of a Rule 33 motion, and ordering a new trial, based on newly discovered information about a key government witness's final (and previously undisclosed) interview with the government prior to his trial testimony; witness gave "the critical testimony inculpating [the defendant]"); *Seijo*, 514 F.2d at 1364, 1365 (new trial ordered where "crucial" government witness' "credibility was the decisive factor" at trial and "his false and conscious concealment of the prior conviction renders the uncorroborated substance of his testimony suspect").

Simply put, if Hickey testified falsely and the government was aware of or should have been aware of that fact, it had an incontrovertible obligation to correct the testimony or to disclose that falsity to the defense.  Moreover, Mr. McPartland is entitled to a new trial if that suppressed information is material.  *United States v. Spinelli*, 551 F.3d 159, 164 (2d Cir. 2008); *United States v. Wong*, 78 F.3d 73, 79 (2d Cir. 1996).  Here, the materiality prong is easily satisfied.

Evidence is "material" for these purposes where, based on consideration of the entire record, there is a "reasonable probability" that had the evidence been disclosed to the defense, the result of the proceeding may have been different.  *United States v. Bagley*, 473 U.S. 667, 682 (1985); *see also Kyles v. Whitley*, 514 U.S. 419, 434 (1995) ("*Bagley*'s touchstone of materiality is a 'reasonable probability' of a different result, and the adjective is important.  The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a

29

verdict worthy of confidence" (citation omitted)).  "Reasonable probability," in turn, is defined as a probability sufficient to undermine confidence in the outcome.  *United States v. Payne*, 63 F.3d 1200, 1209 (2d Cir. 1995).  In considering materiality, the Court is to consider what "skilled counsel" could have done with the withheld evidence.  *See, e.g.*, *Sperling*, 506 F.2d at 1333 (reversing certain counts of conviction and remanding for new trial based on what "skilled counsel" would have been able to do with undisclosed Jencks material); *Graves v. Smith*, No. 02-CV-6550, 2012 U.S. Dist. LEXIS 41354, at *32 (E.D.N.Y. Mar. 23, 2012) (noting the "skill and force of the cross-examiner" and that, armed with knowledge of a government witness' criminal record, "the credibility of this key witness would have been attacked more forcefully"), *aff'd sub nom Graves v. Phillips*, 531 F. App'x 27 (2d Cir. 2013).

A *Giglio* or *Brady* omission must be evaluated "in the context of the entire record."  *United States v. Agurs*, 427 U.S. 97, 112-13 (1976).  "Suppressed impeachment evidence is *necessarily* material where the witness at issue 'supplied the only evidence linking the defendant(s) to the crime.'"  *Graves*, 2012 U.S. Dist. LEXIS 41354, at *34-35 (emphasis added) (quoting *Payne*, 63 F.3d at 1210); *see also United States v. Avellino*, 136 F.3d 249, 256 (2d Cir. 1998) ("In general, evidence whose function is impeachment may be considered to be material where the witness in question supplied the only evidence linking the defendant to the crime"); *Wong*, 78 F.3d at 79 (impeachment material is more likely to be deemed material "if the witness whose testimony is attacked 'supplied the only evidence linking the defendant(s) to the crime'" (quoting *United States v. Petrillo*, 821 F.2d 85, 90 (2d Cir. 1987)); *Seijo*, 514 F.2d at 1364 ("when the reliability of a particular witness may be determinative of innocence or guilt, a 'new trial is required if the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury'") (quoting *Giglio v. United States*, 405 U.S. 150, 154 (1972)); *United States v. Bin Laden*, 397 F. Supp. 2d

465, 514 (S.D.N.Y. 2005) ("where 'the Government's case depend[s] almost entirely on [the impeachable witness's] testimony,' the Government's suppression of significant impeachment material warrants a new trial" (quoting *Giglio*, 405 U.S. at 154)), *aff'd sub nom. In re Terrorist Bombings of U.S. Embassies*, 552 F.3d 93 (2008).

Here, the materiality of the challenged testimony is obvious. Hickey was the government's key witness at trial – indeed, the only witness offering direct evidence of the defendants' alleged guilt. Given Hickey's prominence in the government's case, it is obvious that skilled counsel, armed with the knowledge that Hickey had testified falsely at trial, could likely have argued in devastating fashion that his entire testimony should be disregarded by the jury. Indeed, where (as here) the allegation is that the witness testified falsely at trial, materiality is easily found. *See Wallach*, 935 F.2d at 457 ("It was one thing for the jury to learn that [the witness] had a history of improprieties; it would have been an entirely different matter for them to learn that after having taken an oath to speak the truth he made a conscious decision to lie."); *Browne*, 130 F. Supp. 2d at 557 ("A juror may well find that a lie during the trial itself is far more egregious than a lie told prior to the trial. . . . If the jury had been told that [the witness] lied to them at trial, the jurors may have discredited a great deal – if not all – of his testimony").

In *United States v. Seijo*, for example, the Second Circuit reversed and remanded for a new trial based on newly discovered impeachment evidence as to the "crucial" government witness on whom the "essence of the Government's case . . . reside[d]." Even though the witness had been subject at trial to lengthy and damaging cross-examination on a number of topics, defense counsel had been deprived of evidence that the witness lied *at trial* about whether he had had any prior convictions. The Court concluded that although there had been extensive cross-examination on other subjects, the false denial had a "different and more serious bearing" than other damaging

31

admissions on cross and "cannot be said to constitute merely cumulative impeaching material." *Id.* at 1364.

So too here, knowledge that Hickey had lied to the jury would have been devastating in the hands of skilled counsel.  Indeed, if Mr. McPartland's counsel had been armed with the falsity of (1) Hickey's account of the February 2013 Meeting, or (2) his claims as to when he disclosed that alleged meeting to the government, or (3) his claim as to when he told the government about his hallucinations, or (4) his claim that he had never been asked by the government, prior to trial, for any follow-up medical records, he could easily have made a persuasive argument that Hickey had committed perjury *to the very jury deciding the case,* and thus, that his testimony should be disregarded in its entirety.

For these reasons, just as an evidentiary hearing is mandated to provide Mr. McPartland with an opportunity to establish that Hickey testified falsely and that the government was aware or should have been aware of that falsity, so too a hearing is required to determine if the government engaged in material *Giglio* violations.  *See*, *e.g.*, *United States v. Schlesinger*, 438 F. Supp. 2d 76, 95 (E.D.N.Y. 2006) (ordering an evidentiary hearing on a motion for a new trial "to resolve the disputed facts and to develop the record on the materiality of the alleged *Giglio* material, as well as the government's actual or constructive knowledge of such information").

## CONCLUSION

For the foregoing reasons, defendant Christopher McPartland respectfully submits that, unless the government concedes the relevant facts, he is entitled to an evidentiary hearing to establish his right to a new trial.

Respectfully submitted,

_____
Larry H. Krantz
Lisa Cahill
KRANTZ & BERMAN LLP
747 Third Avenue, 32nd Floor
New York, NY 10017
(212) 661-0009

Bradley R. Gershel
BALLARD SPAHR LLP
1675 Broadway, 19th Floor
New York, NY 10019
(212) 223-0200

*Counsel for Mr. McPartland*