UNITED STATES DISTRICT COURT            <u>For Online Publication Only</u>
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
UNITED STATES OF AMERICA,

             -against-                           **<u>MEMORANDUM &
ORDER</u>**
                                                         17-CR-587 (JMA)
CHRISTOPHER MCPARTLAND, and
THOMAS J. SPOTA,

                         Defendants.
-----------------------------------------------------------------------X
**AZRACK, United States District Judge:**

In December 2019, Defendants Christopher McPartland and Thomas Spota were each convicted of witness tampering, conspiracy to tamper with witnesses, obstruction of justice, and of being an accessory after the fact.  Currently pending before the Court is Defendants' post-trial motion claiming the government's star witness, James Hickey, committed perjury at trial and that the government violated its <u>Brady</u>/<u>Giglio</u> obligations.  Defendants' motion, brought under Federal Rule of Criminal Procedure 33, primarily seeks an evidentiary hearing to allow Defendants to further develop the record in support of their perjury and <u>Brady</u>/<u>Giglio</u> claims.  Defendants also assert, in passing, that they can establish perjury based on the current record and, as such, are entitled to a new trial even absent an evidentiary hearing.  For the reasons stated below, their motions for a hearing and a new trial are denied.

## I.  BACKGROUND

### A.  <u>The Evidence at Trial</u>

#### 1.  Background

From January 1, 2012 until October 27, 2015, James Burke was the Chief of Department for the Suffolk County Police Department, the highest-ranking officer on the force.  Defendant

Thomas Spota was the Suffolk County District Attorney.  He was elected in 2001 and held that position until the end of 2017.  (Tr. 2405–07.)  Defendant Christopher McPartland worked with Spota at the District Attorney's Office until December 2017.  During the events in question, McPartland was the Chief of the Government Corruption Bureau and the Investigations Division. (Tr. 861.)

Lieutenant James Hickey was the commanding officer of the department's criminal intelligence division.  (Tr. 1530, 1535.)  Hickey testified that he was part of an "inner circle" with Spota, Burke, McPartland and William Madigan, the Chief of Detectives.  (Tr. 1534.)  At trial, Hickey testified, pursuant to a cooperation agreement, as the government's star witness.

On the morning of December 14, 2012, Burke discovered that his car had been broken into and that a number of items were stolen, including his gun belt, ammunition, PBA cards, pornography, sex toys, and a Viagra prescription with Burke's name on it.  (Tr. 370–75, 417, 424–25, 431, 1566.)

Later that day, officers found Burke's items in the possession of Christopher Loeb, a heroin addict, during an unrelated probation search of Loeb's residence.  (Tr. 558–60, 564, 413, 645–50.) Loeb was taken to the Fourth Precinct and placed in an interrogation room where he was assaulted by Burke, Detective Kenneth Bombace, and Detective Anthony Leto.  (Tr. 574, 577–78.) Detective Michael Malone also witnessed the assault.  (Tr. 645.)  All three detectives worked in the criminal intelligence division under Hickey.  (Tr. 1530, 1535.)

The charges against Defendants Spota and McPartland stemmed from the ensuing cover-up of the assault.  Burke had extremely close relationships with both Spota and McPartland, the

details of which were set out extensively at trial and provided critical context to explain the involvement of Spota and McPartland in the cover-up of the assault.[1]

Beginning on December 14, 2012, the day of Loeb's arrest and assault, McPartland's Government Corruption Bureau handled the criminal case against Loeb.  (Tr. 899–922.)  On February 8, 2013, in a meeting with the assigned prosecutor, Loeb's lawyer alleged that Loeb was beaten by Burke and sought discovery on this issue.  (Tr. 923–32.)  After this meeting, Spota sought, and eventually obtained, the appointment of a special prosecutor from the Queens District Attorney's Office to handle Loeb's criminal case.  (Tr. 932–34.)

The detectives would eventually meet with the Special Prosecutor in the Spring of 2013.  (Tr. 660, 1222–24.)  Then, on June 25, 2013, Bombace, Leto, and other officers were served with federal subpoenas.  (Tr. 664–65, 1614.)  However, none of the officers who had witnessed the assault cooperated with the federal investigation.  (Tr. 507, 529, 672.)  In October and November 2013, the state court judge presiding over Loeb's criminal case held a suppression hearing where Leto testified and lied about the assault of Loeb.  Eventually, in December 2013, the federal investigation was closed.

In the fall of 2014, an incident occurred at the Central Islip Federal Courthouse involving Suffolk County detectives, which raised suspicions amongst Burke, McPartland and Spota that Bombace might be cooperating with the federal authorities.  (Tr. 1667–75.)

Then, on June 3, 2015, Bombace learned from his lawyer that the federal investigation into the Loeb assault had been reopened.  Despite the efforts by Defendants and Burke to obstruct the investigation, in September and October 2015, Bombace and Leto decided to cooperate and

---

[1] One example of this was a 2011 letter Spota wrote to advance Burke's bid to become Chief.  In the letter, Spota mispresented and covered up an incident from the 1990s in which Internal Affairs had investigated Burke and concluded that he was involved in a sexual relationship with a prostitute who ended up obtaining his service weapon. (See Tr. 257–67, 300–306, 2356–3261, 3563–3564, 3574–3575.)

testified in the grand jury.  (Tr. 768, 1287–90, 1944, 3013.)  Before the end of October, Burke would resign as Chief and Hickey would himself be served with a grand jury subpoena.  In December 2015, Hickey began to proffer with the government and Burke was arrested.

At trial, Hickey recounted how, beginning in 2013, he discussed the Loeb assault with Defendants and Burke and how he was tasked with ensuring that the detectives under him stayed quiet.  Hickey recounted numerous conversations in which McPartland and Spota:  (1) discussed the need to "keep [B]urke out of jail," keep Hickey's guys "quiet and tight," and "to not say anything about this"; and (2) repeatedly asked Hickey if Hickey's guys were "holding up" and if they "are they towing line" and are "okay."  (Tr. 1675, 1591–97, 1600, 1608–11, 1625, 1629.)

At one point, Burke stressed to Hickey that there were two questions for the detectives to answer—"Did you hit anybody?" and "Did you see anybody hit anybody"—and that the answers were "Two nos.  Period.  Not that fucking difficult."  (Tr. 1622.)

Hickey also testified, in great detail, about an important June 4, 2015 meeting, which was held the day after Bombace learned that the federal investigation had been reopened.  At this meeting, both Spota and McPartland threatened witnesses and, along with Burke, made numerous other incriminating statements.  (Tr. 1689–97, 1835–1849.)  At trial, the government argued that Hickey's account of this meeting alone was sufficient to convict Defendants.  (Tr. 3360.)

Hickey also recounted, inter alia, an August 17, 2015 meeting with Burke and McPartland where McPartland told Hickey that he "lost control of Bombace," whom McPartland called a "rat." (Tr. 1722–23.)

While Hickey's testimony provided the direct evidence of obstructive conduct by Defendants, the government introduced multiple witnesses and other pieces of evidence, including phone records and cell site data, that corroborated Hickey's testimony concerning Defendants.  For

example, at trial, Burke's girlfriend testified that Burke often spoke to McPartland during the summer of 2015 and that she overheard Burke tell McPartland that "if everyone would just be quiet, that this would all go away." (Tr. 2935–37.)  The evidence at trial also revealed, inter alia, two incidents that occurred after Burke's arrest and further corroborated Hickey's account of Defendants' involvement in the obstruction.  After Burke was arrested and pled guilty, he instructed his lawyer to tell Defendants that he was not cooperating with the government—a message that his lawyer passed on to Defendants. (Tr. 3022–23.)  Additionally, when McPartland needed money to pay for an attorney, he solicited and received a $25,000 cash loan from Burke's close friend in extremely suspicious circumstances that made it clear that McPartland knew the money was coming from Burke, who was in jail at the time.  (Tr. 2814–921.)

Defendants' motion for a new trial focuses on a few discrete aspects of Hickey's testimony in which Defendants contend Hickey perjured himself.  While the Court has considered all the evidence at trial, only the most relevant aspects of the trial testimony are recounted in detail below.

## 2. The February 2013 and September 2013 Coaching Sessions Involving McPartland and Burke

Hickey testified that he attended a meeting in February or March 2013 with Burke and McPartland where Burke and McPartland tried to come up with a "plausible explanation why Burke was at the Fourth Precinct" on December 14. (Tr. 1596, 1983.)  Hickey's testimony about this meeting is a primary focus of Defendants' post-trial motion.

According to Hickey, at this meeting, Burke and McPartland talked about the possibility that Burke was there just to "pop his head in and nothing more." (Tr. 1596.)  During this back-and-forth between Burke and McPartland, they discussed whether Burke should deny being at the precinct at all.  McPartland, however, shot down that idea, reasoning that too many people had seen Burke at the precinct. (Tr. 1596–97.)  Once it was decided that Burke had to admit he was at

the precinct, Burke suggested that he could say that he "just stuck [his] head in" to "see if he recognized" Loeb.  (Tr. 1596–98.)  McPartland approved this story as plausible and added that Burke could say that he "didn't even know if the door was opened or closed."  (Tr. 1956–98.)

Bombace and Leto also testified that they met with Burke in March 2013 concerning the fabricated narrative of the assault which they were to follow.

Bombace, who received immunity, testified that in March 2013, Hickey told him, Leto and Malone that they "were going to have to go in to meet with and talk with the special prosecutor . . . [and] that we needed to go and meet with the chief in his office to discuss this." (Tr. 656.)  Later that day, Bombace, Leto and Malone met with Burke, who told them "look, nothing happened here. . . . I might have poked my head in, the door might have been opened or it might have been closed.  It's not a big deal." (Tr. 657–58.)  According to Bombace, Burke told them that he popped his head in to see the suspect and did not provide any further explanation why it was necessary for Burke to see the suspect.  (Tr. 658.)  Bombace understood that he was to tell the special prosecutor this false story, which he did.  (Tr. 658–61.)

Leto, who pled guilty and cooperated with the government, also testified about these meetings with Hickey and Burke in March 2013.  Leto testified that when the detectives met with Hickey, they discussed whether they "should [] say the chief came in the room, just popped his head in the room, was [he] even in the building?  And we all agreed that was not a good idea." (Tr. 1217–18.)  According to Leto, at the subsequent meeting with Burke later that day, "[i]t was finally decided that what we would say [was that] the door was open and Chief Burke popped his head in and then left, just asked how everything was going and left."  (Tr. 1220.)  Leto testified that, in the meeting with Burke, different scenarios were discussed, including the possibility that Burke was not even at the precinct.  (Tr. 1299.)  According to Leto, that was ruled out because too

many people had seen him at the precinct.  (Id.)  Instead, Burke told the detectives he just "popped his head into where Loeb was and that was it."  (Id.)

During the summer of 2013, Hickey—acting at the direction of Burke and Defendants—ensured that the detectives stayed quiet in response to the federal investigation.  However, in Loeb's criminal matter, the state court scheduled suppression hearings to determine whether Loeb's statements to the officers at the precinct should be suppressed.  (Tr. 1643.)  According to Hickey, in advance of these hearings, Hickey, Burke and McPartland all met together in Burke's office in September 2013 to prepare Burke in case he had to testify at the suppression hearing.  (Tr. 1644–45, 1956.)  During this meeting, McPartland and Burke engaged in a brief mock examination during which they settled on a story that Burke stuck his head into the interrogation room to see "if he recognized Loeb from his neighborhood because . . . Burke, had an elderly mother who lived next door to him and the park across the street from his house was known for drug problems."  (Tr. 1645.)  At this meeting, they also discussed which of the detectives should testify at the suppression hearing.  (Tr. 1644–48.)  They agreed that Leto should testify because Malone was "too shaky" and Bombace was too inexperienced.  (Id.)

Shortly afterwards, Hickey met with the detectives at his house, where, as Bombace recounted, Hickey told the detectives that "they were sending" Leto in to testify.  (Tr. 676–78 (emphasis added), see also Tr. 724–26 (Bombace's testimony that Hickey told him that Malone was not selected to testify because "they felt that [Malone] was shaky") (emphasis added).)

Leto ended up testifying falsely at the suppression hearing in Loeb's criminal case, which was held over seven days in October and November 2013.  (Tr. 1249, 1649–51, 2222–23.)  Phone records for these dates show numerous calls amongst Burke, Spota, McPartland, Hickey, and

Madigan, who had been chosen by Defendants and Burke to act as the liaison with the special prosecutor and had observed the hearings. (Tr. 1604–06, 1651, 2222–2246.)

In its opening statement at trial, the government referred to McPartland as the "architect of the lies," pointing to the February 2013 meeting with Burke and Hickey. (Tr. 30.)  At trial, the defense argued that Hickey fabricated his claim about the February 2013 coaching session involving McPartland and Burke and that the only coaching session occurred between Burke and the three detectives.  In support of this argument, the defense also stressed that the alleged February 2013 meeting with McPartland and Burke did not appear on Hickey's calendar.[2]  Additionally, as discussed infra, the defense vigorously cross-examined Hickey about when he first disclosed the February 2013 meeting involving McPartland and Burke to the government.[3]

### 3. Hickey's August 2013 Hospitalization

In August 2013, while Hickey was in charge of keeping the detectives quiet, he was hospitalized for five days because of pancreatitis brought on by excessive drinking. (Tr. 1638–39, 1786–87.)  Hickey testified that he was binge-drinking in the summer of 2013 due to the stress he was under from the obstruction conspiracy.  (Tr. 1786–87.)  According to medical records from this hospitalization, Hickey reported that, at the time, he was drinking a bottle of wine and half a bottle of vodka daily.  (GX4000; Tr. 1632–33, 1787, 1905, 1938.)  Hickey testified that he never had another drink after his August 2013 hospitalization.  (Tr. 1638–39, 1788.)

---

[2] The government used entries in Hickey's calendar to corroborate his testimony.  Hickey testified that he documented events on his calendar because he "knew some day when this conspiracy collapsed, I wanted to be able to cooperate." (Tr. 1806–07.)

[3] Burke—who pled guilty in 2016 and had completed his prison sentence by the time of trial—could have been called by the defense to testify about this meeting and other events recounted by Hickey.  The defense, however, elected not to call Burke at trial.

### 4. Hickey's 2015 Hospitalization and Eventual Cooperation

At a meeting on October 15, 2015, Burke informed Hickey that Bombace had testified in the grand jury. (Tr. 1727.) Burke was scared and extremely paranoid during this meeting. (Tr. 1729–30.) During this time, Hickey was also paranoid and "stressed to the max." (Tr. 1731.) He was not sleeping, was always looking out the window, and "living on coffee." (Tr. 1731–32.)

On October 22, 2015, Hickey called Burke because he thought he "saw what appeared to be people outside [his] house." (Tr. 1732.) When Burke came to Hickey's house, his wife told Burke that Hickey "wasn't right and she was taking [him] to Huntington Hospital." (Tr. 1732.) Hickey was admitted to Huntington Hospital that night and was discharged on October 26. (GX4001; Tr. 1732–33.)

The records from Hickey's hospitalization recount that Hickey was seen in the hallway screaming at a family member and was experiencing "auditory/visual hallucinations." (GX4001.) The hospital records also state that while Hickey's wife was in the room, he pulled out his IV, screamed about a girl who was in danger and removed his gown and then ran off the unit toward the elevators. (GX4001.) Hickey continued to hallucinate and was given Haldol and eventually restrained and given a precedex drip to sedate him.[4] (GX4001.) Hickey testified that after sleeping for a day-and-a-half in the hospital, he felt a lot better. (Tr. 1734; see also 1376, 1379.)

---

[4] One note from the hospital record, which both parties focused on at trial, states:

> Wife reports that patient is a SCPD detective and that his work has been very stressful as they reopened a case and coworkers have been issued subpoenas. She reports that he slept less than 10 hours last week due to increased hours at work and fears of getting a subpoena himself. . . . Starting Sunday night [October 18], pt has been having [visual/audio hallucinations] of people outside his house, which he thought are out [to] get him, though no one can verify they were there. At a later date, wife reported that he saw his son in his living room and was talking to him even though his son was away at college. . . . There were more [visual/audio hallucinations] last night where he saw children eating ice cream in the hospital and thought he was selling them ice cream.

(GX4001.)

Although Hickey recalled his admission to the hospital, he testified that he did not remember most of his stay at the hospital and did not personally recall any of the delusions or hallucinations discussed above. (Tr. 1733, 1789.)  However, after his release from the hospital, his wife told him "about the various things not in detail, but she said [he] was in bad shape," and he was aware that he had been restrained in bed and had experienced hallucinations, delusions and paranoia in the hospital. (Tr. 1789, 1909-28.)

Hickey's hospital records indicate that he was initially diagnosed with a TIA (transient cerebral ischemic attack), which lay people would call a mini-stroke. (GX4001; see also Tr. 1349, 1377, 1437–38.)  By the end of his hospitalization, Hickey was ultimately diagnosed with altered mental status or delirium caused by lack of sleep and stress. (Tr. 1390, 1399, 1401, 1419, 1424–26, 1434–36, 1457–59, 1462, 1465–66.)  The parties sparred over these diagnoses, and Hickey's understanding of these diagnoses, at trial.[5]

On October 27, 2015, the day after Hickey was discharged from the hospital, Burke resigned. (Tr. 1759.)

On October 29, 2015, Stu Cameron—who had just been named Acting Chief of Department to replace Burke—called Hickey while he was at a follow-up doctor's appointment

---

[5]   At his early proffer sessions, Hickey only told the government that he had been hospitalized for a mini-stroke and did not tell the government that he had been diagnosed with altered mental status or delirium. (Tr. 1906–07.) At trial, Hickey testified that when he arrived at the hospital, he was told that he was having a mini-stroke and that he believed that he had had a mini-stroke brought on by stress and sleep deprivation. (Tr. 1733, 1788.)  On cross-examination, Hickey stated that by the time he left the hospital he was aware that his ultimate diagnosis was altered mental status and delirium. (Tr. 2176–77.)

At trial , the government argued that Hickey genuinely believed that he had only had a mini-stroke and that, at the very least, there was potential confusion about his diagnosis. (Tr. 3369, 3532, 3537–38.)  By contrast, the defense maintained that Hickey knew that his diagnosis had been changed to altered mental status or delirium and that Hickey did not disclose this fact to the government during his proffer sessions because he knew it could negatively impact his credibility and hurt his chances of receiving a favorable cooperation agreement. (Tr. 3369. 3389; 3409–11.)  The defense maintained that the government did not learn about Hickey's alcoholism and hallucinations until it obtained his hospital records in 2019—after it had already entered into a cooperation agreement with Hickey in 2016 and indicted Defendants in October 2017.  Thus, the defense contended that once the government learned about these issues with Hickey's credibility in 2019 it was too late for the government to change course. (Tr. 53, 3389, 3405.)

and asked him about a rumor that he had been admitted to "CPEP," a psychiatric emergency facility in Stony Brook.  (Tr. 140–41, 1735–36, 1760–61.)  Later that day, Hickey met with Cameron in person and told him that he felt fine and was "the same old Jimmy Hickey."  (Id.) Hickey did not tell Cameron about his hallucinations or the details of his hospitalization.  (Tr. 1923–24.)

On October 30, 2015, Hickey was served with a grand jury subpoena.  (Tr. 1737.)  That same day, Hickey met with Burke and learned that "Leto had collapsed in the grand jury."  (Tr. 1740–41.)

In November 2015, Hickey hired defense attorney Ed Sapone and met with him on four occasions that month.  (Tr. 1770.)  In preparation for his first meeting with Sapone, Hickey prepared four pages of notes to highlight some key points that he wanted Sapone to know.  (Tr. 1770.)  On December 1, 2015, Sapone met with the government for an attorney proffer session to relay what Hickey had told him and explain that Hickey was willing to cooperate.  (Tr. 1776.) Hickey began proffering with the government on December 4, 2015, and, as part of his cooperation with the government, pled guilty on January 15, 2016.  (Tr. 1929.)

**B.  The Trial**

Defendants were indicted in October 2017.  Jury selection for trial began on November 12, 2019 and opening statements commenced on November 14, 2019.

As discussed infra, prior to trial, the prosecution and the defense fought over the disclosure and admission of Hickey's medical records, which were ultimately admitted at trial.

Thirty-three days prior to trial, the government turned over to the defense 3500 material, which contained over 70 pages of 302 reports and agent interview notes from Hickey's proffer sessions.  (Gov't Opp'n Br. at 13.)  As part of his cooperation, Hickey met with the government

11

17 times between December 4, 2015 and November 11, 2019.  (Tr. 1777.)  Additionally, after November 11, 2019, Hickey also met with the government on three or four occasions to prepare for trial.  (Tr. 1777, 1935, 1982.)

During trial, the defense subpoenaed the notes of Hickey's attorneys.  After receiving the subpoena, Hickey took the extraordinary step of waiving attorney-client privilege and produced 75 pages of his attorneys' notes and outlines as well as four pages of notes that Hickey himself drafted in preparation for his first meeting with Sapone in November 2015.  (Tr. 1781–82.)

The defense conducted a vigorous and in-depth cross-examination of Hickey, utilizing the 302s and the various notes from the agents, Hickey's attorneys, and Hickey himself, as well as the medical records introduced at trial.  On the stand, Hickey was questioned extensively about when he first disclosed various events to the government, including the February 2013 coaching session, his 2015 hallucinations, and his 2013 hospitalization for alcoholism.  Given the government's disclosures and Hickey's waiver of attorney-client privilege, the defense had an abundance of ammunition to use during cross-examination.

At trial, the defense argued that Hickey was a rampant liar and attacked his credibility on various grounds, including arguing to the jury that there were "10 reasons why Jim Hickey is not credible."  (Tr. 43–44, 71–72, 3396–97, 3493.)  As noted earlier, defense counsel contended, inter alia, that Hickey fabricated his account of the February 2013 coaching session, stressing that Hickey's account of this meeting contradicted the testimony of Bombace and Leto and that this meeting did not appear in Hickey's calendar.  (Tr. 3408–3411, 3425–26.)

Ultimately, the jury convicted both Defendants on all counts.

## C.  The Defense's Brady Requests During Trial

None of the 302s or notes (from the agents, Hickey's attorneys and Hickey himself) mention the February 2013 coaching session involving Burke and McPartland or state that Hickey suffered from hallucinations in 2015.  The absence of any references to those events in the 302s and various notes is the crux of Defendants' motion for a hearing and new trial.  Defendants contend that the absence of any references in the 302s and interviews to events that Hickey claimed to have disclosed to the government suggests that he lied on the stand when he testified about his earlier disclosures to the government.

At the conclusion of Hickey's direct examination, defense counsel emailed the government, stating:  "Pursuant to Brady and its progeny, I request that prior to the continuation of my cross-examination of Mr. Hickey tomorrow, the government advise me of any testimony that Mr. Hickey gave on cross-examination today that it believes to be false."  (Krantz Decl. ¶ 14.) On December 7, 2019, defense counsel emailed the government about this issue again, stating:

> [I]t does seem to me that to the extent that Hickey claimed in trial testimony to have said things to the govt that he in fact did not say, the govt would have an obligation to disclose that discrepancy to the defense.  There were many things on cross that seemed to me to fall into this category [based on] the 3500 material.

(Krantz Decl. ¶ 15.)

On December 9, 2019, McPartland's attorney, Larry Krantz, spoke over the phone with an Assistant United States Attorney ("AUSA") on the trial team.  Mr. Krantz advised the government that he was concerned about the government's failure to disclose any Giglio material concerning Hickey's testimony and stressed that the "government could not rely on the 3500 material as sufficient disclosure in that regard, because the defense had no way of knowing what may have been said by Hickey, in his government interviews, that was not contained in the 3500 material." (Krantz Decl. ¶ 15.)  The AUSA responded that she had conferred with the prosecution team and

13

there were no <u>Giglio</u> disclosures to make.  (<u>Id.</u>)  The next day, both the defense and the government rested.

The defense elected not to call Sapone or the agents who took notes during Hickey's interviews with the government and who could have testified about what Hickey disclosed in those meetings.  Both  agents were available to testify and were included on the witness list the defense provided to the government on December 8, 2019.  (Dec. 8, 2019 email, ECF No. 217-1; Oct. 15, 2019 email, ECF No. 217-3.)  However, the defense asked the government to stipulate to two specific facts in lieu of the defense calling the agents as witnesses.  (Dec. 9, 2019 email, ECF No. 217-2.)  In this stipulation, the parties agreed that, at Hickey's interview with the government on December 4, 2015, he stated that "[o]n October 26, 2015, he returned home from a hospital stay for a minor stroke."  (Tr. 3158.)  The defense cited this stipulation in summation, arguing to the jury that "according to the evidence," this statement was "all [Hickey] tells the Government [at his first proffer session on December 4, 2015] about his hospitalization just a few weeks [earlier]." (Tr. 3410.)  Relying on this stipulation, the defense argued to the jury that Hickey never told the government at this meeting that he had suffered from an "altered mental status and a psychotic break from reality with hallucinations, delusions and paranoia."  (Tr. 3410.)

## II.  DISCUSSION

### A.  <u>Standard</u>

Federal Rule of Criminal Procedure 33 provides that "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  The rule by its terms gives the trial court "broad discretion . . . to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice."  <u>United States v. Ferguson</u>, 246 F.3d 129, 133 (2d Cir. 2001) (quoting <u>United States v. Sanchez</u>, 969 F.2d 1409, 1413 (2d Cir. 1992)).

"A conviction obtained through the knowing use of false evidence or the unsolicited use of false evidence which the prosecutor does not correct, violates due process." Collado v. Mazzuca, No. 05-CV-4884, 2007 WL 2323589, at *4 (E.D.N.Y. Aug. 10, 2007) (citing Napue v. Illinois, 360 U.S. 264, 269 (1959)).

When a defendant seeks a new trial based on trial perjury, the defendant "must first demonstrate that the witness in fact committed perjury." United States v. Monteleone, 257 F.3d 210, 219 (2d Cir. 2001). "A witness commits perjury if he gives false testimony concerning a material matter with the willful intent to provide false testimony, as distinguished from incorrect testimony resulting from confusion, mistake, or faulty memory." Id. "Simple inaccuracies or inconsistencies in testimony do not rise to the level of perjury." Id. Once perjury has been shown,

> the court must strike a fair balance between the need for both integrity and finality in criminal prosecutions. To do that, the court must assess the materiality of the false statements, applying one of two standards depending on the prosecution's awareness of the falsehoods at the time of trial. If the prosecution knew, or should have known, of the false testimony prior to the conclusion of trial, the conviction must be set aside if there is any reasonable likelihood that the testimony could have affected the jury's judgment. If the government was unaware of the falsity at the time of trial, a new trial is warranted if the court is left with the firm belief that but for the perjured testimony, the defendant would most likely not have been convicted.

United States v. Aquart, 912 F.3d 1, 21–24 (2d Cir. 2018) (citations and internal marks omitted), cert. denied, 140 S. Ct. 511, 205 L. Ed. 2d 320 (2019).

Relatedly, Brady v. Maryland, 373 U.S. 83 (1963), Giglio v. United States, 405 U.S. 150 (1972), and their progeny:

> require[] that the government disclose material evidence favorable to a criminal defendant. Evidence is favorable if it is either exculpatory or impeaching, and it is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. The defendant need not show that the suppressed evidence would have resulted in an acquittal. Rather, a conviction must be reversed upon a showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to

undermine confidence in the verdict.

United States v. Rowland, 826 F.3d 100, 111–12 (2d Cir. 2016) (citations and internal marks omitted).

**B. Analysis**

**1. Overview**

Defendants' primary argument is that the Court should grant them a hearing to allow them to question the agents and prosecutor to probe their discussions with Hickey prior to trial. Defendants maintain that the current record suggests that the government knowingly allowed Hickey to commit perjury and violated its Brady obligations, and that the requested hearing will allow Defendants to flesh out and prove these claims.   Defendants' motion seeks a hearing concerning five discrete topics addressed in Hickey's testimony—which are set out below—that Defendants contend were perjurious.   Additionally, Defendants also argue that, even without a hearing, the Court should, based on the current record, conclude that Hickey lied about the February/March 2013 coaching session and grant a new trial.   The Court will first address this claim and will then turn to Defendants' request for a hearing.

**2. Defendants' Request for a New Trial Based on the Current Record**

Defendants argue that Hickey committed perjury when he testified that he witnessed the February/March 2013 coaching session involving McPartland and Burke.   Defendants' argument concerning this testimony is two-pronged.   In their opening brief, Defendants appear to argue that they are entitled to a hearing on this claim and also that, based solely on the current record, there is sufficient evidence for the Court to find that Hickey perjured himself on this point and therefore to order a new trial.   Defendants' reply brief, however, abandons this argument and instead focuses on their request for a hearing on all of their claims.   (See Defs.' Reply Br. at 6 ("The government

proceeds as if the defense asks the Court to grant a new trial on the current record alone, and then proceeds to attack that imagined argument.  But that is not the defense's request.")).  In any event, as explained below, to the extent that Defendants do raise a perjury claim based on the current record, it fails.

Defendants contend that the following evidence shows that Hickey's testimony was false and that the government knew it was false:  (1) this event is not mentioned in any of the agents' 302 or handwritten notes from Hickey's proffer sessions; (2) this event is not mentioned in the notes that Hickey and his attorney prepared in November 2015; (3) this meeting is not listed in Hickey's calendar; (4) this meeting is not included in two government search warrant applications, dated September 15, 2016 and April 21, 2017; and (5) Hickey's version of this event is, according to Defendants, inconsistent with the testimony of Leto and Bombace about how the false narrative about the assault was conceived in a meeting with Burke and the detectives.

The first time that any coaching session involving McPartland is mentioned in Hickey's 302 or proffer notes is October 2017.  This 302 states:

> HICKEY also recalled a conversation he (HICKEY) was privy to between BURKE and MCPARTLAND in the September, October, November 2013 time frame. HICKEY believed WILLIAM MADIGAN (MADIGAN) was also present during this conversation.  This conversation occurred in BURKE's office.  HICKEY stated the conversation occurred around the time of a suppression hearing in the LOEB criminal prosecution.  During this particular conversation, BURKE floated ideas to MCPARTLAND regarding what position he (BURKE) should take concerning the events of December 14, 2012. HICKEY stated the purpose of the conversation was to determine what "the story" was going to be.  HICKEY later characterized the conversation as a "progression of theories" for the events of December 14, 2012.
>
> ****
>
> During the conversation, BURKE presented the idea that he (BURKE) would claim that he (BURKE) did not go to the Fourth (4th) Precinct on December 14, 2012.  It was agreed that this idea was unacceptable because a number of people had seen BURKE at the Fourth (4th) Precinct on December 14, 2012.  Ultimately, BURKE and MCPARTLAND decided BURKE would state that he (BURKE) went to the

Fourth (4th) Precinct and stuck his (BURKE's) head into the Interrogation Room. It was further agreed that BURKE would state that the reason he (BURKE) stuck his (BURKE's) head into the Interrogation Room was to determine whether he (BURKE) knew Loeb from around his (BURKE's) neighborhood.

HICKEY stated MCPARTLAND was who BURKE relied upon when making decisions. Further, MCPARTLAND gave the ultimate approval on whether or not BURKE's final version of events was believable and/or plausible.

(Krantz Decl., Ex. A at 61 (3500-JH-30).)

Although a district court has the ability, under Rule 33, to consider a perjury claim based solely on the record at trial and make a credibility finding contrary to the jury's, the ability of a district court to do so is constrained.  The Second Circuit set out these constraints in United States v. Sanchez, 969 F.2d 1409, 1413–15 (2d Cir. 1992):

It long has been our rule that trial courts must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses.  It is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment.  Where testimony is patently incredible or defies physical realities, it may be rejected by the court, despite the jury's evaluation.  But the trial judge's rejection of all or part of the testimony of a witness or witnesses does not automatically entitle a defendant to a new trial.  The test is whether it would be a manifest injustice to let the guilty verdict stand.

Manifest injustice cannot be found simply on the basis of the trial judge's determination that certain testimony is untruthful, unless the judge is prepared to answer "no" to the following question: "Am I satisfied that competent, satisfactory and sufficient evidence in this record supports the jury's finding that this defendant is guilty beyond a reasonable doubt?"  In making this assessment, the judge must examine the totality of the case.  All the facts and circumstances must be taken into account.  An objective evaluation is required.  There must be a real concern that an innocent person may have been convicted.  It is only when it appears that an injustice has been done that there is a need for a new trial "in the interest of justice." Although a trial court has broader discretion to grant a new trial pursuant to Rule 33 than to grant a motion for a judgment of acquittal pursuant to Fed. R. Crim. P. 29, where the truth of the prosecution's evidence must be assumed, that discretion should be exercised sparingly.  As in the case of motions for a new trial based on newly discovered evidence, motions for a new trial based on the identification of perjured testimony should be granted only with great caution and in the most extraordinary circumstances.

Sanchez, 969 F.2d at 1413–15 (citations and internal marks omitted); see also United States v. McCourty, 562 F.3d 458, 477 (2d Cir. 2009) (affirming denial of Rule 33 motion based on alleged trial perjury and explaining that the testimony of the police offers who allegedly committed perjury "was not so patently incredible or defiant of physical realities as to justify intrusion upon the jury's verdict.").

Having presided over the trial, seen all the witnesses and evidence, and considered all the documents Defendants claim show that Hickey perjured himself, I do not find any basis to overturn the jury's credibility findings and to conclude that Hickey perjured himself when he testified about the February 2013 coaching session.  In fact, I credit Hickey's testimony concerning the February 2013 coaching session.  Moreover, it is certainly not patently incredible (or even unlikely) that two meetings addressing the cover story for the assault occurred in February and March 2013—one with Burke and McPartland and the other with Burke and the detectives.  The detectives, of course, might have observed or remembered something from the incident that Burke had not, and it is likely that Burke would vet a cover story with McPartland and then, also, with the detectives who were actually present for the assault.

Moreover, Hickey's testimony about two coaching sessions involving Burke and McPartland makes sense and is consistent with other testimony in the record.   Hickey explained that the first session in February/March 2013 focused on whether Burke should say he was at the precinct, whether Burke should say that he "just popped his head in," and whether it mattered whether the door was open or not.  (Tr. 1596.)  By contrast, Hickey testified that the later vetting session in the fall of 2013—with the suppression hearing now imminent—focused on providing a reason for why Burke might have been able to identify Loeb, with McPartland and Burke agreeing on the story involving Burke's mother and nearby park frequented by drug users.  Notably,

Bombace testified that Burke told the detectives, at the March meeting, that he popped his head in to see the suspect, but did not provide any further explanation at that time.  (Tr. 658.)  Bombace's testimony on this point is consistent with Burke further vetting this story with McPartland and providing additional details as the suppression hearing, and the possibility of Burke testifying, grew closer.

Defendants also stress—as they did at trial—the fact that the February/March 2013 meeting with Burke and McPartland does not appear on Hickey's calendar.  This omission does not convince me that Hickey perjured himself because the absence of this event on Hickey's calendar is not dispositive.  I have also considered and weighed the other evidence and materials that Defendants cite in support of their claim that I should conclude that Hickey perjured himself concerning the February/March 2013 meeting.  For example, even though the February/March 2013 meeting is not mentioned in the 302s and the various notes, I still find Hickey's account of this meeting to be credible.  As discussed infra, 302s are generally not verbatim transcripts. Moreover, even assuming that Hickey first disclosed this February 2013 meeting to the government during trial prep sessions in November 2019, I still find Hickey's testimony on this point to be credible. Cf. U.S. v. Bortnovsky, 879 F.2d 30, 33 (1989) (rejecting perjury claim in Rule 33 motion and explaining that the Fire Marshal's "failure to report the smell of gasoline on [the decedent's] clothing earlier [in the reports of his investigation and in earlier testimony] was at most a point for the defense counsel to place before the jury for its resolution").   Ultimately, I find that none of the documents Defendants cite establish the alleged perjury, and certainly do not show the type of clear perjury that would convince a court to reject a jury's credibility

determination.[6]

### 3. Defendants' Request for a Hearing

#### i. Overview

Defendants also seek a hearing for their perjury and <u>Brady</u> claims concerning the following five aspects of Hickey's testimony:

- Hickey's testimony about his prior disclosures to the government concerning: (1) the February/March 2013 coaching session involving McPartland and Burke; (2) the hallucinations that he suffered in October 2015; and (3) his 2013 hospitalization for alcoholism.

- Hickey's testimony that he observed the February/March 2013 coaching session involving Burke and McPartland.

- Hickey's testimony concerning his pre-trial conversations with the government about follow-up visits after his October 2015 hospitalization.

Defendants' request for a hearing concerning the first four points above focuses on the fact that the interview notes and 302s do not mention these events. Thus, Defendants maintain that Hickey's account, at trial, of when he disclosed this information to the government is likely false. With respect to the aspects of Hickey's testimony that concern his earlier disclosures of information to the government, Defendants stress that if Hickey lied at trial about his conversations with the government on these issues then the government would have necessarily known that such testimony was false and, thus, had an obligation to correct it.

---

[6] Presumably, in deciding this claim, it is only appropriate to consider evidence that was actually before the jury at trial. For example, although the search warrant applications that Defendants cite in support of this perjury claim were in their possession at trial, those documents were never introduced into evidence. Undoubtedly, Defendants had strategic reasons for not even attempting to admit these search warrant applications, which do not mention the February 2013 meeting, but detail other damaging allegations against Defendants. In any event, for the sake of completeness, the Court has also considered the search warrant applications as if they had been admitted at trial and concludes that they provide no basis to alter the Court's rejection of Defendants' perjury claim.

As for Hickey's testimony concerning his pre-trial conversations with the government about follow-up visits after his October 2015 hospitalization, Defendants claim that this testimony was false because it is contradicted by a representation made in an August 26, 2019 email from an AUSA.

In addition to arguing that Hickey perjured himself and that the government failed to correct that testimony, Defendants also cast their claims in terms of Brady/Giglio, arguing that the government failed to disclose Brady/Giglio material about Hickey's testimony to the government. Defendants' primary argument here is that if, as Hickey maintained in his testimony, he had disclosed certain events during his prior meetings with the government, then this information would surely have been included in the 302s and interview notes. As these events are not mentioned in those materials, Defendants contend that they are entitled to explore this issue at a post-trial hearing. Defendants assert that, at such a hearing, the agents would likely testify that these events were, in fact, mentioned during these meetings with the government.

Defendants contend that because Hickey's testimony was so central to the government's case, if he perjured himself on any issue, a new trial is required, particularly if the government was aware of the perjury. In support, Defendants cite to United States v. Wallach, 935 F.2d 445, 456 (2d Cir. 1991), and other cases, which state that "if it is established that the government knowingly permitted the introduction of false testimony reversal is virtually automatic."[7]

As explained below, the Court finds that a hearing is not warranted on any of these claims. First, because all of the evidence underlying Defendants' request for a hearing was known to them prior to the verdict, the Court finds a post-trial hearing is not warranted here. Second, even if

---

[7] Wallach is clearly distinguishable from the instant case. In Wallach, not only did the defendant rely on newly discovered evidence, but, after the defendant's trial, the government arrested and indicted the witness for committing perjury during the trial. Wallach, 935 F.2d 445, 455–56.

Defendants' failure to pursue these claims prior to the verdict is not itself fatal to Defendants' request for a hearing, Defendants' claims are simply too speculative and implausible to warrant a hearing.  A close examination of Defendants' perjury and <u>Brady</u> claims reveals they are meritless.

> ii.  *A Post-Trial Hearing is Not Warranted Because Defendants' Claims Involve No Newly Discovered Evidence and Should Have Been Pursued Prior to the Verdict*

Before addressing each challenged aspect of Hickey's testimony, a few overarching points must be stressed.

Critically, Defendants' motion does not involve any newly discovered evidence.  All the evidence that Defendants claim justifies a hearing was in their possession at trial.[8]  A hearing is not warranted here because Defendants could have called the agents at trial or, at the very least, asked the Court, during trial, for a hearing outside of the jury's presence to explore these alleged claims of <u>Brady</u>/<u>Giglio</u> violations and trial perjury.

Defendants decided, as a strategic matter, not to call the agents who could have testified concerning Hickey's prior disclosures to the government.  Given Defendants' claim that the absence of references to certain information—including the February/March 2013 coaching session—in the 302s and the various notes is such an obvious marker that Hickey did not mention this information during those meetings with the government, Defendants' decision not to call the agents was clearly calculated and strategic.[9]  Additionally, Defendants also had the ability to call

---

[8]  Defendants point out that, by its terms, Rule 33 does not require that a motion involve newly discovered evidence. While this is undoubtedly true, it does not mean that the absence of newly discovered evidence is irrelevant for claims—such as those raised here—that could have been pursued prior to a verdict and that seek a post-trial hearing to discover new evidence.

[9]  Not only were Defendants themselves experienced prosecutors, but they were represented by two of the most able members of the defense bar.  Armed with the information that they possessed at trial, Defendants had ample avenues to pursue the claims raised in their motion prior to verdict and their decisions not to do so—and to instead wait until this post-trial motion for a second bite at the apple—were undoubtedly strategic.

Sapone—who was present for Hickey's early proffer sessions, as well as for the attorney-client meetings he had with Hickey in November 2015 prior to those proffer sessions.

Defendants insist that in order to effectively explore the truthfulness of Hickey's testimony concerning his disclosures to the government, they needed to call the AUSA, which they could not do during trial. However, Defendants had several other available witnesses to choose from to pursue this point. Defendants could have—as routinely occurs at criminal trials—called the agents to testify about Hickey's meetings with the government. Having not called the agents (or Sapone) to the stand and presented their testimony to the jury, Defendants' claim that they needed to call the AUSA to explore these issues at trial rings hollow. Moreover, if, as Defendants now maintain, the testimony of the prosecutor was, in fact, so critical to any of these claims, Defendants could have, at the very least, requested a hearing outside of the jury's presence to explore these issues prior to the verdict.[10]

Additionally, none of the cases cited by Defendants support their request for a hearing here. Defendants cite a number of cases in which courts have granted post-trial hearings concerning allegations of perjury and Brady/Giglio violations. However, Defendants do not cite to a single case from the Second Circuit that granted a post-trial hearing on a perjury or Brady/Giglio claim when all the relevant information underlying the hearing request was already known to the defendant at trial.

Defendants maintain that they should not have been required to call the agent witnesses blind because the government has free-standing obligations to disclose Brady/Giglio material and not to knowingly elicit or let stand perjured testimony. This argument, however, does not save

---

[10] As discussed infra, it is not clear if an agent was present for the conversation between the AUSA and Hickey that underlies Defendants' claim concerning Hickey's discussions with the government about follow-up visits after his 2015 hospitalization.

their belated request for a hearing.  For one thing, evidence "is not considered to have been suppressed within the meaning of the Brady doctrine if the defendant or his attorney either knew, or should have known, of the essential facts permitting him to take advantage of that evidence." United States v. Rowland, 826 F.3d 100, 113 (2d Cir. 2016) (quoting United States v. Paulino, 445 F.3d 211, 225 (2d Cir. 2006)) (internal quotation marks omitted).  If the absence of references to certain information in the 302s and notes is as probative as Defendants suggest, then Defendants already knew of the "essential facts permitting [them] to take advantage of" this purportedly exculpatory material.[11]  Moreover, even assuming arguendo that Defendants' decision not to call the agents to testify before the jury is not itself fatal to their perjury and Brady/Giglio claims, Defendants should have, at the very least, requested a hearing (either in camera or otherwise) outside of the jury's presence where the Court could have heard testimony from the agents and/or the prosecutor.  It is well-established that district courts may, upon a sufficient showing by the defendant, conduct an in camera inquiry, before or during trial, to determine whether disclosure to the defense is required under Brady.  See United States v. Leung, 40 F.3d 577, 582 (2d Cir. 1994) ("We have held . . . that in some circumstances the trial court should not rely on the Government's representations as to the materiality of potential impeachment evidence, but should instead undertake an independent in camera review of relevant Government files to determine materiality."); see also United States v. Aguilar, No. 01-CR-1367, 2007 WL 3253570, at *1 (E.D.N.Y. Nov. 2, 2007) (court conducted in camera hearing mid-trial where witness testified to

---

[11]  Defendants assert that, "to the extent that the government was aware of any falsity (as appears to have been the case), it affirmatively misled the defense by stating, in response to the defense's specific requests on this subject . . . that there was no Brady/Giglio material to disclose."  (Defs.' Reply Mem. at 9.)  However, as discussed infra, Defendants' perjury and Brady claims are simply too speculative and implausible to cast doubt on the government's representation that they had disclosed all Giglio material.  Moreover, Defendants' claim that they were misled by the prosecution's Giglio representation is belied by the procedural history of this case.  Immediately after being convicted at trial, Defendants filed the instant motion, claiming—based solely on information that they already knew at trial— that the 302s and interview notes show that the government's representation that all Giglio material was disclosed is so suspicious and unworthy of credence that a post-trial hearing on this issue is required.

determine whether the government had violated its <u>Brady</u> obligations); <u>Kett v. United States</u>, 722 F.2d 687, 689 (11th Cir. 1984) (district court held an <u>in camera</u> hearing with witness testimony to determine, <u>inter alia</u>, whether further disclosure of evidence was required under <u>Brady</u>).  Given that all the evidence underlying Defendants' request for a hearing was known to them at trial, they should have, at the very least, requested an <u>in camera</u> hearing on their <u>Brady</u>/<u>Giglio</u> and perjury claims prior to the verdict.  In light of their failure to do so, the Court declines to grant Defendants a post-trial hearing on this issue.  <u>Cf.</u> <u>United States v. Jumah</u>, 599 F.3d 799, 811 (7th Cir. 2010) (finding that the defendant's "unsupported assertions that the Government has suppressed evidence are insufficient to make out a <u>Brady</u> or <u>Giglio</u> violation" and stating that the defendant's "failure to ask for an <u>in camera</u> inspection of the Government's records further counsels against any relief from this court"); <u>United States v. Shields</u>, 789 F.3d 733, 747–48 (7th Cir. 2015) (rejecting speculative claim that prosecution had suppressed unspecified materials and stating that, if the defendant "had some basis for his belief that Officer Coglianese's file contained evidence that could be used for impeachment purposes," he could have requested that the district court undertake an in camera review of this file).  Given that all the evidence underlying Defendants' request for a post-trial hearing was known to them at trial, I find that such a hearing is not warranted here given Defendants' failure to request a hearing on these issues prior to the verdict.  Defendants—who were already armed with all of the same evidence that they claim now justifies a hearing—sat on this request for a hearing until after they were convicted at trial.

### iii.  Speculative and Implausible Claims Do Not Warrant a Hearing

Even if Defendants' failures to call the agents or request a hearing prior to the verdict do not, standing alone, warrant denying their request for a post-trial hearing, Defendants' request for

a hearing also fails on other grounds.  Defendants' perjury and <u>Brady</u>/<u>Giglio</u> claims are simply too speculative and implausible to warrant a hearing.

When a defendant's perjury or <u>Brady</u>/<u>Giglio</u> claim is speculative and implausible, a hearing to develop that claim further is not warranted.  <u>See</u> <u>United States v. Avellino</u>, 136 F.3d 249, 260–61 (2d Cir. 1998) ("In the absence of a proffer by Avellino of any nonspeculative basis for inferring that, in response to the plea withdrawal motion, the government had not made available to him all pertinent material in its possession, it was well within the discretion of the court to conclude that no evidentiary hearing was necessary."); <u>United States v. Rowland</u>, No. 14-C-79, 2015 WL 800083, at *1 (D. Conn. Feb. 25, 2015), <u>aff'd</u>, 826 F.3d 100 (2d Cir. 2016) (denying hearing and stating that "a district court has discretion to order post-trial discovery or an evidentiary hearing to explore a potential <u>Brady</u> violation but only when a defendant has offered more than mere speculation that a violation may have occurred"); <u>Florez v. United States</u>, No. 07-CV-4965, 2009 WL 2228121, at *10 (E.D.N.Y. July 24, 2009) (citing "plausible claim" standard from ineffective assistance of counsel cases and denying hearing for 2255 petition, explaining that "[a]n evidentiary hearing is necessary only where a petitioner establishes a 'plausible claim' of perjury - one not plainly disproved by the totality of evidence and that, if true, would entitle him to collateral relief. Since petitioner has failed to establish a plausible perjury claim, an evidentiary hearing is not warranted.") (citation omitted); <u>United States v. Brown</u>, No. 86-CR-738, 1987 WL 15116, at *1 (S.D.N.Y. July 29, 1987) (ordering a hearing where "newly-discovered evidence" "suggest[ed] at least the possibility of past or intended perjured testimony"); <u>cf.</u> <u>Bruno v. Connecticut Comm'r of Correction</u>, No. 04-CV-101, 2006 WL 2839232, at *8 (D. Conn. Sept. 29, 2006) ("Mere speculation that a government file may contain <u>Brady</u> material is not sufficient to require a remand

for in camera inspection, much less reversal for a new trial." (quoting United States v. Pou, 953 F.2d 363, 366–67 (8th Cir. 1992)).[12]

As explained below, Defendants have not established that they have any plausible or non-speculative perjury or Brady/Giglio claims that justify a hearing.[13]

The Court will first address Defendants' arguments concerning Hickey's purportedly false testimony about his disclosures of information to the government during his meeting with agents and prosecutors.  Here, Defendants cite Hickey's testimony about when he disclosed to the government:  (1) the February 2013 coaching session involving McPartland and Burke; (2) the hallucinations that he suffered in October 2015; and (3) his 2013 hospitalization for alcoholism. Relatedly, Defendants also seek a hearing to address Hickey's testimony that he, in fact, observed a February/March 2013 coaching session with McPartland and Burke.  None of these claims warrant a hearing.

First, the Court does not find that the absence of references to certain information—including the February/March 2013 coaching session—in the 302s and notes to be as probative as Defendants believe.  Interview notes and 302s are generally not verbatim transcripts and may not include all significant disclosures a witness made during an interview.  Cf. United States v. Forbes,

---

[12]  The only case cited in Defendants' papers that granted a post-trial hearing on a perjury or Brady claim in the absence of newly discovered evidence is United States v. Bernal-Obeso, 989 F.2d 331, 332 (9th Cir. 1993), a decision from the Ninth Circuit that Defendants cite for the first time in their reply papers.  Bernal-Obeso—which involved potential prosecutorial misconduct and intertwined Brady and Confrontation Clause claims concerning the testimony of an informant on the DEA's payroll who the defendant was precluded from examining about his potential lies to the DEA concerning his criminal record—does not justify a hearing here.  While a court can surely order a post-trial hearing when it believes that the record before it may only be the "'tip of an iceberg' of other evidence that should have been revealed," id. at 333, I do not find that to be the case here.

[13]  Even if Defendants' failure to pursue their perjury and Brady claims prior to a verdict does not, standing alone, warrant denying the post-trial hearing they seek, it would certainly seem appropriate, in weighing Defendants' request for a post-trial hearing, for this Court to accord some weight to that failure given the discretion afforded to district courts in addressing Rule 33 motions and the fact that all of the evidence underlying Defendants' hearing request was known to them prior to the verdict.  In any event, even if this factor is completely excluded from consideration, as explained infra, Defendants are still not entitled to a hearing because their perjury and Brady claims are speculative and implausible.

No. 02-CR-264, 2007 WL 141952, at *3 (D. Conn. Jan. 17, 2007) ("the [government's] notes were not verbatim transcripts of the interviews and did not set forth the substance of the interviews in a question and answer format").  Moreover, agents can have differing practices in this area and can also make varying judgments on what to include in the notes or 302 of a specific interview. Notably, although Defendants' claims rely heavily on what the 302s and interview notes do not say, Defendants do not cite to any cases from the Second Circuit or elsewhere indicating that the failure of an agent's 302 or interview notes to mention significant information referenced in a witness's testimony at trial is—as Defendants maintain—such powerful evidence of a potential perjury or Brady claim that it warrants a hearing (either prior to or after the verdict).[14]

Second, the defense used the 302s and notes from the agents, Hickey's attorneys, and Hickey himself, to extensively probe Hickey's testimony.  The fact that the jury still found Hickey credible is itself powerful evidence that the Defendants' claims here are implausible and speculative and do not warrant a hearing.

Third, a close examination of each claim of allegedly perjured testimony—excerpts from the trial transcript are set out below—shows that Defendants do not have plausible claims that Hickey perjured himself.  As such, a post-trial hearing is not warranted.

### a.  Hickey's Testimony Concerning His Disclosure of the February/March 2013 Meeting to the Government

Hickey's extensive testimony during cross-examination concerning his disclosures of the February/March 2013 meeting and other information to the government is set out below:

Q:  Now, you testified about 24 meetings with the government, correct?

A:  Right.

---

[14] If Defendants' argument were correct, post-trial hearings on these types of claims would likely become routine in criminal cases.

Q:  And during those meetings you told them everything you could possibly think of that was relevant to their investigation in this case, true?

A:  I told them as much as possible in the times that we were together and the questions that they asked.

Q:  You didn't hold back information, correct?

A:  As a matter of fact, each time I came in there was more information because they asked me different questions, so yes, I told them everything that I had knowledge of.

Q:  And certainly if something was important as to Mr. McPartland, you made sure to tell them early on in those sessions, true?  It was important.

A:  I told my lawyer, I told the government, my entire story regarding this case.

****

Q:  You testified that somewhere around February 2013, you were present when James Burke met with Christopher McPartland.  Do you recall testifying to that?

A Yes.

****

Q:  Do you recall testifying before this jury in February of 2013, Mr. McPartland was vetting cover stories for Mr. Burke. Do you recall that? Yes or no?

A:  Yes, he did. Yes.

****

Q:  Would you agree that's pretty important accusation you're making, that Mr. McPartland is vetting false cover stories for Mr. Burke openly in front of you. Would you agree that's an important allegation in this case?

A It's a fact.

****

Q:  You understand that is an important accusation, in your own mind, true?

A:  True.

Q:  Isn't it a fact that in all your meetings with the government, at least through November 11, 2019, you never once made that accusation?

A:  I don't recall if that was covered.  I remember in prior, coming up to the trial, they asked me specifically about dates and times and I provided that to them.

Q:  Do you recall ever making that accusation to the government prior to November 11, 2019.  Yes or no?

MS. GATZ: What were the accusations?

Q:  The accusations that in February 2013, Mr. McPartland with Mr. Burke and essentially, according to you, vetted cover stories for the Loeb situation?

A:  I told the government from the very beginning about McPartland okaying the progression of theories.  It was Mr. McPartland who did the progression of theories with Burke, yes, and in front of me, and I told that to the government from the beginning.

Q: So you told that to the government in the beginning.  The beginning is December 2015, that's when you had your initial proffer meetings.

A:  I don't know in the first meetings, there were numerous, but I provided that information to the government.

Q:  Certainly before your guilty plea, true?

A:  I don't recall when it was provided to the government. You'd have to check their notes of their interviews which I didn't have access to.

Q:  But that was an important piece of information that you provided to the government according to you early on, correct?

A:  Correct.

(Tr. 1954–58) (emphasis added).

When cross-examination resumed the following day, defense counsel returned to this topic:

31

Q:  Isn't it a fact, Mr. Hickey, that you testified to a number of important facts in this courtroom that you had never told the Government in any of your interview sessions up to November 11, 2019?

****

A:  That is not a fact.  Everything I said in this courtroom I've had said to the Government.

Q:  You're clear about that in your mind that every significant statement you made in this courtroom concerning Mr. McPartland's involvement in the conspiracy you testified to, you told the Government in prior interview sessions prior to November 11th, 2019, correct?

MS. GATZ: Objection. That's a different question, your Honor. Objection.

THE COURT: Overruled.

A:  I've met with the Government after November 11th in preparation for this trial. Everything I testified to in this courtroom I said to the Government.

Q:  My question is:  Did you tell the Government everything significant that you testified to in this courtroom in any of your interviews up to November 11th, 2019?

A:  I told the Government everything that was asked of me up to November 11th and what was asked of me after November 11th.

* * * *

Q:  Mr. Hickey, I placed before you what I have marked as Defendant's Exhibit 34.

Do you see that there?

A: Yes.

Q:  That is a list of the 17 dates for which we have received interview notes from the Government.  Can you take a look at those dates and tell me if they seem roughly right to you. It shows 17 meetings or phone conversations.

A:  I'll take your word for it.

* * * *

Q:  Now, you'll accept my representation that these are the 17 meetings or conversations for which we have notes?

A:  Yes.

Q:  So it ends on November 11, 2019, do you see that there?

A:  Yes.

Q:  About how many times did you meet with the Government after that?

A:  For trial prep, three or four.

Q:  Were those lengthy meetings?

A:  No, not really.

****

Q:  And you indicated that you personally saw, with your own eyes, Mr. McPartland nodding yes or no when Mr. Burke spun different scenarios that he might make up, true?

A:  It could have been as late as it was after Loeb public in early February, and before the special prosecutor, around the time of the special prosecutor, which that was in March.  So it was an approximate timeframe.

Q:  I'm asking you the approximate timeframe.  But it's your testimony in this Court that you personally saw with your own eyes Mr. McPartland coaching, essentially coaching, Chief Burke on how to lie; is that your testimony?

A:  Yes.

Q:  Would you agree that that is a significant allegation in your own mind as to this trial?

A:  Yes.

Q:  Isn't it a fact that in all 17 of the meetings that are reflected on that document, you never once made that allegation?

A. That is not a fact.  I spoke to the Government about two separate meetings in Burke's office with McPartland, one in that timeframe that we're speaking of right

now, and one by the Loeb suppression hearings which was a mock cross-examination that McPartland conducted on Burke in my presence.

Q:  My question is simply -- and if you can answer it yes or no, please do – isn't it a fact that you never made the allegation that I just described in any of those meetings with the Government; yes or no?

A:  No, that's not a fact. I talked to the Government about two separate meetings.

Q:  I'm asking –

THE COURT:  You already answered it. You asked it. This is the second time you asked it and you answered it twice.

Q:  Can you tell me at which of these meetings you told the Government that allegation against Mr. McPartland?

A:  I told the Government about two separate meetings.

Q:  I'm asking you to tell me which of the meetings you made the allegation – I'm referring to February 2013 -- the allegation that in February 2013, approximately, Mr. McPartland coached Mr. Burke. Which of the Government meetings did you make that allegation in?

A:  I've never seen the Government's notes, so I couldn't tell you which meeting that was in.

****

Q:  And isn't it a fact -- by the way, that first meeting was pretty much an all day meeting, true?

A:  Which meeting are you referring to?

Q:  December 4th.

****

Q:  Isn't it a fact that at that meeting you said nothing about Mr. McPartland coaching Mr. Burke's lies in February, in or about February 2013; isn't that true?

A:  I don't recall what was said at the first meeting, the second meeting, the 17th meeting.  I don't know what was discussed.

Q:  You also testified in this courtroom on direct that Mr. Burke openly admitted in front of Mr. McPartland – I believe your words were -- that Burke had beat the hell out of Loeb.  Do you recall that?

A:  Yes.

****

Q:  Isn't it a fact, Mr. Hickey, that in those 17 meetings referenced in these notes, you never once made that accusation to the Government, yes or no?

A:  Many times I talked to the Government about Burke openly saying about his beating of Loeb.  We talked about it. Burke would always admit it when he was feeling sorry for himself.  So, it was openly discussed.

****

Q:  In the first meeting with the Government did you make that accusation, yes or no?

A:  I don't recall what was said in the first meeting, counselor.

Q:  You also testified in this courtroom that it was openly said in front of Mr. McPartland that the goal of  what everyone was doing was to keep Burke out of jail; do you remember that?

A:  Keep Jimmy out of jail.  We talked about it all the time.

****

Q:  Isn't it a fact that in all 17 of these meetings reflected on Defendant's Exhibit 34, you never once said that it was discussed that the purpose of these conversations was to keep Jimmy out of jail?  Isn't it a fact you never said that before in these meetings?

A:  I don't know what was said in those meetings.  You would have to go to the Government's notes for that.

Q: You don't remember, one way or the other, if you said that before, correct? It's a yes or no.  Do you remember one way or the other?

A:  I don't remember what was said exactly in which meeting.

Q:  So we would have to go to the Government's notes or call an agent to get that information, correct?

A. Correct.

Q:  Now, you also testified to this jury that Mr. McPartland said to you expressly about the Oliva wire that it was a pretext for getting revenge against John Oliva, and that they could use the leaks as a pretext for retaliating against him.  Do you recall you testified that Mr. McPartland expressly said that to you? expressly said that to you?

A. He said it in a meeting that we were at in the DA's office, yes.

****

Q:  Isn't it a fact that in none of these 17 sessions with the Government did you ever make that accusation, yes or no?

A:  Once again, counselor, you have to go to the Government's notes to see where and when that was discussed.

****

Q:  But is it your testimony that you said it at least in one of the meetings?

A:  Everything I testified in this courtroom I have said at one time or another to the Government, yes.

Q:  I'm asking about the 17 meetings, not the ones after this date.  Do you understand that?

A:  I understand what you're trying to get me to say.  I can say everything I testified in this courtroom I've said it one time or another to the Government.  I don't know which was said at what meetings.

Q:  In other words, there may have been some things you said in this courtroom that you told the Government after November 11th, 2019, in preparation for your testimony, correct?

A:  Correct.

Q:  Now, that would have been almost four years after you started cooperating, correct?

36

A:  Correct.

Q:  And is it your testimony that four years after your cooperation and after 17 meetings with the Government, you remembered significant new information just prior to this trial, is that what you're saying?

A:  It wasn't new information, counselor, it was information that I was directly questioned about prior to testifying at this trial.

Q:  And, in other words, there was new information -- withdrawn.  Was there new information that you had never before told them in any of the 17 prior sessions?

A:  In preparation for the trial we went through an extensive timeline and the Government asked me specific questions about specific date ranges and times, and I explained to them what was going on at those times.  It wasn't new information. It was the first time that I was asked.

Q:  When I say new information, I mean the first time you told the Government about it.  Do you understand that?

A:  Yes.  The first time I was asked is the first time I told.

****

Q:  Wasn't it your obligation to be as full and complete with them as you could be?

A:  I was full and complete with them as I could be at every meeting and every phone call.

Q:  But if we want to know at what meetings any of these were allegedly said by you, you don't recall. We would have to use another source, correct?

A:  Correct.

(Tr. 1980–1994 (emphasis added).)

Subsequently, on re-direct examination, Hickey gave the following testimony:

Q:  Now, you had 17-plus meetings with the government, 17 proffers and a bunch of meetings to prepare your trial testimony; is that right?

A:  Yes.

37

Q:  Is it fair to say you don't remember what you said on each occasion but you remember what you said in toto with the government?

A:  Yes.

Q:  Is it fair to say in trial preparation many more specific questions were asked of you than had been asked during your proffer meetings?

A:  Absolutely.

(Tr.  2158 (emphasis added).)

When Hickey's entire testimony concerning his disclosure of the February 2013 coaching session to the government is viewed in context, it is apparent that there is no plausible claim of perjury (or a Brady/Giglio violation) here that warrants a hearing.  See United States v. Milikowsky, 896 F. Supp. 1285, 1297 (D. Conn. 1994), aff'd, 65 F.3d 4 (2d Cir. 1995) ("For purposes of determining whether the prosecutors were constitutionally required to correct [the witness's allegedly false] testimony, the Court believes that [the witness's] testimony on the issue of when he informed the prosecutors of the Chicago meeting—testimony that spans fifty pages of transcript—should be considered as a whole.  The Court believes that the record should be reviewed in its entirety, rather than on an answer-by-answer basis for two reasons; first, because the Court must consider the testimony in the same manner and in the same context as did the jury; and second, because the Court must consider for purposes of the second [of element of the test for false testimony], whether the testimony, when viewed in context, should have been recognized by the government as false.") (citation omitted).

Even if a post-trial hearing were held and the agents testified that Hickey disclosed a February 2013 coaching session, for the first time, during trial preparation sessions and never disclosed that coaching session during his 17 proffer sessions that occurred prior to November 12, 2019, Defendants' claims would still fail.  Hickey's trial testimony about his disclosure of the

February 2013 meeting is simply too ambiguous and equivocal to establish that his testimony constituted perjury.  For essentially the same reasons, Defendants cannot show that a Brady/Giglio violation occurred here.  Not only would such testimony from the agents fail to establish perjury, but it would have had minimal, if any, other impeachment value.

When Hickey was initially asked about the February 2013 meeting during cross-examination, Hickey stated that he didn't "recall if that was covered" and remembered, "coming up to the trial, [the government] asked me specifically about dates and times and I provided that to them." (Tr. 1957.)  Thus, at the very outset of his testimony, Hickey indicated that he informed the government about the February 2013 meeting during trial prep, not during his earlier proffer sessions with the government.

Defendants latch on to one vague and ambiguous portion of Hickey's testimony in which, according to Defendants, he testified that he told the government about the February 2013 meeting in the "very beginning" and "early on."  This vague excerpt appears to be the crux of Defendants' claim that Hickey perjured himself in testifying about his disclosures to the government concerning the February 2013 meeting.  (See Defs.' Mot. at 21; Defs.' Reply Br. at 1, 4.)  Although, at the outset of this exchange, Hickey was explicitly asked about the February 2013 coaching meeting, his response did not mention a timeframe and instead simply asserted that "I told the government from the very beginning about McPartland okaying the progression of theories." (Tr. 1958.)  Of course, Hickey testified to two instances of coaching occurring, once in February/March 2013 and again in September 2013.  And, a meeting in the fall of 2013 involving a "progression of theories" is mentioned in a 302 from October 2017—two years before trial.  (Krantz Decl., Ex. A at 61 (3500-JH-30).)  Moreover, Hickey immediately qualified his answer, stating "I don't recall when it was provided to the government. You'd have to check their notes of their interviews which I

didn't have access to."  (Tr. 1958.)  Finally, during this exchange, when asked "But that was an important piece of information that you provided to the government according to you early on, correct?," Hickey responded "correct."  (Tr. 1958.)  However, the phrase "early on" is vague and the question's reference to "that" can reasonably be interpreted to refer back to Hickey's prior answer, which discussed the "progression of theories" without providing a timeframe or identifying the specific coaching session at issue and, thus, could easily be referring to the fall 2013 meeting that is mentioned in the 302 from October 2017.

The other portion of Hickey's testimony that Defendants cite, which is excerpted below, is also vague and ambiguous.

> Q:  Isn't it a fact that in all 17 of the meetings that are reflected on that document, you never once made that allegation?
>
> A:  That is not a fact.  I spoke to the Government about two separate meetings in Burke's office with McPartland, one in that timeframe that we're speaking of right now, and one by the Loeb suppression hearings which was a mock cross-examination that McPartland conducted on Burke in my presence.
>
> Q:  My question is simply – and if you can answer it yes or no, please do – isn't it a fact that you never made the allegation that I just described in any of those meetings with the Government; yes or no?
>
> A:  No, that's not a fact. I talked to the Government about two separate meetings.
>
> Q:  I'm asking –
>
> THE COURT:  You already answered it. You asked it. This is the second time you asked it and you answered it twice.
>
> (Tr. 1984.)

Here, despite being pressed by defense counsel, Hickey refused to simply answer these questions with a "yes" or a "no" and went on, in his both of these answers, to insist—without providing any timeframe for when these disclosures occurred—that he "spoke" "to the Government about two

separate meetings."  Hickey's preface to these answers (i.e., "that's not a fact") are insufficient to make them perjurious.

Additionally, Hickey's subsequent testimony includes further qualifications and caveats about when he disclosed specific information, including his recollection of the February 2013 meeting, to the government.  When asked at which meeting he disclosed the February 2013 coaching session, Hickey made clear "I've never seen the Government's notes, so I couldn't tell you which meeting that was in" and "I don't recall what was said at the first meeting, the second meeting, the 17th meeting.  I don't know what was discussed."  (Tr. 1985, 1988.)  When the questioning turned to other specific information disclosed to the government, Hickey gave multiple answers stressing his general inability to recall what he disclosed in specific meetings with the government.  (See (Tr. 1990 ("I don't know what was said in those meetings.  You would have to go to the Government's notes for that"); (Tr. 1980–81 (stating that he disclosed some of the information discussed in his trial testimony after November 11, 2019 during trial preparation); (Tr. 1991–92 ("I can say everything I testified in this courtroom I've said it one time or another to the Government.  I don't know which was said at what meetings.").)  In fact, at one point, Hickey stated, "I don't remember what was said exactly in which meeting" and agreed that defense counsel would have to "go to the Government's notes or call an agent to get that information."  (Tr. 1990.)  Moreover, on redirect, Hickey again made clear that he could not remember what he said on each occasion when he spoke with the government, but that he did remember what he said "in toto" to the government during all of his interviews and trial preparation sessions.  (Tr. 2158.)

The testimony above shows that Defendants' perjury claim is not plausible.  Hickey's testimony on this issue is ambiguous and equivocal, and the Court concludes that it is impossible to characterize it as clearly false or perjurious.  Accordingly, a hearing is not warranted on either

Defendants' perjury claim or their related <u>Brady</u>/<u>Giglio</u> claim.  <u>See</u> <u>Milikowsky</u>, 896 F. Supp. at 1297–98 (denying motion for new trial based on witness's equivocal testimony about his disclosures to the government that the court found were "not so clearly 'false' as to place upon the prosecutors a duty to correct" the testimony)[15]; <u>Monteleone</u>, 257 F.3d at 220 (affirming denial of motion for a new trial without a hearing because, <u>inter alia</u>, the witness's trial testimony was "so ambiguous as to preclude a finding of perjury"); <u>United States v. Polizzi</u>, 801 F.2d 1543, 1550 (9th Cir. 1986) (rejecting perjury claim because witness's testimony about whether he was a government informant was "ambiguous" and "the question of [his] status as an informant appears to be an unanswerable matter of semantics").

Additionally, even assuming <u>arguendo</u> that Hickey never disclosed the February 2013 coaching session in the 17 meetings identified by defense counsel and that Hickey's two answers that he prefaced with the phrase "that's not a fact" could be considered inaccurate, the Court still finds that such testimony would not rise above the level of "[s]imple inaccuracies." <u>Monteleone</u>, 257 F.3d at 219.  Even assuming <u>arguendo</u> that Hickey's two vague answers were limited to the 17 meetings identified in defense counsel's question, Hickey made it clear that he could not

---

[15]   <u>Milikowsky</u> has a number of parallels to the instant case.  In <u>Milikowsky</u>, the witness gave equivocal testimony at trial concerning his prior disclosure of information about a particular meeting to prosecutors.  At numerous points, the witness testified that he "'believed'" that he had relayed the information at issue to prosecutors in 1990. <u>Milikowsky</u>, 896 F. Supp. at 1296–97.  That testimony, however, was contrary to the recollections of the prosecutors, who recalled that the witness had only relayed that information to the government years later. <u>Id.</u> at 1295.  The prosecutors' recollections were memorialized in a formal <u>Brady</u> letter provided to the defendant. <u>Id.</u>  The witness also testified at least fourteen times during trial "that he could not recall when he gave the government the information in question." <u>Id.</u> at 1297.  The government never corrected the witness's testimony and, at trial, the district court denied the defendant's request to admit "the <u>Brady</u> letter as an admission of a party opponent" and refused to order the government to stipulate to the "facts incorporated in the <u>Brady</u> letter." <u>Id.</u> at 1295.  The district court, in denying the defendant's motion for a new trial, ultimately found—based on the entirety of the witness's testimony—that the witness's "equivocal and qualified statements . . . honestly reflected his inability to recollect" and that the witness's testimony was "not so clearly 'false' as to place upon the prosecutors a duty to correct" the testimony. <u>Id.</u> at 1297–99.  On appeal, the Second Circuit explicitly affirmed the denial of this claim for the very same reasons that were set forth in the district court's opinion denying the motion for a new trial. <u>United States v. Milikowsky</u>, 65 F.3d 4, 6 (2d Cir. 1995).

identify at which specific meeting he had disclosed this information and the last of these 17 meetings occurred on November 11, 2019.  Even if Hickey only disclosed the February 2013 coaching session during the trial prep sessions after November 11, 2019, those trial prep sessions occurred only a few days after the November 11, 2019 meeting.  Under all of the circumstances, a potential discrepancy between two meetings, in November 2019, that were only a few days apart would constitute a simple inaccuracy rather than perjury.

Thus, the Court finds that a hearing concerning this testimony is not warranted.

### b. Hickey's Testimony Concerning the Existence of the February 2013 Meeting

The Court now turns to Defendants' related request for a hearing concerning Hickey's testimony that he actually observed the coaching meeting involving Burke and McPartland in February/March 2013.  In the previous section above, the Court already rejected Defendants' request for a hearing to inquire into when Hickey first disclosed this information to the government.  For similar reasons, the Court finds that a hearing into that issue is also not warranted on Defendants' related claim that Hickey's testimony about the existence of this meeting was perjurious.

Defendants' additional arguments in support of a hearing to inquire into the alleged perjury/Brady violations concerning the February/March 2013 coaching session are also not persuasive.  Defendants have nothing more than sheer speculation that a hearing would add any material evidence to Defendants' claim that Hickey's testimony about the alleged February 2013 meeting was perjurious.  The government, of course, has no independent knowledge about whether this purported meeting between Hickey, Burke and McPartland in fact occurred.  It is sheer speculation that a hearing involving prosecutors and agents would elicit any material evidence on this point.  The defense already had key pieces of substantive evidence to try to contradict Hickey's

43

claim on this point, including Hickey's calendar and the testimony of Bombace and Leto—evidence which defense counsel stressed at trial and in summation.  Defendants' other purported justifications for a hearing on this issue—namely, to inquire into how the government first elicited this information from Hickey and to inquire into what steps the government took to understand why Hickey may have first raised this allegation years into his cooperation, (see Defs.' Reply Br. at 4)—are a speculative fishing expedition that do not warrant a hearing.  Defendants, of course, already had the opportunity, at trial, to call the agents, in order to try to elicit this information—none of which is likely to be material under Brady.

Accordingly, a hearing is not warranted on this claim.

### c. Hickey's Testimony Concerning His Disclosures to the Government About His Paranoia and Hallucinations

A close examination of Hickey's testimony concerning his hallucinations and paranoia reveals that Defendants' perjury and Brady claims on this point are speculative and not plausible. As such, no hearing is warranted on these claims.

At trial, Hickey gave the following testimony:

Q:  Did you tell [the government] that you had had five days of hallucinations?

A:  I did not have five days of hallucinations I don't believe.

****

Q:  No one ever told you you had hallucinations before you ever got to the hospital?

A:  No.  Yes, I was hallucinating before I got to the hospital. I don't know about five days before I got to the hospital.  I did not know that.

Q:  How about four days?

A:  I only remember what led me to the hospital that day.

Q:  You knew that you were having hallucinations before you got to the hospital, true, or some period of time, true?

44

A:  Well, I believed I saw what I saw. That's what I believed, that I saw people out coming to get me, yes.  That's what I believed.

Q:  By the time of your discharge from the hospital, were you aware that you had been having hallucinations?

A:  Yes.

Q:  Were you aware that you had been having delusions?

A:  Yes.

Q:  Were you aware that you had been having paranoia?

A:  Yes.

Q:  Prior to entering into your guilty plea, in your meetings with the Government, did you tell them that you had hallucinations during your hospitalization or before it, yes or no?

A:  No.

Q:  Did you ever tell them you had delusions, yes or no?

A:  No.

Q:  Did you ever tell them you had paranoia?

A:  No.

****

Q:  Isn't it a fact that you didn't tell them about the hallucinations or the delusions or the paranoia or the altered mental status or the delirium because you felt that that would hurt your chances of getting a cooperation deal, yes or no?

A:  No.  We discussed the paranoia, we discussed the fact that I saw people coming to get me.  We discussed that, yes, we did.

Q:  Didn't you just testify two minutes ago to this jury that you did not tell the Government about hallucinations, delusions or paranoia?  Didn't you say that right here in this courtroom five minutes ago?

A:  I told them what I believed at the time, which was mini stroke brought on by sleep deprivation and stress.  They knew about the paranoia.  I told them.  Actually, the first conversation, counselor, that we ever had when I got to the United States Attorney's office, they asked me, before we even sat down, they asked me, we heard that you -- there was a rumor out there that you tried -- that you got CPEP, that you were brought to psychiatric emergency.  And I before we ever sat down, I explained to them that was the Burke rumor that was put out, that it was not, and I explained to them that the stress I was under I actually thought I saw people out coming to get me.  So, yes, we discussed that before we even sat down to the table.  I don't know where they put it in the notes.  I don't know where it's located in the U.S. Government's notes.  I never looked at them.

Q:  So is it your testimony now that you did tell the Government about your hallucinations prior to your guilty plea; is that your testimony?

A:  Yes, they know about my paranoia.  I don't know if it occurred in the hospital. I testified to that.  I did not remember what happened in the hospital.

Q:  So when you testified a few minutes ago that you did not tell them about your hallucinations, that was in error; is that right?

A:  Yes. I told them, right.

Q:  Yes or no?

A:  Yes. I told them before we even sat down.  They asked me, how are you doing? We heard a rumor that you got CPEP. And I explained it to them.

Q:  So they said they heard a rumor. And when you say CPEP, that's like a psychiatric ward?

A:  Psychiatric emergency room, yes.

Q:  So, in essence, the question, according to you, was we heard you had some sort of mental problems, let's talk about it.  That's your testimony, correct?

A:  And I told them.

****

Q:  So, your testimony now is that they asked you about these rumors about mental problems and you told them all about that you had hallucinations, you had delusions, you had paranoia, you've been hospitalized for it, is that your testimony?

A:  <u>Yes.</u>

Q:  When you told them that, according to your testimony, did they say, gee, maybe we should get your hospital records?

A:  They did say early on that they were going to get my hospital records, yes.

Q:  Mr. Hickey, isn't it a fact that all you told the Government in your initial proffer sessions before your guilty plea was that you've been hospitalized for a mini stroke and of explanation of hospitalization; is that true or not?

A:  Not true, counselor.  As I just said, the first time I ever stepped into that office and met with the United States Attorneys, the first thing, before we ever sat down, they said to me, are you okay?  We heard a rumor that you got CPEP.  And I said, I did not, that I was brought to Huntington Hospital with what I thought was a mini stroke and sleep deprivation and stress.  <u>But I did discuss the fact that I thought I saw people outside, that I thought people were coming to get me.</u>  And I further told them that I called Burke and told him that and Burke came to my house and only him and my wife knew that I was going to the hospital.  Yes, the United States Government knew all of that right away before we even sat down.

Q:  <u>You told them everything you understood had happened during your hospitalization, correct?</u>

A:  <u>I didn't know what happened during my hospitalization, counselor.</u>  I knew what brought me there and I knew I felt fine when I got out of there.

Q:  Well, you testified two minutes ago in front of this jury that you knew you had hallucinations in the hospital, did you just testify to that?

****

Q:  <u>Did you testify a few minutes ago in front of this jury that by the time you were discharged from the  hospital, you knew you had had hallucinations and delusions in the hospital.  Did you say that in this courtroom?</u>

A:  Yes.

Q:  <u>And is it your testimony that you told that to the Government during those initial meetings before your plea, yes or no?</u>

A:  <u>I don't know if I talked about that. We talked about the hospitalization.</u>

(Tr. 1908–1915 (emphasis added).)

Based on the testimony above, Defendants maintain that Hickey testified that "he disclosed his hallucinations to the government at his first meeting, 'before they even sat down.'" (Defs.' Mot. at 4.) Defendants suggest that the absence of any references to this purported disclosure in the 302s or the various notes is powerful evidence that Hickey likely perjured himself on this issue and warrants a hearing. Defendants also claim that the government's representations and conduct prior to trial further support their claim that Hickey never disclosed this information to the government. Specifically, Mr. Krantz's declaration attests that on several occasions prior to the indictment of Defendants in October 2017, he told the government that he had reasons to believe that Hickey suffered some kind of mental breakdown, possibly including hallucinations, and that the government advised him that was not accurate and was instead false information that had been spread by Burke. (Krantz Decl. ¶ 16; see also infra at 52–58 (setting out background of counsel's communications concerning Hickey's medical conditions and treatment).) Defendants also point out that the government did not seek Hickey's medical records until 2018, which, according to Defendants, indicates that the government was not aware of Hickey's hallucinations.

One fatal flaw in Defendants' arguments is that Hickey never squarely testified at trial that he told the government he suffered from "hallucinations." Even assuming arguendo that one might, under the circumstances, expect a witness's disclosure of "hallucinations" to be memorialized in a 302 or interview notes, Hickey never clearly testified that he used the word "hallucination" in this interview with the government. Nor was he ever clearly asked, at trial, if he used the term "hallucination" in that interview. Relatedly, Hickey never claimed on the stand that, during this interview, he relayed to the government more detailed descriptions of the hallucinations he experienced both prior to, and during his hospitalization. In fact, when asked

about his delusions and hallucinations that occurred in the hospital, Hickey admitted, "I don't know if I talked about that.  We talked about the hospitalization."  (Tr. 1915.)

The most reasonable reading of Hickey's entire testimony on this point is that he merely told the government he was paranoid and that "I thought I saw people outside, that I thought people were coming to get me."[16]  (Tr. 1913.)  Even accepting arguendo Defendants' position that any significant information disclosed during an interview would likely be memorialized in a 302 or interview notes, Hickey's purported statements to the government were not as significant as Defendants suggest.  Rather, these are relatively innocuous statements made by a police officer discussing his paranoia when a federal investigation into obstruction of justice was closing in around him.  That the target of a federal investigation would experience and describe such paranoia is not surprising.  It is also not surprising that an agent—hearing Hickey's characterization of this episode—would not record Hickey's statement in his interview notes or 302 for this meeting. Defendants' speculation that that absence of any reference to this statement in the 302 or interview notes is insufficient to warrant a hearing.

Given all of Hickey's testimony on this issue, including his clarifying answers to subsequent follow-up questions, Defendants' perjury claim concerning this testimony is not plausible.  It is sheer speculation that a hearing would establish that Hickey lied when he testified that he told the government, at this first proffer session, that he was paranoid and that "[he] thought [he] saw people outside, that [he] thought people were coming to get me."  (Tr. 1913.)

---

[16]  It is true that Hickey answered "yes" to defense counsel's leading and compound question which asked whether, after the government asked you about the rumors of your mental problems, "you told them all about that you had hallucinations, you had delusions, you had paranoia, you've been hospitalized for it, is that your testimony?"  (Tr. 1912.)  However, Hickey immediately provided clarity and context to that answer by explaining, in a narrative response,  that he told the government he was paranoid and that "[he] thought [he] saw people outside, that [he] thought people were coming to get me."  (Tr. 1913.)

Additionally, Defendants' response, at trial, to Hickey's testimony on this point reinforces that their decisions at trial concerning their potential perjury and Brady/Giglio claims were calculated and strategic. Rather than calling the agents before the jury or requesting a hearing outside of the jury's presence, the defense instead sought and secured a stipulation that, at Hickey's interview with the government on December 4, 2015, he stated that "On October 26, 2015, he returned home from a hospital stay for a minor stroke." (Tr. 3158.) The defense deftly used this stipulation in summation, arguing to the jury that "according to the evidence," this statement was "all [Hickey] tells the Government [at his first proffer session on December 4, 2015] about his hospitalization just a few weeks [earlier]." (Tr. 3410.) Securing this stipulation gave the defense ammunition to impeach Hickey's testimony on this point without the potential risks of calling the agents. Even if the agents would have given testimony on this point (or about Hickey's disclosure of the February 2013 meeting) that the defense could have tried to argue contradicted Hickey's testimony on these issues, there was an enormous downside that counseled against calling the agents. Specifically, the agents could have confirmed the many aspects of Hickey's testimony that he clearly did tell the government during his proffer sessions.

Finally, Defendants also contend that Hickey's testimony about this disclosure to the government cannot be squared with the fact that: (1) the government denied to defense counsel that Hickey had suffered a mental breakdown and hallucinations; and (2) the government did not even seek Hickey's medical records until 2018, which, according to Defendants, demonstrates that the government was not aware of Hickey's hallucinations until it received those records in 2019.[17] Neither of these points are surprising given that Hickey himself testified that he told the

---

[17] The details of the parties' pretrial conversations and litigation concerning Hickey's medical conditions and medical records is set out in detail infra at pages 53–58.

government that he suffered a mini-stroke and never claimed that, in his initial interview, he suffered a mental breakdown or used the term "hallucination" with the government.  Thus, the government's statements to Mr. Krantz and the government's failure to immediately seek Hickey's hospital records earlier are not as surprising, as Defendants claim.  Moreover, while it may have been advisable for the government to seek Hickey's hospital records earlier, their failure to do so does not suggest that Hickey lied in this testimony.  There could be any number of reasons why the government prioritized other parts of the investigation before seeking Hickey's medical records.

In sum, I find that a hearing is not warranted on this claim.

### d. Hickey's Disclosure to the Government about his Alcoholism

On cross-examination, Hickey testified that, at some point prior to his guilty plea in January 2016, he told the government about his alcoholism.[18]  (Tr. 1901–1904, 1915–16.)  Defendants' opening brief raised Hickey's testimony concerning the disclosure of his alcoholism to the government in a footnote.  In that footnote, Defendants argued that "[t]o the extent that a hearing is ordered, this subject [i.e., Hickey's testimony concerning about his disclosure of his alcoholism to the government] should also be a proper subject of inquiry."  (Defs.' Mot. at 6 n.4.)  Because the Court concludes that a hearing is not warranted on any of Defendants' other claims, Defendants' further request to also explore this testimony about Hickey's alcoholism at a hearing is denied.

In their reply brief, Defendants appear to also argue that a hearing is independently warranted concerning Hickey's testimony about his alcoholism.  To the extent Defendants seek to

---

[18]  Defendants received the records from Hickey's 2013 hospitalization for alcoholism in August 2019, well in advance of trial, which began on November 14, 2019.

raise such an argument, they waived that argument by not raising it in their opening brief and, instead, discuss Hickey's testimony about his alcoholism in a passing footnote.

In any event, even if this argument was properly before the Court, the Court would not grant a hearing on this claim. Defendants' argument that Hickey's testimony about this disclosure was false is premised on the absence of references to Hickey's alcoholism in the 302s and interview notes. However, Defendants' claim that Hickey never personally disclosed his alcoholism to the government is simply too speculative to warrant a hearing. Hickey testified that, in addition to personally informing the government of his alcoholism, he also informed his lawyers, in November 2015, that he was hospitalized in 2013 for alcohol abuse and authorized Sapone to relay that information to the government in the attorney proffer that ultimately occurred on December 1, 2015. (Tr. 2134.) An outline prepared by Hickey's lawyers in preparation for the attorney proffer with the government explicitly references the fact that Hickey was hospitalized at Huntington Hospital for five days in 2013 for alcohol abuse. (3500-JH-51, ECF No. 211-2; Tr. 1782, 2132–34.) Given this document, Defendants' suggestion that Hickey never personally disclosed that same information to the government is sheer speculation. In light of the attorney proffer session, Hickey had no reason to hide this hospitalization. Even if this argument had not been waived, the Court would conclude that Defendants are not entitled to a hearing on this claim.

**e.  Hickey's Testimony Concerning the Governments' Inquiry into
Follow-Up Visits after His 2015 Hospitalization**

In order to address this claim, it is first necessary to set out the background of the government's communications with defense counsel about Hickey's medical conditions and records, including an August 26, 2019 email exchange between counsel concerning follow-up visits that Defendants claim shows that Hickey's testimony about his communications with the government about follow-up visits was false.

According to a declaration submitted by McPartland's counsel, Mr. Krantz, on several occasions prior to McPartland's indictment on October 25, 2017, counsel raised "with the government the issue of Hickey's mental health, and in particular, that [he] had reason to believe that Hickey had suffered from some kind of mental breakdown, possibly including hallucinations, during the relevant time period."  (Krantz Decl. ¶ 16.)  "In each instance, the government responded that the information [he] had about Hickey was not accurate.  More particularly, the government advised [Mr. Krantz] that this was false information being spread by James Burke." (Id.)

As explained infra, at trial, Hickey testified that he originally requested his hospitalization records in 2018.  After some delays, he received them in early 2019 and turned them over to the government on February 1, 2019.

According to the Krantz Declaration, on March 20, 2019, counsel for Spota spoke with the government over the phone.  During the call, Spota's counsel raised the issue of Hickey's mental health and the existence of reports that he was hospitalized in August 2013 and October 2015. (Krantz Decl. ¶ 19.)  The Krantz Declaration asserts that, after the call, Spota's counsel relayed the substance of the call to Mr. Krantz, explaining that, in the call, the government had advised Spota's counsel that:

> The government was aware that James Burke had told people that Hickey was experiencing hallucinations, but there was no evidence to support Burke's claims.
>
> The government had in its possession certain of Hickey's medical records relating to an October 2015 hospitalization, but that those records were unrelated to a mental health issue, and contained nothing relating to mental health.

(Krantz Decl. ¶ 19.)

On March 26, 2019, defense counsel submitted a letter to the government formally requesting all materials related to medical treatment that Hickey had received, including for any hospitalizations in 2015. (Krantz Decl. ¶ 20.) Ultimately, on July 31, 2019, the government filed a copy of Hickey's hospital records in camera with the Court and asked the Court to preclude the admission of these records at trial. The government did not provide the defense with the records at that time, but instead provided the defense with a letter purporting to summarize the records. (Krantz Decl. ¶ 23.) This letter stated that "Hickey was ultimately diagnosed with a [TIA]" and that the records revealed "unequivocally" that Hickey's "condition was entirely attributable to a physical condition health issue—that is, the loss of blood flow to critical areas of his body."[19] (See Krantz Decl. ¶ 23.) On August 15, 2019, the Court ordered the government to disclose Hickey's hospital records to the defense and reserved decision on their admissibility until the defense had an opportunity to review the records and respond to the government's motion to exclude those records from evidence. The Court would ultimately find these records to be admissible.

After reviewing these hospitalization records, which included directions for Hickey to seek follow-up care, defense counsel emailed the government on August 19, 2019 seeking all "records of any other hospitalizations or out-patient treatments, between January 1, 2013 and the present,

---

[19] While some of the government's statements to counsel concerning Hickey's condition and hospital records are indicative of a sharp-elbowed litigation posture by the government and, perhaps, a few instances of carelessness, they do not suggest prosecutorial misconduct. The government provided Hickey's hospital records to the Court for an in camera review well in advance of trial and the defense had ample opportunity to use those records at trial.

related to Hickey's alcoholism, pancreatitis, delirium, hallucinations, TIA, stroke, or any other medical or mental condition that may affect memory or perception." (Krantz Decl. ¶ 26.) The government informed the defense on August 20, 2019 that it had no documents responsive to this request. (Id. ¶ 27.) On August 26, 2019, Mr. Krantz had the following conversation with an AUSA on the trial team over the phone:

> I advised her, in substance, that I was very surprised and concerned that there were no follow-up medical records and that I wanted to make it clear that I was asking for medical records of any kind relating to any type of follow-up concerning Hickey's October 2015 hospitalization, whether for physical, mental or psychiatric conditions. I further advised her that I did not want to "parse words" with her as to what was a mental condition versus a physical condition. The AUSA responded that she understood, that she had spoken to Hickey on the subject, and that he was "prepared to testify under oath" that no such records existed, because he saw no doctors after October 2015 for any reason (with the possible exception of an eye doctor visit at Stony Brook hospital).

(Krantz Decl. ¶ 28.) In order to memorialize this conversation, Krantz emailed the AUSA on August 26, 2019. The AUSA's August 26, 2019 response (which includes both Mr. Krantz's original email and the AUSA's response in bold) is set out below:

> Thank you for speaking with me today. This will confirm our conversation in which you advised me:
>
> ****
>
> You have spoken with James Hickey and he has confirmed, and is prepared to testify under oath, that other than his two hospitalizations that have been disclosed, for the time period 2013 to the present, he has not seen any medical professionals for any physical, mental, or psychiatric conditions (and therefore there are no records of such).
>
> > **Yes – however, please be reminded that we have moved to preclude any cross- examination of Hickey about any purported mental or psychiatric conditions, as none exist. We continue to await the Court's ruling in that regard. Thus, in our conversation, I did not mean to suggest we intend to elicit this information, as we do not.**

You said the only exception to this was a visit to an eye doctor, which you believed to have been disclosed in your letter to the Court dated July 31, 2019.  I am having trouble finding that, so perhaps you can point me to it?

**Letter to the Court dated 7/31/19**

**FN#1 - At the request of defense counsel, the Government has sought, via subpoena duces tecum, additional hospitalization and medical records for this witness, but has received no other records. According to information provided by the Stony Brook University Hospital System in response to the subpoena, Hickey has been seen as a patient at certain out-patient practices, in particular: (a) in 1998, Hickey saw a dermatologist affiliated with Stony Brook; (b) in 1999, Hickey saw an ophthalmologist affiliated with Stony Brook; and (c) in 2002, Hickey saw a gastroenterologist affiliated with Stony Brook.**

\*\*\*\*

Please confirm the above.  Thank you for your courtesies.

(Krantz Decl., Ex. F.)

The defense subsequently referenced this disclosure by the government in the defense's September 29, 2019 submission to the Court, which argued that Hickey's records were admissible (a position the Court ultimately adopted).  (Krantz Decl. ¶ 30.)  On November 5, 2019, the Court held a <u>Daubert</u> hearing to determine the admissibility of the defense's proposed medical expert. (Krantz Decl. ¶ 31; ECF No. 152.)

On November 20, 2019, the government produced, without any explanation to defense counsel, additional medical records documenting Hickey's four post-hospitalization office visits with a cardiologist, Dr. Joshua Klein.  (Krantz Decl. ¶ 33; Tr. 3159.)  This occurred during the second week of trial.  Hickey did not end up taking the stand until November 26, 2019 and his cross-examination did not begin until December 2, 2019.

Once on the stand, Hickey testified about his treatment, his disclosures to the government about this treatment, and his efforts to obtain his medical records.  Hickey maintained that in the

spring or early summer of 2018, the government requested that he obtain a copy of the medical records from his hospitalizations.  (Tr. 1783–84, 1912–13, 1916.)  Hickey called Huntington Hospital to obtain these records and requested that they be sent to him.  (Tr. 1783.)  When Hickey did not receive the records, he followed up with a second phone call and was assured that the records would be sent. (Tr. 1783.)  When the records were still not forthcoming, Hickey personally went to the hospital and requested a copy of his records and executed a HIPAA release.  (Tr. 1784, 3159.)  Shortly thereafter, Hickey received his records and, on February 1, 2019, provided them to the government.  (Tr. 1784, 3159.)  As explained earlier, on August 15, 2019, pursuant to the Court's order, the government produced these medical records to the defense.  (Gov't Opp'n at 5.)

At trial Hickey also testified about the records for his four follow-up visits with Dr. Klein in October, November, and December 2015 and March 2016 that the government produced in the beginning of trial.[20]  Hickey testified that he recalled having a follow-up visit with a doctor after his hospitalization when, during trial preparation, he recounted his conversation with Chief Cameron after his hospitalization and remembered that Cameron had called him while he was at Dr. Klein's office.  (Tr. 1918.)  According to Hickey, the government then asked him to obtain his records from Dr. Klein.  (Tr. 1916–918.)

On cross-examination, Hickey stated that prior to the month before trial, the government had not asked him if he had any follow-up visits with medical providers of any kind.  (Tr. 1916–19; see also Tr. 1919 (stating that he "did not recall" if the government had previously asked him

---

[20] The records from Dr. Klein—who, according to the hospitalization records, had also seen Hickey while in the hospital, (GX4001)—contained information potentially favorable to both the defense and the government that each side sought to exploit at trial.  (DX32.)  The records contain multiple references to "AMS" and "altered mental status" and note, inter alia, "altered mental status with psychosis with hypertension requiring precedex drip."  (DX32.)  The prosecution, however, stressed that Dr. Klein's records from Hickey's December 2015 visit also included the notation "TIA?", which supported the government's theory at trial that Hickey believed that he had suffered a mini-stroke.  (Tr. 3537.)

for records of follow-up visits during August 2019).)  During cross-examination, defense counsel did not attempt to introduce the August 26, 2019 e-mail or raise it with the Court.

On re-direct examination, the government asked, in a leading question, whether, in meeting with the government and talking about his health issues, the government asked him whether he had seen a "psychiatrist or a therapist after [his] 2015 hospitalization."  (Tr. 2150.)  Hickey answered that the government had asked him this and that he had not seen a therapist or a psychiatrist after his 2015 hospitalization.  (Tr. 2150.)

After Hickey gave this testimony on re-direct, Mr. Krantz requested a sidebar at which he sought to introduce and use the AUSA's August 26, 2019 email concerning follow-up visits to impeach Hickey.  At the sidebar, the AUSA stated that, given the defense's pretrial focus on Hickey's purported psychiatric history, she was imprecise when she had spoken with Hickey before trial and in responding to Krantz's email.  (Tr. 2165.)  The government also argued against the email coming into evidence.  (Tr. 2167.)  Although the Court expressed some doubt as to whether the email could be used to impeach Hickey, the Court ultimately never ruled on Mr. Krantz's request, which he ended up withdrawing during the following exchange:

> MR. KRANTZ:  Ms. Gatz is saying my e-mail is false.  I assumed the e-mail was true and so it would be circumstantial evidence that Mr. Hickey did say this to Ms. Gatz.  Ms. Gatz has taken the position no, the e-mail is false, I'm making a mistake.
>
> MS. GATZ:  If I was trying to hide it I wouldn't have gotten the record three weeks ago.
>
> MR. KRANTZ:  I'll not use the exhibit.
>
> THE COURT:  Don't use the exhibit.
>
> MR. KRANTZ:  Fine.

(Tr. 2167–68.)

On re-cross, defense counsel pressed Hickey on this issue and Hickey again insisted that he only recalled the government asking him about whether he had seen a "therapist or a psychiatrist as a follow-up" to the 2015 hospitalization.  (Tr.  2173–74.)  Defense counsel did not make any renewed attempt to use the August 26, 2019 e-mail exchange.

Defendants contend that because Hickey's testimony concerning these follow-up visits contradicts the government's earlier representation on this issue as set out in the August 29, 2019 email, the Court should hold a hearing to determine if Hickey committed perjury on this issue.

After considering all of the points set out above, I find that a hearing on this issue is not warranted.  First, Defendants abandoned their attempt to use the August 26, 2019 email at trial before the Court even ruled on the defense's request at sidebar.  Second, Defendants' argument that they needed to call the AUSA to effectively explore this issue is unpersuasive.  The defense already had an email from the AUSA memorializing this representation, which potentially could have been used by the defense without having to call the prosecutor.  The defense, however, decided to withdraw its request at sidebar concerning the email before the Court had even ruled on that request.  Additionally, the defense never even asked the government if an agent was present for this conversation between the AUSA and Hickey.  If an agent was present, the defense could have called the agent to testify about this conversation or sought a hearing (in camera or otherwise) with the agent outside of the jury's presence.  Moreover, even if no agent was on the call, if the defense truly believed that this was an issue that needed to be explored, the defense could have asked the Court to hear testimony from the prosecutor at a hearing (in camera or otherwise) outside of the jury's presence.  The defense, however, never sought such a hearing and instead waited until after trial to seek that hearing.

I also find that a hearing is not warranted because Defendants do not have a plausible claim that Hickey committed perjury on this issue.

To show that Hickey perjured himself, the defense theory would have to be that: (1) the government originally asked Hickey about follow-up visits from all medical providers; (2) Hickey lied to the government by denying that he had any such follow-up visits; (3) nevertheless, Hickey subsequently decided to disclose to the government, shortly before trial, that he did, in fact, have a few follow-up visits and then went ahead and obtained those records, which the government disclosed to the defense; and (4) Hickey then lied on the stand twice, first stating that the government had never previously asked him for these records and then lying on re-direct and re-cross by stating that the government had only previously asked him about follow-up visits with therapists and psychiatrists.  This sequence of event is not plausible.  If Hickey wanted to cover these visits up, he would not have disclosed them prior to trial.  The notion that Hickey lied to the government about these follow-up visits in August 2019—after the defense had already received his hospitalization records—and then subsequently decided to disclose these visits to the government shortly before trial makes no sense.  Moreover, it is not as if the treatment provided by Klein (or anything in the Klein records) was so damaging that Hickey or the government had a reason to cover up his visits to Klein, a cardiologist.  In fact, as noted above, the government was able to use the Klein records at trial to argue that Hickey believed that he had suffered a TIA.

Moreover, the government's explanation that, when they initially questioned Hickey about follow-up visits, they were focused on mental health and psychiatric providers is credible given that this had been the defense's focus prior to trial.  The fact that the AUSA's response to the August 26, 2019 email explicitly discusses the issue of Hickey's "purported mental or psychiatric conditions" provides further support for the explanation given by the government at sidebar.

Finally, defense counsel argues that the AUSA's claim that she only asked Hickey about follow-up visits with therapists and psychiatrists is implausible because, during the conversation between counsel in August 2019, the AUSA referenced a follow-up visit by Hickey to an eye doctor. Defendants claim that this shows that the AUSA did, in fact, ask Hickey about all follow-up visits and did not limit her inquiry to psychiatrists and therapists. This is not persuasive and does not justify a hearing. Notably, when defense counsel raised the issue of Hickey's eye doctor visit in the August 26, 2019 email exchange, the AUSA referred defense counsel to a prior letter from the government that referenced records from an ophthalmologist visit in 1999. This strongly suggests that the AUSA never discussed a 2015 follow-up ophthalmologist visit with Hickey and that her statements to defense counsel about an ophthalmologist visit were the result of some confusion on her part.

Ultimately, none of Defendants' arguments for a hearing on this issue are persuasive.

### III. CONCLUSION

For the reasons set forth above, Defendants' motion for a new trial and request for a hearing is denied.

**SO ORDERED.**

Dated:  November 27, 2020
Central Islip, New York

_____/s/ (JMA)_____
JOAN M. AZRACK
UNITED STATES DISTRICT JUDGE