UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X
UNITED STATES OF AMERICA,

Docket No. 17-CR-0587 (JMA)

- against -

CHRISTOPHER MCPARTLAND                    FILED UNDER SEAL
and THOMAS J. SPOTA,

Defendants.
-----------------------------------------------------X

**EXHIBITS TO DEFENDANTS' JOINT LETTER DATED AUGUST 8, 2019**

KRANTZ & BERMAN LLP
Attorneys for Defendant
Christopher McPartland
747 Third Avenue, 32nd Floor
New York, New York 10017
(212) 661-0009

NY: 1194079-1

# Exhibit A

# COVINGTON

BEIJING  BRUSSELS  DUBAI  JOHANNESBURG  LONDON
LOS ANGELES  NEW YORK  SAN FRANCISCO  SEOUL
SHANGHAI  SILICON VALLEY  WASHINGTON

Covington & Burling LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
T  +1 212 841 1000

November 20, 2017

**BY EMAIL AND REGULAR MAIL**

Lara Treinis Gatz, Esq.
John J. Durham, Esq.
Assistant United States Attorneys
United States Attorney's Office
610 Federal Plaza
Central Islip, New York 11722

Re:     United States v. Christopher McPartland and Thomas Spota
        <u>CR 17 0587 (LDW)</u>

Dear Ms. Gatz and Mr. Durham:

As counsel for the defendant Thomas Spota in the above-referenced matter, I write this letter pursuant to Rule 16 of the Federal Rules of Criminal Procedure and all other applicable rules, statutes, and court decisions, seeking discovery in this case.

<u>Preliminary Instructions</u>

Our request for discovery relates to materials and other information in the possession, custody, or control of the United States Attorney's Office for the Eastern District of New York (including any agent, employee or other representative thereof) (collectively, the "Office") as well as all other federal, state and local government agencies or private entities or associations (including any agents, employees or other representatives of such agencies, entities or associations) over which the Office has sufficient influence or control to enable it to obtain

1

access to materials or other information possessed by such agency, entity association or any person affiliated with them.

If the Office does not have the requested materials or other information in its possession, we ask for a statement to the effect that such items do not exist or are not in the Office's possession. If the Office is aware that requested materials or other information exists but does not have them in its possession, then we request that the Office disclose the whereabouts of the materials or other information.

We request that the Office inquire of all persons who participated or are participating in any way in the investigation or prosecution of this case whether they are aware of any of the materials or other information requested in this letter and, if they are, to obtain possession of such materials or other information and disclose them to us.

With respect to all of the requests in this letter, we request all materials and other information which are in the possession, custody, or control of the government, the existence of which is known or, through the exercise of due diligence, may become known to the government.

As used herein, the term "materials" means any tangible item, in whatever form, containing, reflecting or capable of reproducing or having reproduced from it, any information requested in this letter.

Requests

It is requested that the Office disclose the following:

1.	Any and all relevant written or recorded statements made by the defendant, his co-defendant or any alleged co-conspirator, or any of their respective agents.

2.	The substance of any and all oral statements made by the defendant, his co-defendant or any alleged co-conspirator, or any of their respective agents, which the government intends to offer in evidence at trial, as well as that portion of any written record containing the substance of any such statements.

3.	Any and all books, papers, documents, data, photographs, tangible objects, buildings or places or copies of portions thereof which are material to the preparation of Mr. Spota's defense or which are intended for use by the government as evidence-in-chief at trial or were obtained from or belong to the defendant.

4.	Any and all subpoenas issued in connection with the investigation or prosecution of this case, including but not limited to the subpoenas referred to in paragraph 7 of the indictment.

5.	Any and all materials referring or relating to the meetings and conversations referred to in paragraph 8 of the indictment, including but not limited to the dates, times, lengths, locations, participants, and contents of such meetings and conversations.

6.	Any and all materials referring or relating to any and all prosecutions of Christopher Loeb.

7.	Any and all materials referring or relating to the prosecution of James Burke (*United States v. James Burke,* CR 15-627 (LDW)).

8.     Any and all results or reports of physical or mental examinations and of scientific tests or experiments, or copies thereof which are material to the preparation of the defense or are intended for use by the government as evidence-in-chief at trial.

9.     A list of any and all persons the Office intends to call as witnesses at trial and the addresses, phone numbers and email addresses of such persons.

10.     Any and all materials reflecting the content or substance of any statements of any kind by any person that the Office intends to call as a witness at trial, relating to the subject matter of the person's anticipated testimony.

11.     A summary of any and all testimony the Office intends to offer at trial pursuant to Fed. R. Evid. 702, 703 and/or 705, including but not limited to the witnesses' opinions; the bases and the reasons for such opinions; any reports, studies, data or other information which such witnesses will rely on in giving testimony; and the witnesses' qualifications.

12.     A list of any and all exhibits the Office intends to offer at trial.

13.     The names, addresses, telephone numbers and email addresses of any person whom the government knows or believes to have information relating to the investigation or prosecution of this case.

14.     With respect to each witness the Office intends to call at trial, or any member of the family of any such witness, a summary of all criminal or disciplinary charges or civil, administrative or regulatory proceedings which could be or could have been brought by any government, regulatory or self-regulatory agency, but which have not been, or may not be, or which the witness believes may not be, brought because the witness has cooperated, is

cooperating or will cooperate with the government, or because the government has requested, recommended or otherwise suggested in any way that such charges or proceedings not be brought.

15.     With respect to each witness the Office intends to call at trial, any and all materials and other information regarding any current or past drug and alcohol usage, abuse, and/or dependency, including but not limited to records relating to treatment of such individual in any federal, state, local, military or private drug, alcohol or other detoxification program.

16.     With respect to each witness the Office intends to call at trial, any and all materials and other information regarding any current or past physical or mental disease, disability, or disorder, including but not limited to records of any hospitalizations or other treatments for such physical or mental disease, disability, or disorder or any leaves of absence from employment relating in any way to such physical or mental disease, disability or disorder.

17.     With respect to each witness the Office intends to call at trial, any and all materials and other information regarding any polygraph examination(s) administered at any time by any person, including but not limited to all questions asked, all answers given, and any analysis of and reporting relating thereto.

18.     Any and all materials and other information required to be disclosed pursuant to *Brady v. Maryland*, *Giglio v. United States*, *United States v. Agurs*, *United States v. Bagley* and *Kyles v. Whitley* and their progeny. This includes but is not limited to:

> (a)     Any and all materials and other information which is exculpatory, favorable in any way to the defendant, may tend to negate or mitigate the guilt of the defendant in any

way as to any of the offenses charged, or may tend to reduce the defendant's potential punishment;

(b)     Any and all materials and other information that may be used to impeach any witness the Office intends to call at trial;

(c)     Any and all information described in this request that the government has not memorialized (*United States v. Rodriguez* (2d Cir. 2007));

(d)     Any and all materials and other information described in this request that is in the possession, custody or control of the Office or any entity, association or individual who participated or is participating in the investigation or prosecution of this case; and

(e)     The names, addresses, telephone numbers and email addresses of any and all persons who know or may know of any materials or other information described in this request or who may have information leading to persons, materials or other information described in this request.

19.     With respect to each witness the Office intends to call at trial, as well as any other

person with whom the Office, or any other person who participated or is participating in the

investigation or prosecution of this case, communicated:

(a)     Any and all statements indicating, implying or suggesting in any way that the witness or other person, or any statements made by such witness or other person, was not truthful or accurate in any way;

(b)     Any and all statements constituting or that could be construed as threats to the witness or other person if such witness or other person did not provide additional or different information than what such witness or other person had previously provided;

(c)     Any and all statements constituting or that could be construed as pressure for the witness or other person to provide additional or different information than what such witness or other person had previously provided;

(d)     Any and all statements reflecting or containing any indication of any potential negative or adverse consequences to the witness or other person if such witness or other person did not provide additional or different information than what such witness or other person had previously provided; and

(e)     Any and all statements indicating, implying or suggesting in any way any benefits to or other potential positive actions or results for the witness or other person if such witness or other person provided additional or different information than what such witness or other person had previously provided.

20.     With respect to each witness the Office intends to call at trial, or any member of the family of any such person, all indictments, informations, complaints, arrest warrants, or other materials reflecting any criminal or disciplinary charges or civil, regulatory or administrative claims brought against such person by any federal, state or local government agency, self-regulatory body or private entity or association.  With respect to any of the foregoing, please state what charges, counts, claims, actions or proceedings have been the subject of a guilty plea; conviction; determination of liability or wrongdoing or any violation of any law, statute, rule, regulation or other provision applicable to such person; deferred prosecution agreement; non-prosecution agreement; dismissal; or an agreement to dismiss, and provide any and all materials and other information relating to same.  With respect to any of the foregoing, please state whether the government recommended, requested or otherwise suggested in any way (or has agreed to do so) that any such charges, counts, claims, actions or proceedings be dismissed, not pursued, deferred, or otherwise resolved favorably for the witness.

21.     With respect to each witness the Office intends to call at trial, any and all materials and other information relating to conduct by such person that was a violation, or alleged to be a violation, of any law, statute, rule, regulation, or condition of such person's current or any past employment.

22.     With respect to each witness the Office intends to call at trial, any and all requests made to the government that demonstrate or could demonstrate any hope or expectation on the part of that person for favorable governmental action on his or her behalf or on behalf of any person, entity or association at the request or on behalf of such witness, regardless of whether or not any agent of the government has made any promise or representation regarding that hope or expectation.

23.     Any and all materials and other information relating to any and all agreements, formal or informal, by and between the Office or any federal, state or local government agency, and each witness the Office intends to call at trial.

24.     Any and all materials and other information relating to any and all oral or documented inducements, promises, payments or other benefits, contingent or otherwise, to any witness the Office intends to call at trial or to any person, entity or association at the request or on behalf of such witness; any and all materials and other information relating to such witness's relationship with or to any federal, state or local government agency; and any and all materials and other information which may otherwise relate to the credibility of such witnesses.  This request includes any inducements, promises, payments or other benefits conferred or to be conferred on any other person or entity or association, at the request or on behalf of any such witness.

25.     Any and all materials and other information concerning any informants, including but not limited to the names, addresses, telephone numbers and email addresses of such informants, the services or acts performed by such informants at the request or with the

knowledge of any federal, state or local government agency or individual, and any payments made or to be made or other benefits conferred or to be conferred to such informants or to any other person, entity or association at the request or on behalf of such informants.

26.     Any and all materials and other information which demonstrates or may demonstrate any inconsistency or arguable inconsistency with any statement made by any witness the Office intends to call at trial.

27.     Any and all materials and all information which demonstrates or may demonstrate a lack of knowledge or denial of knowledge concerning any matter relating to the investigation or prosecution of this case by any witness the Office intends to call at trial.

28.     Any and all materials and other information which relates to any grant or promise of leniency or immunity (whether court-ordered, contractual or otherwise, and whether formal or informal) made to or on behalf of any person, entity or association in connection with the investigation or prosecution of this case.

29.     Any and all materials and other information relating to actions, promises or efforts, formal or informal, successful or otherwise, on the part of the government to aid, assist or obtain benefits of any kind for each witness the Office intends to call at trial or for any person, entity or association at the request or on behalf of such witness.  This request includes but is not limited to (a) communications to any person, entity or association informing the recipient of the witness's past or future cooperation or attempted cooperation; (b) recommendations or other communications relating to any federal, state or local government financial assistance, retirement status, tax matters or other benefits relating to the witness or any person, entity or association at

the request or on behalf of such witness; (c) recommendations concerning licensing, certification, registration or other eligibility relating to the witness or any person, entity or association at the request or on behalf of such witness; (d) promises to help, or not to jeopardize or otherwise negatively affect, the status (in a profession, business or employment) of the witness or any person, entity or association at the request or on behalf of such witness; (e) assistance in obtaining a new identity, new residence or new employment for the witness or any member of the witness's family; or (f) any other actions, promises, or efforts similar in kind or related to the items listed in (a) through (e) above.

30. Any and all materials and other information relating to any commendations, awards, or any other form of recognition made to or on behalf of any person, entity or association that participated or is participating in the investigation or prosecution of this case.

31. A list of the names, addresses, telephone numbers and email addresses of all alleged co-conspirators, whether or not they have been charged.

32. A list of the names, addresses, telephone numbers and email addresses of all unnamed individuals referenced in paragraphs 8, 10, 12 and 14 of the indictment.

33. Any and all materials and other information relating to telephone calls or toll records for any communication device in which the defendant, his co-defendant, any alleged co-conspirator, any witness the Office intends to call at trial, or any other person who participated or is participating in or has any information concerning the events that were or are the subject of the investigation or prosecution of this case, maintained a possessory interest.

34.     Any and all materials and other information relating to the seeking, granting or denying of judicial permission to conduct a physical search of any person or place relating to the investigation or prosecution of this case.

35.     Any and all materials and other tangible items which were obtained by virtue of any physical search and/or seizure of any person or place, with or without prior judicial authorization, relating to the investigation or prosecution of this case.

36.     Any and all materials and other information relating to any "pen register", "trap and trace" or similar devices which were utilized in the investigation or prosecution of this case to record the telephone numbers of any incoming or outgoing telephone calls, text messages or other communications.

37.     Any and all photographs, video recordings or motion pictures which were obtained or created in connection with the investigation or prosecution of this case.

38.     Any and all materials and other information relating to any visual or physical surveillance that was obtained or conducted in connection with the investigation or prosecution of this case.

39.     Any and all materials and other information relating to any electronic interceptions, whether or not judicially authorized, which was obtained or occurred in connection with the investigation or prosecution of this case. This includes but is not limited to:

(a)     Any and all statements -- including but not limited to oral statements, written statements, text messages, instant messages, chats, emails, or other communications -- of any person whose communications were intercepted;

(b)     Any and all logs, line sheets, reports, summaries, transcripts, or other materials reflecting any and all such statements;

(c)     Any and all applications and orders seeking or requiring the sealing of tapes or other recordings;

(d)     Any and all applications and orders seeking or granting any initial interception order or renewal or extension of a previously existing order;

(e)     Any and all progress reports and orders to make such reports;

(f)     Any and all applications and orders amending an electronic interception order or warrant to include the seizure of communications relating to alleged offenses other than those specified in the original order of authorization;

(g)     Any and all inventories prepared in connection with any electronic interception;

(h)     Any and all orders served in connection with the requirement, under 18 U.S.C. § 2518(8)(d), to provide notice of interception and any and all materials and other information relating to extensions or renewals thereof;

(i)     Any and all materials and other information relating to requests for permission of any federal, state or local government agency to consensually record electronic, wire or oral communications;

(j)     Any and all materials and other information which reflect the consent of a person to have his or her electronic, wire or oral communications intercepted; and

(k)     Any and all subscriber or customer records obtained pursuant to section 2703 of the Electronic Communications Privacy Act of 1986, as amended by the Electronic Communications Privacy Act of 2000 and the USA Patriot Act of 2001, and any and all materials relating to the authorization of the government to obtain such information.

40.     Any prior criminal record of the defendant, his co-defendant, any alleged co-conspirators and any persons the Office intends to call as witnesses at trial, and a statement reflecting the use, if any, the Office intends to make of such information at trial.

41. The following information relating to the administration and procedures utilized in conducting the grand jury investigation relating to this case:

(a) The day upon which the grand jury that returned the instant indictment was empanelled, the duration of its term and any extensions thereof;

(b) If any grand jury extensions were obtained, the affidavit and order in support of such extensions;

(c) Any persons other than counsel for the government, witnesses, and a court stenographer who were present in the grand jury room while the grand jury was in session;

(d) Whether during the deliberations of and voting by the grand jury, any persons, other than grand jurors, were present in the grand jury room;

(e) Whether 16 members of the grand jury were present at the time the indictment was returned;

(f) Whether instructions concerning the law and with respect to the duties of the grand jurors and any matters before them, were made by an Assistant United States Attorney to the grand jury and, further, if these instructions were recorded in the minutes of the grand jury;

(g) Whether the grand jurors that returned the indictment were told that they were entitled to formulate and pose their own individual questions to any witness who appeared before them;

(h) Whether any grand jury subpoenas were issued to prospective witnesses who never testified in the grand jury, but instead were interviewed outside the presence of the grand jury;

(i) Any and all statements to the grand jury regarding any prosecutor's personal opinion of the credibility or lack of credibility of any grand jury witness;

(j) Any and all communications between grand jurors and prosecutors while the grand jury was in session, not reflected in the record of the grand jury's proceedings;

(k) Any failure to inform the grand jury of crimes known to have been committed by a grand jury witness (or a person whose statements were presented to the grand jury through the testimony of another person), or the fact that such person was or will not be

prosecuted for such crimes or will receive any other favorable treatment or benefit because that person cooperated, was cooperating or will cooperate with the government;

(l)    Whether any current or former member of the Office testified before the grand jury;

(m)    Whether the grand jury voted separately as to each offense in the indictment;

(n)    Whether at least 12 jurors voted to return the indictment; and

(o)    Whether any grand jury materials, including grand jury transcripts or any documents or information produced to the grand jury or obtained pursuant to subpoenas issued by the grand jury, were disclosed or released to any person other than the grand jurors, witnesses, court reporters, and counsel for the government. If such disclosure was made, please provide a copy of any court order authorizing such disclosure, the identities of all persons authorized to receive such disclosure, and the identities of all individuals to whom such disclosure was made.

42.    Any and all evidence that the Office intends to offer at trial pursuant to Federal Rule of Evidence 404(b) and, with respect to such evidence, a description of all crimes, wrongs, or acts, including but not limited to the date, time, location, participants and the nature of such crimes, wrongs or acts. Please also include the Office's theory of admissibility of all such evidence.

43.    If it is the Office's intention to impeach the defendant's credibility, should he testify, with evidence offered or testimony elicited pursuant to Federal Rules of Evidence 608 and 609, please disclose all such evidence or a summary of such anticipated testimony so that an advance ruling may be sought as to the admissibility of such evidence or testimony.

44.    Any statement made by Christopher McPartland inculpating Thomas Spota, the introduction of which would raise a potential issue of admissibility under *Bruton v. United States* and its progeny.

45.     Please state whether any witness or prospective witness was hypnotized.  If so, please describe the circumstances surrounding the hypnosis, including the witness's name, the person(s) administering the hypnosis, other persons present, the methods used to hypnotize the witness, and the date of the hypnosis, and provide any recording used to memorialize the hypnotic procedure or any and all materials relating to the procedure.

46.     Any and all materials and other information relating to the investigation or prosecution of this case, other than those described above, that was created or obtained by any person, entity or association that participated or is participating in the investigation or prosecution of this case, to the extent that such materials and other information reflect non-privileged matters.  It is understood that such materials may be redacted to protect any privileged matter from disclosure.

\* \* \* \* \*

As to all of the foregoing requests, we request that the Office adhere to its continuing duty to promptly disclose additional responsive materials and other information.

Should you have any questions concerning any of these requests, please do not hesitate to contact me.

Sincerely,

Alan Vinegrad

cc:     Larry Krantz, Esq.
        Attorney for Christopher McPartland

# Exhibit B



JJD/LTG
F. #2015R01885

November 22, 2017

<u>By Federal Express</u>

Larry Krantz, Esq.
Krantz & Berman LLP
747 Third Avenue, 32nd Floor
New York, New York 10017

Alan Vinegrad, Esq.
Covington & Burling LLP
620 Eighth Avenue
New York, New York 10018

> Re:  United States v. McPartland/Spota
> <u>Criminal Docket No. 17-587 (LDW)</u>

Dear Counsel:

Enclosed please find certain discovery materials in accordance with Rule 16 of the Federal Rules of Criminal Procedure. Additional discovery materials will be provided on a rolling basis. The government also requests reciprocal discovery from the defendants.

I.  <u>The Government's Discovery</u>

A.  <u>Statements of the Defendants</u>

Any statements of the defendants will be provided to the respective defendant under separate cover.

B.  <u>The Defendants' Criminal Histories</u>

Criminal history searches for the defendants yielded negative results.

C.   Documents and Tangible Objects

- Disk 1 contains the following materials: (1) the Suffolk County Police Department ("SCPD") personnel file for co-conspirator James Burke (Bates No. 1-351); (2) SCPD crime scene photographs of Burke's house (Bates No. 352-365); (3) SCPD crime scene photographs of Christopher Loeb's house (Bates No. 366-450); (4) SCPD crime scene photographs of recovered property (Bates No. 451-506); and (5) SCPD paperwork regarding Loeb and Miguelez arrests (Bates No. 507-620).

- Disk 2 contains certain telephone records (Bates No. PH 1-3442).

- Disk 3 contains additional telephone records (Bates No. PH 3443-8118).

- Disk 4 contains transcripts from the Loeb suppression hearing (Bates stamped by date).

You may examine the physical evidence discoverable under Rule 16, including original documents, by calling me to arrange a mutually convenient time.

D.   Reports of Examinations and Tests

The government will provide you with copies of any reports of examinations or tests in this case as they become available.

E.   Expert Witnesses

The government will comply with Fed. R. Crim. P. 16(a)(1)(G) and Fed. R. Evid. 702, 703 and 705 and notify you in a timely fashion of any expert that the government intends to call at trial and provide you with a summary of the expert's opinion.

At present, the government anticipates calling an expert at trial to testify about various cell site communications and location data, including: the engineering and operation of cell site technology, specifically, the design of cell sites and cell phone towers; how cellular telephones communicate with cell phone towers; and how cell site data can be used to determine the geographical location of a cellular phone.

The identity, qualifications, and bases for the conclusions of each expert will be provided to you when they become available.

F.   Brady Material

The government understands and will comply with its continuing obligation to produce exculpatory material as defined by Brady v. Maryland, 373 U.S. 83 (1963), and its progeny.

Before trial, the government will furnish materials discoverable pursuant to Title 18, United States Code, Section 3500, as well as impeachment materials. See Giglio v. United States, 405 U.S. 150 (1972).

G.     Other Crimes, Wrongs or Acts

The government will provide the defendants with reasonable notice in advance of trial if it intends to offer any material under Fed. R. Evid. 404(b).

II.     The Defendants' Required Disclosures

The government hereby requests reciprocal discovery under Rule 16(b) of the Federal Rules of Criminal Procedure. The government requests that each defendant allow inspection and copying of (1) any books, papers, documents, data, photographs, tapes, tangible objects, or copies or portions thereof, that are in the defendant's possession, custody or control, and that the defendant intends to introduce as evidence or otherwise rely on at trial, and (2) any results or reports of physical or mental examinations and of scientific tests or experiments made in connection with this case, or copies thereof, that are in the defendant's possession, custody or control, and that the defendant intends to introduce as evidence or otherwise rely upon at trial, or that were prepared by a witness whom the defendant intends to call at trial.

The government also requests that each defendant disclose prior statements of witnesses who will be called by the defendant to testify. See Fed. R. Crim. P. 26.2. In order to avoid unnecessary delays, the government requests that the defendant have copies of those statements available for production to the government no later than the commencement of trial.

The government also requests that each defendant disclose a written summary of testimony that the defendant intends to use as evidence at trial under Rules 702, 703, and 705 of the Federal Rules of Evidence. The summary should describe the opinions of the witnesses, the bases and reasons for the opinions, and the qualification of the witnesses.

Pursuant to Fed. R. Crim. P. 12.3, the government hereby demands written notice of each defendant's intention, if any, to claim a defense of actual or believed exercise of public authority, and also demands the names and addresses of the witnesses upon whom the defendant intends to rely in establishing the defense identified in any such notice.

III.     Future Discussions

If you have any questions or requests regarding further discovery or a disposition of this matter, please do not hesitate to contact me.

Please be advised that, pursuant to the policy of the Office concerning plea offers and negotiations, no plea offer is effective unless and until made in writing and signed by authorized representatives of the Office. In particular, any discussion regarding the

3

pretrial disposition of a matter that is not reduced to writing and signed by authorized representatives of the Office cannot and does not constitute a "formal offer" or a "plea offer," as those terms are used in <u>Lafler v. Cooper</u>, 132 S. Ct. 1376 (2012), and <u>Missouri v. Frye</u>, 132 S. Ct. 1399 (2012).

Very truly yours,

BRIDGET M. ROHDE
Acting United States Attorney

By: <u>/s/ John J. Durham</u>
   John J. Durham
   Lara Treinis Gatz
   Assistant U.S. Attorneys
   (631) 715-7851/7913

Enclosures

cc: Honorable Leonard D. Wexler (By hand, without enclosures)
  Clerk of the Court (LDW) (By ECF, without enclosures)

# Exhibit C

# COVINGTON

BEIJING  BRUSSELS  DUBAI  FRANKFURT  JOHANNESBURG
LONDON  LOS ANGELES  NEW YORK  SAN FRANCISCO
SEOUL  SHANGHAI  SILICON VALLEY  WASHINGTON

Alan Vinegrad

Covington & Burling LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
T  +1 212 841 1022
avinegrad@cov.com

March 26, 2019

**BY EMAIL AND REGULAR MAIL**

Lara Treinis Gatz, Esq.
John J. Durham, Esq.
Justina Geraci, Esq.
Assistant United States Attorneys
United States Attorney's Office
610 Federal Plaza
Central Islip, New York 11722

> Re:  United States v. Christopher McPartland and Thomas Spota
> No. 2:17-cr-0587 (JMA)

Counsel:

I write in furtherance of our recent discussions.

On behalf of both defendants[1], I respectfully request that you confirm that you will produce to us, by whatever date is set by the Court for the disclosure of materials required to be disclosed pursuant to *Brady, Giglio* and their progeny, the following materials (in addition to the categories of previously-requested material set forth in our discovery letters dated November 20, 2017 and March 1, 2018 and in our pre-trial motions, which requests are expressly reiterated herein):

1.   All materials required to be disclosed pursuant to *Brady* and *Giglio* that is in the possession of the Suffolk County Police Department ("SCPD") or other agencies of Suffolk County government, including but not limited to the Suffolk County District Attorney's Office ("SCDAO").

2.   With respect to each current or former member of the SCPD or SCDAO who may testify at the trial of this case, his or her SCPD or SCDAO personnel file or personnel materials, and all SCPD Internal Affairs Bureau files or materials relating to him or her, to the extent that such materials contain impeachment or other exculpatory material.

---

[1] Larry Krantz, Esq. has authorized me to submit this letter to you on behalf of Mr. McPartland.

3. With respect to James Hickey, all materials relating to any medical treatment, including but not limited to hospitalizations at Huntington Hospital in 2013 and October 2015, a hospitalization in a Suffolk County medical facility in or about December 2015, and any other hospitalizations or other visits to medical care facilities, for any condition relating to the use of alcohol, pancreatitis, or any mental or emotional condition. This also includes all such materials in the possession of South Country Ambulance Co. and Stony Brook University Hospital. This further includes all SCPD materials relating to any of the foregoing, as well as all SCPD materials relating to any absences from work, reassignments, or treatment for the use of alcohol, pancreatitis or any mental or emotional condition.

4. Any instances in which James Burke made statements, in words or substance, concerning James Hickey's mental or emotional condition; hospitalizations or other medical treatment relating to Mr. Hickey's use of alcohol, pancreatitis or mental or emotional condition; or any attempt or claimed attempt by Mr. Hickey to commit suicide, regardless of whether or not the government contends that any such statements by Mr. Burke were or were not accurate. Such information constitutes *Brady* and/or *Giglio* information with respect to Mr. Hickey (if accurate) or Mr. Burke (if not accurate) and, as to the latter, would be admissible pursuant to Fed. R. Evid. 806 to the extent that the government introduces other statements of Mr. Burke at trial.

To the extent any of the above-referenced materials are not currently in your possession, we request that you confirm that you will promptly take whatever steps are necessary to obtain possession of such materials.

We request that you confirm your intentions with respect to the foregoing matters by Monday, April 1, 2019.

We appreciate your attention to the foregoing, and would be happy to discuss it further with you at your convenience.

Sincerely,

Alan Vinegrad / CA

Alan Vinegrad

cc: Larry Krantz, Esq.

2

**Exhibit D**



JJD:LTG/JLG
F. #2018R00279                    *610 Federal Plaza*
                                    *Central Islip, New York 11722*


                                    April 12, 2019

<u>By E-mail</u>

Larry H. Krantz
lkrantz@krantzberman.com

Bradley Gershel
gershelb@ballardspahr.com

Lisa Cahill
lcahill@krantzberman.com

Alan M. Vinegrad
avinegrad@cov.com

Erin K. Monju
emonju@cov.com


          Re:    United States v. Christopher McPartland and Thomas J. Spota
                 <u>Criminal Docket No. 17-587 (JMA)</u>

Dear Counsel:

          Pursuant to the government's continuing obligation to produce exculpatory material as defined by <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and its progeny, the government hereby notifies you of the following, which is being provided pursuant to the parties' stipulated Protective Order of March 29, 2019:[1]

---

[1]     The information being provided herein does not, in many instances, constitute *Brady* material *per se*, but is being disclosed regardless, as it may prove helpful to the defense.

I. <u>False Exculpatory Statements of Former Suffolk County Police Chief of Department James Burke</u>

James Burke made certain statements concerning the December 14, 2012 assault of an in-custody defendant, Christopher Loeb (the "Loeb Matter"), and the related federal civil rights and obstruction investigation, including, in sum and substance, denying his own involvement in the assault, and asserting that the federal investigation into the assault was unfounded, and was merely retaliation for Burke, among other things, removing Suffolk County Police Department ("SCPD") personnel from a federal task force,[2] to the following individuals:[3]

1. Steven Bellone
2. Alexandra Beyrer
3. Tracy Lynne Broxmeyer
4. James Burke
5. John Cahill
6. Brian Carty
7. Dennis Cohen
8. Emily Constant
9. Barbara Craft
10. Robert Donohue
11. Anthony D'Orazio
12. Frank Guidice
13. James Hickey
14. Clifford Lent
15. Kevin Law
16. William Madigan
17. Russell McCormick
18. John Meehan

---

[2] Although the government intends to introduce certain statements made by Burke during and in furtherance of the charged conspiracy, *see* Federal Rule of Evidence 801(d)(2)(E), the government intends to move *in limine* to preclude the introduction of false exculpatory statements made by Burke to other witnesses, *see* Fed. R. Evid. 403 (danger of confusing the issues and misleading the jury), 801 and 802 (hearsay). Subsequent to making these false exculpatory statements to the witnesses listed herein, Burke pled guilty on February 26, 2016 to a civil rights violation in connection with his assault of Loeb and to conspiring to obstruct justice with respect to the federal investigation into the assault, *see* 15 Cr. 627 (LDW).

[3] Most, if not all, of the individuals listed herein are presently represented by legal counsel, who have advised the government that communications with their clients must be made through them. Should you wish to speak to any of these individuals, please refer to the enclosed list of counsel contacts.

19. John Rodriguez
20. Richard Schaffer
21. Dennis Sullivan
22. John Sumwalt
23. John Toal
24. Edward Webber

II.      The Propriety of the Investigation into SCPD Detective John Oliva

As noted in our letter of March 11, 2019, the government intends to offer evidence at trial concerning certain improprieties surrounding the investigation of SCPD Detective John Oliva and the related court-ordered wire interception of Oliva's cellular telephone from in or about March 2014 through in or about June 2014.  The following individuals have provided information supportive of certain aspects of the Oliva investigation and/or the wiretap of Oliva's cellular telephone:[4]

1.  Alexandra Beyrer
2.  John Cahill
3.  Paul Caroleo
4.  Emily Constant
5.  Lucy Graziano
6.  Thomas Iacopelli
7.  Kenneth Kearns
8.  William Madigan
9.  John Meehan
10. Spiros Moustakas

III.     Other Statements Concerning the Loeb Matter and the Subsequent Federal Investigation

The government hereby discloses that the following individuals have opined that Burke did not assault Loeb:

1.  Frank Catalina
2.  Brian Mitchell

The government further discloses that the following individuals have questioned the motivation for, and/or the validity of, the federal investigation and prosecution of Burke, and/or the instant matter, or reported that others have done so:

1.  Joseph Conway

---

[4]      To be clear, the government does not take the position that the Oliva investigation and wiretap was wholly inappropriate or that a crime had not been committed by Oliva.

    2. Emily Constant
    3. William Madigan
    4. Russell McCormick
    5. Kenneth Regensburg
    6. Joseph Sawicki

IV.    <u>Statements Concerning the Defendants' Knowledge of the Loeb Matter</u>

The government hereby discloses that the following individuals have provided information concerning the defendant(s) lack of knowledge that Burke assaulted Loeb:

    1. George Burke
    2. Emily Constant
    3. Barbara Craft
    4. Anthony D'Orazio
    5. Frank Guidice
    6. Thomas Iacopelli
    7. William Madigan
    8. John Rodriguez

\* \* \* \*

Because of the nature and contents of this letter, which discloses the names of numerous individuals who have been interviewed during the course of the investigation, the government, with the consent of both defendants, respectfully requests that it be filed under seal. <u>See</u> <u>United States v. Amodeo</u>, 71 F.3d 1044, 1050-51 (2d Cir. 1995) (privacy interests of third parties may be compelling reason justifying sealing). Moreover, public disclosure of the information contained in this letter could potentially impact the right of the defendants or others to a fair trial. <u>See</u> <u>United States v. Graham</u>, 257 F.3d 143, 154 (2d Cir. 2001) (protecting a defendant's right to fair trial may be compelling reason justifying sealing). Under these circumstances, the government respectfully submits that the countervailing interests set forth above outweigh the public's qualified right to access. As the facts set forth

above provide ample support for the "specific, on the record findings" necessary to support sealing, <u>Lugosch v. Pyramid Co.</u>, 435 F.3d 110, 120 (2d Cir. 2006), the government respectfully requests that the Court record those findings and file this letter under seal.

Very truly yours,

RICHARD P. DONOGHUE
United States Attorney

By:     _/s/_ _____
John J. Durham
Lara Treinis Gatz
Justina L. Geraci
Assistant U.S. Attorneys
(631) 715-7851/-7913/-7835

Enclosure.

cc:      Clerk of the Court (JMA) (by Hand)

**Exhibit E**



U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

JJD:LTG/JLG
F. #2018R00279

*610 Federal Plaza*
*Central Islip, New York 11722*

July 8, 2019

By E-mail

Larry H. Krantz
lkrantz@krantzberman.com

Bradley Gershel
gershelb@ballardspahr.com

Lisa Cahill
lcahill@krantzberman.com

Alan M. Vinegrad
avinegrad@cov.com

Erin K. Monju
emonju@cov.com

> Re:     United States v. Christopher McPartland and Thomas J. Spota
>         Criminal Docket No. 17-587 (JMA)

Dear Counsel:

We write in response to your email of May 2, 2019, concerning the government's Brady disclosure of April 12, 2019, wherein you request "any summaries, reports and/or notes of these witnesses' statements so that the defense can make effective use of the disclosure." Please be advised of the following supplemental information:

### I.     False Exculpatory Statements of Former Suffolk County Police Chief of Department James Burke

James Burke made certain statements concerning the December 14, 2012 assault of an in-custody defendant, Christopher Loeb (the "Loeb Matter"), and the related federal civil rights and obstruction investigation, including, in sum and substance, denying his own involvement in the assault, and asserting that the federal investigation into the assault was unfounded, and was merely retaliation for Burke, among other things, removing Suffolk

County Police Department ("SCPD") personnel from the Long Island Gang Task Force ("LIGTF"),[1] to the following individuals:[2]

1. **Steven Bellone**. Burke told Bellone, in substance and in part, that: *(i)* the Loeb assault was "his word versus my word," and that he (Burke) did nothing wrong; and *(ii)* the federal investigation was a conspiracy against Burke, and the federal authorities "had an axe to grind." Burke provided Bellone with a document that purported to be a timeline of events occurring both before and after the Loeb assault (hereinafter, the "Burke Timeline").[3]

2. **Alexandra Beyrer**. Burke told Beyrer that the "feds" were trying to kill him, but that he had done nothing wrong, and that Loeb had no injuries. Burke provided Beyrer with the Burke Timeline, and stated that it was "all politics" and that they were "out to get him."

3. **Tracy Lynne Broxmeyer**. Burke told Broxmeyer, in substance and in part, that the federal investigation was retribution for Burke's handling of the Gilgo Beach investigation.

4. **James Burke**. Attached hereto as Exhibit 1 is the substance of a statement made by Burke to Special Prosecutor Peter Crusco of the Queens District Attorney's Office on or about May 14, 2013.

5. **John Cahill**. Cahill heard Burke say during a meeting, in substance and in part, that the Loeb investigation was "all bullshit."

---

[1] Although the government intends to introduce certain statements made by Burke during and in furtherance of the charged conspiracy, *see* Federal Rule of Evidence 801(d)(2)(E), the government intends to move *in limine* to preclude the introduction of any false exculpatory statements made by Burke to other witnesses, *see* Fed. R. Evid. 403 (danger of confusing the issues and misleading the jury). Subsequent to making these false exculpatory statements to the witnesses listed herein, Burke pled guilty on February 26, 2016 to a civil rights violation in connection with his assault of Loeb and to conspiring to obstruct justice with respect to the federal investigation into the assault, *see* 15 Cr. 627 (LDW).

[2] As previously indicated, most, if not all, of the individuals listed herein are presently represented by legal counsel, who have advised the government that communications with their clients must be made through them. Should you wish to speak to any of these individuals, please refer to the previously provided list of counsel contacts.

[3] The Burke Timeline was previously produced as Rule 16 discovery in this matter.

6. **Brian Carty**. Burke told Carty, in substance and in part, that the Loeb investigation was "all bullshit," and that he (Burke) would be fine.

7. **Dennis Cohen**. Burke told Cohen, in substance and in part, that the "feds were out to get him," because of his removal of Suffolk Police members from the LIGTF. Burke further denied all of the allegations with respect to the Loeb assault, and claimed that he did nothing wrong.

8. **Barbara Craft**. Burke told Craft, in substance and in part, that none of what was being said about him in the Loeb matter was true, and that people were trying to put him (Burke) in jail.

9. **Robert Donohue**. Burke told Donohue, in substance and in part, that he (Burke) had only talked to, or scared, Loeb, but that he did not hit Loeb. Burke also told Donohue, in substance and in part, that the federal authorities were "out to get him," and were trying to "lock him up," "destroy him," and/or "kill him."

10. **Anthony D'Orazio**. Burke told D'Orazio, in substance and in part, that the allegations against him made by Loeb were false, that he was innocent, and that the federal authorities were his enemies, and were trying to get back at him. Burke further told D'Orazio that Bellone was forcing him (Burke) to retire, but that he (Burke) had done nothing wrong.

11. **Frank Guidice**. Burke told Guidice, in substance and in part, that the "feds" were "out to get him."

12. **James Hickey**. Burke told Hickey, in substance and in part, that: *(i)* all he (Burke) did to Loeb was squeeze his face and tap him on the head, and that another officer had beat up Loeb; *(ii)* no one will believe a "perjured cop" and a "junkie;" and *(iii)* the federal authorities are "going to get me," and that the United States Attorney's Office is seeking revenge against him (Burke) for removing officers from the LIGTF. Burke also described the federal investigation as an "amorphous conspiracy," in which no crime had been committed.

13. **Clifford Lent**. Burke told Lent, in substance and in part, that there was an "ongoing dispute" between himself on the one hand, and the FBI and federal prosecutors on the other, that led Burke to be accused of various things related to the Loeb matter.

14. **Kevin Law**. Burke told Law, in substance and in part, that the allegations surrounding the Loeb incident were "all b.s."

3

15. **Russell McCormick**. Burke told McCormick, in substance and in part, that: *(i)* "nothing happened," with respect to Loeb; *(ii)* he (Burke) only looked into the interview room, to see if he recognized Loeb; and *(iii)* the "Feds were out to get him."

16. **John Meehan**. Burke told Meehan, in substance and in part, that Meehan would hear untrue allegations that Burke had hit Loeb and that there was child pornography taken from his vehicle.

17. **John Rodriguez**. Burke "minimized" his involvement in the Loeb assault when discussing the matter with Rodriguez, and told Rodriguez, in substance and in part, that the "feds" were going to get him (Burke).

18. **Richard Schaffer**. Burke told Schaffer, in substance and in part, that: *(i)* "there were no issues," and that there was nothing to the accusations being made by Loeb; and *(ii)* the federal investigation was "bullshit," and that the "Feds" were out to get him (Burke) because he pulled SCPD members off of the LIGTF to work in other areas. Burke also provided Schaffer a copy of the Burke Timeline, and requested that Schaffer read it.

19. **Dennis Sullivan**. Sullivan heard Burke say during a meeting, in substance and in part, that the Loeb assault and related federal investigation were "bullshit allegations." Burke also told Sullivan that the "Feds were out to get him," because of the LIGTF issue.

20. **John Sumwalt**. Burke told Sumwalt, in substance and in part, that the "Feds are out to get him." Burke also provided the Burke Timeline to Sumwalt.

21. **John Toal**. Burke told Toal, in substance, that the "Feds" were after him.

22. **Edward Webber**. Burke denied Loeb's allegations to Webber.

II.     Other Statements Concerning the Loeb Matter and the Subsequent Federal Investigation

The government hereby discloses that the following individuals have stated the following, in substance and in part, with respect to the Loeb Matter and/or the resulting federal investigation and prosecution:

1. **Frank Catalina**. Catalina was present at the Fourth Precinct during the assault of Loeb. He maintained that Burke did not assault Loeb.

2. **Joseph Conway**. Conway has opined that the federal investigation was reopened in retaliation for the Oliva wiretap, following a meeting between defendant Spota and then-U.S. Attorney Loretta Lynch concerning the wire.

3. **Russell McCormick.** McCormick has opined that the allegations against Burke and others concerning the Loeb Matter came from former SCPD Detective Robert Trotta, who was removed from a command and vowed to get even with Burke.

4. **Kenneth Regensburg.** Regensburg has opined that Burke did not assault Loeb, and that all of these allegations were made up by former SCPD Detective Trotta, who had begrudgingly been reassigned from a task force in or about 2012.

5. **Joseph Sawicki.** Sawicki told others that the federal investigation into defendants Spota and McPartland was a "fishing expedition."

III.    Statements Concerning the Defendants' Knowledge of the Loeb Matter

The government hereby discloses the following statements, in substance and in part, concerning the defendants' knowledge of the Loeb assault:

1. **Barbara Craft.** Burke told Craft that he would refuse to cooperate and "take the fall" for the Loeb Matter. Burke also said that defendant McPartland had nothing to do with the Loeb Matter, so he (Burke) would protect McPartland because McPartland was innocent.

2. **Anthony D'Orazio.** According to D'Orazio, defendant McPartland told him that he (McPartland) had received a target letter, but that it was "all bullshit," and that he was innocent. McPartland further stated to D'Orazio that a SCPD officer involved in the Loeb investigation is going to claim that McPartland was present at a certain meeting, but that that is not true, and that he (McPartland) will be vindicated.

3. **Frank Guidice.** Guidice opined that Burke lied to defendant McPartland, defendant Spota, and everyone in the Suffolk County District Attorney's Office about the circumstances of the Loeb assault, and about (Burke) being innocent.

4. **Thomas Iacopelli.** According to Iacopelli, defendant McPartland told Iacopelli that Burke had done nothing wrong, and that McPartland believed what Burke told him.

5. **John Rodriguez.** According to Rodriguez, defendant Spota told him that Burke had assured Spota that "there was nothing there."

IV.     Miscellaneous

Also enclosed, please find the Grand Jury testimony ████████████████
████████████████████████████████████ and a FBI-302 report dated March 28,
2017 of an interview of Emily Constant, as these items may contain information helpful to the
defense. ██████████████████████████
████████████████████████

V.     Conclusion

Because of the nature and contents of this letter, which discloses the names of
numerous individuals who have been interviewed during the course of the investigation, the
government, with the consent of both defendants, respectfully  requests that it be filed under
seal.  See United States v. Amodeo, 71 F.3d 1044, 1050-51 (2d Cir. 1995) (privacy interests
of third parties may be compelling reason justifying sealing).  Moreover, public disclosure of
the information contained in this letter could potentially impact the right of the defendants or
others to a fair trial.  See United States v. Graham, 257 F.3d 143, 154 (2d Cir. 2001) (protecting
a defendant's right to fair trial may be compelling reason justifying sealing).  Under these
circumstances, the     government respectfully submits that the countervailing interests set
forth above outweigh the public's qualified right to access.  As the facts set forth above provide
ample support for the "specific, on the record findings" necessary to support sealing,  Lugosch
v. Pyramid Co., 435 F.3d 110, 120 (2d Cir. 2006), the government respectfully requests that
the Court record those findings and file this letter under seal.

Very truly yours,

RICHARD P. DONOGHUE
United States Attorney

By:     /s/
        John J. Durham
        Lara Treinis Gatz
        Justina L. Geraci
        Assistant U.S. Attorneys
        (631) 715-7851/-7913/-7835

cc.     Clerk of the Court (JMA) w/enclosures

6

# Exhibit F

**FEDERAL BUREAU OF INVESTIGATION**

OFFICIAL RECORD

Date of entry    05/18/2017

On March 28, 2017, EMILY CONSTANT (CONSTANT), was interviewed by
Federal Bureau of Investigation (FBI) Special Agent (SA) Michael J.
Weniger, Eastern District of New York (EDNY) Assistant United States
Attorney (AUSA) Lara Gatz, and EDNY AUSA John Durham at the EDNY United
States Attorney's Office in Central Islip, New York. Also present during
the interview was CONSTANT's attorney Fred Hafetz. After being advised of
the identities of the interviewing Officials and the nature of the
interview, CONSTANT provided the following information:

### BACKGROUND

CONSTANT has worked for the Suffolk County District Attorney's Office
(SCDAO) for approximately thirty-eight (38) years. CONSTANT's current
position at the SCDAO is as the Chief Assistant District
Attorney. CONSTANT explained she (CONSTANT) is the second in command and
reports directly to the Suffolk County District Attorney, THOMAS SPOTA
(SPOTA). CONSTANT stated she (CONSTANT) has been the Chief Assistant
since December 2012.

### RELATIONSHIP WITH JAMES BURKE

CONSTANT was the Chief of Domestic Violence and Child Abuse at the
SCDAO from 2003 to 2005. During a portion of this period CONSTANT was
also named the Division Chief of Investigations. CONSTANT stated that she
(CONSTANT) met JAMES BURKE (BURKE) during this period. BURKE and CONSTANT
provided presentations to Suffolk County Police Department (SCPD) officers
on domestic violence and child abuse issues. CONSTANT stated she had a
professional relationship with BURKE during this time
period. Additionally, CONSTANT and BURKE had offices next to one another
from 2003 to 2012. CONSTANT stated she (CONSTANT) was friendly with BURKE
but did not socialize with BURKE outside of the workplace.

### INITIAL NOTIFICATION OF LOEB INCIDENT

CONSTANT stated the arrest of CHRISTOPHER LOEB (LOEB) occurred in
December 2012. CONSTANT learned of LOEB's arrest several days after the
arrest occurred, possibly on December 17, 2012. CONSTANT became aware of

| Investigation on | 03/28/2017 | at Central Islip, New York, United States (In Person) |
| --- | --- | --- |
| File # 282A-NY-2894669 | | Date drafted    03/31/2017 |
| by WENIGER MICHAEL J | | |

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

LOEB's arrest while overhearing a conversation that occurred in SPOTA's office. CONSTANT explained her (CONSTANT's) office was next to SPOTA's office. CONSTANT heard SPOTA raise his (SPOTA's) voice and looked into SPOTA's office. Inside, CONSTANT saw SPIROS MOUSTAKAS (MOUSTAKAS) and CHRISTOPHER MCPARTLAND (MCPARTLAND) speaking with SPOTA. CONSTANT entered SPOTA's office and joined the meeting. SPOTA asked CONSTANT if she knew anything about LOEB's arrest and the circumstances surrounding it. CONSTANT told SPOTA that she (CONSTANT) was not aware of the situation.

CONSTANT stated SPOTA was upset for two (2) reasons. First, SPOTA expressed displeasure with the SCPD for requesting a search warrant for LOEB's residence after the SCPD had already searched the residence. SPOTA asked MOUSTAKAS to write a memorandum for the LOEB file detailing the SCPD's request. Second, SPOTA was upset that the SCPD failed to produce LOEB at his (LOEB's) initial appearance the day after his (LOEB's) arrest. CONSTANT learned that MOUSTAKAS went to the courthouse on a Saturday, the day after LOEB was arrested, for LOEB's initial appearance. MOUSTAKAS told SPOTA and the others that the SCPD failed to produce LOEB. CONSTANT also learned the SCPD claimed they (the SCPD) did not have the manpower to produce LOEB because there was a fatal car accident on the day the initial appearance was scheduled for. CONSTANT stated LOEB was produced for his initial appearance on Sunday, two (2) days after his (LOEB's) arrest. SPOTA told MOUSTAKAS to prepare a second memorandum for the SCDAO file regarding the initial appearance delay.

As the conversation ended, MCPARTLAND and MOUSTAKAS left SPOTA's office. SPOTA then asked CONSTANT why the SCDAO's Government Corruption Bureau (GCB), which was headed by MCPARTLAND, had the LOEB case. SPOTA asked CONSTANT to ensure that the LOEB case was transferred to the SCDAO's Major Crime Bureau (MCB). CONSTANT explained SPOTA wanted the case moved off of the GCB's docket because of the close relationship between MCPARTLAND and BURKE. Additionally, SPOTA wanted the case moved to the MCB because the MCB would typically be assigned theft cases. CONSTANT was unable to recall whether she (CONSTANT) ever informed MCPARTLAND or MOUSTAKAS that SPOTA wanted the LOEB case transferred to the MCB.

CONSTANT was asked why the GCB initially had the LOEB case. MCPARTLAND told CONSTANT that the LOEB arrest occurred at a point in time when there were a large number of Christmas parties. As a result, there were not many Assistant District Attorneys (ADAs) in the office when the SCPD contacted the SCDAO about the case. MOUSTAKAS, however, was in the office when the arrest occurred. Therefore, MOUSTAKAS was initially assigned to the LOEB case by MCPARTLAND.

CONSTANT believed the LOEB case originally went to the GCB because BURKE called MCPARTLAND and MCPARTLAND called MOUSTAKAS. MOUSTAKAS was then assigned to shepherd the case moving forward. MCPARTLAND tasked MOUSTAKAS with appearing at LOEB's arraignment, which was scheduled to take place on a Saturday. CONSTANT explained the SCDAO had duty ADAs that were on-call during weekends. The duty ADA handled any matters that arose over the weekend. Still, it was not unusual for someone, other than the duty ADA, to go to an arraignment.

After the December 17, 2012 meeting in SPOTA's office, CONSTANT did not have any conversations about the LOEB case until February 2013. At that time, MCPARTLAND told CONSTANT that he (MCPARTLAND) received a telephone call from MOUSTAKAS, who was at the courthouse in Riverhead. MOUSTAKAS told MCPARTLAND that there had been a court appearance in the LOEB case. MOUSTAKAS told MCPARTLAND that during the court appearance LOEB's attorney had disclosed to the court allegations that LOEB was struck by BURKE after LOEB's arrest. MCPARTLAND told CONSTANT that LOEB's attorney alleged BURKE went to the 4th Precinct, entered the interrogation room, and made physical contact with LOEB. MCPARTLAND also told CONSTANT that LOEB's attorney alleged there was "something of concern" in the duffel bag taken by LOEB from BURKE's vehicle.

CONSTANT believed she was informed that BURKE had, in fact, went to LOEB's residence and the 4th Precinct. CONSTANT believed she (CONSTANT) made this discovery in February 2013, possibly during the meeting discussed above. CONSTANT stated the notion that BURKE went to the 4th Precinct to thank the officers involved in LOEB's arrest was "classic BURKE." CONSTANT did not, however, believe BURKE was foolish enough to enter the interrogation room where LOEB was being held. Moreover, CONSTANT did not believe BURKE hit LOEB.

When MCPARTLAND relayed the information provided by MOUSTAKAS regarding LOEB's court appearance and the allegations against BURKE, CONSTANT grew concerned. CONSTANT stated she (CONSTANT) was concerned because she (CONSTANT) had forgotten to move the LOEB case from the GCB to another SCDAO bureau. CONSTANT realized she (CONSTANT) had to confess her (CONSTANT's) error to SPOTA. MCPARTLAND and CONSTANT then informed SPOTA of the situation regarding CONSTANT's failure to move the case out of the GCB and the allegations made against BURKE.

After SPOTA was briefed on the allegations made against BURKE, SPOTA provided marching orders. SPOTA wanted a special prosecutor to be assigned to the case. In order for a special prosecutor to be assigned, the SCDAO Appeals Bureau needed to make a motion to the Court. CONSTANT was unaware of who contacted the Appeals Bureau from the SCDAO.

Between December 17, 2012 and February 2013, CONSTANT did not have any conversations regarding the LOEB case with anyone, to include BURKE. CONSTANT explained that in 2012 and 2013 she (CONSTANT) rarely had communications with BURKE because BURKE was no longer working out of the SCDAO. CONSTANT estimated she (CONSTANT) only saw BURKE on four (4) or five (5) occasions each year. CONSTANT's first conversation with BURKE about the allegations made by LOEB's attorney was not until June 2013.

CONSTANT explained neither BURKE nor MCPARTLAND told her (CONSTANT) that BURKE actually struck LOEB. CONSTANT believed BURKE when he (BURKE) stated that he (BURKE) did not strike LOEB. In fact, CONSTANT witnessed BURKE cry over the situation on at least two (2) occasions.

**SPECIAL PROSECUTOR**

CONSTANT was unsure as to whether the SCPD opened an Internal Affairs Bureau (IAB) case after the allegations against BURKE were made. CONSTANT stated the SCDAO also had the ability to open investigations of police officers if the conduct alleged was criminal in nature. CONSTANT explained the SCDAO had an investigator that acted as the liaison between the SCPD IAB and the SCDAO. The investigator assigned to this position was EDWARD HEILIG (HEILIG). Assuming an allegation against a police officer was clearly criminal in nature then the case would be sent to the GCB.

After the allegations of LOEB came to light, SPOTA directed the SCDAO to obtain a special prosecutor. The special prosecutor selected was from the Queens District Attorney's Office (QDAO). The special prosecutor assigned to conduct the prosecution was QDAO ADA PETER CRUSCO (CRUSCO). CONSTANT stated Suffolk County Judge JAMES HUDSON (HUDSON) assigned the QDAO to act as the special prosecutor. HUDSON assigned the QDAO after the SCDAO made a motion to the Court requesting a special prosecutor. Before the motion was made, SPOTA contacted JACK RYAN (RYAN), the Queens District Attorney. CONSTANT was unaware of any special requests by SPOTA to have CRUSCO assigned as the special prosecutor. CONSTANT never communicated with representatives of the QDAO regarding the LOEB case.

The motion for a special prosecutor was prepared by the SCDAO Appeals Bureau. In 2012, the Chief of the SCDAO Appeals Bureau was MIKE MILLER (MILLER).

To the best of CONSTANT's knowledge, the special prosecutor was asked to investigate the criminal case against LOEB. Still, CONSTANT was unaware of the directives outlined in HUDSON's order for a special prosecutor. CONSTANT was unable to recall any discussions regarding the

QDAO investigating the allegations made by LOEB against BURKE. CONSTANT assumed the allegations against BURKE were being investigated by the SCPD IAB.

CONSTANT denied that the SCDAO intended to avoid an investigation of BURKE. Instead, the SCDAO wanted to avoid any involvement in the case against LOEB or the allegations made by LOEB against BURKE.

CONSTANT learned that on the day of LOEB's arrest MCPARTLAND, WILLIAM MADIGAN (MADIGAN), and BURKE were driving into New York City for a Christmas party. BURKE turned around and returned to Suffolk County after learning of LOEB's arrest. BURKE later maintained that he (BURKE) returned to Suffolk County in order to retrieve his (BURKE's) stolen items and traveled to the 4th Precinct to thank the SCPD officers that made the arrest.

## JUNE 2013

On the morning of June 25, 2013, CONSTANT was working inside of her (CONSTANT's) office at the SCDAO. CONSTANT was interrupted from her (CONSTANT's) work by SPOTA. SPOTA told CONSTANT to meet him (SPOTA) at his (SPOTA's) residence for a meeting. At the time, CONSTANT deemed the request "unusual." Nevertheless, CONSTANT complied with SPOTA's request and drove to his (SPOTA's) residence.

CONSTANT, SPOTA, and MCPARTLAND were all in attendance at the meeting in SPOTA's residence. Within a short amount of time, BURKE also arrived. CONSTANT stated it was possible that MADIGAN was also there. CONSTANT stated JAMES HICKEY (HICKEY) was not present at the meeting. Also, no representatives from the SCPD police unions were present at the meeting. CONSTANT stated the group sat around SPOTA's kitchen table. After BURKE arrived, he (BURKE) explained the situation. BURKE told the group that the FBI had served subpoenas on members of the SCPD in relation to the allegations made against him (BURKE) by LOEB.

BURKE was extremely distraught as he (BURKE) explained the situation to the group. CONSTANT stated BURKE was in tears. BURKE continuously stated that he (BURKE) did not know why the "feds" were doing this. BURKE surmised the Federal Investigation was in retaliation for BURKE's decision to pull several SCPD police officers from a Federal Task Force. BURKE repeatedly proclaimed his (BURKE's) innocence during the meeting. Finally, BURKE apologized to the group.

Throughout the meeting BURKE was talking to people on his (BURKE's) cellular telephone. CONSTANT stated that this was not unusual as BURKE was constantly on his (BURKE's) cellular telephone.

CONSTANT was asked about the content of the discussions that occurred during this meeting. CONSTANT stated BURKE made the statements discussed above. The others merely offered support and condolences. CONSTANT did not believe the group discussed who, specifically, was served with subpoenas. CONSTANT did not recall anyone mentioning the names MIKE MALONE, ANTHONY LETO, and MIKE MCDOWELL. Moreover, the group did not discuss any proactive efforts to assist BURKE. CONSTANT stated the group did not discuss or speculate as to who might be cooperating with Federal Authorities. Further, the group did not discuss debriefing the SCPD police officers that had been served and, potentially, interviewed by Federal Authorities.

The group believed the federal investigation was driven by BURKE's enemies. CONSTANT stated BURKE's enemies included ROBERT TROTTA (TROTTA), JOHN OLIVA (OLIVA), WILLIE MALDONADO (MALDONADO), JERRY MCCARTHY (MCCARTHY), and others. Further the group believed the investigation was the product of a longstanding feud between the EDNY USAO and the SCPD. CONSTANT and MCPARTLAND thought that there was a strong relationship between the SCDAO and the EDNY USAO. Nonetheless, the SCPD believed the EDNY USAO poached cases from the SCPD. CONSTANT stated BURKE made a compelling case in this regard.

CONSTANT stated the meeting lasted a few hours. CONSTANT believed she (CONSTANT) was the first to leave the meeting.

CONSTANT stated SPOTA's home was used for the meeting because it was a convenient location based upon the fact that BURKE was coming from the Eastern part of Suffolk County. CONSTANT explained BURKE had been on his (BURKE's) way to Orient Point where he (BURKE) intended to go fishing. BURKE later turned around and began driving in the direction of SPOTA's home after learning that subpoenas had been served. CONSTANT assumed BURKE and SPOTA conversed over the telephone prior to the meeting.

CONSTANT explained she (CONSTANT) had been to SPOTA's residence on other occasions for both social and professional matters. CONSTANT stated that in December 2015 she (CONSTANT) met with SPOTA and JANET ALBERTSON (ALBERTSON) at SPOTA's home to discuss an issue in a rape/homicide case. CONSTANT was unable to provide other examples of occasions where work related meetings were held at SPOTA's residence as opposed to the SCDAO.

After the subpoenas were served, a number of the SCPD police officers that received subpoenas contacted lawyers. CONSTANT was not aware of any coordinated attempt to get certain lawyers for certain people.

## OCTOBER 2013

CONSTANT was asked about the hearings that occurred during LOEB's prosecution in late October 2013. CONSTANT had no knowledge of anyone from the SCDAO contacting the special prosecutor, CRUSCO, regarding the LOEB case. In fact, SPOTA specifically told CONSTANT and MCPARTLAND that they (CONSTANT and MCPARTLAND) were not to communicate with the QDAO after the special prosecutor was assigned.

CONSTANT had no knowledge of discussions about what witnesses to call in the LOEB hearings. CONSTANT had no knowledge of discussions where the possibility of BURKE testifying during the hearings was discussed.

CONSTANT was unaware of MCPARTLAND assisting BURKE with his (BURKE's) legal defense. In fact, CONSTANT would have had to approve any outside legal work completed by attorneys within the SCDAO, including MCPARTLAND.

CONSTANT was unfamiliar with anyone within the SCDAO possessing or viewing FBI FD-302 interview reports regarding the LOEB case. CONSTANT stated there were, however, FD-302s turned over to the QDAO sometime before the hearings in late October 2013. CONSTANT discovered, from either BURKE or MCPARTLAND, that the FBI FD-302s were turned over to the QDAO. CONSTANT and the others believed the Federal Government's actions in turning over the FBI FD-302s to the QDAO was a positive sign for BURKE. In other words, they believed the FD-302s would not have been turned over in the LOEB state prosecution if the Federal Government intended to prosecute BURKE.

CONSTANT was familiar with an EEOC filing by MCCARTHY that referenced the FBI FD-302s. MCCARTHY's filing alleged members of the SCPD were provided FD-302s from the Federal Investigation of BURKE. CONSTANT learned that RUSTY MCCORMICK (MCCORMICK) was the individual at the center of these rumors and allegations.

CONSTANT was aware of the fact that MCCORMICK had been subpoenaed by Federal Authorities during the Federal Investigation. CONSTANT and MCCORMICK never discussed anything related to the Federal Investigation, to include the FBI FD-302s mentioned above. CONSTANT saw MCCORMICK at the courthouse during the hearings in late October 2013. MCCORMICK went to all of the hearings. CONSTANT exchanged pleasantries with MCCORMICK when they saw each other in the courthouse. Still, CONSTANT and MCCORMICK did not discuss anything of substance related to the hearings.

**DECEMBER 2013**

In December 2013, CONSTANT learned the Federal Investigation into LOEB's allegations against BURKE had ended. MADIGAN told CONSTANT and SPOTA that he (MADIGAN) had spoken with FBI Assistant Director APRIL BROOKS (BROOKS). During the conversation, BROOKS informed MADIGAN that the FBI closed it's investigation. BURKE's attorney, JOSEPH CONWAY (CONWAY), then called EDNY AUSA TARYN MERKL (MERKL). MERKL confirmed the information provided by BROOKS. CONSTANT stated she (CONSTANT) did not have conversations with CONWAY regarding the Federal Investigation at any time to include in 2013.

BURKE also informed CONSTANT, SPOTA, and MCPARTLAND that the Federal Investigation into LOEB's allegations against BURKE had ended. CONSTANT stated all parties at the meeting (CONSTANT, SPOTA, MCPARTLAND, and BURKE) were happy about the news.

During most, if not all, of 2014, CONSTANT did not hear anything about a Federal Investigation into BURKE.

**2015**

In the late Spring or early Summer of 2015, CONSTANT heard that the Federal Government had reopened the BURKE investigation. CONSTANT heard these rumors from either BURKE or MCPARTLAND. They told her (CONSTANT) and SPOTA that ED JENKS (JENKS), the attorney for KEN BOMBACE (BOMBACE), had been approached by an EDNY AUSA from the Central Islip office regarding the possibility of BOMBACE cooperating. BURKE asked CONSTANT, MCPARTLAND, and SPOTA whether it was possible the EDNY USAO in Central Islip could have reopened the investigation of BURKE.

CONSTANT stated she (CONSTANT) then had a conversation with MCPARTLAND and SPOTA. CONSTANT, MCPARTLAND, and SPOTA thought that it was unlikely the EDNY USAO in Brooklyn would close an investigation and the EDNY USAO in Central Islip would reopen the same investigation. Ultimately, CONSTANT, MCPARTLAND and SPOTA discredited the rumors because they (CONSTANT, MCPARTLAND, and SPOTA) thought the rumors did not make sense.

A few weeks after hearing of the first conversation between EDNY USAO prosecutors and JENKS, CONSTANT learned there was a second conversation between JENKS and an EDNY AUSA. The second conversation allegedly concerned the same sentiments as the first conversation. At the time, CONSTANT knew that BOMBACE was part of the SCPD Intelligence Unit. Moreover, CONSTANT was aware that BOMBACE was at the 4th Precinct on the day LOEB was arrested.

CONSTANT never heard anyone say that as long as members of the SCPD Intelligence Unit keep their mouths shut then BURKE was going to be fine. CONSTANT never heard anyone say that the "Feds" would not waste resources on a accusations made by a junkie thief.

CONSTANT recalled a meeting in her (CONSTANT's) office at the SCDAO in the late Summer or early Fall of 2015. Present in CONSTANT's office were SPOTA and "most likely" MCPARTLAND. During the meeting, SPOTA called CONWAY from CONSTANT's phone. SPOTA did not put the call on speaker phone. SPOTA asked CONWAY what conduct constituted Federal Obstruction of Justice. SPOTA asked this question in the context of the Federal Investigation into BURKE. After getting off of the phone, SPOTA stated that the Obstruction of Justice statute was very broad and could include almost any conduct. CONSTANT was unable to recall any conversation regarding the Federal Civil Rights statute.

CONSTANT was asked what precipitated SPOTA's call to CONWAY. CONSTANT was not certain, but speculated that the call occurred because the SCPD unions were getting lawyers for those involved in the BURKE case, the media was reporting about the case, and speculation was rampant. [Agent's Note: CONSTANT later provided clarification to this information. CONSTANT's attorney e-mailed this information to AUSA Gatz. This e-mail is attached to this document in a 1A Envelope.]

CONSTANT never conducted legal research into the Federal Obstruction of Justice statute or the Federal Civil Rights statute. CONSTANT was unaware of MCPARTLAND, SPOTA, or MADIGAN conducting legal research into these matters during the Federal Investigation.

In 2015, BURKE frequently discussed rumors concerning the Federal Investigation with CONSTANT, MCPARTLAND, and SPOTA. During these conversations, BURKE informed CONSTANT that he (BURKE) went to LOEB's residence in order to retrieve his (BURKE's) belongings. In particular, BURKE wanted to retrieve toiletry items because BURKE was scheduled to travel to Florida on, or about, the day LOEB was arrested. BURKE also told CONSTANT that he went to the 4th Precinct to thank the police officers that arrested LOEB. BURKE informed CONSTANT that he (BURKE) looked into the 4th Precinct interrogation room to get a visual of LOEB. CONSTANT interpreted this as though BURKE looked through a two-way mirror into the interrogation room.

CONSTANT did not hear about HICKEY's involvement in the Federal Investigation until late September or early October 2015. At that time, two (2) incidents occurred. The first incident occurred after BURKE called SPOTA and informed SPOTA that he (BURKE) received a telephone call

from HICKEY. HICKEY had not been to work for a substantial period of time. HICKEY allegedly told BURKE that there were black SUVs flooding his (HICKEY's) neighborhood and individuals in black coats interviewing all of his (HICKEY's) neighbors. BURKE told SPOTA that HICKEY was hysterical during the telephone call. BURKE allegedly drove to HICKEY's neighborhood to verify HICKEY's information. When BURKE drove down HICKEY's street he (BURKE) did not see anyone on the block.

The second incident occurred the following day. BURKE told SPOTA that he (BURKE) got a second call from HICKEY. During the call, HICKEY allegedly told BURKE that his (HICKEY's) block was swarming with uniformed police officers. BURKE again went to verify HICKEY's information. When BURKE arrived in the vicinity of HICKEY's residence, he (BURKE) did not see any police officers. BURKE then made contact with HICKEY. BURKE told SPOTA that HICKEY was a mess. HICKEY was apparently wide eyed and looked terrible. BURKE spoke with HICKEY's spouse and learned that HICKEY had been drinking excessively for a substantial period of time. BURKE expressed concern to SPOTA for HICKEY's wellbeing. CONSTANT learned that HICKEY was hospitalized later in the day due to a medical condition.

BURKE also told SPOTA that HICKEY believed there was a tracking device on his (HICKEY's) vehicle. BURKE drove the vehicle away from HICKEY's residence and to the SCDAO. When SPOTA learned that BURKE drove HICKEY's vehicle to the SCDAO, SPOTA immediately told BURKE to get the vehicle out of the SCDAO parking lot.

After BURKE was arrested, CONSTANT heard that HICKEY was cooperating with Federal Authorities. CONSTANT learned this information from MCPARTLAND. MCPARTLAND did not use the term "ratting" or other similar phrases.

CONSTANT believed MCPARTLAND was never told the truth about the LOEB incident by BURKE.

CONSTANT recalled another conversation she (CONSTANT) had with SPOTA after BURKE was arrested by Federal Authorities. SPOTA told CONSTANT that he (SPOTA) had a "queasy" feeling about BURKE's possible involvement in assaulting LOEB. SPOTA informed CONSTANT that he (SPOTA) got this feeling in September or October of 2015 after BURKE said something to the effect of, "I hope he [HICKEY] can hold up." SPOTA told CONSTANT that after BURKE made the above remark, SPOTA, for the first time, believed BURKE may have actually assaulted LOEB.

On, or about, October 28, 2015, BURKE was fired by Suffolk County Executive STEVE BELLONE (BELLONE). After receiving this news, a group of people decided to meet at CONSTANT's residence in Port Jefferson, New

York. The group ultimately included CONSTANT, MCPARTLAND, MADIGAN, SPOTA
and BURKE. CONSTANT stated they met at her (CONSTANT's) residence because
media was likely to be gathering at the SCDAO, SPOTA's residence, and
other locations. CONSTANT suggested the group meet at her (CONSTANT's)
house because it was unlikely that media would gather there.

When CONSTANT arrived at her (CONSTANT's) house, BURKE was already
parked outside. CONSTANT stated BURKE was on the telephone. After
speaking with BURKE, CONSTANT learned that BELLONE had fired him
(BURKE). BURKE also told CONSTANT that MADIGAN had been summoned to
BELLONE's office. MADIGAN later arrived at CONSTANT's residence and
informed the group that he (MADIGAN) had not been fired but was required
to take an extended leave from work.

During the meeting inside CONSTANT's house, BURKE cried. Everyone in
attendance felt very badly for BURKE. CONSTANT stated "it was a sad end"
to BURKE's career.

After BURKE's firing, CONSTANT and BURKE did not have any additional
substantive conversations regarding the Federal Investigation.

**BAIL LETTER**

After BURKE was arrested by Federal Authorities, there was a
conversation between CONSTANT, SPOTA, and MCPARTLAND. SPOTA asked
CONSTANT and MCPARTLAND about some of the details enumerated in a bail
letter filed by the EDNY USAO prosecutors in the case against
BURKE. Specifically, SPOTA asked about two (2) alleged meetings BURKE had
with "outside agencies." SPOTA asked CONSTANT and MCPARTLAND if either of
them (CONSTANT and MCPARTLAND) had ever met with BURKE outside of the
office and in the presence of HICKEY. MCPARTLAND acknowledged he
(MCPARTLAND) met with BURKE and HICKEY on two (2) separate occasions
earlier in 2015. MCPARTLAND thought these two (2) meetings could be what
was referenced in the bail letter. MCPARTLAND told SPOTA and CONSTANT
that both of these meetings occurred in the parking lot of Saint Patrick's
Roman Catholic Church in Smithtown, New York.

MCPARTLAND informed SPOTA that during the first meeting, BURKE and
HICKEY had a question regarding eligibility for the Witness Protection
Program (WPP). MCPARTLAND said that BURKE and HICKEY believed the WPP was
only applicable to organized crime cases. MCPARTLAND acknowledged the
discussion regarding the WPP was in the context of the LOEB matter.

MCPARTLAND told SPOTA that the second meeting at Saint Patrick's Roman
Catholic Church occurred only a short time after the first
meeting. During the second meeting, BURKE and HICKEY asked MCPARTLAND how

grand jury immunity worked in the federal system.  MCPARTLAND believed grants of immunity for federal grand jury purposes were considered use immunity versus transactional immunity.

SPOTA asked MCPARTLAND why these meetings occurred in a church parking lot.  MCPARTLAND stated the location was convenient.  SPOTA asked why MCPARTLAND went to these meetings.  MCPARTLAND told SPOTA that BURKE had asked MCPARTLAND to meet.

CONSTANT stated SPOTA had no idea the above mentioned meetings occurred prior to his (SPOTA's) conversation with MCPARTLAND.

CONSTANT stated after the bail letter was read, everyone assumed BOMBACE was cooperating with the Federal Government.  Much of this assumption was due to BOMBACE's familial relationship to an AUSA in the EDNY USAO, RAY TIERNEY.

SPOTA also asked MCPARTLAND about a car accident that was cited in the bail letter.  MCPARTLAND acknowledged that he (MCPARTLAND) was involved in an accident with BURKE after BURKE's promotion.  MCPARTLAND explained the accident occurred after BURKE, MCPARTLAND, SAMMY PANCHEL (PANCHEL) and others celebrated BURKE's promotion at Butterfields bar.  MCPARTLAND stated BURKE ran into the back of MCPARTLAND's vehicle as they were on their way home.  MCPARTLAND denied being intoxicated at the time of the accident.

**OLIVA WIRETAP**

CONSTANT was familiar with the wiretap conducted on a telephone line associated with OLIVA.  OLIVA and several other SCPD detectives were assigned to a Federal Task Force that was disbanded by BURKE.  Around the same time, NEWSDAY reporter TANYA LOPEZ (LOPEZ) was reporting on matters that were law enforcement sensitive.  CONSTANT stated it became clear that LOPEZ had a source within the SCPD.  SCPD and SCDAO management believed the leak was one of the disgruntled SCPD detectives that had been assigned to the Task Force.

CONSTANT explained the SCPD attempted to audit their computer system in order to see who was accessing the sensitive information being published in NEWSDAY.  Unfortunately, the SCPD system did not have an audit function set up prior to the inquiry.  Nonetheless, the SCPD installed an audit function in order to monitor access moving forward.

Additionally, there were leaks to the media regarding a pattern robbery investigation.  Some of these leaks caused officer safety issues and therefore caused a great deal of concern for SCPD and SCDAO

management. In turn, a wiretap was deemed appropriate for OLIVA's
phone. CONSTANT stated toll records clearly showed OLIVA frequently spoke
with LOPEZ, particularly before stories with leaked information appeared
in the newspaper.

CONSTANT maintained the wiretap was not a backdoor way to get revenge
on OLIVA or anyone else. CONSTANT never heard that suggestion before,
during, or after the wiretap occurred. CONSTANT stated the wiretap was
kept up for several additional months because it appeared OLIVA was taking
federal documents.

### ROBERT MACEDONIO

CONSTANT stated the SCDAO conducted a long investigation into ROBERT
MACEDONIO (MACEDONIO). This investigation included a wiretap that
continued for an extensive period of time. Overall, the evidence derived
from the wiretap was "disappointing." CONSTANT stated the SCDAO stayed up
on the wiretap because there was some evidence that SCDAO ADA JOHN SCOTT
PRUDENTI (PRUDENTI) was receiving bribes for official action in criminal
cases. This allegation was never substantiated during the course of the
investigation.

CONSTANT stated MACEDONIO was ultimately charged and pleaded guilty to
narcotics related offenses. CONSTANT explained the evidence was weak and
therefore the SCDAO did not have a great deal of leverage over
MACEDONIO. Nonetheless, SPOTA crafted a plea offer for MACEDONIO. It was
eventually accepted by MACEDONIO.

Years later MACEDONIO's plea was withdrawn with the concurrence of the
SCDAO. MACEDONIO was then resentenced to a misdemeanor that allowed
MACEDONIO to petition for reinstatement of his (MACEDONIO's) law
license. The mechanism used to get to this result was a Rule 440
Motion. MACEDONIO's situation did not fit precisely into the Rule but was
still granted.

CONSTANT stated the SCDAO never anticipated the resentencing of
MACEDONIO at the time of the original guilty plea. CONSTANT was unaware
of SPOTA or others at the SCDAO making the SCDAO's support of MACEDONIO's
resentencing contingent on MACEDONIO not writing a book or providing
information to bloggers.

CONSTANT explained current Suffolk County Judge JOHN ROUSE (ROUSE) was
captured on the MACEDONIO wiretap. ROUSE was questioned by the SCDAO
after warrants were served on MACEDONIO's law office. ROUSE acknowledged
illegal conduct. Nonetheless, SPOTA decided not to prosecute ROUSE.

CONSTANT stated PRUDENTI's call frequency with MACEDONIO plummeted after the MACEDONIO wiretap began. CONSTANT assumed this drop in contact was because someone tipped off PRUDENTI. At the end of the MACEDONIO wiretap SPOTA declined to confront PRUDENTI.

CONSTANT stated there were rumors that PRUDENTI assisted in the resentencing of BENNY PICCOLO (PICCOLO) in exchange for two (2) jet skis. Despite these rumors, SCPD and SCDAO detectives were unable to locate the jet skis. Moreover, there did not appear to be any irregularities in the PICCOLO file kept in the SCDAO. CONSTANT explained the SCDAO file failed to reflect the resentencings. Despite this discovery, SPOTA decided not to take action related to PRUDENTI because of the current Federal Investigation.

**MISCELLANEOUS**

CONSTANT was asked about the phone system within the SCDAO. CONSTANT stated there was not a main number to the SCDAO Executive Offices where she (CONSTANT) and SPOTA worked. Instead, SPOTA's direct line was 853-4169. CONSTANT's direct line was 853-4170. Still there were a total of approximately five (5) phone lines available in the SCDAO Executive Offices. Outside of the two (2) telephone numbers for SPOTA and CONSTANT, there were three (3) other lines in the SCDAO Executive Offices. CONSTANT stated the three (3) other lines were typically used by BOB CLIFFORD (CLIFFORD), the SCDAO employee responsible for public relations and media inquiries.

CONSTANT stated the SCDAO used a swipe card security system for employees. The system was maintained by FRANK GUIDICE. CONSTANT stated the swipe card system captured most of the employees that entered the building, but employees occasionally held the doors so those behind them entered the building without swiping their cards. CONSTANT stated that all entrances to the SCDAO building had swipe card readers. There was a front door and two (2) rear doors to the building. BURKE had a swipe card when he (BURKE) was assigned to the SCDAO. CONSTANT stated it was likely BURKE maintained his (BURKE's) swipe card after he (BURKE) was transferred back to the SCPD,