UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| UNITED STATES OF AMERICA | No. 2:17-cr-0587 (JMA) |
| - against - | **Notice of Defendants'** |
| CHRISTOPHER MCPARTLAND and THOMAS J. SPOTA, | **Joint Supplemental** |
| | **Pre-Trial Motions** |
| Defendants. | **(Request to be filed under seal)** |

PLEASE TAKE NOTICE that, upon the accompanying Memorandum of Law, dated August 30, 2019, the affirmation of Larry Krantz, Esq., dated August 30, 2019 and the exhibits thereto, and all prior pleadings and proceedings herein, the defendants Christopher McPartland and Thomas J. Spota will jointly move this Court, before the Honorable Joan M. Azrack, at a date and time to be fixed by the Court, at the United States District Court, 100 Federal Plaza, Central Islip, New York 11722, for an Order: (1) directing the government to disclose to the defendants all interview reports and notes and grand jury testimony of the 35 witnesses included in the government's list of individuals possessing exculpatory information; (2) to the extent the government seeks to use the grand jury testimony ████████████ in any way at trial, precluding the use of all such testimony that was improperly obtained or the admission of which would otherwise violate the Federal Rules of Evidence; (3) directing the government to disclose to the defendants all *Giglio* and 3500 material, as well as witness and exhibit lists, at least 45 days before trial; (4) directing the government to disclose to the defendants, for potential government witnesses, all material contained within the Suffolk County custodial data in its possession required to be disclosed under Federal Rule of Evidence 16, the Jenks Act, *Brady* and *Giglio*; (5) directing the government to disclose James Burke's statements regarding James Hickey's mental condition; and (6) granting such further relief as the Court deems proper.

Dated: August 30, 2019
New York, New York

Respectfully submitted,

Larry H. Krantz
Lisa A. Cahill
KRANTZ & BERMAN LLP
747 Third Avenue, 32nd Floor
New York, New York 10017
(212) 661-0009

*Counsel for Christopher McPartland*

Alan Vinegrad
Erin Monju
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
(212) 841-1022

*Counsel for Thomas J. Spota*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

   - against -

CHRISTOPHER MCPARTLAND and
THOMAS J. SPOTA,

                 Defendants.

No. 2:17-cr-0587 (JMA)


**MEMORANDUM OF LAW IN SUPPORT OF THE DEFENDANTS' JOINT
SUPPLEMENTAL PRE-TRIAL MOTIONS**


**UNREDACTED VERSION – REQUEST TO BE FILED UNDER SEAL**


KRANTZ & BERMAN LLP
747 Third Avenue, 32nd Floor
New York, New York 10017
(212) 661-0009

*Counsel for Christopher McPartland*

COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
(212) 841-1022

*Counsel for Thomas J. Spota*

# TABLE OF CONTENTS

Preliminary Statement ........................................................................................................... 1

Factual Background ............................................................................................................... 4

Argument ............................................................................................................................... 17

I.     The Defense is Entitled to an Order Compelling the Disclosure of All Witness
       Statements and Grand Jury Testimony of the 35 Witnesses with Exculpatory
       Information ................................................................................................................ 17

II.    Should the Government Seek to Use the ██████ Grand Jury Testimony at Trial, it
       Should be Precluded From Using Any Portion That Is Objectionable Under the
       Federal Rules of Evidence or Is Otherwise the Result of Improper Questioning ................. 24

III.   The Defense is Entitled to Disclosure of all *Giglio* and 3500 Material, as well as
       Witness and Exhibit Lists, at least 45 Days Before Trial ...................................... 27

IV.    The Defense is Entitled to Disclosure of all Rule 16, 3500, *Brady* and *Giglio*
       Material Contained in Data Produced to the Government by Suffolk County ..................... 30

V.     The Government Should Be Compelled to Produce James Burke's Statements
       Regarding James Hickey's Mental Health ............................................................. 36

Conclusion ............................................................................................................................. 39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Berger v. United States*,
    295 U.S. 78 (1935)........................................................................................19

*Blankenship v. United States*,
    No. 5:14-cr-00244, Doc. No. 738 (S.D.W.V. Aug. 26, 2019)..............................20

*Brady v. Maryland*,
    373 U.S. 83 (1963).................................................................................. *passim*

*Campbell v. Maryland*,
    769 F.2d 314 (6th Cir. 1985) ............................................................................37

*Contreras v. Artus*,
    778 F.3d 97 (2d Cir. 2015).................................................................................24

*Dennis v. Pennsylvania Department of Corrections*,
    834 F.3d 263 (3d Cir. 2016)..............................................................................37

*Giglio v. United States*,
    405 U.S. 150 (1972).................................................................................. *passim*

*Green v. Boc Laundry Mach. Co.*,
    490 U.S. 504 (1989)..........................................................................................25

*Kyles v. Whitley*,
    514 U.S. 419 (1995)...........................................................................31, 33, 34

*Lindsey v. King*,
    769 F.2d 1034 (5th Cir. 1985) ..........................................................................37

*Parker v. Herbert*,
    No. 02-CV-037, 2009 WL 2971575 (W.D.N.Y. May 28, 2009)....................31, 34

*Shows v. M/V Red Eagle*,
    695 F.2d 114 (5th Cir. 1983) ............................................................................25

*Smith v. Cain*,
    565 U.S. 73 (2012)............................................................................................37

*Strickler v. Greene*,
    527 U.S. 263 (1999)..........................................................................................19

*United States v. Anh The Duong*,
   CR 01-20154, 2010 U.S. Dist. LEXIS 21754 (N.D. Cal. Feb. 9, 2010)...........................36, 37

*United States v. Agurs*,
   427 U.S. 97 (1976) ....................................................................................................33

*United States v. Avellino*,
   136 F.3d 249 (2d Cir. 1998)...........................................................................31, 32, 35

*United States v. Bagley*,
   473 U.S. 667 (1985)....................................................................................................31

*United States v. Bin Laden*,
   397 F. Supp. 2d 465 (S.D.N.Y. 2005)........................................................................31

*United States v. Brown*,
   650 F.3d 581 (5th Cir. 2011) .....................................................................................19

*United States v. Canniff*,
   521 F.2d 565 (2d Cir. 1975)..................................................................................34, 35

*United States v. Coppa*,
   267 F.3d 132 (2d Cir. 2001)........................................................................................31

*United States v. Espinal*,
   96 F. Supp. 3d 53 (S.D.N.Y. 2015) ...........................................................................20

*United States v. Ferguson*,
   246 F.R.D. 107 (D. Conn. 2007)................................................................................26

*United States v. Friedman*,
   854 F.2d 535 (2d Cir. 1988)........................................................................................38

*United States v. Gerard*,
   507 Fed. Appx. 218 (3d Cir. 2012)............................................................................26

*United States v. Gil*,
   297 F.3d 93 (2d Cir. 2002)..........................................................................................19

*United States v. Golyansky*,
   291 F.3d 1245 (10th Cir. 2002) .................................................................................36

*United States v. Gotti*,
   457 F. Supp. 2d 395 (S.D.N.Y. 2006)........................................................................26

*United States v. Hutcher*,
   622 F.2d 1083 (2d Cir. 1980)..................................................................................34, 35

*United States v. Lang*,
589 F.2d 92 (2d Cir. 1978)..............................................................................25, 26

*United States v. Lauderdale*,
5:15-cr-00012, 2015 U.S. Dist. LEXIS 151189 (N.D. Cal. Nov. 5, 2015)..............36

*United States v. McVeigh*,
954 F. Supp. 1441 (D. Colo. 1997)....................................................................35

*United States v. Payne*,
63 F.3d 1200 (2d Cir. 1995)........................................................................31, 32

*United States v. Ruiz*,
536 U.S. 622 (2002)............................................................................................35

*United States v. Stein*,
488 F. Supp. 2d 350 (S.D.N.Y. 2007)..........................................................31, 35

*United States v. Stevens*,
No. 08-CR-231 (D.D.C.)....................................................................................20

*United States v. Stewart*,
907 F.3d 677 (2d Cir. 2018)..............................................................................38

*United States v. Stillo*,
91 CR 795-1-2, 1992 U.S. Dist. LEXIS 15595 (N.D. Ill. Oct. 9, 1992)................37

*United States v. Swain*,
No. S4 08 Cr. 1175, 2011 U.S. Dist. LEXIS 92639 (S.D.N.Y. Aug. 16, 2011)......36

*United States v. Swano*,
91 CR 477-02-03, 1992 U.S. Dist. LEXIS 7554 (N.D. Ill. June 1, 1992)..............37

*United States v. Triumph Cap. Group, Inc.*,
544 F.3d 149 (2d Cir. 2008)..............................................................................19

*United States v. Uvino*,
590 F. Supp. 2d 372 (E.D.N.Y. 2008)................................................................38

*United States v. W.R. Grace*,
401 F. Supp. 2d 1069 (D. Mont. 2005)..............................................................35

*United States v. Wilson*,
15-CR-142 (EAW) (MJR), 2017 WL 1456984 (W.D.N.Y. Apr. 25, 2017)............19

**Statutes and Rules**

18 U.S.C. § 3500.......................................................................................... *passim*

Federal Rule of Criminal Procedure 16 .................................................................................. *passim*

Federal Rule of Evidence 403 ..................................................................................21, 22, 25, 26

    Rule 410 ....................................................................................................................26

    Rule 602 ..............................................................................................................25, 26

    Rule 613 ....................................................................................................................21

    Rule 801 .........................................................................................................25, 26, 38

    Rule 803 ....................................................................................................................26

    Rule 804 ..............................................................................................................25, 26

    Rule 806 ....................................................................................................................38

**Other Authorities**

U.S. Attorney's Manual § 9-5.001 ............................................................................................19

U.S. Attorney's Manual § 9-5.002 ............................................................................................19

## Preliminary Statement

These joint motions are submitted on behalf of defendants Christopher McPartland and Thomas Spota, to supplement their pre-trial motions filed in October 2018.

This submission is necessitated by new information that has only recently come to light, based on a series of belated disclosures by the government. We do not submit this memorandum lightly, as we have great respect for the Office of the United States Attorney for the Eastern District of New York (the "Office"). However, recent events necessitate the filing of these supplemental motions, in order to ensure that Mr. McPartland and Mr. Spota receive the fair trial to which they are constitutionally entitled.

Recently, the government has made several disclosures that reflect a troubling failure to be fully candid with defense counsel on the subject of *Brady* and *Giglio* material, as well as an insensitivity to the defense's need to receive *Brady* and *Giglio* material on a timely basis. These disclosures have also shown the government's continued failure to timely produce material under Federal Rule of Criminal Procedure 16. The disclosures are as follows:

1. On April 12, 2019 – nearly 18 months after indictment, and on what would have been the eve of trial but for a government-precipitated adjournment – the government revealed the names of 35 potential witnesses who have exculpatory information on topics critical to the defense. This barebones disclosure included the fact that former Suffolk County Police Chief James Burke had repeatedly *denied* to a multitude of people that he assaulted Christopher Loeb. This information is critical because the evidence at trial will show that Burke steadfastly denied his guilt to Mr. Spota and Mr. McPartland as well – evidence that will be crucial in evaluating the defendants' state of mind, knowledge and intent.

2. On July 8, 2019, following repeated defense requests, the government supplemented its April 12, 2019 disclosure by providing some (although still inadequate) detail as to what exculpatory statements these witnesses had made to the government. The government still refused to provide the witness statements and

prior grand jury testimony of these witnesses, except as to two witnesses: Emily Constant ███████████████

As to Constant, who was the Chief Assistant District Attorney during the relevant time period, the government disclosed an FBI 302 report summarizing an interview it had conducted with her in 2017. That 302 is clearly exculpatory on key points of the case, and there seemingly is no reason – other than tactical advantage – that the government withheld it from the defense until more than 20 months after indictment.

██████████████████ the government disclosed his grand jury testimony, ████████████████████████████

████████████ The disclosure of the ██████ transcripts is particularly troubling not only because ██████████ were belatedly disclosed, but also because ████████ reveal numerous inappropriate questions and tactics by the government. The government bullied ████████ tried repeatedly ████████ ████████ to put words into his mouth that were inconsistent with his prior testimony, █████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ and perhaps worst of all, misstated his prior testimony – over and over – in an effort to mislead him into adopting the government's mischaracterizations. The result is demonstrably unreliable testimony, brought about by the government's improper questioning.

3. On July 31, 2019, after repeated requests from the defense, the government submitted to the Court, *in camera*, the medical records of James Hickey as to two hospitalizations. The history of that disclosure is set forth in our letter to the Court dated August 8, 2019, and will not be restated here. However, now that the records have finally been disclosed (pursuant to the Court's order), it is clear that the government had no legitimate basis for withholding these records from the defense, and that it should have disclosed those records promptly - and without a fight. Even more disturbing, the records (and the government's own letter to the Court summarizing those records) show that the government misled the defense as to the substance of these records for months, claiming that Hickey's hospitalization records did not relate to a "mental condition" and had

no "effect on his 'ability to perceive or to recall events or to testify accurately.'" *See* Govt's July 31, 2019 Ltr. at p. 5. Given that the records document that Hickey was suffering from acute alcoholism and pancreatitis in 2013 (caused by binge drinking), and delirium with multiple visual and auditory hallucinations in 2015, these characterizations cannot be squared with the facts and appear to have been designed to dissuade defense counsel from pursuing the records. Indeed, had defense counsel accepted the government's representations, the defendants would have been deprived of *Brady* and/or *Giglio* material of potentially staggering import.

4. On August 3, 2019 – more than *one year* after the discovery deadline set by the Court in this case – the government informed the defense, for the first time, that it had "backup tapes" with custodial data from *all* Suffolk County employees from December 2012 through December 2017, but that it would not review or produce any of this material, with the exception of nine custodians that it unilaterally selected – in direct contravention of its obligations under Federal Rule of Criminal Procedure 16, the Jencks Act, *Brady* and *Giglio*.

5. On August 28, 2019, the government produced to the defense *over 200,000* pages of additional Rule 16 documents, in direct contravention of the representations it made at the time of the last status conference on June 27, 2019.

This series of events raises significant questions as to the government's overly aggressive tactics in investigating and prosecuting this case, and raises doubts as to the government's ability – fairly and objectively – to make timely and complete *Brady*, *Giglio* and Rule 16 disclosures. Accordingly, we respectfully submit that the following relief is warranted:

1. An order compelling the government, within a specified time period, to disclose all witness statements and grand jury testimony of the 35 witnesses contained on its list of individuals possessing exculpatory information;

2. To the extent that the government seeks to use ████████ ████████████ in any way at trial, the preclusion of all ██████ that was improperly obtained, or the admission of which would otherwise violate the Federal Rules of Evidence;

3.   Disclosure of all *Giglio* and 3500 material, as well as witness and
     exhibit lists, at least 45 days before trial, so that the defense may
     make effective use of what is expected to be an enormous quantity
     of information, by way of further investigation, motions *in limine*
     and at trial;

4.   Disclosure of all Rule 16, 3500, *Brady* and *Giglio* material from the
     Suffolk County custodial data referenced in the government's
     August 3 letter; and

5.   Entry of an order compelling the government to disclose James
     Burke's statements regarding James Hickey's mental condition.

We set forth the basis for these requests below.

## Factual Background

The defendants are charged with obstruction of justice (and related offenses) in connection

with the Office's investigation of former Suffolk County Police Chief James Burke.  We set forth

the essential allegations of the case – drawn from the indictment and discovery material produced

to date – in order to give context to these motions.

### A.   Burke I

On December 14, 2012, Christopher Loeb was arrested for breaking into James Burke's

car and stealing his duffel bag, containing a gun belt and personal items.  Loeb was on probation

at the time for another offense, and his theft was discovered when his probation officer conducted

a routine search of Loeb's house and discovered the stolen bag.  The probation officer notified the

Suffolk County Police Department ("SCPD") and Loeb was arrested at his house that same day by

the SCPD Intelligence Squad (the "Intel Squad"), under the command of then-Lieutenant James

Hickey ("Hickey").  Loeb was transported to the Fourth Precinct for processing.  At the precinct,

Burke went into the interrogation room and – as is now known – assaulted Loeb together with, and

in the presence of, other SCPD officers from the Intel Squad. Burke and the other officers did not disclose the assault, and took steps to cover it up.

In February 2013, Loeb moved to suppress his post-arrest statements and accused Burke of assaulting him. This led the Suffolk County District Attorney's Office (the "SCDAO"), with court approval, to transfer Loeb's prosecution to a Special Prosecutor from the Queens County District Attorney's Office ("Special Prosecutor") to avoid any potential conflict of interest (since Burke had worked at the SCDAO for many years). ████████████████████████████ ███████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████

Loeb's allegation led the Office, in approximately April 2013, to open a federal civil rights investigation into the alleged assault of Loeb. This investigation (referred to herein as "Burke I") was conducted out of the Brooklyn office of the United States Attorney's Office. The Office served numerous subpoenas in June 2013 in connection with its investigation. During that investigation, certain SCPD officers falsely denied that Burke had assaulted Loeb in an effort to obstruct the Burke I investigation.

In October 2013, the Special Prosecutor conducted a suppression hearing in connection with Loeb's motion to suppress. At that hearing, Burke did not testify, but several other officers testified about the events at both Loeb's house and the precinct. One of those witnesses (an officer who apparently witnessed and participated in the assault, along with Burke) falsely denied that Burke had assaulted Loeb. Loeb's suppression motion was, in significant respects, denied.

In December 2013, the Burke I investigation was apparently closed, with no charges being filed. At that time, the apparent closing of the investigation was communicated to █████ and

Burke, as well as to Mr. McPartland and Mr. Spota.  In January 2014, Loeb pleaded guilty to burglarizing Burke's car, among other charges.

B.    **Burke II**

Nearly a year-and-a-half later, in or about mid-2015, the federal investigation of the alleged assault of Loeb was either renewed or reopened by the Office, this time by prosecutors working out of the Central Islip office (referred to herein as "Burke II").  According to the government, in late May 2015 it contacted the attorney for one of the SCPD officers who apparently witnessed and/or participated in the Loeb assault and advised the attorney that his client would be subpoenaed "to testify before the grand jury regarding the assault of [Loeb] and the ensuing cover-up."  Sept. 15, 2016 Search Warrant Aff. at ¶ 12, Doc. No 58-1.  This contact led to a flurry of conversations among those who had been involved in Burke I, as to what was transpiring.  During Burke II, the government also subpoenaed, in or about October 2015, police union records relating to the arrangements for the payment of legal fees for various witnesses, leading to much conversation and speculation as to why this had occurred.

As a result of the Burke II investigation, Burke was ultimately arrested in December 2015, on charges of violating Loeb's civil rights and conspiring to obstruct justice.  He pleaded guilty to both charges in February 2016.  Hickey, who supervised several of the officers who witnessed and/or participated in the assault of Loeb, proffered with the government multiple times in December 2015, and ultimately pleaded guilty pursuant to a cooperation agreement on January 15, 2016.

C.    **The Instant Charges**

Almost two years after Burke's arrest, in October 2017, Mr. McPartland and Mr. Spota were charged with obstructing the federal investigation into Burke and related offenses.  The

allegations in the indictment are highly general, and the government has refused to provide a bill of particulars, or even to identify the defendants' alleged co-conspirators. However, the gist of the government's case appears to be set forth in two search warrant applications from 2016 and 2017, which were disclosed to the defense on October 4, 2018, nearly 11 months after they were requested in discovery. Based on these search warrant applications, the defendants are accused of the following:

1. As to Burke I, Mr. McPartland is alleged to have had two inculpatory conversations. The first was on June 25, 2013, allegedly with Hickey and Burke.[1] Specifically, Mr. McPartland allegedly "directed [Hickey] to debrief the SCPD members who had been served by the FBI [with subpoenas] and to control them." Sept. 15, 2016 Search Warrant Aff. at ¶ 11. As to the second alleged conversation, which took place around the time of the Loeb suppression hearing in October 2013, an "immunized police officer witness," identified as CS #2, "testified that the strategy to force an officer to give perjured testimony [at the Loeb suppression hearing] to protect Burke was formulated by [Mr.] McPartland." April 21, 2017 Search Warrant Aff. at ¶ 10, Doc. No. 58-2. The government has confirmed that CS # 2 is ▇▇▇▇▇▇

2. As to Burke II, the search warrant applications allege that Mr. McPartland and Mr. Spota had an inculpatory conversation with Hickey and Burke on June 4, 2015 in Mr. Spota's office, wherein they allegedly discussed, among other things, who was a "rat" in connection with the federal investigation, and the fact that Hickey needed to "get his guys in order" and to remind them what happens to people who "go against the administration." *Id.* at ¶ 16.

   The search warrant applications also allege that Mr. McPartland had an incriminating conversation with Hickey and Burke on August 17, 2015, wherein he allegedly stated that "nothing would happen as long as the people that were in the room with [Loeb] did not talk," that "the Feds might be working on an obstruction case and 'our actions fit within the statute,'" and that "SCPD Member #3 (one of

---

[1] Although Hickey is not identified by name in the search warrant applications, it is apparent from the applications' content that he is "Cooperating Defendant 1" in the application dated September 15, 2016 and "Cooperating Witness" in the application dated April 21, 2017.

Hickey's subordinates) was a 'rat' and it was [Hickey's] failure to control SCPD Member #3 that had created the current situation." *Id.* at ¶ 20.

The application also alleges that on October 15, 2015, Mr. McPartland and other police officers attended a wake together and afterwards went drinking at a bar, where Mr. McPartland allegedly stated that "he was concerned because the obstruction of justice statute was very broad." *Id.* at ¶ 22.

Finally, the application alleges that on November 11, 2015, there was a conversation at a restaurant including Burke, Mr. McPartland and others, during which Burke said he was going to be arrested and Mr. McPartland stated that "the case involved civil rights violations" but "questioned what the 'damages' would be." *Id.* at ¶ 25.

Those are the only specific allegations of obstruction against Mr. Spota and Mr. McPartland set forth in the two search warrant applications.[2] To the extent the government relies at trial on any other allegedly incriminating conversations, those allegations are not contained in any of the discovery materials received to date, other than in portions of ███████████████ ████████ which we discuss in detail below.

Based on the above, it is clear that the case against Mr. McPartland and Mr. Spota rests significantly on Hickey's testimony and will largely rise or fall based upon the jury's determination of his ability to recall (or not recall) conversations accurately, credibly and precisely. Indeed, as

---

[2] The government's memorandum of law in opposition to the defendants' pre-trial motions sets forth additional conduct not set forth in the indictment or the two search warrant applications, namely: (1) Mr. McPartland assigning the prosecution of Loeb to the SCDAO Government Corruption Bureau, which he supervised, in order to control it; (2) requiring that police witnesses, through the unions, obtain representation from a list of "approved attorneys provided by Burke's attorney, with the expectation that [they] would share information with Burke's attorney;" (3) "debriefing each of the police witnesses and/or their attorneys" about the investigation; (4) "arranging for high-ranking members of the SCPD and union officials to interact with potential police witnesses and the special prosecutor . . ."; and (5) "deciding which witnesses should/should not testify at the suppression hearing." Doc. No. 58 at 6. Some or all of these allegations may be the subject of future *in limine* motions by the defense.

to the content of the conversations set forth above, there are no recordings, e-mails or text messages that corroborate Hickey's account of these alleged discussions. Additionally, as for the government's allegation that ████ testified that Mr. McPartland "formulated" the strategy to have a witness commit perjury at the Loeb suppression hearing, this allegation simply cannot be ████████████████████████████ which itself is the product of grossly improper questioning by the government, as further described below and as reflected in Exhibits A through E, submitted in support of these motions.

### D.     <u>The Government's Handling of its Disclosure Obligations</u>

#### i.     <u>The Government's Production of *Brady* Material</u>

As set forth in our submission dated August 8, 2019, the defense has been on a 21-month quest to obtain the *Brady* and *Giglio* material to which it is constitutionally entitled. Unfortunately, the government has at times been lethargic, and at times downright disingenuous, in satisfying its obligations. The defense made its *Brady* and *Giglio* requests on multiple occasions: by letter dated November 20, 2017, at a meet and confer on August 7, 2018, in its pre-trial motions submitted in October 2018, by letter dated March 26, 2019, and at a status conference held on April 1, 2019. Despite these requests, the defense received no *Brady* or *Giglio* whatsoever until the government served its letter dated April 12, 2019. *See* Govt's Apr. 12, 2019 Ltr. (Ex. D to Deft's August 8, 2019 Ltr.). At that time – less than five weeks before the originally scheduled trial date (which had been adjourned just days before), and after standing silent on the subject for nearly 18 months – the government disclosed the names of 35 witnesses who had potentially exculpatory information, as well as a brief summary of the subject matter of that information.

By e-mail dated May 2, 2019, defense counsel responded to the government's letter of April 12, 2019, in relevant part stating:

> Brady. We appreciate the government's *Brady* disclosure. However, given the very brief descriptions provided, and the unavailability to the defense of many of the witnesses, we respectfully request that the government provide any summaries, reports and/or notes of these witnesses' statements so that the defense can make effective use of the disclosure. The details of these witnesses' statements may well be crucial in allowing the defense to understand, and potentially make use of, the information summarized in the government's letter. Absent that, the government's disclosure, while well-intentioned, would, as a practical matter, be rendered all but useless to the defense.

By e-mail dated June 10, 2019, the government advised defense counsel, in relevant part, that it would be augmenting its prior *Brady* disclosure. One month later, the government provided a supplemental *Brady* disclosure concerning the 35 witnesses with exculpatory information described in its letter of April 12, 2019. *See* Govt's July 8, 2019 Ltr. (Ex. E to Deft's August 8, 2019 Ltr.). That letter provided some additional detail as to what these witnesses had recounted to the government but, with two exceptions, did not provide any reports or notes of interviews or grand jury testimony for these witnesses. The two exceptions were the following:

### a.    The Emily Constant Interview Report

*First*, the government disclosed with its July 8, 2019 letter an FBI 302 report of an interview that took place March 28, 2017, with a key exculpatory witness, former Chief Assistant District Attorney Emily Constant. *See* Ex. F. to Deft's Aug. 8, 2019 Ltr. Although it was not disclosed for over 18 months, this report contains a wealth of exculpatory material. For example, Constant recounted to the government what transpired at a meeting at Mr. Spota's house on June 25, 2013 (early in Burke I) – the very same day that Hickey claims to have had one of the allegedly incriminating conversations with Mr. McPartland. According to Constant:

> CONSTANT, SPOTA, and MCPARTLAND were all in attendance at the meeting in SPOTA's residence. Within a short amount of time, BURKE also arrived. CONSTANT stated it was possible that MADIGAN was also there. . . . After BURKE arrived, he (BURKE)

explained the situation. BURKE told the group that the FBI had served subpoenas on members of the SCPD in relation to the allegations made against him (BURKE) by LOEB.

BURKE was extremely distraught as he (BURKE) explained the situation to the group. CONSTANT stated BURKE was in tears. BURKE continuously stated that he (BURKE) did not know why the 'feds' were doing this. BURKE surmised the Federal Investigation was in retaliation for BURKE's decision to pull several SCPD police officers from a Federal Task Force. BURKE repeatedly proclaimed his (BURKE's) innocence during the meeting. Finally, BURKE apologized to the group. . . . The others merely offered support and condolences.

*Id.* at 5-6.

Constant also recounted to the government key exculpatory information as to the events during Burke II. For example, Constant recounted Burke's continuing denials in 2015 that he had assaulted Loeb, and his claim that he had merely looked into the interrogation room to see if he could identify Loeb. *Id.* at 9.

b. ████████████████ **Grand Jury Testimony**

*Second*, the government's July 8, 2019 letter disclosed ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

While the government's disclosure of this ███████████ was unduly delayed, ███████ testimony is disturbing for an additional reason – the highly improper tactics employed by the government in questioning ███████ Indeed, we respectfully submit that a fair reading of the ███████ transcript – as a whole – shows that the government conducted the examination not as a search for the witness's truth, █████████████████████████████ ███████████████████████ and to neutralize an otherwise exculpatory witness. ███ █████████████████████████████████ The government (1) made improper remarks and engaged in other inappropriate behavior, ███████ ███████ and cutting short his answers numerous times; ████████████████████ █████████████████████████████████████████ ████████████████████████████ (3) repeatedly elicited rank speculation and improper opinion testimony █████████████████████████ █████████████████████ (4) repeatedly misstated the witness's prior testimony in an effort to have him "adopt" what he was being inaccurately told was his prior testimony. In the end, over the course ███████████ the government twisted and turned

[REDACTED] testimony beyond the breaking point and, as a result, ended up with wholly objectionable and patently unreliable testimony.

For example, the government:





in order

to provide additional illustrative examples, we attach Exhibit A, ████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████                    We also attach as Exhibit B a compendium of further

examples of the improper questioning conducted by the government ████████████████

Finally, we attach as Exhibits C, D and E ████████████████████████████████████

We respectfully ask the Court to review these materials so that Your Honor – who knows what █

████████████████████████████████████ – may form her own view as to the propriety of

what transpired.

<h3 style="text-align:center">ii.    <u>The Government's Production of Suffolk County Custodial Data</u></h3>

The government has also been markedly dilatory in its production of custodial data that it

received from Suffolk County, to the point that it has violated not only the Court-imposed

discovery deadline of July 31, 2018 by nearly one year, *see* Doc. No. 42, but also its recent

assurance to the Court (at the June 27, 2019 status conference) that it would complete its

production of these materials by the end of July 2019.  Thus, despite the fact that the indictment

in this case was filed nearly *two years* ago, the government's production of these materials is

evidently still ongoing, with no end in sight.

As is relevant to this motion, and as is outlined in the government's letter to the defense

on this issue (Exhibit F), the government subpoenaed electronic files from the Suffolk County

Department of Information Technology over one year ago, on June 6, 2018.  *See* Ex. F (Gov't Aug.

3, 2019 Ltr.) at 2. From March 20, 2019 through May 15, 2019, the government produced materials for nine custodians – Mr. Spota, Mr. McPartland, Burke, Constant, and Madigan; former SCDAO employees Spiros Moustakas, Frank Guidice, and Cynthia Sczezny; and former SCPD officer Russell McCormick – from the files produced by Suffolk County to the government in response to the subpoena. *See* Doc. Nos. 76, 81, 87. The government represented to the defense at the June 27, 2019 status conference that it would produce the remaining files for these nine custodians, which it said would consist of approximately a couple of thousand pages, within two weeks and, in any event, no later than the end of July. The defense did not receive any of these files until August 28, 2019. *See* Doc. No. 92. At that time, the government produced an additional *201,995 pages* of these materials to the defense*, in direct contravention of its earlier representation. *See* Doc. Nos. 92, 93. (The defense reserves its right to seek additional relief with respect to this belated and massive disclosure.) Moreover, according to the government, more may be forthcoming.

In addition to this belated disclosure, on August 3, 2019, over 13 months after the government requested the data from Suffolk County and nearly five months after the government began producing a subset of the data, the government informed the defense – for the very first time – that it was also in possession of electronic files for *all* other Suffolk County custodians for a five-year period (from December 12, 2012 through December 31, 2017) that almost precisely overlaps with the time period of the alleged conspiracy charged in this case. *See* Ex. F at 1-3. The government simultaneously claimed that, because it did not specifically seek this additional data in its subpoena and because it would be overly expensive to process the remaining data, the government would not review or produce any of the information it received beyond the data for the nine custodians whose data has already (partially) been produced. *See id.* In an effort to

minimize its burden, defense counsel asked the government whose data it received, including which potential government witnesses had data in the production. The government initially refused to answer the question, but later stated that 15 to 20 custodians are potential government witnesses at trial (while continuing to refuse to reveal their names).

**Argument**

I.  **The Defense is Entitled to an Order Compelling the Disclosure of All Witness Statements and Grand Jury Testimony of the 35 Witnesses with Exculpatory Information**

The government acknowledged in its letter dated April 12, 2019 that 35 witnesses possess potentially exculpatory information on four topics, two of which are most relevant here: (1) that Burke denied he had assaulted Loeb and claimed that the federal investigation into the assault was unfounded and retaliatory; and (2) that Mr. McPartland and Mr. Spota lacked knowledge that Burke had assaulted Loeb. Both of these topics – which overlap – are of critical importance to the defense, since it is the defendants' position that, during the relevant time period, Burke never admitted to Mr. McPartland or Mr. Spota, or to anyone else in their presence, that he had in fact assaulted Loeb, and indeed Burke vociferously denied it. This is a pivotal point because the government's prosecution rests on the theory that both defendants *knew* that Burke was guilty of the assault and took steps to help him cover the assault up. Indeed, in meetings with defense counsel during the investigation stage, the government claimed that "everyone" knew Burke was guilty, and scoffed at any notion that the defendants might not have known that.

Thus, a critical issue at trial will be whether Burke openly admitted his guilt to "everyone" – as claimed by the government – or whether he vehemently denied his guilt to just about anyone who would listen. The government acknowledges that Burke denied his guilt to 22 witnesses it interviewed (this is a subset of the 35). This is highly relevant exculpatory testimony and must be

provided to the defense in a form that may be used effectively at trial. Nonetheless, while the government's July 8, 2019 letter provided a thumbnail sketch of the information that each witness has provided to the government on these subjects, the government has refused to provide any interview reports or notes, or the grand jury testimony, of these witnesses (other than for Constant ██████████████ Moreover, since at least some of these witnesses may not be called by the government at trial, information for these witnesses presumably *will not* be provided to the defense as 3500 material. Under these circumstances, these interview reports and notes, and grand jury testimony, plainly constitute *Brady* material and should be ordered produced forthwith.

There is no question that the exculpatory statements of these witnesses constitute *Brady* material and must be disclosed. Indeed, the government has all but conceded as much by providing the summaries to the defense under *Brady* and its progeny. Thus, the issue here is whether the government can attempt to comply with its *Brady* obligations by providing its own high-level summary to defense counsel, rather than the underlying witness interview reports and notes or grand jury testimony, and then move *in limine* to exclude testimony regarding the subjects of the *Brady* material (as the government has said it intends to do for at least some of the *Brady* information provided by these witnesses). *See* Govt's July 8, 2019 Ltr. (Ex. E to Deft's August 8, 2019 Ltr.) at n.1. This is the same tactic it used with respect to the Hickey medical records. And for largely the same reasons, the government should be required to disclose the actual witness interview reports and notes, and grand jury testimony, of these witnesses with exculpatory information.

The United States Supreme Court has explained that the government's duty to disclose derives from:

> The special role played by the American prosecutor in the search for truth in criminal trials. Within the federal system, for example, we

> have said that the United States Attorney is 'the representative not
> of an ordinary party to a controversy, but of a sovereignty whose
> obligation to govern impartially is as compelling as its obligation to
> govern at all; and whose interest, therefore, in a criminal prosecution
> is not that it shall win a case, but that justice shall be done.'

*Strickler v. Greene*, 527 U.S. 263, 281 (1999) (citing *Berger v. United States*, 295 U.S. 78, 88

(1935)). These principles dictate prompt disclosure in this case of the requested *Brady* material,

for at least four reasons.

*First*, while there may be certain circumstances where a summary of *Brady* information is

sufficient, it is always a matter for the Court's discretion, and summaries are often insufficient

because they are, by definition, only partial disclosures. Thus, production of more complete

information is favored, and often required, to adequately discharge the government's *Brady*

obligation. *See* U.S. Attorney's Manual § 9-5.001 (favoring a broad view of materiality and

encouraging prosecutors to err on the side of disclosure); *id.* § 9-5.002 (noting that disclosure by

letter – as opposed to original source material – may be warranted where issues such as national

security are present); *United States v. Triumph Cap. Group, Inc*., 544 F.3d 149, 161-66 (2d Cir.

2008) (granting new trial due to *Brady* violation where late-disclosed proffer notes were materially

different from the government's disclosure of the witness's exculpatory statements, as reflected in

grand jury minutes and 302 report, and were directly at odds with the government's theory of the

case); *United States v. Wilson*, 15-CR-142 (EAW) (MJR), 2017 WL 1456984, at n.4 (W.D.N.Y.

Apr. 25, 2017) (requiring production of 302 reports containing *Brady* material); *see also United*

*States v. Gil*, 297 F.3d 93, 104 (2d Cir. 2002) (vacating conviction where the government withheld,

until days before trial, a memorandum which included exculpatory information); *United States v.*

*Brown*, 650 F.3d 581, 591-92 (5th Cir. 2011) (summary disclosure of non-testifying witnesses was

insufficient under *Brady* because the summaries did not provide full exculpatory information);

*Blankenship v. United States*, No. 5:14-cr-00244, Doc. No. 738, at 30-57 (S.D.W.V. Aug. 26, 2019) (recommending vacatur of conviction based in part on the government's withholding of interview memoranda for testifying and non-testifying witnesses that contained favorable information, even where the government disclosed a 302 report, grand jury transcript and summary of favorable information for one of the witnesses).

Indeed, in *United States v. Stevens*, the trial court cautioned against the government's use of summaries to discharge its *Brady* obligations, stating: "I therefore, urge my judicial colleagues on every trial court everywhere to be vigilant and to consider entering an exculpatory evidence order at the outset of every criminal case, whether requested to do so or not, and to require that the exculpatory material be turned over in a useable format because as we've seen in this case, the use of summaries is an opportunity for mischief and mistake[.]" April 7, 2009 Tr. at 6-7, *United States v. Stevens*, No. 08-CR-231 (D.D.C.).

The recent opinion in *United States v. Espinal*, 96 F. Supp. 3d 53 (S.D.N.Y. 2015) (Chin, J.) is also instructive on the dangers attendant to the government's use of summaries to discharge its *Brady* obligations. In that case, the court found that the government engaged in a number of "overly aggressive" pretrial tactics, including providing "unduly late" disclosure of *Brady* material and providing inadequate summaries of certain *Brady* material. *Id.* at 62-63. Specifically, the government itself admitted that the summaries should have been fuller in order to discharge its *Brady* obligations and ultimately produced the underlying grand jury testimony to the defendants. *Id.* at 67. The court also found that the government's summaries were "inadequate and misleading" and held that "[w]hen the government discloses only part of the story and omits matters that undercut its charges, it is not meeting its discovery obligations." *Id*. at 67.

Here, likewise, we respectfully submit that the summaries of exculpatory information provided by the 35 witnesses are inadequate to discharge the government's *Brady* obligations because they do not provide sufficient information to enable the defense to make proper use of the disclosure. For example, as to the 22 witnesses identified by the government as to whom Burke denied that he had assaulted Loeb, the government's submission leaves defense counsel to guess at a host of critical questions, including: (a) In what setting did Burke say that to them? (b) Who else was present? (c) When was the statement made? (d) Was it in the context of other relevant statements? (e) What was the response? (f) Was there any detailed conversation on the subject? (g) How many times did Burke make the denial? and (h) Did Burke provide any explanation why he thought the government was alleging he assaulted Loeb or was investigating him for doing so? Given that most of these witnesses have refused (through counsel) to speak with defense counsel on these subjects, the defense has no meaningful way of answering any of these questions and thus no way of determining if it would be helpful or not to call these witnesses at trial, such that the summaries are of little, if any, use in preparing for trial.

*Second*, the government's summaries are of no evidentiary value. In contrast, relevant portions of a grand jury transcript can be offered in evidence; as to interview reports, they can be shown to the witness and, in appropriate cases, the author also can testify about the witness's prior statements. *See, e.g.,* Fed. R. Evid. 613. For these two reasons alone, full disclosure of the interview reports and notes, and grand jury transcripts, of the 35 witnesses should be ordered.

*Third,* the underlying interview reports and grand jury minutes should be disclosed because the government has already stated in its July 8, 2019 letter disclosing the summaries that it "intends to move *in limine* to preclude the introduction of any false exculpatory statements made by Burke to other witnesses, see Fed. R. Evid. 403 (danger of confusing the issues and misleading the jury)."

Gov'ts July 8, 2019 Ltr. at n. 1.  The government should not be permitted to move *in limine* to preclude the use of this exculpatory evidence while also keeping the full substance and context of that information from the defense.  To the contrary, the defendants must be given access to the full versions of the statements, in order to respond adequately to the government's motion, to explain why Rule 403 does not justify exclusion, and to rebut the government's claim that it was common knowledge that Burke had in fact assaulted Loeb.

*Fourth,* the production of the underlying exculpatory statements, via interview reports and notes as well as grand jury testimony, is further warranted by the history of this case, which calls into doubt the government's objectivity, candor and diligence with respect to its *Brady* obligations. As demonstrated above, the government has unjustifiably delayed satisfying its *Brady* obligations, and even affirmatively misled defense counsel as to the full nature of the *Brady* material in its possession.  For example, with respect to Hickey's mental condition, the government represented that:

1. The government was aware that James Burke had told people that Hickey was experiencing hallucinations, but there was *no evidence to support* Burke's claims.

2. The government had in its possession certain of Hickey's medical records relating to an October 2015 hospitalization, but that those records *were unrelated to a mental health issue, and contained nothing relating to mental health*; and

3. Hickey's diagnosis was consistent with a capacity to perceive and remember.

*See* Deft's Aug. 8, 2019 Ltr. at 6, 9 (emphasis added).

The records the Court ordered the government to produce – now that they have been examined by defense counsel – simply cannot be squared with the government's representations. Not only are the 2015 records replete with references to visual and auditory hallucinations,

delusions and memory issues, but the October 2013 records also document chronic alcoholism and drinking in such large quantities that Hickey developed acute pancreatitis, with Hickey described as confused, disoriented and having impaired judgment. Indeed, as reflected in excerpts from the medical records (Exhibit G), the 2013 records show that Hickey was drinking a bottle of wine and a quart of vodka *daily*, "especially in the past year," and that he had been "binge drinking" a bottle of wine and a half bottle of vodka daily since February 2013 – covering the time period of some of the most critical alleged conversations in this case. *See* Ex. G at Hickey Medical 000009, 000026 (highlights added). One need not be a medical expert to understand that being under the influence of such staggeringly large quantities of alcohol can significantly affect one's ability accurately to perceive and remember events.

Not only were the government's representations to defense counsel inaccurate, but its cover letter to the Court "summarizing" those records was also inaccurate and incomplete. *See* Govt's July 31, 2019 Ltr. For example, the government stated in its letter that Hickey "was ultimately diagnosed with a 'transient cerebral ischemic attack,'" *id.* at p. 4, inexplicably omitting that Hickey had also been diagnosed by a psychiatrist at the hospital as suffering from "AXIS 1: delirium." *See* Ex. G at Hickey Medical 000697, 000702 (highlights added). AXIS 1 is a category of mental disorder contained in the Diagnostic and Statistical Manual of Mental Disorders (DSM), which includes criteria for a diagnosis of "delirium." Thus, the government's statement in its letter to the Court that Hickey received "no psychiatric or psychological diagnosis" was false. *See* Govt's July 31, 2019 Ltr. at 5.

These misstatements and omissions highlight the problem of relying solely on government "summaries" to disclose critical *Brady* information. Under these circumstances, the defense should not have to rely on the government's summaries of this critical information, but should

instead be provided with the original source information: reports and notes of interviews, and grand jury testimony. Indeed, the government's disclosure of ███████████████████ ███████████████ – Constant ████████ – makes it abundantly clear that there is no effective substitute for disclosure of the entirety of the witnesses' statements.

Accordingly, we respectfully request an order requiring the government to promptly disclose the underlying interview reports and notes, and grand jury testimony, of the 35 witnesses identified in its April 12, 2019 *Brady* letter. In the alternative, although we do not think it necessary under the circumstances, we ask that the Court undertake an *in camera* review, as it did with the Hickey medical records, and order disclosure of the materials consistent with *Brady*. *See Contreras v. Artus*, 778 F.3d 97, 114-15 (2d Cir. 2015) (stating that *in camera* review of documents for *Brady* material should be "encouraged" because "where disclosure can make the difference between acquittal and conviction, we have urged that the defendant's access to potentially exculpatory evidence should not depend solely on the representations of the government. Supplementing the government's assessment of materiality with the impartial view of the trial judge, the court's in camera inspections provides a check on the prosecution's determinations and helps protect the defendant's rights to an effective defense at trial." (internal quotations and citations omitted)).

**II.     Should the Government Seek to Use ██████████████████████ at Trial, it Should be Precluded From Using Any Portion That Is Objectionable Under the Federal Rules of Evidence or Is Otherwise the Result of Improper Questioning**

As set forth above, and as detailed in Exhibits A through E, the government's questioning ████████████ grand jury repeatedly crossed the line from zealous to improper. This is made evident by the two examples set forth at length in Exhibit A, the numerous additional examples summarized in Exhibit B, and ████████████ included as Exhibits C, D and E. The government

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████

We assume that either the government or the defense will be calling ██████ as a witness at trial.  In either event, the government in all likelihood will not be able ████████████ ████████████████ in a trial setting, where it is subject to judicial supervision, the rules of evidence and standards of courtroom decorum.  The government should be precluded from using ██████████████ testimony for impeachment or as substantive evidence, or to refresh the witness' recollection, to the extent that the questioning it seeks to rely on is objectionable or improper.

It is a basic concept of evidence that even if a statement meets a hearsay exception, or is not defined as hearsay (such as a prior inconsistent statement made under oath under Rule 801(d)(1)), the statement must still satisfy the rules of evidence in order to be admitted.  Indeed, when an out-of-court statement is offered before the jury, the Court must assure itself that (a) the statement is admissible as non-hearsay or under an exception to the hearsay rule, *and* (b) the statement is otherwise admissible and satisfies the basic rules of evidence – including but not limited to relevance, probity, prejudice and first-hand knowledge.  *See United States v. Lang*, 589 F.2d 92, 97-98 (2d Cir. 1978) (reversing conviction because, notwithstanding the admissibility of the statement as an exception to the hearsay rule under Rule 804(b)(3), the statement was inadmissible under Rule 602, which requires personal knowledge); *Shows v. M/V Red Eagle,* 695 F.2d 114, 118 (5th Cir. 1983), *abrogated on other grounds, Green v. Boc Laundry Mach. Co.*, 490 U.S. 504 (1989) (affirming district court's preclusion of Rule 801(d)(1) statement under Rule 403);

*United States v. Gerard*, 507 Fed. Appx. 218, 222 (3d Cir. 2012) (finding no abuse of discretion where underlying statement satisfied both Rules 801(d)(1)(A) *and* 602); *United States v. Ferguson*, 246 F.R.D. 107, 119 (D. Conn. 2007) (precluding Rule 801(d)(2) testimony because its probative value was outweighed by the danger of unfair prejudice); *United States v. Gotti*, 457 F. Supp. 2d 395, 402 (S.D.N.Y. 2006) (finding statements qualified under Rule 804, but excluding the statements under Rules 403 and 410). Indeed, as the Advisory Committee notes to Rule 803 state: "In a hearsay situation, the declarant is, of course, a witness, and neither this rule nor Rule 804 dispenses with the requirement of firsthand knowledge." Fed. R. Evid. 803 (quoting Advisory Committee notes). In fact, in *Lang*, the government "concede[d] that Rule 602 applies to statements offered pursuant to Rule 804." *Lang,* 589 F.2d at 98.

Under the facts presented here, ████████████████████████████████████
████████████████████████████████████████████ At trial, the government should be precluded from offering or using any such improperly-derived testimony as it would violate the rules of evidence, lead to jury confusion under Rule 403, and would reward the government's improper questioning before the grand jury.

As set forth in Exhibit A, the government's examination of ████████████████████
████████████████████████████████████████████████
████████████████████████████ And, as set forth in Exhibits, B, C, D and E, the rest of the examination was hardly any better. The witness was badgered; his prior testimony was repeatedly misstated; the questions unnecessarily injected the thoughts and views of the prosecutor; and the questions improperly called for opinion testimony ████████████████████
████████████████████████ While a prosecutor may be able to employ these tactics in the secrecy of the grand jury room – where there is no judge, no defense lawyer and the rules of

26

evidence do not apply – that does not transform the examination into *admissible* testimony at trial, where judicial oversight exists, defense lawyers are present and the rules of evidence *do* apply. Accordingly, we move *in limine* to preclude the government from using all objectionable portions of the ██████████████████████ at trial, as set forth in Exhibits A and B.

### III. The Defense is Entitled to Disclosure of all *Giglio* and 3500 Material, as well as Witness and Exhibit Lists, at least 45 Days Before Trial

The defense previously moved for the disclosure of all *Giglio* and 3500 material at least 30 days before trial. *See* Doc. No. 61-1 at 18–20. However, the government's recent disclosures have made clear that production of the *Giglio* and 3500 material in this case only 30 days before trial will be plainly inadequate for the defense to effectively prepare for trial and for the Court to ensure an orderly and fair trial. Accordingly, the defense now asks the Court to direct the government to produce these materials at least 45 days before trial, so that the defense may make effective use of the information through further investigation, likely motions *in limine* and at trial.

The volume of *Giglio* and 3500 material in this case is potentially enormous. The volume of such material with respect to Hickey alone will be very substantial, and is instructive. The government has produced nearly 800 pages of medical records that call Hickey's ability to accurately perceive and recall events into question. This disclosure alone will require further investigation by the defense, including expert consultations, and will likely result in additional motion practice before the Court concerning its admissibility. And that is just what the government has disclosed so far. The government has represented that it will collect and produce Hickey's Internal Affairs files and personnel records, to the extent required by *Brady* and *Giglio*, but the defense has not yet received any of these materials. Nor has the government yet disclosed any of the statements made by Hickey during the *thirteen* government interviews (resulting in *fifteen* reports, according to the government) that have occurred to date. If the government's prior

productions are any guide, these remaining documents will be voluminous and detailed, will require careful study and investigation by the defense, and may well spur additional motion practice.

This volume of material is just the tip of the iceberg. The government has represented that its case will be far more sprawling than just Hickey, potentially including (according to the government's bail letter) "dozens of witnesses." *See* Doc. No. 2 at 3. Indeed, just two weeks ago, the government represented that at least 15 to 20 current or former Suffolk County employees are expected to testify at trial. And this does not include other law enforcement officials, civilian witnesses or the government's expert. The defense will need adequate time to review the *Giglio* and 3500 material for all of these witnesses, and to file any appropriate *in limine* motions.

We respectfully submit that 45 days is the minimum time necessary to allow the defense to make effective use of these materials. Beyond the sheer number of witnesses and the expected volume of their prior statements, the defense can only speculate as to whom most of these witnesses are. But based on the government's search warrant applications, which are the most detailed descriptions of the government's allegations provided thus far, only a small handful of potential witnesses allegedly had direct contact with Mr. McPartland or Mr. Spota when the government's investigation of the Loeb assault was discussed. Thus, we expect that many witnesses' accounts of Mr. McPartland's or Mr. Spota's alleged involvement may be attenuated or non-existent. This will undoubtedly require extensive *in limine* motion practice, given that the defense will identify and seek to exclude testimony that is irrelevant, confusing, cumulative, unfairly prejudicial or otherwise inadmissible.

Second, many of these witnesses are likely to be local law enforcement officials with substantial records that may require production under *Giglio*, including Internal Affairs files and

personnel records. Indeed, the government has previously represented to the defense that it has "a lot" of *Giglio* material for these witnesses. In addition, based on the length of the government's several-year investigation; the number of interviews it conducted of Hickey; and ████████ ████████████████ grand jury testimony ████████████████████████████ ████████████ the government is almost certainly in possession of a significant number of lengthy statements by many of its other witnesses as well. Given the safe assumption that the government's remaining witnesses have even a fraction of the materials produced for Hickey, the defense will require at least 45 days to review those materials, conduct appropriate follow-up investigation, prepare *in limine* motions and effectively make use of them at trial.

Additionally, given the large number of potential witnesses and more than one million pages of documents and e-mails already provided, the government should be directed to produce its exhibit lists at least 45 days prior to trial. Indeed, although the government's Rule 16 productions have been ongoing for nearly two years, the government has still not completed its Rule 16 productions despite the fact that the Court imposed a discovery deadline of July 31, 2018 at a status conference in June 2018, *see* Doc. No. 42, and despite the fact that the government represented to the Court at the June 27, 2019 status conference that it would complete its production by the end of July 2019 (a representation it has since violated). This belated and incomplete production of discovery to the defense, as well as the sheer volume of discovery produced – including over one million pages of documents and dozens of hours of audio recordings – has left the defense searching for needles in a haystack. In order to ensure a fair and orderly trial, the government must be required to identify the exhibits it *actually* intends to rely on as least 45 days before trial.

Finally, to the extent the government is directed to disclose all *Giglio* and 3500 material at least 45 days before trial, it should also be directed to disclose at the same time the identities of witnesses it intends to call at trial but for whom there is no *Giglio* and 3500 material. This request replicates the parallel treatment of *Giglio*, 3500 material, witnesses and exhibits reflected in the defense's initial motion, *see* Doc. No. 61-1 at 18–20, and would provide the defense the time necessary to effectively prepare for trial with respect to these witnesses as well.

For these reasons, the Court should direct the government to disclose all *Giglio* and 3500 material, and its exhibit list, at least 45 days prior to trial, *see* Doc. No. 61-1 at 19–20 (collecting cases), and to identify any of its potential trial witnesses for whom there is no *Giglio* and 3500 material at the same time.

## IV. The Defense is Entitled to Disclosure of all Rule 16, 3500, *Brady* and *Giglio* Material Contained in Data Produced to the Government by Suffolk County

By its August 3, 2019 letter, the government seeks to avoid its obligations under Rule 16, the Jencks Act, *Brady* and *Giglio* by asserting that it is not in possession, custody or control of electronic files that were produced to the government by Suffolk County in response to a government-issued subpoena, simply because more files were produced than the government requested. Gov't Aug. 3, 2019 Ltr. at 1-3. There is simply no such limitation in Rule 16, the Jencks Act, *Brady* or *Giglio*. Moreover, the government has acknowledged to defense counsel that these files include materials of 15 to 20 potential government witnesses, making it highly likely that the files contain, at a minimum, additional Rule 16 and 3500 material. Indeed, based on the government's prior *Brady* disclosures, it is very likely that the files include *Brady* and/or *Giglio* material as well.

Rule 16 requires the government, upon request, to permit a defendant to inspect and copy an item material to the preparation of the defense "if the item is within the government's

possession, custody or control." Fed. R. Crim. P. 16(a)(1)(E). Courts have read "possession, custody or control" to extend broadly, including beyond actual possession. *See United States v. Stein*, 488 F. Supp. 2d 350, 363 (S.D.N.Y. 2007) ("It . . . is not surprising that every circuit to have considered the question has held that 'control' under the federal rules of procedure includes the legal right to obtain the documents in question."); *id.* at 361 ("The term 'control' is broadly construed.") (internal citation omitted). Under the Jencks Act, the government bears a separate obligation to provide a defendant with "any statement . . . of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified." 18 U.S.C. § 3500(b). Here too, courts have broadly construed the meaning of "possession." *See United States v. Bin Laden*, 397 F. Supp. 2d 465, 483–84 (S.D.N.Y. 2005) (citing *United States v. Bufalino*, 576 F.2d 446, 449 (2d Cir. 1978)).

In addition, under *Brady* and *Giglio*, the government must disclose to a defendant information in its actual or constructive possession. *See, e.g.*, *United States v. Bagley*, 473 U.S. 667, 681–82 (1985). The government bears the responsibility of determining whether it is in actual or constructive possession of *Brady* material, *Kyles v. Whitley*, 514 U.S. 419, 437 (1995), and that obligation is interpreted broadly, *Parker v. Herbert*, No. 02-CV-037, 2009 WL 2971575, at *58 (W.D.N.Y. May 28, 2009), such that the government is "presumed . . . to have knowledge of all information gathered in connection with [its] investigation of the case," *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998); *see also, e.g.*, *United States v. Payne*, 63 F.3d 1200, 1208 (2d Cir. 1995) (same); *United States v. Coppa*, 267 F.3d 132, 140 (2d Cir. 2001) (the government must disclose *Brady* material "in its files and in the files of related agencies reasonably expected to have possession of such information"); *Parker*, 2009 WL 2971575 at *41 ("[A] number of courts have found that prosecutors 'suppressed' evidence by failing to search for background information . . .

that is readily available through routine investigation of the prosecution's files or the files of other government agencies.").

The government's refusal to review the Suffolk County custodial data and produce Rule 16, 3500, *Brady* and *Giglio* material is squarely inconsistent with each of these obligations. As an initial matter, the government has conceded that the files at issue were produced to the government in response to a government-issued subpoena. Thus, there can be no serious dispute that the government "gathered [the files] in connection with [its] investigation of the case," *see Avellino*, 136 F.3d at 255; *Payne*, 63 F.3d at 1208, and that the files are in the possession, custody and control of the government. The government insinuates that it is not in *actual* possession of the files because the files are now housed with a government-controlled contractor. *See* Gov't Aug. 3, 2019 Ltr. at 2 (asserting that it "has not sought, obtained or reviewed" the files and that it has no intention "to seek actual possession"). This hyper-technical argument is specious: if the government may be required in appropriate circumstances to obtain and review files from other government agencies, it is plainly required to obtain and review files from its own contractor, particularly when (as is evident from the government's letter) the government sent the files to the contractor, paid the contractor to process other custodians' files, and directed the contractor as to what portions of the files to locate, process and produce. And while the government claims that its "permissible access to [the files] is questionable at best," *id.* at 1, it does not cite any legal limit to its ability to access these files – or, at the very least, files of individuals of relevance to this case.

Moreover, the government is aware that these files almost certainly contain materials that must be disclosed under Rule 16, the Jencks Act, *Brady* and/or *Giglio*. The government has conceded that the files contain materials of 15 to 20 potential government witnesses. As noted above, the government must disclose "any statement . . . of the witness in the possession of the

United States which relates to the subject matter as to which the witness has testified" under the Jencks Act. It is inconceivable that the government has collected five years' worth of communications for 15 to 20 potential witnesses but not one of those communications relates to the subject matter of their anticipated testimony. Indeed, the government has already recognized that materials from the very same set of Suffolk County files are material to preparing the defense by citing Rule 16 as the basis for its production of a subset of these files (i.e., files of the nine above-named custodians) to the defendants. *See* Doc. Nos. 76, 81, 87 at 1.

It is just as likely that the files contain *Brady* and/or *Giglio* material. First, the government has already identified 35 witnesses with exculpatory information – nearly all of whom were Suffolk County employees during the period for which the government has received custodial data. Gov't Apr. 12, 2019 Ltr.; Gov't July 8, 2019 Ltr. Thus, the likelihood that exculpatory or impeachment information is in the custodial data produced to the government is high. Second, as noted above, Hickey's credibility will be central to the trial of this case, and there is reason to believe that his credibility is highly suspect. *See, e.g.*, Gov't July 31, 2019 Ltr. Hickey was a member of the SCPD throughout the period for which the government has Suffolk County data, and it is therefore likely that the government is now in possession of five years' worth of his electronic data. There is no basis in *Brady* or *Giglio* (or Rule 16 or the Jencks Act) to permit the government to ignore the potential for exculpatory, impeaching or otherwise relevant information in Hickey's files. *See, e.g.*, *Kyles*, 514 U.S. at 439 (stating that "prudent prosecutor[s]" will resolve questions in favor of disclosure) (quoting *United States v. Agurs*, 427 U.S. 97, 108, (1976)).

The only reason why the defense cannot make the same particularized showing for potential government witnesses other than Hickey is because the government has refused the defense's request for their names, claiming that it is not prepared to provide a (partial) witness list

at this time.  Putting aside the seemingly specious nature of this refusal – less than three months before trial, in a case that has been pending for nearly two years – the government surely cannot evade its constitutional, statutory and rule-based disclosure obligations by keeping this information a secret.  More to the point, the Court should not countenance the government's highly selective approach to its discovery obligations here: reviewing and producing electronic data of nine custodians from Suffolk County's files – including data of the defendants and several of their apparent[3] alleged co-conspirators – but refusing to do the same for many of its own witnesses, from the very same data source.  *See Parker*, 2009 WL 2971575 at *44 (finding "it significant that *Kyles* rejected the compartmentalized, 'hear no evil, see no evil, speak no evil' approach urged by the prosecution").

In an effort to escape its disclosure obligations, the government makes much of the fact that it received more data from Suffolk County than it requested.  But that fact does not change the legal implications of its possession, custody and control over these materials, and the government cites no case law supporting its position.  The government cites *United States v. Hutcher*, 622 F.2d 1083 (2d Cir. 1980) and *United States v. Canniff*, 521 F.2d 565 (2d Cir. 1975), but neither supports the government's position.  In *Hutcher*, the government's failure to produce affidavits that were filed in a bankruptcy proceeding was determined not to be a disclosure violation because the affidavits were in the possession of the bankruptcy court and were not subject to the government's control.  622 F.2d at 1088.  Similarly, in *Canniff*, the government's failure to produce a pre-sentence report prepared by the United States Probation Office was not a disclosure violation because the Probation Department is an arm of the judiciary and is thus not subject to the

---

[3] We say "apparent" since the government has refused the defense's request for a list of the persons whom it contends are co-conspirators.  *See* Doc. No 60-1 at 10-16.

prosecution's control. 521 F.2d at 573. *Hutcher* and *Canniff* therefore stand for the proposition that documents in the possession *of another branch of government* that is *not controlled by the government* cannot be attributed to the government. They say nothing about the facts here – where documents were produced to the government and are in the physical possession of a contractor controlled by the government.

The government also cites *United States v. Avellino*, 136 F.3d 249 (2d Cir. 1998) and *United States v. Ruiz*, 536 U.S. 622 (2002), but these cases also do not support the government's position. In *Avellino*, the court decided the *Brady* issue on materiality grounds and thus did not reach the question of knowledge – but noted that "troublesome questions" concerning the government's knowledge (which it denied) of *Brady* material likely would have merited remand if the information had been material. 136 F.3d at 256. In *Ruiz*, the Court merely held that impeachment evidence need not be produced prior to a guilty plea. *See* 536 U.S. at 628-33. Yet in so doing, it reinforced the fundamental role that impeachment evidence serves to guarantee a fair trial. *Id*. These cases do not support the government's position here.

Finally, the government asserts that the financial cost of complying with its discovery obligations would be too high. That is simply not a permissible ground for the government to refuse to comply with its discovery obligations. *See Stein*, 488 F. Supp. 2d at 364 ("The plain language of Rule 16 makes clear that documents material to defense that are within the government's control are producible. That the government . . . might regard compliance with the rule . . . to be inconvenient warrants no different conclusion."); *United States v. W.R. Grace*, 401 F. Supp. 2d 1069, 1079 (D. Mont. 2005) ("The prosecutor's obligation to seek out exculpatory evidence in the government's possession is not tempered by considerations of reasonableness or undue burden."); *United States v. McVeigh*, 954 F. Supp. 1441, 1450 (D. Colo. 1997) (stating that

a *Brady* violation "is not excused by inconvenience, expense, annoyance or delay. Determining materiality of information discoverable under Rule 16 or required to be produced under *Brady* must not be made according to a cost benefit analysis.").

Accordingly, we respectfully seek an order requiring the government to comply with its disclosure obligations by reviewing the electronic files of the 15 to 20 potential government witnesses whose data is in the government's possession, custody or control and producing all materials required to be produced pursuant to Rule 16, the Jencks Act, *Brady* and/or *Giglio*.

## V.    The Government Should Be Compelled to Produce James Burke's Statements Regarding James Hickey's Mental Health

The defense has requested, and the government has declined to provide, any statements made by Burke concerning Hickey's mental or emotional condition; hospitalizations or other treatment relating to Hickey's use of alcohol, pancreatitis or his mental condition; or any attempt or claimed attempt by Hickey to commit suicide, regardless of whether or not the government contends that any such statements by Burke were credible or accurate. Such statements would constitute *Brady* and *Giglio* information and, to the extent such statements were made, the government should be ordered to produce the statements promptly.

If Burke made such statements, the statements plainly must be produced. As numerous courts have held, including in this circuit, information calling into question the mental health, condition or capacity of a government witness must be produced under *Brady* and/or *Giglio*. *See, e.g.*, Def. Aug. 8, 2019 Ltr. at 13–17 (collecting cases); *United States v. Golyansky*, 291 F.3d 1245, 1248 (10th Cir. 2002) (requiring production of information concerning key witness's mental health history); *United States v. Lauderdale*, 5:15-cr-00012, 2015 U.S. Dist. LEXIS 151189, *4-5 (N.D. Cal. Nov. 5, 2015) (mental health reports); *United States v. Swain*, No. S4 08 Cr. 1175, 2011 U.S. Dist. LEXIS 92639, *26 (S.D.N.Y. Aug. 16, 2011) (psychiatric impairment); *United States v. Anh*

*The Duong*, CR 01-20154, 2010 U.S. Dist. LEXIS 21754, *4 (N.D. Cal. Feb. 9, 2010) (mental health records); *United States v. Stillo*, 91 CR 795-1-2, 1992 U.S. Dist. LEXIS 15595, * 9 (N.D. Ill. Oct. 9, 1992) (psychiatric disorder); *United States v. Swano*, 91 CR 477-02-03, 1992 U.S. Dist. LEXIS 7554, *36 (N.D. Ill. June 1, 1992) (psychological or psychiatric history). While the government has been compelled to disclose Hickey's records for two hospitalizations, in 2013 and 2015, statements by Burke may add crucial context to the records, including with respect to Hickey's ability to accurately perceive and recall events relevant to this case – particularly with respect to events that occurred outside the time periods of Hickey's hospitalizations or that may not be reflected in the disclosed medical records.

Moreover, the government must produce Burke's statements even if the government does not credit the statements. It is axiomatic that the government's assessment of the credibility of favorable information is immaterial under *Brady* and *Giglio*. *See, e.g.*, *Smith v. Cain*, 565 U.S. 73, 76 (2012) (rejecting government's arguments as to why jury "could" have discounted undisclosed, favorable statements); *Dennis v. Pennsylvania Department of Corrections*, 834 F.3d 263, 306-07 (3d Cir. 2016) (en banc) ("[M]aking *Brady* disclosure depend on a prosecutor's own assessment of evidentiary value, as opposed to the benefit to defense counsel, is anathema to the goals of fairness and justice motivating *Brady*."); *Campbell v. Maryland*, 769 F.2d 314, 318 (6th Cir. 1985) ("[W]here information has been specifically requested by the defense, the subjective evaluation of that information's evidentiary value is not for the prosecutor to make."); *Lindsey v. King*, 769 F.2d 1034, 1040 (5th Cir. 1985) ("It was for the jury, not the prosecutor, to decide whether the contents of an official police record were credible, especially where – as here – they were in the nature of an admission against the state's interest in prosecuting [the defendant].").

Finally, even assuming *arguendo* that the statements Burke made were false, they would constitute *Brady* and/or *Giglio* material with respect to Burke and must be disclosed on that basis. Federal Rule of Evidence 806 provides that "[w]hen a hearsay statement – or a statement described in Rule 801(d)(2) . . . (E) [governing co-conspirator statements] – has been admitted in evidence, the declarant's credibility may be attacked . . . by any evidence that would be admissible for those purposes if the declarant had testified as a witness." Fed. R. Evid. 806. Thus, if statements by Burke are introduced at trial – as we fully expect they will be – the defense would be permitted to impeach Burke's credibility, including by introducing false or inconsistent statements by him. *See, e.g.*, *United States v. Friedman*, 854 F.2d 535, 570 n. 8 (2d Cir. 1988) (suggesting that extrinsic evidence concerning a non-testifying declarant's character for truthfulness may be admissible under Rule 806, since that Rule applies "when the declarant has not testified and there has by definition been no cross-examination, and resort to extrinsic evidence may be the only means of presenting such evidence to the jury"); *United States v. Uvino*, 590 F. Supp. 2d 372, 374 (E.D.N.Y. 2008) (admitting extrinsic evidence to impeach statements made by non-testifying declarants); *United States v. Stewart*, 907 F.3d 677, 687 (2d Cir. 2018) ("A hearsay declarant may be impeached by showing that the declarant made inconsistent statements, based upon the theory that such a declarant is in effect a witness and therefore his credibility should in fairness be subject to impeachment as though he had in fact testified." (internal quotation marks and alterations omitted)).

Accordingly, we respectfully seek an order directing the government to promptly disclose any statements made by Burke concerning Hickey's mental health, condition or capacity.

## Conclusion

For all these reasons, the defendants respectfully request that the Court grant their supplemental motions.

Dated: New York, New York
      August 30, 2019

By:                 
Larry H. Krantz
Lisa A. Cahill
KRANTZ & BERMAN LLP
747 Third Avenue, 32nd Floor
New York, New York 10017
(212) 661-0009

Bradley R. Gershel
BALLARD SPAHR LLP
1675 Broadway, 19th Floor
New York, New York 10019
(212) 223-0200

*Counsel for Christopher McPartland*

Alan Vinegrad
Erin Monju
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
(212) 841-1022

*Counsel for Thomas J. Spota*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                                        :
UNITED STATES OF AMERICA,                               :
                                                        :
                                                        :
                                                        :
        vs.                                             :   2:17-cr-0587 (JMA)
                                                        :
CHRISTOPHER McPARTLAND and                              :   **(Request to be filed under seal)**
THOMAS J. SPOTA,                                        :
                                                        :
                Defendants.                             :
                                                        :
-------------------------------------------------------------X

### AFFIRMATION OF LARRY H. KRANTZ IN SUPPORT OF DEFENDANTS' JOINT SUPPLEMENTAL PRETRIAL MOTIONS

        Larry H. Krantz, an attorney duly admitted to practice in the courts of the State of New York, hereby affirms under penalty of perjury as follows:

        1.      I am the attorney for the Defendant Christopher McPartland in this matter, and submit this affirmation in support of defendants' joint supplemental pretrial motions.

        2.      Attached hereto as Exhibit A is an analysis of portions of the grand jury testimony of ███████████████████████████████████████████████████████████ (together, "Testimony").

        3.      Attached hereto as Exhibit B is a true and correct copy of certain excerpts of ███████████ Testimony.

        4.      Attached hereto as Exhibit C ███████████████████████████████████ ███████████████████████████████

        5.      Attached hereto as Exhibit D ███████████████████████████████████ ███████████████████████████

6.	Attached hereto as Exhibit E ███████████████████████████████████

███████████████████████████████

7.	Attached hereto as Exhibit F is a true and correct copy of the government's August 3, 2019 letter to defense counsel.

8.	Attached hereto as Exhibit G is a true and correct copy of certain excerpts of James Hickey's medical records, produced by the government to defense counsel on August 16, 2019, with highlighted portions added.


Dated: August 30, 2019
	New York, NY




_____/s/ LHK_____
Larry H. Krantz
Krantz & Berman LLP
747 Third Avenue, 32ndFloor
New York, New York 10017
212-661-0009

*Counsel for Defendant Christopher McPartland*

# Exhibit A

**(Request to be filed under seal)**

# Exhibit B

## (Request to be filed under seal)

# Exhibit C

# (Request to be filed under seal)

**Exhibit D**

**(Request to be filed under seal)**

**Exhibit E**

**(Request to be filed under seal)**

**Exhibit F**

**(Request to be filed under seal)**



**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

| | |
|---|---|
| JJD:LTG/JLG | *610 Federal Plaza* |
| F. #2018R00279 | *Central Islip, New York 11722* |

August 3, 2019

By E-mail

Larry H. Krantz, Esq.
lkrantz@krantzberman.com

Bradley Gershel, Esq.
gershelb@ballardspahr.com

Lisa Cahill, Esq.
lcahill@krantzberman.com

Alan M. Vinegrad, Esq.
avinegrad@cov.com

Erin K. Monju, Esq.
emonju@cov.com

Re:    United States v. Christopher McPartland and Thomas J. Spota
       <u>Criminal Docket No. 17-587 (JMA)</u>

Dear Counsel:

We write to inform you of the existence of certain electronic documents and materials that may be viewed as being constructively in the Government's possession, custody and control. As set forth herein, although these materials were produced by a state entity in response to a subpoena *duces tecum*, they are very clearly well beyond the scope of the materials sought by the subpoena; therefore, the Government's permissible access to them is questionable at best. Furthermore, for the reasons stated below, the Government submits that it has no obligation pursuant to Rule 16, Federal Rules of Criminal Procedure; *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny; *Giglio v. United States*, 405 U.S. 150, 154 (1972), and its progeny; and/or the Jencks Act, 18 U.S.C. § 3500, to obtain, review, and produce these materials. *See*, *e.g.*, *United States v. Hutcher*, 622 F.2d 1083, 1088 (2d

Cir. 1980) ("Clearly the government cannot be required to produce that which it does not control and never possessed or inspected." (citation omitted)).

By way of background, the government issued a subpoena *duces tecum*, dated June 6, 2018, to the Suffolk County Department of Information Technology ("SCDIT"), seeking, in substance, the electronic files of nine custodians – namely, Thomas Spota, Christopher McPartland, Spiros Moustakis, Emily Constant, Frank Guidice, James Burke, William Madigan, Russell McCormick, and Cynthia Scezny – for the time period beginning December 14, 2012 up through and including December 31, 2017. Those materials have been, and continue to be, produced to you on a rolling basis via a third party data hosting and processing company (the "Contractor").

However, due to the antiquated nature of Suffolk County's backup servers, where these materials were archived and stored, SCDIT was unable to segregate the electronic files of only these nine subpoenaed custodians. Therefore, in order to comply with the subpoena, SCDIT provided to the government the electronic files – in the form of "backup tapes" – of *all* custodians/users on their system for the time period requested. This data was massive, comprising approximately 159 backup tapes, which the Government was unable to process in-house. As you know, the Government has gone to great lengths, at tremendous expense, to obtain the subpoenaed materials for the nine specified custodians, engaging the services of the Contractor in order to decrypt all of the backup tapes, locate the subpoenaed accounts/custodians/users on each backup tape, extract the specific materials, and de-duplicate and convert that data.

In providing these backup tapes to the Contractor for processing, as described above, the Government requested, and has received, only the electronic data of the nine subpoenaed custodians. Put another way, the Government has not sought, obtained or reviewed – and does not intend to seek, obtain or review – the electronic data of any additional custodians or accounts – including for any potential Government witnesses – that may be contained on the backup tapes that have been provided by SCDIT.

Because the government may be deemed to have constructive possession of these electronic materials, we are informing you of their existence, and of our intention not to seek actual possession of any SCDIT materials that are beyond the scope of those requested by the June 6, 2018 subpoena. The Government does not view these materials as discoverable under Rule 16, *Brady*, *Giglio*, and/or the Jencks Act. The Government's disclosure obligations are not limitless. *See United States v. Ruiz*, 536 U.S. 622, 629 (2002) ("[T]he Constitution does not require the prosecutor to share all useful information with the defendant."). Rather, the duty to disclose favorable evidence to the accused is an obligation that extends only "to material evidence … *known to the prosecutor*." *United States v.*

*Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) (emphasis added). The Second Circuit has held that the Government "cannot be required to produce that which it does not control and never possessed or inspected." *United States v. Canniff*, 521 F.2d 565, 573 (2d Cir. 1975); *see also Hutcher*, 622 F.2d at 1088 ("We reject … a notion of 'possession' which is so elastic as to embrace materials that the prosecution never had in its files, never inspected, and never knew about.").

Finally, please be aware that the estimate provided by the Contractor for the processing of electronic data related to additional custodians on these backup tapes is approximately $175,000.00. Based on the Government's experience to date with the Contractor's preliminary estimates, we believe this number will be only a fraction of the actual costs associated with the processing, production and/or hosting of this data.

Please let us know if you wish to discuss this issue further.

Very truly yours,

RICHARD P. DONOGHUE
United States Attorney

By:     /s/                                          
John J. Durham
Lara Treinis Gatz
Justina L. Geraci
Assistant U.S. Attorneys
(631) 715-7851/-7913/-7835


cc:     The Honorable Joan M. Azrack, U.S.D.J.  (by Hand)

**Exhibit G**

**(Request to be filed under seal)**

| ACCOUNT NO. | PATIENT LAST NAME | FIRST | AGE | SOC SECURITY | REG. DATE | TIME | MED. REC. NO. |
|---|---|---|---|---|---|---|---|
| 4671592 | HICKEY | JAMES | 49 Y | XXX-XX-XXXX | 08/24/13 | 01:17 | 000735755 |

| ADDRESS | | CITY | | STATE ZIP | BIRTHDATE | HOME PHONE | WORK PHONE |
|---|---|---|---|---|---|---|---|
| 5 TALL TREE LANE | | SMITHTOWN | | NY 11787 | 04/11/64 | 631-265-3706 | |

| RACE | SEX | M.S. | REL. | GUAR LAST NAME | | GUAR FIRST | | | | GUARANTOR EMPLOYER |
|---|---|---|---|---|---|---|---|---|---|---|
| W | M | M | RC | HICKEY | | JAMES | | | | SUFFOLK COUNTY |

| PLAN | DESCRIPTION | | POLICY HOLDER/POLICY# | | REL | SEX | DOB | GROUP/PAYOR ID |
|---|---|---|---|---|---|---|---|---|
| 181/01 | | HICKEY, JAMES R | | PT | | 04/11/64 | ER |
| | EMPIRE BLUE CROSS PP | CDKSC3349969 | | | | 09/06/46 | |

| EMERGENCY CONTACT: NAME | HOME PHONE | | | | MOA | ACCOMPANIED BY | REGISTERED BY |
|---|---|---|---|---|---|---|---|
| HICKEY DEBRA | 631-265-3706 | | | | WI | | LPER |

| PRIOR VISIT | HOSP EMP | SELF PAY | WC | MVA | ACCIDENT DATE | FAMILY PHYSICIAN: NAME | PHONE |
|---|---|---|---|---|---|---|---|
| 00/00/00 | | | | | 08/23/13 | | |

CHIEF COMPLAINT/REASON FOR VISIT:

ABDOMIANL PAIN/ VOMITING

**ISOLATION REQUIRED**  Y  N  CIRCLE ONE

# PLACE TRIAGE STICKER HERE

| Time | BP | P | RR | Temp | SaO2 | | | Time | Type | Amt | Time | Type | Amt | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | **Input** | | | **Output** | | | |
| 0230 | 164/10 | 93 | 18 | — | 99. | | | | | | | | | Time 0155 |
| 0445 | 160/113 | 109 | 18 | — | 95. | | | 0235 | NS | 1 L | | | | Site R forearm |
| 060 | 163/112 | 104 | 18 | — | 95. | | | 0310 | NS | 150ml/hr | | | | Gauge 20  started by |
| | | | | | | | | | | | | | | Soln  Ke |
| | | | | | | | | | | | | | | Rate |

## PAIN MANAGEMENT

| TIME | PAIN LEVEL | PAIN LOCATION | CHARAC-TERISTICS | INTERVEN-TIONS | INITIAL | PAIN LEVEL / OUTCOME | TIME | INITIAL |
|---|---|---|---|---|---|---|---|---|
| 0310 | 10 | abd | sharp | meds | Ke | 8 change | 0320 | Ke |
| 0335 | 10 | " | " | " | Ke | 5 | 0340 | Ke |

| Time | Nursing notes | Sign |
|---|---|---|
| 0245 | received pt c̄ c/o abd pain. Pt has been having x 2 months, drinking "heavily" since february. pt states drinks 1 bottle wine & 1/2 bottle vodka daily, has not drank since yesterday afternoon c/o nausea, vomiting. frequent vomiting since arrival. IV est labs drawn. bolus medicated as ordered for nausea & tramors. pt placed on mtr, ETOH withdrawal flowsheet done. will mtr closely 4/0/2/2/zen 0400 pt med. for pain. banana bag. pt for CT scan. | |

MEDICAL RECORDS

4-140 (1/26/12)

# HISTORY AND PHYSICAL

Name: HICKEY, JAMES Acct#: 4671592 MR#: 000735755 MSV: MED
Admit Date: 08/24/2013 Discharge Date: Location: 2S

## HISTORY

CHIEF COMPLAINT: Per the patient, "I had belly pain, nausea, and vomiting; I feel very shaky since Friday morning."

HISTORY OF PRESENT ILLNESS: The patient is a 49-year-old gentleman with no significant past medical history except a history of EtOH abuse. The patient reports that on and off, he has been drinking a good part of his life, but more excessively in the last one year. He reports drinking at least a bottle of wine daily; in addition to that, up to a quarter of He went to bed, woke up Friday morning with severe epigastric pain without radiation. The patient reported that, in addition to his pain, he had intractable nausea and vomiting, unable to keep anything down. His symptoms persisted nonstop, and therefore, he came to the ER for further evaluation. In the ED, prior to my examination, he has received 1 liter IV fluid along with multiple doses of Ativan, Zofran, morphine, and his last alcohol withdrawal CIWA protocol score was 7. On my examination, presently, the patient is complaining of abdominal pain. He is very tremulous, shaky, with the wife at bedside. There is no complaint of chest pain or shortness of breath.

REVIEW OF SYSTEMS: Positive epigastric pain that developed yesterday morning. Positive nausea and positive vomiting. Feels very, very tremulous, shaky, anxious, complaining of chills, but no fevers. Positive weakness. Remainder of the review of systems is unremarkable.

PAST MEDICAL HISTORY: History of EtOH abuse/dependence.

PAST SURGICAL HISTORY: The patient denies.

ALLERGIES: NO KNOWN DRUG ALLERGIES.

MEDICATIONS: He takes Nexium 40 mg once a day.

FAMILY HISTORY: Father was an alcoholic; he died as a result of complications and sequelae of cirrhosis including liver cancer. Older sister is an alcoholic as well.

SOCIAL HISTORY: Denies any smoking or drug abuse. Drinks excessively, especially in the past one year. He has been drinking a bottle of wine daily along with a quart of vodka. He is married. He has four children. By occupation, he is a police officer.

## PHYSICAL EXAMINATION

VITAL SIGNS: His initial blood pressure was 184/119, O2 sat was 98% on room air, temperature of 98, pulse of 84, and respiratory rate of 20.
GENERAL: Young gentleman, sitting up in stretcher, uncomfortable due to nausea and tremulous, in obvious apparent respiratory distress.
HEENT: Pupils are equal and reactive to light. Extraocular muscles are

Hi▒▒▒▒▒▒▒ 0001002▒

| Description | Dose | Route | Freq/ Rate | Last Given |
|---|---|---|---|---|
| | SOLN (1 Dose) | | | |
| LORazepam INJECTION[ATIVAN] (ATIVAN FORM) | 2 MG=1 ML. SOLN (1 Dose) | IM | ONCE | 10/22/2015 20:22 |
| SODIUM CHLORIDE 0.9% | 1,000 ML (24 Hours) | IV | 100 ml/ hr | 10/22/2015 20:51 |

**Mental Status Exam:** Orientation Person: oriented; Place: Glen Oaks; Date: 10/23/2015; Appearance: WNL; Attitude: Guarded, Other; Motor activity/Gait: Restless, Affect: Anxious, constricted; Mood: Irritated; Speech: slowed, slurred; Thought process: - mostly linear and goal oriented, though some instances where it was loose and illogicalThought content Delusional; Comment: suspiciousness and paranoia that others are out to get him. He claims it's due to the nature of his work ( a detective); Not obsessed; Hallucinates; No Auditory Hallucinations-; Pt has been having AH/VH periodically during his stay. ; No Visual Hallucinations; No suicidal ideation; No homicidal ideation; Judgement: Fair, limited; Insight: limited; Memory: - 0/3 on three item recall
remote memory intact
; Concentration: - 1/5 on spelling world backwards; Intellect: WNL; Language: WNL; MMSE score (if applicable): 18/30

Pt had difficulty with 3 item recall 0/3, impaired attention world spelling backwards 2/5,
had trouble follwoing a three step command 2/3, had trouble understanding the instructions to oerfoming a reading task.
Imapired spatial ability (pt could could not locate the paper given to him and reached the other way)
**Also discussed with:** : family, house staff
**Collateral details:** -: Wife Debbie Hickey 631-335-7356. See HPI.
**Assessment and Plan:** :: 51 year old male with no past psychiatric history presents with fluctuating altered mental status, confusion, agitation, suspiciouness, AH/VH, following a stressful week at work and lack of sleep. Medical work up so far negative.

Assessment

A. Presentation most consistent with delirium, possibly secondary to sleep deprivation. In support : Fluctuating altored mental status, Visual hallucinations, agitation and disorientation

B. R/O Lewy body dementia. In support: fully formed visual hallucinations, fluctuatings in alertness and cognition, history of memory imapirment and difficulty multitasking, impaired spatial ability.

C. R/O Bipolar do. In support : Lack of sleep, increased activity at work, some irritability. Against: No psych history of mood episodes, altered mental status and confusion is not typical of a manic episode.

D. R/O cognitive impairement due to chronic alcoholism. ( MRI shows normal ventricles and sulci, though which can be enlarged in cognitive imapirment in chronic alcoholics.)

Plan

1. For confusion and agitation, may give Haldol 2-5 mg q 4 hrs, max dose 30mg. Caution advised in giving Haldol IV as it can cause QTc elongation.

2. Pt requires further observation to see if further mental status changes are occuring to determine whethere this is delirium or a psychotic presentation.

3. Wife stated that Patient was close to his normal baseline today after he woke up, despite MMSE score of 18/30. Pt had just woken from being sedated which could have affected his performance on the test.

4. Keep on 1:1 for safety

5. Psych to follow
**Diagnosis:** AXIS I: Delirium, r/o Bipolar Disorder, ETOH Dependence; AXIS II: deferred; AXIS III: Hx of pancreatitis

Saved by: NINA GREIF, DO 10/23/2015 12:07
Saved by: NINA GREIF, DO 10/23/2015 12:07
Saved by: NINA GREIF, DO 10/23/2015 12:22

HICKEY, Mhoxxx 000000XX

**HICKEY, JAMES R**
Huntington Hospital - CC
Rm-Bed: 0044 - 1    Admit Dt: 10/22/2015 01:26    Disch Dt:
Age: 51 yr    Gender: M
DOB: 04/11/1964    Acct: 4875332    MRN: 000735755

| Description | Dose | Route | Freq/ Rate | Last Given |
|---|---|---|---|---|
| | SOLN (1 Dose) | | | |
| LORazepam INJECTION[ATIVAN] (ATIVAN FORM) | 2 MG=1 ML SOLN (1 Dose) | IM | ONCE | 10/22/2015 20:22 |
| SODIUM CHLORIDE 0.9% | 1,000 ML (24 Hours) | IV | 100 ml/ hr | 10/22/2015 20:51 |

**Mental Status Exam:** Orientation Person: oriented; Place: Glen Oaks; Date: 10/23/2015; Appearance: WNL; Attitude: Guarded, Other; Motor activity/Gait: Restless; Affect: Anxious, constricted; Mood: Irritated; Speech: slowed, slurred; Thought process: - mostly linear and goal oriented, though some instances where it was loose and illogicalThought content Delusional; Comment: suspiciousness and paranoia that others are out to get him. He claims it's due to the nature of his work ( a detective); Not obsessed; Hallucinates; No Auditory Hallucinations-: Pt has been having AH/VH periodically during his stay. ; No Visual Hallucinations; No suicidal ideation; No homicidal ideation; Judgement: Fair, limited; Insight: limited; Memory: - 0/3 on three item recall
remote memory intact; Concentration: - 1/5 on spelling world backwards; Intellect: WNL; Language: WNL; MMSE score (if applicable): 18/30

Pt had difficulty with 3 item recall 0/3, impaired attention world spelling backwards 2/5,
had trouble follwoing a three step command 2/3, had trouble understanding the instructions to performing a reading task. Imapired spatial ability (pt could could not locate the paper given to him and reached the other way)
**Also discussed with:** -: family, house staff
**Collateral details:** -: Wife Debbie Hickey 631-335-7356. See HPI.
**Assessment and Plan:** :: 51 year old male with no past psychiatric history presents with fluctuating altered mental status, confusion, agitation, suspiciouness, AH/VH, following a stressful week at work and lack of sleep. Medical work up so far negative.

Assessment

A. Presentation most consistent with delirium, possibly secondary to sleep deprivation. In support : Fluctuating altered mental status, Visual hallucinations, agitation and disorientation

B. R/O Lewy body dementia. In support: fully formed visual hallucinations, fluctuatings in alertness and cognition, history of memory imapirment and difficulty multitasking, impaired spatial ability.

C. R/O Bipolar do. In support : Lack of sleep, increased activity at work, some irritability. Against: No psych history of mood episodes, altered mental status and confusion are not typical of a manic elpisode.

D. R/O cognitive impairment due to chronic alcoholism. ( MRI shows normal ventricles and sulci, though which can be enlarged in cognitive impairment in chronic alcoholics.)

Plan

1. For confusion and agitation, may give Haldol 2-5 mg q 4 hrs, max dose 30mg. Caution advised in giving Haldol IV as it can cause QTc elongation.

2. Pt requires further observation to see if further mental status changes are occuring to determine whethere this is delirium or a psychotic presentation.

3. Wife stated that Patient was close to his normal baseline today after he woke up, despite MMSE score of 18/30. Pt had just woken from being sedated which could have affected his performance on the test.

4. Keep on 1:1 for safety

5. Psych to follow
**Diagnosis:** AXIS I: Delirium, r/o Bipolar Disorder, ETOH Dependence; AXIS II: deferred; AXIS III: Hx of pancreatitis

Saved by: NINA GREIF, DO 10/23/2015 12:07
Saved by: NINA GREIF, DO 10/23/2015 12:07
Saved by: NINA GREIF, DO 10/23/2015 12:22