UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| UNITED STATES OF AMERICA | No. 2:17-cr-0587 (JMA) |
| - against - | **Notice of Defendants' Joint Motions *In Limine* to Preclude Certain Evidence and for Additional *Brady/Giglio* Material** |
| CHRISTOPHER MCPARTLAND and THOMAS J. SPOTA, | |
| Defendants. | **(Request to be filed under seal)** |

PLEASE TAKE NOTICE that, upon the accompanying Memorandum of Law, dated October 24, 2019, and all prior pleadings and proceedings herein, the defendants Christopher McPartland and Thomas J. Spota will jointly move this Court, before the Honorable Joan M. Azrack, at a date and time to be fixed by the Court, at the United States District Court, 100 Federal Plaza, Central Islip, New York 11722, for an Order (a) precluding the government from offering the evidence set forth in the accompanying memorandum of law; (b) directing the government to disclose additional *Brady/Giglio* material; and (c) granting such further relief as the Court deems proper.

Respectfully submitted,

Larry H. Krantz
Lisa Cahill
KRANTZ & BERMAN LLP
747 Third Avenue, 32nd Floor
New York, NY 10017
(212) 661-0009

Brad Gershel
BALLARD SPAHR LLP
1675 Broadway, 19th Floor
New York, NY 10019
(212) 223-0200

*Counsel for Mr. McPartland*

Alan Vinegrad
Erin Monju
Sarah LeMaster
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
(212) 841-1022

*Counsel for Mr. Spota*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

   - against -

CHRISTOPHER MCPARTLAND and
THOMAS J. SPOTA,

                         Defendants.

No. 2:17-cr-0587 (JMA)

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
MOTIONS *IN LIMINE* TO EXCLUDE EVIDENCE AND
FOR DISCLOSURE OF ADDITIONAL *BRADY/GIGLIO* MATERIAL**

**<u>UNREDACTED VERSION – REQUEST TO BE FILED UNDER SEAL</u>**

KRANTZ & BERMAN LLP
747 Third Avenue, 32nd Floor
New York, New York 10017
(212) 661-0009

*Counsel for Christopher McPartland*

COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
(212) 841-1022

*Counsel for Thomas J. Spota*

# Table of Contents

Preliminary Statement...................................................................................................... 1

Argument ......................................................................................................................... 3

I.      Testimony Must Be Limited to Witnesses' Personal Knowledge Obtained
        Through Their Five Senses ................................................................................... 3

II.     Evidence of Burke's Alleged Misconduct Must be Excluded ........................... 17

III.    Evidence of the Defendants' Other Prosecutorial Conduct Must Be Excluded .............. 20

IV.     Evidence of the Oliva Investigation and Wiretap Must Be Excluded ............................ 22

V.      Evidence of the Salacious Details of Loeb's Theft and Assault Must be Excluded........ 39

VI.     Evidence of How Lawyers for Various Police Witnesses Were Recommended,
        How Information Was Shared Among the Lawyers, and the Terms by Which the
        Unions Paid Their Fees Must Be Excluded .................................................... 42

VII.    Evidence Concerning the Defendants' Alcohol Consumption Must be Excluded .......... 49

VIII.   The Government Should Be Ordered to Comply with Defendants' *Brady/Giglio*
        Requests ............................................................................................................. 50

Conclusion ..................................................................................................................... 55

# Table of Authorities

**Cases**                                                                                                    Page(s)

*Ali v. Police Officer William Connick,*
 No. 11 Civ. 5297, 2016 WL 3080799 (E.D.N.Y. May 31, 2016) ..........................................19

*Demirovic v. Ortega,*
 No. 15 Civ. 327, 2017 WL 4621089 (E.D.N.Y. Oct. 13, 2017) ...........................................33

*Giglio v. United States,*
 405 U.S. 150 (1972).......................................................................................50, 52, 54

*Hester v. BIC Corp.,*
 225 F.3d 178 (2d Cir. 2000).................................................................................8, 16

*John v. Masterson,*
 No. 08-0141, 2010 WL 2232569 (D. Conn. May 27, 2010).................................................19

*Knox v. Ferrer,*
 No. 5:07-CV-6, 2008 WL 4446532 (S.D. Miss. Sept. 25, 2008) ..........................................50

*Los Angeles Times Commc'ns, LLC v. Dep't of Army,*
 442 F. Supp. 2d 880 (C.D. Cal. 2006) ......................................................................4

*Estate of Mauricio Jaquez v. Flores,*
 No. 10 CIV. 2881, 2016 WL 1084145 (S.D.N.Y. Mar. 17, 2016) ........................................42

*Morisseau v. DLA Piper,*
 532 F. Supp. 2d 595 (S.D.N.Y 2008)........................................................................8

*Nesbitt v. Sears, Roebuck and Co.,*
 415 F. Supp. 2d 530 (E.D. Pa. 2005) ......................................................................49

*Old Chief v. United States,*
 519 U.S. 172 (1997)........................................................................................35

*Olmstead v. United States,*
 277 U.S. 438 (1928)........................................................................................36

*Palucki v. Sears, Roebuck & Co.,*
 879 F.2d 1568 (7th Cir. 1989) ...............................................................................9

*People v. Tesen,*
 739 N.W.2d 689 (Mich. Ct. App. 2007) ...............................................................37, 38

*Perez v. Volvo Car Corp.,*
 247 F.3d 303 (1st Cir. 2001)..................................................................................8

*Randolph v. Collectramatic, Inc.*,
   590 F.2d 844 (10th Cir. 1979) ........................................................................8

*Rao v. Rodriguez*,
   No. 14 Civ. 1936, 2017 WL 1403214 (E.D.N.Y. Apr. 18, 2017)...........................................19

*Romanelli v. Long Island R. Co.*,
   898 F. Supp. 2d 626 (S.D.N.Y. 2012)..................................................................3

*Schlossberg v. Schwartz*,
   2014 WL 1976650 (Sup. Ct. N.Y. Co. 2014) ........................................................44

*Smith v. Cty. of Barry*,
   No. 1:15-CV-131, 2016 WL 10321585 (W.D. Mich. Sept. 26, 2016) ..................................50

*Townsend v. Rhodes*,
   No. 4:14-CV-10411, 2015 WL 13743550 (E.D. Mich. June 9, 2015) ..................................4

*Union Carbide Corp. v. Montell N.V.*,
   28 F. Supp. 2d 833 (S.D.N.Y. 1998)..............................................................21, 22

*United States v. Aboumoussallem*,
   726 F.2d 906 (2d Cir. 1984).........................................................................34

*United States v. Aiello*,
   864 F.2d 257 (2d Cir. 1988).......................................................................14, 15

*United States v. Bagaric*,
   706 F.2d 42 (2d Cir. 1983).........................................................................28

*United States v. Bin Laden*,
   91 F. Supp. 2d 600 (S.D.N.Y. 2000)................................................................36

*United States v. Birdman*,
   602 F.2d 547 (3d Cir. 1979).....................................................................36, 37

*United States v. Borello*,
   766 F.2d 46 (2d Cir. 1985)......................................................................31, 40

*United States v. Borrero*,
   630 F. Appx. 20 (2d Cir. 2015)....................................................................15

*United States v. Carboni*,
   204 F.3d 39 (2d Cir. 2000).........................................................................28

*United States v. Cuti*,
   720 F.3d 453 (2d Cir. 2013).........................................................................8

ii

*United States v. Durham*,
  464 F.3d 976 (9th Cir. 2006) ........................................................................4

*United States v. Ferguson*,
  246 F.R.D. 107 (D. Conn. 2007) ...................................................................29

*United States v. Ferguson*,
  No. 06 Cr. 137, 2007 WL 4240782 (D. Conn. Nov. 30, 2007) ....................33

*United States v. Garcia*,
  291 F.3d 127 (2d Cir. 2002) ............................................................12, 14, 15

*United States v. Garcia*,
  413 F.3d 201 (2d Cir. 2005) ..........................................................................4

*United States v. Gilliam*,
  994 F.2d 97 (2d Cir. 1993) .....................................................................31, 42

*United States v. Grinage*,
  390 F.3d 746 (2d Cir. 2004) .........................................................................16

*United States v. Harvey*,
  991 F. 2d 981 (2d Cir. 1993) ........................................................................40

*United States v. Johnson*,
  No. S5 16 CR. 281, 2019 WL 690338 (S.D.N.Y. Feb. 16, 2019) ...............33

*United States v. Johnston*,
  690 F.2d 638 (7th Cir. 1982) ..................................................................36, 38

*United States v. Kahale*,
  789 F. Supp. 2d 359 (E.D.N.Y. 2009) ..........................................................29

*United States v. Kaplan*,
  490 F.3d 110 (2d Cir. 2007) ..............................................................4, 12, 13

*United States v. Mahaffy*,
  477 F. Supp. 2d 560 (E.D.N.Y. 2007) ..........................................................29

*United States v. Massino*,
  546 F.3d 123 (2d Cir. 2008) ...........................................................................9

*United States v. Morgan*,
  786 F.3d 227 (2d Cir. 2015) .........................................................................41

*United States v. Nektalov*,
  325 F. Supp. 2d 367 (S.D.N.Y. 2004) ..........................................................28

*United States v. Newton*,
  No. 01-CR-635, 2002 U.S. Dist. LEXIS 2414 (S.D.N.Y. Feb. 14, 2002) ...............................29

*United States v. Nosov*,
  221 F. Supp. 2d 445 (S.D.N.Y. 2002) .......................................................................................40

*United States v. Ozsusamlar*,
  428 F. Supp. 2d 161 (S.D.N.Y. 2006) .......................................................................................35

*United States v. Panebianco*,
  543 F.2d 447 (2d Cir. 1976) .....................................................................................................41

*United States v. Prantil*,
  764 F.2d 548 (9th Cir. 1985) .........................................................................................36, 37, 38

*United States v. Qamar*,
  671 F.2d 732 (2d Cir. 1982) .....................................................................................................41

*United States v. Rea*,
  958 F.2d 1206 (2d Cir. 1992) ......................................................................................... *passim*

*United States v. Rodriguez*,
  496 F.3d 221 (2d Cir. 2007) .....................................................................................................52

*United States v. Rodriguez-Adorno*,
  695 F.3d 32 (1st Cir. 2012) .........................................................................................................8

*United States v. Rubin/Chambers, Dunhill Ins. Servs., Inc.*,
  828 F. Supp. 2d 698 (S.D.N.Y. 2011) ......................................................................................28

*United States v. Scheer*,
  168 F.3d 445 (11th Cir. 1999) ..................................................................................................52

*United States v. Scott*,
  677 F.3d 72 (2d Cir. 2012) .......................................................................................................31

*United States v. Stein*,
  521 F. Supp. 2d 266 (S.D.N.Y. 2007) ......................................................................................28

*United States v. Townsend*,
  No. 06 Cr. 34, 2007 U.S. Dist. LEXIS 32639 (S.D.N.Y. Apr. 30, 2007) ................................28

*United States v. Triumph Capital Grp., Inc.*,
  544 F.3d 149 (2d Cir. 2008) .....................................................................................................52

*United States v. Urlacher*,
  979 F.2d 935 (2d Cir. 1992) .....................................................................................................14

*United States v. Wade*,
    512 F. App'x 11 (2d Cir. 2013) ............................................................................34

*United States v. Yannotti*,
    541 F.3d 112 (2d Cir. 2008)..................................................................................15

*Village of Freeport v. Barrella*,
    814 F.3d 594 (2d Cir. 2016)....................................................................................8

*Whethers v. Nassau Health Care Corp.*,
    956 F. Supp. 2d 364 (E.D.N.Y. 2013) ...................................................................9

*White v. Whitman*,
    No. 99-CV-4777, 2002 WL 776589 (S.D.N.Y. Apr. 26, 2002) ..............................8

*Witten v. A.H. Smith & Co.*,
    No. 84-CV-2269, 1986 WL 217559 (4th Cir. Feb. 13, 1986) .................................8

**Other Authorities**

American Bar Association, Code of Professional Responsibility (1978).....................36

Fed. R. Evid. 401 .......................................................................................... *passim*

Fed. R. Evid. 402 .......................................................................................... *passim*

Fed. R. Evid. 403 .......................................................................................... *passim*

Fed. R. Evid. 404(b).......................................................................................... *passim*

Fed. R. Evid. 602 .......................................................................................... *passim*

Fed. R. Evid. 602 Comm. ...........................................................................................4

Fed. R. Evid. 701 .......................................................................................... *passim*

Hastings Bus. L. J. 275, 278–81 (2011)......................................................................44

N.Y. R. Prof'l Conduct § 3.7 ......................................................................................38

U.S. Const. amend. VI ...............................................................................................37

29 Wright and Miller, *Federal Practice and Procedure* § 6255 ..................................16

## Preliminary Statement

Based on our review of the government's 3500 material, two things are clear.

*First*, the government will be offering at trial scant direct proof supporting the charged offenses. Despite having identified 38 potential trial witnesses, it is clear that the government's direct case relies heavily on the testimony of Suffolk County Police Department ("SCPD") Lieutenant James Hickey. Indeed, Hickey is the only witness who claims to have had any direct communications with the defendants, Christopher McPartland and Thomas Spota, in which they— through comments they purportedly made—allegedly attempted to obstruct the federal investigation into SCPD Chief of Department James Burke's assault of Christopher Loeb. Moreover, even Hickey's recitation of those direct communications consists of nothing more than a handful of disparate conversations—some in 2013 and some in 2015—in which one or both of the defendants allegedly made these comments. As the Court knows, the testimony of Hickey— who pled guilty to conspiring to obstruct justice and will be testifying pursuant to a cooperation agreement—will be strongly contested at trial, based in part on his admitted, rampant alcohol abuse during much of 2013 and his documented delirium, delusions, and hallucinations in October 2015.

Beyond Hickey, not a single one of the government's other 37 witnesses claims to have had a direct communication with either Mr. McPartland or Mr. Spota in which they encouraged or pressured the witness (or anyone else) to obstruct the federal investigation in any way. And while the government may contend that ███████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████

*Second*, the 3500 material reveals that the government's strategy to remedy this lack of direct proof may be to seek to admit at trial—under the guise of "background," "relationships," "state of mind of co-conspirators," "completing the story," and "other crimes or wrongs" of the defendants—a panoply of irrelevant, speculative, and unfairly prejudicial evidence that will allow the government to (a) improperly assassinate the defendants' character; (b) prove guilt by association (through the fact of the defendants' close relationship with Burke); and (c) elicit extensive evidence of aspects of the conspiracy that either (i) are conceded by the defense—such as the Loeb assault and the fact that Burke and other SCPD officers conspired to cover-up that assault, or (ii) involve obstructive activities by Burke and others as to which the defendants had no knowledge or involvement. Through these tactics, the government may attempt at trial to inflame the jury and to make it appear as if there is far more direct proof against the defendants of the crimes charged than is actually the case. Given the government's potential tactics here, it is crucial that it be held rigorously to the Federal Rules of Evidence at trial. Indeed, the outcome of this case may well turn on whether the government is permitted to stretch the Rules of Evidence beyond their breaking point.

By this motion, we seek to preclude the government from offering various categories of information that appear in the 3500 material that we respectfully submit are irrelevant, otherwise inadmissible, or where any marginal relevance is plainly outweighed by the danger of unfair prejudice, waste of time and/or confusion. Specifically, we move to preclude the government from offering evidence of:

1. Witnesses' beliefs, assumptions, and characterizations, as well as testimony purporting to interpret what various declarants meant by their statements;

2. Alleged misconduct by Burke, other than his assault of Loeb and the ensuing cover-up;

3. Prosecutorial conduct of the defendants, other than in the Loeb case;

4. The investigation and wiretap of former SCPD Detective John Oliva (this is in response to the government's motion *in limine* to allow the introduction of this evidence);

5. Salacious details of Loeb's theft of Burke's property and the assault of Loeb;

6. The selection of lawyers for witnesses subpoenaed by the government, the sharing of information among lawyers, and the circumstances under which the union would or would not pay for the lawyers' fees; and

7. The drinking habits of either defendant.

In addition, we seek additional disclosure of *Brady/Giglio* material for the government's witnesses, based on requests made nearly two years ago and reiterated several times since— including 10 days ago, in a detailed written request to which the government has not responded. The requested information is critical to enable the defense to fully explore, during cross-examination, these witnesses' credibility and reliability.

We set forth the basis for these requests below.

<u>Argument</u>

**I.    Testimony Must Be Limited to Witnesses' Personal Knowledge Obtained Through Their Five Senses**

Federal Rule of Evidence 602 provides that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed. R. Evid. 602. Accordingly, "[a] witness may testify only about matters on which he or she has first-hand knowledge," as "perceived by the witness through one of the five senses." *See* 3 Weinstein's Federal Evidence § 602.02 (2019); *see also, e.g.*, *Romanelli v. Long Island R. Co.*, 898 F. Supp. 2d 626, 633 (S.D.N.Y. 2012) (setting forth requirement that fact witness testimony must be "grounded in first-hand information obtained through one of his or her five

senses"); *Townsend v. Rhodes*, No. 4:14-CV-10411, 2015 WL 13743550, at *3 (E.D. Mich. June 9, 2015) (noting that fact witness testimony must be based on "events perceived by the witness through one of the five senses" (citation omitted)); *Los Angeles Times Commc'ns, LLC v. Dep't of Army*, 442 F. Supp. 2d 880, 886 (C.D. Cal. 2006) ("Generally, Rule 602 requires that a witness's testimony be based on events perceived by the witness through one of the five senses."). As explained in the Practice Comment to Rule 602, the requirement that "testimony [must be] grounded in first-hand information obtained through one of his or her five senses . . . is based on the concern that repeated transmission of information, or deduction from clues, tends to decrease accuracy, and thus first-hand information tends to be more reliable." Fed. R. Evid. 602 Comm.

Similarly, Federal Rule of Evidence 701 limits the admission of lay opinion testimony to testimony that is "rationally based on the witness's perception" and "helpful to clearly understanding the witness's testimony or to determining a fact in issue." Fed. R. Evid. 701. This Rule, together with Rule 602, prevents the admission of testimony that amounts to little more than speculative beliefs, assumptions, characterizations, and mind-reading. *See, e.g.*, *United States v. Kaplan*, 490 F.3d 110, 119 (2d Cir. 2007) (citing Rule 602 and *United States v. Durham*, 464 F.3d 976, 982 (9th Cir. 2006) for the rule that fact witness testimony "must be predicated upon concrete facts within the witness's own observation and recollection—that is facts perceived from their own senses, as distinguished from their opinions or conclusions drawn from such facts" (internal quotation marks omitted)); *United States v. Garcia*, 413 F.3d 201, 211 (2d Cir. 2005) (similar). Troublingly, the 3500 material produced by the government is replete with just this sort of inappropriate speculation. Because such testimony would be improper under Rules 602 and 701, as well as Rule 403, it must be excluded.

## A. Testimony Concerning Witnesses' Beliefs, Assumptions, and Characterizations Must Be Excluded

Based on a review of the pre-trial discovery and 3500 material produced in this case, the government appears poised to make up for what it lacks in direct evidence of guilt by introducing witness testimony that amounts to little more than speculative and unsupported beliefs, assumptions, and characterizations concerning the defendants and the alleged obstruction at issue here—a tactic the government has already engaged in repeatedly before the grand jury. *See, e.g.*, Gov't Exs. 3550-KB-9 at 64, 77–78, 81; ██████████████████████████ Indeed, based on these materials, it appears that such improper speculation pollutes just about every facet of the government's case.

For example, shortly after the Loeb assault, the SCPD failed to timely present Loeb for his arraignment, blaming a staffing shortage. A former prosecutor in the Suffolk County District Attorney's office ("SCDAO"), Spiros Moustakas, has shared his "belie[f]" with the government that "the SCPD's failure to [timely] produce Loeb at [his] arraignment was intentional," despite Moustakas's admission in the same interview that he had no "concrete information" concerning the assault. *See* Gov't Ex. 3500-SM-10 at 5, 10. Similarly, Suffolk County Executive Steven Bellone—who did not have any role in the Loeb assault or the investigation of it—has opined to the government he had "the overall impression that representatives of the [Queens District Attorney's office, the court-appointed Special Prosecutor in the Loeb case] were involved in the cover up because there appeared to be no concern that they had been brought into the case." *See* Gov't Ex. 3500-SB-7 at 12.

Other portions of the government's case are also infected with similar speculation. For example, while the government seeks to criticize aspects of the Oliva wiretap (discussed below, in Section IV of this memorandum), Moustakas (who was involved in overseeing the wire) has

admitted to the government that he had "heard nothing of any substance" concerning problems with the wire save for "a lot of rumors." *See* Gov't Ex. 3500-SM-2 at 2. In addition, the government appears to theorize that conspirators obtained Federal Bureau of Investigation ("FBI") 302 reports relating to the Loeb investigation to determine who was cooperating with the government—but this theory also appears to rely heavily on "rumor." *See* Gov't Ex. 3500-JC-4 at 2; 3500-JC-6 at 1; *see also, e.g.*, Gov't Exs. 3500-SM-12 at 2; 3500-JRC-4 at 2.

Numerous other witnesses have also spitballed to the government about who they think participated in the cover-up. For example, one witness "felt" an SCPD union representative was involved, though he "never spoke with [him] about the Loeb matter," *see* Gov't Ex. 3500-JRC-4 at 2; another witness "guessed" Madigan was aware of the cover-up, *see* Gov't Exs. 3500-JM-1 at 2; 3500-JM-3 at 3; yet another "had the impression" that Mr. McPartland was aware of the assault, despite admitting to minimal contact with him, *see* Gov't Ex. 3500-DS-3 at 1–2; and yet another "assumed" his comments concerning the assault were passed on to Mr. McPartland and Mr. Spota, whom the witness "believed" were aware of the assault and cover-up, *see* Gov't Ex. 3500-KB-4 at 1–2. Hickey has also asserted his "feel[ing]" that Mr. McPartland and Mr. Spota "would go to all lengths to protect Burke." *See* Gov't Ex. 3500-JH-7 at 7. And, bewilderingly, a bartender (who is on the government's witness list) informed the government that Mr. Spota did not "frequent[]" his bar, but nonetheless saw fit to opine that Burke "got his confidence from [Mr. Spota] backing him." *See* Gov't Ex. 3500-MS-1 at 1–2.

The government has also made clear that it will seek to introduce witnesses' beliefs that "an enemy of James Burke was an enemy of McPartland and Spota" and that "crossing Burke was crossing McPartland and Spota," such that "refusing to participate in the cover up of Burke's assault of Loeb would ensure retaliation from all three." *See* Gov't Ltr. Mot., dated Oct. 18, 2019,

at 3 n.2. But much of the material produced to date reflects an utter lack of personal knowledge or foundation for these conclusory assertions. *See, e.g.*, Gov't Exs. 3500-MK-14 at 1–2 (expressing "belie[f]" that "if you spoke negatively [about] Burke, Spota would hear it," despite only meeting Mr. Spota once, nearly a decade prior to the Loeb assault); 3500-AL-20 at 1 (expressing "understand[ing]" that "decisions were being made" with Mr. McPartland's and Mr. Spota's "concurrence" in Loeb cover-up, based in part on Burke's "close relationship" with "Spota [and McPartland]," despite no apparent interactions with either); 3500-JM-5 at 1 (stating there was a "perception" that "the tentacles of the [SCDAO] were going out in response to the federal grand jury subpoenas being served").

Finally, the government's witnesses have also frequently resorted to name-calling, sharing with the government such objectionable characterizations as "the Trinity" (Mr. Spota, Mr. McPartland, and Burke), *see* Gov't Ex. 3500-JH-33 at 1; the "master" (Burke), *see* Gov't Ex. 3500-CL-1 at 3; the "cabal" (Mr. Spota, Mr. McPartland, Burke, and then-SCDAO Chief Assistant Emily Constant), *see* Gov't Ex. 3500-MS-10 at 7; and, in numerous iterations, the "Inner Circle" (including, in various combinations, Mr. McPartland, Mr. Spota, Constant, Burke, Madigan, Hickey, and SCPD union representatives Noel DiGerolamo and William Plant), *see, e.g.*, 3500-JRC-4 at 1; 3500-SC-1 at 2; ██████████████████ 3500-JM-1 at 2; 3500-MS-10 at 7; 3500-JS-1 at 3; 3500-DS-10 at 7. Similarly baseless *ad hominems* are littered throughout the 3500 material.

All of these statements and others like them—which are grounded in the witnesses' speculative assumptions, beliefs, and characterizations, and not their five senses—patently violate the Federal Rules of Evidence, and must be excluded at trial.

### 1.    <u>Such Testimony Must Be Excluded Under Rules 602 and 701</u>

There is ample case law forbidding the precise types of speculative assumptions, beliefs, and characterizations at issue here.  *See, e.g.*, *United States v. Cuti*, 720 F.3d 453, 458 (2d Cir. 2013) (citing favorably rule prohibiting the admission of testimony that "pil[es] . . . inference upon inference" (internal quotation marks omitted)); *Perez v. Volvo Car Corp.*, 247 F.3d 303, 316 (1st Cir. 2001) (noting that "personal knowledge must concern facts as opposed to conclusions, assumptions, or surmise"); *Witten v. A.H. Smith & Co.*, No. 84-CV-2269, 1986 WL 217559, at *3 n.5  (4th Cir. Feb. 13, 1986) ("Generally an assumption does not suffice as a substitute for proof."); *Randolph v. Collectramatic, Inc.*, 590 F.2d 844, 847–48 (10th Cir. 1979) ("There is uniformity among the courts that the testimony . . . is admissible if predicated upon concrete facts within [witnesses'] own observation and recollection[;] that is facts perceived from their own senses, as distinguished from their opinions or conclusions drawn from such facts."); *United States v. Rodriguez-Adorno*, 695 F.3d 32, 39 (1st Cir. 2012) (faulting admission of witness's "characterization" under Rule 701).

For example, in *Village of Freeport v. Barrella*, 814 F.3d 594 (2d Cir. 2016), the Second Circuit held that the admission of "naked speculation" concerning the defendant's hiring practices was reversible error, because the witnesses had no personal knowledge of the defendant's "thinking."   *Id.* at 610–12; *see also id.* at 612 n.82 (criticizing the admission of other "unsubstantiated speculation").   Similarly, the Second Circuit has criticized the admission of "speculative lay opinion[s]" concerning a defendant's conduct, admonishing that testimony must "focus[] on objective facts," and vacating the verdict as a result.  *See Hester v. BIC Corp.*, 225 F.3d 178, 184–86 (2d Cir. 2000).  Other courts have similarly prohibited testimony based merely on "common knowledge," *see White v. Whitman*, No. 99-CV-4777 (FM), 2002 WL 776589, at *15 (S.D.N.Y. Apr. 26, 2002); "office or plant gossip," *Morisseau v. DLA Piper*, 532 F. Supp. 2d 595,

621 n.164 (S.D.N.Y 2008); and witnesses' "gut feeling[s]," *see, e.g.*, *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572 (7th Cir. 1989); *Whethers v. Nassau Health Care Corp.*, 956 F. Supp. 2d 364, 379 (E.D.N.Y. 2013), *aff'd*, 578 F. App'x 34 (2d Cir. 2014) ("A plaintiff's speculations, generalities, and gut feelings, however genuine, when they are not supported by specific facts, do not allow for an inference of discrimination to be drawn.").

The foregoing statements, and others like them, are inadmissible under these precedents. The statements are not grounded in events the witnesses actually perceived through their five senses, or rationally based on the witnesses' actual perceptions. Rather, they are assumptions, feelings, and conjectures, and often grounded in suspicion, rumor, gossip, and innuendo. Even if the Court were to find some basis for a smattering of the opinions—and the defendants assert there is none—such beliefs, assumptions, and characterizations would nonetheless be inadmissible because they would usurp the role of the jury—which is solely responsible for drawing such inferences from the witnesses' factual testimony. Accordingly, all such testimony must be excluded under Rules 602 and 701.

### 2.      Such Testimony Must Be Excluded Under Rule 403

Even if the foregoing statements could possibly serve some valid evidentiary purpose—a purpose that could only be found by scraping the bottom of the evidentiary barrel—admission of the statements would nevertheless unfairly prejudice the defendants. Evidence is unfairly prejudicial when "it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." *See United States v. Massino*, 546 F.3d 123, 132 (2d Cir. 2008); *see also* Rule 403, Advisory Committee Notes, 1972 Proposed Rules ("'Unfair prejudice' . . . means an undue tendency to suggest decision on an improper basis."). Plainly, accusations that the defendants were part of a "cabal" run out of the SCDAO who would punish Burke's "enemies" on command—accusations supported by gossamer-thin foundation—

would go directly to the ultimate issue in this case and would (based on the dearth of direct evidence) pose a serious threat that the jury could convict the defendants based on the equivalent of water-cooler talk, educated guesswork (or just plain guesswork), and purported mind-reading. Accordingly, such testimony must be excluded under Rule 403.

### B. *Testimony Interpreting What Declarants Meant by Their Alleged Statements Must Be Excluded*

The pre-trial discovery and 3500 material produced to date also makes clear that the government may attempt to bolster its case by relying on a specific variant of lay opinion testimony—by asking fact witnesses to opine as to what they thought declarants meant when they made allegedly inculpatory statements. Again, the government has an already-extensive track record of seeking such improper and unsupported testimony.

For example, the government appears to believe that SCPD union officials threatened to withhold payment of attorney fees from any union member who implicated other officers in the Loeb assault (an allegation that the government does not connect to the defendants in any materials produced to date). *See* Gov't Ex. 3500-KB-9 at 77–78. The government sought to support this allegation before the grand jury by questioning former SCPD officer Kenneth Bombace, who participated in the Loeb assault, about whether union officials had made any such statements. *Id.* Bombace recalled only that one official said the union would withhold fees if officers admitted their *own* criminal wrongdoing. *Id.* Undeterred, the government asked whether it was nonetheless Bombace's "impression" from the union official's statements that fees would be withheld if Bombace implicated *others* in the assault. *See id.* at 78, 85. Taking the government's cue, Bombace replied, baselessly, "[t]hat's what the insinuation was." *See id.*

The government elicited similarly inadmissible opinions in its witness interviews. For example, former SCPD officer Anthony Leto, who also assaulted Loeb, told the government that

Hickey had told Leto that "they" selected Leto to testify at a suppression hearing in Loeb's criminal case concerning the assault because "they" did not want Burke to testify. *See* Gov't Ex. 3500-AL-17. Without any evident basis, Leto expounded that, when Hickey said "they," he thought Hickey was referring to Mr. McPartland, Mr. Spota, Madigan, and Constant. *Id.* Likewise, Hickey evidently told the government that, from time to time, Mr. Spota had asked him "how his guys were doing," as well as other similar questions. Without factual basis, Hickey opined that Mr. Spota allegedly meant that Hickey should "keep [them] quiet." *See* Gov't Ex. 3500-JH-18 at 2.

With each of these statements (and similar statements that are peppered throughout the 3500 material), the government sought to extract from witnesses opinions that they could not permissibly give at trial and that must be excluded, for three independent reasons: first, because such testimony would not be rationally based on the witnesses' perceptions under Rule 701; second, because such testimony would not be helpful to the jury under Rule 701; and third, because such testimony would be unfairly prejudicial under Rule 403.

### 1. <u>Such Testimony Must Be Excluded Under Rule 701</u>

Lay opinion testimony must meet "two express preconditions for admissibility"—it must be "'rationally based on' the witness's own perceptions" and "'helpful' to a clear understanding of the witness's testimony or the determination of a fact in issue." *United States v. Rea*, 958 F.2d 1206, 1215 (2d Cir. 1992) (quoting Fed. R. Evid. 701). The opinions scattered throughout the 3500 material purporting to interpret what declarants meant by their alleged statements do not satisfy either precondition and must be excluded at trial.

### a. *Such Testimony Is Not Rationally Based on the Witnesses' Alleged Perceptions*

A witness testifying as to his perceived meaning of a declarant's statements will "only satisfy the rationally-based requirement if the witness has personal knowledge of one or more

'objective factual bases from which it is possible to infer with some confidence that [the witness] knows a given fact.'" *Kaplan*, 490 F.3d at 119 (quoting *Rea*, 958 F.2d at 1216). Such bases include "concrete facts within the [witness's] own observation and recollection—that is facts *perceived from their own senses*, as distinguished from *their opinions or conclusions drawn from such facts*." *Id.* (internal quotation marks omitted and emphases added). Applying these principles, the Second Circuit has made clear that lay opinion testimony interpreting a declarant's statement is inadmissible when the foundation for the witness's interpretation is too "vague" (even where the witness heard the statement first-hand), *see, e.g.*, *id.* (vacating convictions on this basis), or when the interpretation expands upon the plain meaning of a "coherent" statement without an adequate and objective foundation for doing so, *see, e.g.*, *United States v. Garcia*, 291 F.3d 127, 141 (2d Cir. 2002) (vacating convictions in part on this basis).

The statements excerpted above, and similar ones found throughout the 3500 material, run directly afoul of these principles. For example, Bombace's opinion flips the meaning of a "coherent" statement on its head, without any foundation for doing so. Bombace testified that the union official informed officers that "we are going to provide funding for legal representation" but that "if at any point you admit wrongdoing, [the union would] no longer provide[] that representation, or that funding for representation." *See* Gov't Ex. 3500-KB-9 at 77. The only other statements Bombace described from that meeting concerned the fact that union officials and officers did not have an attorney-client privilege with each other and that the union would appoint attorneys for the officers. *Id.* The union official who uttered these statements does not otherwise arise in Bombace's testimony. Yet, Bombace twisted these words—utterly without basis—as follows: "Q. And in your mind it was also—the next step, if any—if you point the finger at anybody

else, no lawyers fees? A. That's what the insinuation was." *Id.* at 85; *see also id.* at 78. Under *Kaplan* and *Garcia*, such unsubstantiated opinion testimony is improper and must be barred.

Leto's and Hickey's statements are similarly unsupported. The entire foundation for Leto's statement that Hickey was referring to Mr. McPartland, Mr. Spota, Mr. Madigan, and Constant when he said that "they" decided that Leto should testify at the Loeb suppression hearing was that Leto "knew [it] from experience." *See* Gov't Ex. 3500-AL-17. But there is no indication in the 3500 material that Leto ever interacted with Mr. McPartland or Mr. Spota concerning the alleged conspiracy (or at any other time), or that he had an adequate, objective, factual basis for his opinion. Indeed, his opinion is facially implausible, in that it omits Burke himself from the group of individuals that allegedly decided that Burke would not testify at the suppression hearing. *Id.*

There is also an absence of objective support for Hickey's opinion regarding the statements allegedly made by Mr. Spota. That is because there is nothing in the materials produced to the defendants reflecting that Hickey knew that Mr. Spota *knew* the assault occurred—making it illogical and speculative for Hickey to opine that Mr. Spota intended for Hickey to cover up the assault. In order words, while *Hickey* may have believed he was having a conversation about obstructing the federal investigation, there is no adequate foundation to support his suggestion that *Mr. Spota* shared that obstructive intent. Accordingly, Hickey cannot be permitted to engraft his own subjective interpretation onto Mr. Spota's alleged statements.

Because Bombace's, Leto's, and Hickey's purported factual bases for their opinions are too "vague" (if not non-existent), and because their opinions do not arise from "facts perceived from their own senses" but are instead "their opinions or conclusions drawn from such facts," these statements—and any other statements like them—must be barred. *See Kaplan*, 490 F.3d at 119.

### b.       *Such Testimony Will Not Be Helpful to the Jury*

Even if the Court were to find that such testimony was rationally based on witnesses'
perceptions, it must still be excluded because it will not be helpful to the jury.  As the Second
Circuit has held, the helpfulness requirement is "designed to provide 'assurance[] against the
admission of opinions which would merely tell the jury what result to reach.'"  *Rea*, 958 F.2d at
1215 (quoting Advisory Committee Note on 1972 Proposed Rules).  That is especially true where
"the jury [is] in as good a position as the witness to draw the inference," *id.* at 1216, such as when
a statement was "relatively clear, understandable, and logical," *see, e.g.*, *Garcia*, 291 F.3d at 142.
To that end, the Second Circuit has explicitly held that "[w]hen the issue is a party's knowledge,
. . . we suspect that ***in most instances* a proffered lay opinion will *not* meet the requirements of
Rule 701**."  *Rea*, 958 F.2d at 1216 (emphases added).  That is because, if a proper foundation is
laid for such testimony—such as "what a defendant was in a position to observe, what the
defendant was told, and what the defendant said or did"—the testimony will "often not be 'helpful'
[to the jury] . . . because the jury will be in as good a position as the witness to draw the inference
as to whether or not the defendant knew."  *Id.*; *see id.* at 1219 (finding such testimony was not
helpful when the jury had bases for drawing its own inferences regarding the statement).

Thus, testimony relevant to a party's knowledge is typically admitted only when it is
essential to helping the jury understand "confusing" or "disjointed" conversation.  *Compare
Garcia*, 291 F.3d at 142 (noting that the helpfulness requirement is not met where a conversation
is "facially coherent," and finding that interpretive testimony was not helpful where the witness
and defendant had a "facially coherent conversation" and spoke "clearly in full sentences, . . .
us[ing] words that make sense contextually") *with United States v. Urlacher*, 979 F.2d 935, 939
(2d Cir. 1992) (approving admission of such testimony where it "was helpful to the jury's
understanding of the often confusing and disjointed discussion on the tapes"); *United States v.*

*Aiello*, 864 F.2d 257, 265 (2d Cir. 1988) (allowing such testimony where the "language on the tape [was] sharp and abbreviated, composed with unfinished sentences and punctuated with ambiguous references to events clear only to the [participants]"); *United States v. Yannotti*, 541 F.3d 112, 126 (2d Cir. 2008) (admitting such testimony where the conversation between the witness and defendant was "cryptic and required interpretation"); *United States v. Borrero*, 630 F. Appx. 20, 24 (2d Cir. 2015) (permitting a witness to interpret statements such as "wild boy" and "get[ting] busy" because they were "ambiguous" or "slang").

The testimony here does not satisfy the helpfulness requirement. For example, given the clarity of the union official's statement to Bombace, no interpretation of the statement is needed. Indeed, Bombace's opinion would be *unhelpful* insofar as it purports to turn the official's statement on its head without basis. Likewise, Hickey's use of the word "they" came in the course of a "relatively clear, understandable, and logical" conversation—therefore, Leto can recount the conversation, and the jury can decide on the pronoun's meaning based on the other evidence in the case. Indeed, given that the declarant (Hickey) can testify (if he is able) about who decided that Leto should testify, there is no reason to believe that Leto's interpretation of Hickey's statement would provide any "help" to the jury at all. Finally, Hickey's opinion concerning Mr. Spota's alleged statements goes *directly* to Mr. Spota's knowledge of the alleged cover-up (an element of Counts 1, 2 and 3) and the underlying assault (an element of Count 4). *See Garcia*, 291 F.3d at 141 (noting that lay opinion testimony as to the meaning of a defendant's statements is "indirectly offering [an] opinion as to what [a defendant] knew"). Therefore, Hickey's opinion would *only* be admissible if it interpreted a "confusing" or "disjointed" statement. But there is nothing "confusing" or "disjointed" about the alleged statements here. While there may be a question as to whether the statements were obstructive or not obstructive, or whether they were made at all,

they are, at a minimum, coherent. Thus, admitting Hickey's opinion regarding Mr. Spota's alleged statements would "amount to little more than choosing up sides" for the jury—the precise sort of testimony that must be excluded under Rule 701. *See Rea*, 958 F.2d at 1216; *United States v. Grinage*, 390 F.3d 746, 750 (2d Cir. 2004) (finding that a case agent's interpretive lay opinion testimony told the jury "what inferences to draw" from the evidence and was thus improper).

## 2. Such Testimony Must Be Excluded Under Rule 403

Even if this Court were to determine that such testimony does not violate Rule 701, the testimony should nevertheless be excluded under Rule 403 because any probative value of the testimony will be "substantially outweighed by a danger of . . . unfair prejudice." *See* Fed. R. Evid. 403. Indeed, the Second Circuit has expressly held that this sort of evidence is excludable on this precise basis. *Rea*, 958 F.2d at 1216 ("[E]ven those lay opinions that pass Rule 701's dual test of admissibility may be excluded by the court under [Rule] 403 if the court determines that . . . [the opinion's] helpfulness is substantially outweighed by the danger of unfair prejudice . . . .").

As the Second Circuit has observed, "'the costs of lay opinion testimony increase and the benefits diminish the closer the opinion approaches the crucial issues in the case'" because "the opinion may distract jurors from their task of drawing an independent conclusion as to an ultimate issue in the case." *Hester*, 225 F.3d at 182 (quoting 29 Wright and Miller, *Federal Practice and Procedure* § 6255 at 2). In addition, the cost of such lay opinion testimony is substantially magnified where the testimony is "central to the government's case" and serves as "the principal evidence against [the defendant]." *Cf. Garcia*, 291 F.3d at 144–45.

The cost of such lay opinion testimony here—substantial unfair prejudice—well outweighs any purported benefit. For the reasons stated above, such testimony will have minimal, if any, probative value. At most, the testimony will "tell the jury what result to reach"—specifically, that the union sought to withhold fees to pressure officers not to implicate others, and that Mr.

McPartland and Mr. Spota were knowingly and corruptly involved in the cover-up—when the jurors should be drawing their own inferences on these issues from the fact testimony presented. *See Rea*, 958 F.2d at 1215. Moreover, there is an extreme risk of unfair prejudice here. By all appearances, the government's case against the defendants may turn in large part on such lay opinion testimony—particularly from Hickey. As such, there is an unacceptable risk that the defendants could be convicted solely on the basis of such interpretive testimony, which would be tantamount to convicting the defendants based on the witnesses' mind-reading capabilities. The jury—and not the witnesses—should be responsible for determining what was, or was not, in the declarants' minds when they allegedly made the statements in question. For all of these reasons, the risk of unfair prejudice from the proposed testimony well outweighs any probative value and the testimony should thus be excluded under Rule 403.

## II. Evidence of Burke's Alleged Misconduct Must be Excluded

The materials produced in this case contain a litany of grievances against Burke. But while Burke's assault of Loeb and his subsequent cover-up are relevant to the charges here, any other alleged misconduct by Burke (other than evidence that may be admitted under Federal Rule of Evidence 404(b)[1]) has no place at this trial, lest the defendants be improperly and unfairly sullied by Burke's alleged sins and not tried solely on the charges against them in the indictment.

---

[1] This motion addresses alleged conduct relating to Burke, other than (1) the Oliva investigation and wiretap (which is addressed in Section IV of this memorandum), (2) a car accident involving Burke and Mr. McPartland (which the government has moved today to admit, and which the defendants will address in our October 29 memorandum in opposition to the government's *in limine* motions), and (3) other topics identified in the government's 404(b) notice but for which it has indicated (by letter to the Court earlier today) that it does not intend to file a motion—namely, aspects of Burke's Internal Affairs history, and a loan from Anthony D'Orazio to Mr. McPartland (which the defendants will address in our October 29 memorandum).

The 3500 material produced to the defendants is littered with references to Burke's alleged personal and professional wrongdoing. For example, the materials frequently reference Burke's many relationships with women, including his alleged surveillance of a girlfriend and her stepson, "look[ing] into" a girlfriend's ex-boyfriend, and use of SCPD officers to run background checks on women and to deal with "problems" caused by a girlfriend's handyman. *See, e.g.*, Gov't Exs. 3500-JH-7 at 3; 3500-JH-9 at 2; 3500-AL-11 at 1; 3500-CL-1 at 2. There are also repeated references to Burke's alleged practice of punishing "enemies," including by allegedly sending "friendl[ies]" to monitor a retirement party of an officer he disliked, surveilling a colleague suspected of not working when required, and securing allegedly inflated charges against an officer's son who was caught in possession of a gun. *See, e.g.*, Gov't Exs. 3500-SC-1 at 3; 3500-JH-10 at 1–2; 3500-JH-11; 3500-SP-2 at 2; 3500-DS-1 at 4. There are also numerous references to Burke allegedly making racist and sexist comments, as well as his drinking habits. *See, e.g.*, Gov't Exs. 3500-JH-9 at 2 (alleging Burke spoke of "hog tying" a female colleague); 3500-KB-2 at 2 (alleging Burke used the "N word"); 3500-SP-5 at 2 (alleging Burke drove under the influence of alcohol). Because none of this evidence is relevant under Rules 401 and 402, and because it is unfairly prejudicial under Rule 403, it must be excluded at trial.

## A.   *The Evidence Is Irrelevant Under Rules 401 and 402*

Whether Burke womanized, misused SCPD resources, sought to punish "enemies" without any connection to the Loeb assault, drove drunk, or used inappropriate language is simply irrelevant to whether Mr. McPartland and Mr. Spota engaged in the conduct alleged in the indictment. In the absence of evidence that the defendants were complicit in Burke's misconduct and leveraged that misconduct to obstruct the federal investigation into Loeb's assault, any evidence concerning Burke's misconduct is irrelevant to the charges here and must be excluded at trial.

### B.     The Evidence Is Unfairly Prejudicial Under Rule 403

Even if the evidence were found to have any relevance (though any sort of relevance is difficult to conceive of), the evidence must still be excluded because any relevance would be overwhelmed by the risk of "unfair prejudice, confusing the issues, misleading the jury, undue delay, [and] wasting time." *See* Fed. R. Evid. 403.  Burke's alleged exploits read like those of a tabloid fixture and risk inflaming the passions of the jury against the defendants.  Courts have barred the admission of just this type of inflammatory evidence based on similar concerns.  *See, e.g.*, *Rao v. Rodriguez*, No. 14 Civ. 1936 (NGG) (ST), 2017 WL 1403214, at *5 (E.D.N.Y. Apr. 18, 2017) (excluding evidence of racist comments); *Ali v. Police Officer William Connick*, No. 11 Civ. 5297 (NGG) (VMS), 2016 WL 3080799, at *4 (E.D.N.Y. May 31, 2016) (excluding evidence of driving under the influence, in part, because "jurors don't tend to like people who drive drunk"); *John v. Masterson*, No. 08-0141 (TLM), 2010 WL 2232569, at *1 (D. Conn. May 27, 2010) (excluding evidence of stalking and threatening a woman as unfairly prejudicial).

Moreover, delving into the sordid details of Burke's alleged personal and professional misconduct would risk confusing the issues and misleading the jury to believe that the defendants' mere association with Burke was improper and, therefore, that they must be guilty of obstructing the investigation of the Loeb assault as well.  Further, the detours required to prove (or refute) Burke's alleged misconduct—and the time the defense would need to rebut the insinuation that the alleged conduct was somehow attributable to Mr. McPartland and Mr. Spota—would result in undue delay and waste the time of the jury and the Court.

For all these reasons, evidence of Burke's alleged misconduct—except conduct that concerns his assault of Loeb and his cover-up of the assault—must be excluded under Rule 403.

**III.    Evidence of the Defendants' Other Prosecutorial Conduct Must Be Excluded**

The materials produced in this case also contain numerous allegations that the defendants made prosecutorial decisions based on political considerations.    While these allegations are categorically denied, they also have no place in this trial—which concerns the defendants' conduct with respect to the Loeb case*,* and not the entirety of their careers as prosecutors.

For example, several witness interview memoranda reflect the baseless allegation that Mr. McPartland's role in the so-called "Babylon 5" case (a late 1990s prosecution of several Babylon public officials) was somehow untoward.  *See, e.g.*, Gov't Exs. 3500-SB-4 at 1; 3500-RS-2A at 2; 3500-RS-12 at 5.  From that, they segue to the claim that Mr. Spota was somehow wrong not to fire Mr. McPartland after Mr. Spota became the District Attorney in 2002.  There are also several accusations that the SCDAO under Mr. Spota pursued political prosecutions, including the investigations of former Suffolk County Executive Steve Levy and his associates and associates of current Suffolk County Executive Steven Bellone (including as to issues that the federal government is itself investigating).  *See, e.g.*, Gov't Exs. 3500-SB-4 at 4–14; 3500-SB-5 at 1–6; 3500-JH-36 at 1.  The materials also include allegations that the SCDAO was in other instances too lenient, including with respect to the prosecution of Suffolk County attorney Robert Macedonio.  *See, e.g.*, 3500-SM-8 at 1–2.  Finally, the materials include other fantastical accusations, such as the SCDAO "kidnapp[ing]" witnesses and bald (and baseless) assertions that the SCDAO "selectively enforced laws against it[s] adversaries" and "targeted specific government workers for political gain."  *See, e.g.*, Gov't Exs. 3500-SB-4 at 4; 3500-SB-5 at 1; 3500-KB-11 at 2; 3500-JH-18 at 2.

Disturbingly, the government solicited many of these statements in just the past two months, *see, e.g.*, 3500-RS-12 at 5; 3500-KB-11 at 2; 3500-JH-36 at 1, suggesting that the government may be planning to rely on this evidence at trial.  But such evidence is not only entirely

irrelevant, it is also highly prejudicial and would convert a contained trial on the indictment's allegations into a free-wheeling spectacle covering the last 20 years of Suffolk County criminal justice enforcement. There is no valid reason for such a sideshow, and the evidence must therefore be excluded.

## A. The Evidence Is Irrelevant Under Rules 401 and 402

The evidence is facially irrelevant to the charges in this case. The defendants are charged with obstructing the federal investigation into Loeb's assault—and not for any other alleged (and vigorously denied) prosecutorial misconduct that occurred over the last 20 years in Suffolk County. There is simply no logical, causal, or evidentiary connection between these allegations and the instant charges, and such evidence should be excluded on that ground alone.

## B. The Evidence Is Unfairly Prejudicial Under Rule 403

Admission of the evidence would also be improper under Rule 403, given the substantial risk of "unfair prejudice, confusing the issues, misleading the jury, undue delay, [and] wasting time." *See* Fed. R. Evid. 403. Here, the risk of such unfair prejudice, confusion, misdirection— and needless consumption of extensive trial time—is obvious. Admission of evidence that SCDAO prosecutions were politically motivated would pose the enormous risk that the jury could convict based solely on these extraneous allegations. *See Union Carbide Corp. v. Montell N.V.*, 28 F. Supp. 2d 833, 843 (S.D.N.Y. 1998) (excluding evidence of an alleged "association with political corruption" "to prevent undue prejudice"). For that same reason, admission of such evidence would cause undue delay and waste time, given that trial in this matter would necessarily devolve into numerous mini-trials, taking additional days and possibly weeks so that the defendants could defend themselves against these scurrilous charges. Accordingly, any evidence concerning the defendants' prosecutorial conduct—except for the SCDAO's handling of Loeb's prosecution—must be excluded.

**IV.    Evidence of the Oliva Investigation and Wiretap Must Be Excluded**

The government has moved *in limine* to admit evidence of an investigation and judicially-authorized wiretap concerning conduct engaged in by John Oliva, a former police detective who, as a result of the investigation, ultimately pleaded guilty to the charge of official misconduct (the "Oliva Investigation").  Gov't Ltr., dated Oct. 18, 2019 ("Gov't Ltr."), at 1.  This application is factually and legally baseless, and should be denied.

The government does not claim that the Oliva Investigation was factually related to the Loeb investigation.  Indeed, there is no overlapping temporal relationship between the two investigations:  the Oliva Investigation took place in 2014, during the interval between the initial federal investigation of the Loeb assault in 2013 ("Burke I"—which was closed in December 2013) and the subsequent investigation of that assault in 2015 ("Burke II"—which commenced in the spring of 2015 and culminated in Burke's arrest in December 2015).

Nor does the government claim (as it once did) that the Oliva wiretap was "improperly obtained, improperly monitored or improperly extended."  *Id.* at 2.  Similarly, the government has abandoned its assertion that the wiretap was used "to improperly gain information concerning one or more federal investigations, including the investigation into Burke's civil rights violations."  *Id.* and Gov't 404(b) Notice dated March 11, 2019.

In its motion, the government now seeks to offer evidence of the Oliva Investigation on three theories of admissibility.  *First*, it claims that the Oliva Investigation is "direct evidence of the charged offense, as it is inextricably intertwined with the evidence regarding the offenses charged in the Indictment."  Gov't Ltr at 5.  *Second*, it argues that the evidence is relevant because it "tends to prove . . . the intent and state of mind of the defendants during the relevant time periods . . . and also helps provide the jury with context and background to the environment in which various witnesses operated relevant to the crimes charged."  *Id.  Third***,** it argues that although it is

not offering this evidence under Rule 404(b), "[w]ere the court to find" that it is 404(b) evidence, it meets the test for admission under that Rule. *Id.* at 6. Each of these arguments is factually and legally devoid of merit.

### A. Background

The story of the Oliva Investigation is a long and complicated one. To summarize, on January 14, 2014, *Newsday* ran a story about a suspected serial robbery team that, at the time of publication, was the subject of a large-scale investigation by SCPD. OlivaWire 41, 112. That article, written by Tania Lopez, revealed highly sensitive information that had been distributed among SCPD's investigative team as part of its "tactical plan" to apprehend the suspects. *See id.* at 43. The article disclosed, among other things, the hamlet where SCPD believed one of the suspects lived, his use of cars to flee, the weapon he appeared to use, and what the suspect wore. SCDA000071717; SCDA 000276824. It was explicitly stated in the article that the information was based on "intelligence documents" provided by "[p]olice sources." *Id.* at 112.

On that same day, the SCPD had surrounded the home of the two main suspects—suspects believed to be armed and dangerous. SCDA000276824. When the SCPD got word of *Newsday's* decision to run the story, it pleaded with the newspaper to have it taken down from its website. *Id.* *Newsday* declined to do so. *Id.* When the suspects were ultimately apprehended by the SCPD, one of them "told police that he had seen the article and changed his pattern in response to it." OlivaWire 43.

The reaction of law enforcement to the article was swift, strong, and negative. In a letter to *Newsday's* editors, the Coalition of Suffolk Police Unions "strongly condemned" the decision to run the story, which "not only compromised an on-going investigation, but more importantly put Suffolk families and police officers at risk." SCDA 000071717. On January 17, the President of the Suffolk County Police Benevolent Association ("Suffolk PBA") held a press conference,

during which he called upon the SCDAO to open an investigation into "the dissemination of sensitive and confidential information about Police Officers and information concerning a then-current, ongoing criminal investigation." SCDA 000150560. On the heels of these events, the SCDAO investigated the potential source of the unauthorized disclosure to Lopez.

Oliva was a prime suspect: a preliminary analysis of Oliva's phone records revealed "[a] clear pattern of frequent contact" between Oliva and Lopez. OlivaWire 44. Those records also revealed that the phone Oliva had primarily used to communicate with Lopez was assigned to the FBI in Washington, D.C. OlivaWire 49. Accordingly, on January 30, 2014, Mr. McPartland advised FBI Special Agent Richard Frankel, then the Special Agent In Charge of the Criminal Division in the New York Field Office, of the nature of the SCDAO's investigation, that the SCDAO had obtained records of Oliva's FBI-issued phone, and that the SCDAO "did not know this was an FBI number and do not seek to interfere with any FBI or US Attorney operations by doing so." SCDA 000383312. In further discussions between Mr. McPartland and Frankel, Mr. McPartland advised Frankel that any wiretap application submitted by the SCDAO would expressly authorize the FBI to listen in on the wiretap. *See* OlivaWire 8–9. The FBI retrieved its phone from Oliva the next day, but the SCDAO was subsequently able to identify Oliva's new phone.

On March 14, 2014, the SCDAO submitted to the Suffolk County Supreme Court an application to wiretap that phone. *Id.* at 59. The wiretap application made clear that one of its objectives was "to fully determine the roles [of Oliva] and others in the illegal removal of records from [SCPD], as well as to determine the identities and roles of co-conspirators in the unlawful access and removal of records from the [SCPD]." *Id.* In light of Oliva's involvement in federal cases, and consistent with Mr. McPartland's communications with Frankel well in advance of the

Oliva wiretap, the SCDAO's proposed order—which was approved by the court—provided that the FBI was "authorized and empowered to intercept, listen to, overhear, eavesdrop and make copies" of the intercepted calls. *Id.* at 8–9.

As a result of the Oliva wiretap, intercepted conversations between Oliva and Lopez established that he had disclosed a range of confidential and highly sensitive information, including information related to ongoing federal investigations. For instance, in addition to Oliva having provided Lopez with "live time details" of an MS-13 member's capture in Nicaragua (OlivaWire 251), on June 3, 2014, the SCDAO intercepted a conversation between Oliva and Lopez, during which Oliva agreed to provide Lopez with hard-copies of SCPD records that pertained to investigations by the federal-local Long Island Gang Task Force (of which Oliva used to be a member). *See* OlivaWire 365–75. In that call, Oliva stated, in part: "I mean the next time I meet with you I actually have to give you my case load that I had . . . I will give you the whole flicking thing . . . photos, names . . . the whole ah I'll give you my cases, you could, I'm not working on them so you could fuck and work on them." OlivaWire 372. Lopez asked whether the "Feds" are "ok with this" and whether Oliva's disclosure had been "cleared." Oliva responded, "[t]hey don't know where this is coming from." OlivaWire 372–77.

The very next day, having learned that Oliva was planning to leak information that might impact federal criminal cases, Mr. McPartland contacted Assistant United States Attorney Nicole Boeckmann, Chief of the Long Island Criminal Division for the Eastern District of New York ("EDNY"), to discuss the contents of the calls and, in particular, the fact that Oliva had agreed to provide *Newsday* with records pertaining to what was believed to be ongoing federal criminal investigations. *See* SCDA000364262. Mr. McPartland's efforts to advise the EDNY culminated in an in-person meeting on June 5, 2014, with senior members of the SCDAO, the EDNY, and the

FBI.  That meeting took place at the EDNY's Central Islip office, and was attended by Loretta Lynch (then-United States Attorney for the EDNY), James McGovern (then-Chief of EDNY's Criminal Division), Ms. Boeckmann, Frankel, Mr. McPartland, Mr. Spota, and Constant.  At the meeting, SCDAO representatives played portions of the Oliva wiretap, offered to provide copies of the entire wiretap to federal authorities, and enlisted the participation of federal authorities in apprehending Oliva in the event he leaked the aforementioned records to Lopez.

There were further communications between Mr. McPartland and Ms. Boeckmann concerning the Oliva wiretap after that meeting. For example, the two communicated on June 12, 2014, by e-mail from Ms. Boeckmann to Mr. McPartland (SCDA 000403659), and a follow-up phone conversation on or about the same day (with no one else on the line) regarding the possible arrest of Oliva.  There was another phone conversation between Mr. McPartland and Ms. Boeckmann on or about June 16, 2014 (again with no one else on the line).  In that call, Mr. McPartland advised Ms. Boeckmann that, based on calls intercepted on the wiretap, the fact and content of the June 5 meeting between the SCDAO and the EDNY had been leaked to Oliva. Needless to say, the fact that Oliva was advised of the meeting was of great concern to the SCDAO. Mr. McPartland again spoke to Ms. Boeckmann on July 11, 2014, a conversation Ms. Boeckmann summarized in an e-mail to Frankel. *See* SCDA 000538113) ("I just got off the phone with Chris. He informed me that the wire is now down and they plan to complete their case the week of July 21st . . . you can reach out to Chris directly if you have any further questions or you want to confirm the details with him.").

When ultimately confronted by the SCDAO in July 2014, Oliva admitted that he had been the source of the leaks concerning the armed robbery pattern that precipitated the wiretap.  He also admitted to improperly providing Lopez with information about federal investigations into gang

activities, including sensitive information obtained from federal cooperators and from proffers. He further acknowledged that his conduct was motivated by the fact that he was removed by Burke from the Long Island Gang Task Force in the summer of 2012 and was looking to "exact revenge." *See* Witness Statement 408, 410. Notably, Burke himself later pointed to his decision to remove Oliva and others from the Task Force—and the angry confrontation he had with Ms. Boeckmann about it—in explaining to the defendants, and many others, why he believed the federal authorities were unfairly targeting him for allegedly assaulting Loeb.

On July 24, 2014, Ms. Boeckmann e-mailed Mr. McPartland "to confirm our conversation from earlier today where I advised you that my office would be providing you with a subpoena on Monday for all the materials related to the SCPD leak investigation." SCDA 000401497. Ms. Boeckmann communicated again with Mr. McPartland on August 7, 2014, asking for a copy of an order relating to the wiretap. SCDA 000537156. Correspondence between Ms. Boeckmann and Mr. McPartland concerning the Oliva wiretap continued throughout the month of September. *E.g.*, SCDA 000538102 (Ms. Boeckmann requesting copies of various notes of interviews with Oliva "as promised last week"); SCDA 000364265 (Ms. Boeckmann requesting additional information related to the Oliva prosecution).

In September 2014, Oliva pleaded guilty to one charge of official misconduct for stealing police documents and information. SCDA 000276824. In a press release, the Suffolk PBA stated that Oliva's guilty plea, "although disturbing, demonstrates that [the SCPD], with its internal checks and balances, and working in conjunction with [the SCDAO], is able to monitor and provide the proper oversight of its Police. As troubling as this incident is to all members of law enforcement, we are grateful to the District Attorney and the cooperating parties who are helping to bring closure to this issue." SCDA 000150560–61.

**B.** *Evidence of the Oliva Investigation is Not Admissible as Direct Evidence of the Charged Conspiracy*

The government makes the meritless claim that evidence of the Oliva Investigation is "inextricably intertwined" with the charges in the indictment. Gov't Ltr. at 5. According to the government, "the actions of the defendants" as they relate to the Oliva Investigation "constitute[] a series of transactions designed to simultaneously obstruct the federal investigation and send a message to the police officers—that crossing James Burke has consequences so keep your mouth shut." *Id.* This argument cannot withstand scrutiny.

In conspiracy cases, "the Government may offer proof of acts not included within the indictment, as long as they are within the scope of the conspiracy." *United States v. Bagaric*, 706 F.2d 42, 64 (2d Cir. 1983). In such instances, the uncharged activity must be "inextricably intertwined with the evidence regarding the charged offense, or . . . necessary to complete the story of the crime on trial." *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (citation omitted). Importantly, the "allegation of broad conspiracies does not . . . render 'inextricably intertwined' with those conspiracies every transaction conducted by Defendants during the relevant time period." *United States v. Rubin/Chambers, Dunhill Ins. Servs., Inc.*, 828 F. Supp. 2d 698, 706–07 (S.D.N.Y. 2011). Rather, evidence will only be considered "inextricably intertwined" if it is also "necessary to understand the charged transaction." *United States v. Stein*, 521 F. Supp. 2d 266, 271 (S.D.N.Y. 2007). Even where the "proffered testimony relates to similar transactions with the same [cooperating witness]" and "there is a strong argument that the evidence arises from the same series of transactions as, and is necessary to complete the story of, the charged conduct," courts may still find that the transactions are not "inextricably intertwined." *United States v. Nektalov*, 325 F. Supp. 2d 367, 370 (S.D.N.Y. 2004); *see also*, *e.g.*, *United States v. Townsend*, No. 06 Cr. 34, 2007 U.S. Dist. LEXIS 32639 (S.D.N.Y. Apr. 30, 2007) ("[A]lthough the proffered evidence

is certainly relevant to show the background of the charged conspiracy, it does not appear to be inexorably intertwined." (internal marks and alterations omitted)); *United States v. Ferguson*, 246 F.R.D. 107, 115 (D. Conn. 2007) (same); *United States v. Kahale*, 789 F. Supp. 2d 359, 384–85 (E.D.N.Y. 2009).

Courts have also refused to find conduct "inextricably intertwined" where the "charged crimes are straightforward and may be fully understood without reference to" such other evidence. *United States v. Newton*, No. 01-CR-635 (CSH), 2002 U.S. Dist. LEXIS 2414, at *6–7 (S.D.N.Y. Feb. 14, 2002). Likewise, acts are not a part of the charged conspiracy where they relate to a "separate, discrete offense that may be conceptually segregated from the charged offenses without impairing the jury's ability to understand the facts underlying the schemes alleged in the indictment." *United States v. Mahaffy*, 477 F. Supp. 2d 560, 566 (E.D.N.Y. 2007).

Under these precedents, the government's reliance on the theory that the Oliva Investigation was "inextricably intertwined" with the Loeb investigation is baseless, for several reasons. *First*, the government cannot plausibly claim that the Oliva Investigation was intended to or did "obstruct the federal investigation." As noted above, the Oliva wiretap took place in 2014—in between the two phases of the federal investigation of the Loeb assault, at a time when (to our knowledge) no witness claims there was an active federal investigation of the assault. The government attempts to massage this fact by noting the date range of the conspiracy set forth in the indictment ("between 2012 and the filing of the indictment," Gov't Ltr. at 5) to make it appear as if the Loeb investigation existed simultaneously with the Oliva Investigation. But an indictment is not proof of anything, and the government's claim that the Loeb and Oliva Investigations overlapped temporally appears unsupported, as we are unaware of any witness who makes such a claim. Moreover, insofar as the government will not contest that the Oliva Investigation was

lawful, it is illogical to argue simultaneously that it was intended to obstruct a non-existent federal investigation.

*Second*, the government cannot persuasively claim that the charged offenses are "inextricably intertwined" with the Oliva Investigation on the theory that there is a need to understand one to understand the other. In fact, the Loeb and Oliva Investigations are wholly separate events that have virtually nothing in common. Indeed, most of the government's witnesses regarding the Loeb investigation had no involvement whatsoever with the Oliva wiretap.

*Third*, much of the government's proposed proof in support of its theory of admissibility is plainly objectionable. Specifically, the government proposes to offer evidence of the "state of mind" of various police witnesses to show that the Oliva wiretap "affected their decision not to cooperate with the [subsequent] federal investigation." Gov't Ltr. at 6. Any such testimony, however, would be sheer speculation and inadmissible conjecture on the part of the witness. Put another way, a witness cannot be permitted to testify that he had a *subjective* belief that cooperating against Burke would lead to unlawful retaliation by the defendants, even though neither defendant ever spoke with the witness about the Loeb investigation in an improper (or any other) way. *See* Section I, *supra*. This suggestion by the government is anathema to the basic concept that a defendant's guilt must be proved by admissible evidence as to his or her own words and deeds— not by rank speculation of others as to what they *imagined* the defendant's conduct might be under a specified set of hypothetical circumstances.

Similarly meritless is the government's proffer that witnesses "believed" the wiretap was "unnecessary." Gov't Ltr. at 3. To begin with, the witnesses' "belief" about the necessity of the wiretap is irrelevant—especially in the face of repeated court authorizations premised on the conclusion that other means of investigating the leaks were inadequate and thus this particular

investigative technique was indeed necessary.  And this proffer flies directly in the face of the government's concession that it will <u>not</u> seek to prove that the wiretap was "improperly obtained, improperly monitored or improperly extended."  *Id.* at 2.  The government cannot have it both ways.

Finally, the government argues that because one witness (Hickey) may claim that Mr. McPartland made a single reference to Oliva during a conversation about the Loeb investigation, this opens the door to proof as to the "import of the Oliva wire"—namely, that it was a "targeted, retaliatory and over-the-top investigation and prosecution."  *Id.* at 4, 6.  But this single alleged comment (which will be contested) cannot possibly justify opening up the trial to a battle of witnesses' subjective beliefs as to whether the Oliva Investigation was "over-the-top" or not.

In that regard, we have no objection to stipulating that Oliva was a Suffolk County Police Officer who was prosecuted by the SCDAO and pleaded guilty, and a description of his crime, so that the jury may have appropriate context for the alleged comment by Mr. McPartland.  Indeed, such a stipulation would obviate entirely the government's proposed excursion into the complicated details of the Oliva Investigation and the defense's need to provide a thorough and fulsome response.  This is, as a matter of law, the appropriate solution.  *See United States v. Gilliam*, 994 F.2d 97, 101 (2d Cir. 1993) (stating that it may be appropriate to accept a stipulation where the relevant evidence was not a "critical element" of the crime charged (citing *United States v. Borello*, 766 F.2d 46, 60 (2d Cir. 1985) (finding admission of evidence despite defendant's proposed stipulation was in error, and ordering that the evidence not be admitted on remand))).

### C.     *Evidence of the Oliva Investigation Is Not Admissible Under Rule 404(b)*

In the first instance, the government's contention that proof regarding the Oliva Investigation is not 404(b) evidence because none of the proof the government seeks to offer "is *per se* criminal" (Gov't Ltr. at 5) fails as a matter of law.  *United States v. Scott*, 677 F.3d 72, 78

(2d Cir. 2012) (holding that Rule 404(b) extends to non-criminal acts or wrongs). But given the government's concession that the Olivia Investigation is *not* proper 404(b) evidence, little time need be spent on its alternative argument that it is. Suffice it to say that there is nothing about the Oliva Investigation that qualifies it as an act admissible under Rule 404(b), as it was not part of the same "scheme or plan" as the charged offenses, bears no real relationship to the Loeb Investigation, and is not admissible under any other part of the Rule.

In support of its alternative argument under 404(b), the government purports to make two points. The first—that the proffered evidence will show that the defendants intended to "assist James Burke in covering up his crimes," and what witnesses thought about the Oliva wiretap (Gov't Ltr. at 6)—does not withstand scrutiny, when one examines what precisely the government wishes to prove. Proof that Oliva was allegedly an "enemy" of Burke (*id.*, at 3, item 1), the defendants showing an interest in wiretapped conversations (*id.*, item 2), or their considering whether to get a search warrant for Lopez's phone (*id.*, item 4), has no bearing on allegedly helping Burke conceal his crimes. Nor can what witnesses may have "believed" (*id.*, item 3) or "perceived" (*id.*, item 6) about the wiretap prove what was in the *defendants'* minds, let alone prove that the defendants actually did anything to obstruct the Loeb investigation. The only specified area of proof that plausibly relates to either defendant's intent – Mr. McPartland's alleged statement about Oliva to Hickey (*id.*, item 5)—can be easily addressed by the stipulation described above.

The second point—the paragraph starting with "Next" (Gov't Ltr. at 6)—also does not withstand scrutiny. In fact, it is nothing more than a reiteration of the first point addressed above, and thus is without merit for the same reasons.

### D. Evidence of the Oliva Investigation Is Also Not Admissible Under Rule 403

Evidence of the Oliva Investigation is inadmissible not only for all of the reasons stated above, but also because whatever probative value the government's proffered evidence could have is substantially outweighed by the danger of unfair prejudice, confusion, and wasting of time.

The government's argument why this highly-charged evidence meets Rule 403 is contained in a single sentence: they argue there is "no risk" of unfair prejudice because there is no "inherent criminality" in that evidence. Gov't Ltr. at 7. This argument is hard to fathom, given the government's assertion that the defendants, in substance, pursued an unnecessary wiretap against Burke's enemies in order to conceal his crimes and scare people into submission. Indeed, the stark fact remains that wiretaps are, although lawful, an intrusion on the right of privacy. Evidence of this type of investigatory conduct is itself inflammatory, especially in a case having nothing else to do with wiretaps. *See Olmstead v. United States*, 277 U.S. 438, 470 (1928) (Holmes, J., dissenting) (observing that wiretapping is "dirty business").

In any event, the government's suggestion that only "inherent[ly] criminal[]" conduct can satisfy the Rule 403 bar is made up out of whole cloth. Not surprisingly, courts have, explicitly or otherwise, held to the contrary. *See, e.g.*, *Demirovic v. Ortega*, No. 15 Civ. 327 (CLP), 2017 WL 4621089, at *5 (E.D.N.Y. Oct. 13, 2017), *aff'd*, 771 F. App'x 111 (2d Cir. 2019) (excluding references to a party's "alleged religion or sexist views" under Rules 401, 402, and 403); *United States v. Johnson*, No. S5 16 CR. 281 (PGG), 2019 WL 690338, at *25 (S.D.N.Y. Feb. 16, 2019) (excluding evidence of officer's violation of police policies and procedures concerning alcohol consumption under Rules 401 and 403); *United States v. Ferguson,* No. 06 Cr. 137 (CFD), 2007 WL 4240782, at *3 (D. Conn. Nov. 30, 2007) (excluding evidence of defendant's post-investigation property transfers under Rule 403).

Introduction of evidence relating to the Oliva Investigation will also result in a waste of time, given the volume and the complexity of the evidence that will be necessary to rebut the government's theory that, although lawful, there was something improper about the Oliva Investigation. For example, to rebut the government's argument that Mr. McPartland and Mr. Spota "showed an unusual interest in the intercepted conversations" (Gov't Ltr. at 3), the defense will be compelled to introduce evidence of the unique circumstances of the Oliva Investigation, including the fact that Oliva's unlawful disclosures included operational details of highly sensitive criminal investigations and that these disclosures had, in at least one instance, put other police officers at risk of physical harm. *See* OlivaWire 204. The same is true for the government's desire to prove that a search of Lopez's phone was considered: this would take the jury on a complex legal and factual detour about search warrants, wiretaps, reporters, the First Amendment, and the New York shield law, among other issues. Exclusion on this ground alone is compelling. *See*, *e.g.*, *United States v. Wade*, 512 F. App'x 11, 14 (2d Cir. 2013) (summary order) (upholding exclusion of defendant's proffered testimony because it "presented a risk of juror confusion and extended litigation of a collateral matter").

Moreover, admission of the Oliva Investigation will lead to juror confusion. The government plainly plans to blur the line between lawful and unlawful conduct in arguing that the Oliva Investigation, albeit lawful, shows that the defendants had an improper "intent to assist James Burke in covering up his crimes"—a tactic made all the more likely by the government's many, somewhat conflicting, and internally inconsistent arguments for the admissibility of this issue. This reason alone warrants preclusion. *See United States v. Aboumoussallem*, 726 F.2d 906, 912 (2d Cir. 1984) (affirming district court's conclusion that the "adverse consequences of jury confusion and trial delay" outweighed the benefits of evidence proposed under Rule 404(b)

based on a fear that the proposed testimony would require the jury to conduct a "trial within a trial").

Finally, a "conscientious assessment" under Rule 403 includes an assessment of "whether there exists any alternative evidence with the same or greater probative value, but with a lesser threat of unfairly prejudicing the defendant, as the proffered evidence." *United States v. Ozsusamlar*, 428 F. Supp. 2d 161, 170 (S.D.N.Y. 2006); *see also Old Chief v. United States*, 519 U.S. 172, 184 (1997) ("[W]hen a court considers 'whether to exclude on grounds of unfair prejudice,' the 'availability of other means of proof may . . . be an appropriate factor.'" (citation omitted)). Here, the government will have ample opportunity to introduce other evidence of the defendants' prior relationships with Burke and their alleged desire to assist in covering up his assault of Loeb. And admission of the fact that Oliva was prosecuted by the SCDAO, together with Mr. McPartland's alleged invocation of that case in a later conversation with Hickey, will allow the government to provide context for that statement without presenting all of the dangers that Rule 403 is designed to prevent.

When weighed against the probative value of the proffered evidence, as Rule 403 requires, the palpable risks of delay, confusion, and unfair prejudice are overwhelming. The government's evidence would result in a parade of witnesses and create a sideshow that will unnecessarily prolong the trial, confuse the jury, and lead to unfair prejudice. Indeed, the government's proposed detour into the contours of the Oliva Investigation—and the lengthy evidentiary refutation that this would invite—is precisely the type of tangential issue that courts routinely exclude under Rule 403. For all of these reasons, the government's motion *in limine* to introduce evidence of the Oliva Investigation should be denied.

### E.    If Evidence of the Oliva Investigation is Admitted at Trial, a Member of the Prosecution Team May Need to be a Defense Witness and Therefore Must Be Disqualified

Should the Court determine that evidence of the Oliva Investigation is admissible, notwithstanding the multiple grounds for excluding it, we respectfully submit that the right of the defendants to present a complete defense warrants that Ms. Boeckmann be disqualified so that, if necessary, the defense can call her as a witness. As a potential witness, Ms. Boeckmann cannot continue in her role as a member of the prosecution team.

The ethical rules adopted by the American Bar Association ("ABA"), and codified in many states (including New York), have long recognized that "the roles of an advocate and of a witness are inconsistent; the function of an advocate is to advance or argue the cause of another, while that of a witness is to state facts objectively." ABA, Code of Professional Responsibility 5–9 (1978); *see also United States v. Birdman*, 602 F.2d 547, 552–53 nn.14–16 (3d Cir. 1979) (collecting cases in which courts have condemned an attorney's simultaneous service as advocate and witness). Permitting an advocate to testify as a witness also creates a risk that jurors will be unable to distinguish the lawyer's argument from his testimony and might therefore erroneously "accord testimonial credit to the prosecutor's . . . argument[s]." *United States v. Prantil*, 764 F.2d 548, 553 (9th Cir. 1985) (citing *United States v. Johnston*, 690 F.2d 638, 643 (7th Cir. 1982) (en banc)). Courts are thus reluctant to permit an advocate to testify as a witness in a case in which the lawyer is representing a litigant. If a litigant's lawyer must be a witness, the lawyer cannot be permitted to serve as an advocate at trial.

The need for disqualification is even stronger when the lawyer in question is a prosecutor in a criminal case. "When a prosecutor testifies, in addition to all of the concerns specified above, there is a danger that the prestige associated with the prosecutor's office might induce a jury to grant too much weight to his testimony." *United States v. Bin Laden*, 91 F. Supp. 2d 600, 622

36

(S.D.N.Y. 2000) (citing *Birdman*, 602 F.2d at 553–54 & 553 n.17; *Prantil*, 764 F.2d at 553 ("The rule prevents the prestige and prominence of the prosecutor's office from being attributed to testimony by a testifying prosecutor.")).

To be sure, we recognize that the decision to disqualify a prosecutor cannot be made lightly. But if the government is permitted to inject collateral evidence concerning the purported impropriety of certain aspects of the Oliva Investigation, the defendants must have the right to rebut that evidence, even if it requires testimony from a member of the prosecution team. *See Prantil*, 764 F.2d at 548 (reversing defendant's convictions because the district court abused its discretion by denying the defendant's motion to recuse the prosecutor, a key fact witness against defendant, from his advocacy role); *People v. Tesen*, 739 N.W.2d 689, 694–95 (Mich. Ct. App. 2007) (per curiam) (finding that a prosecutor was properly disqualified from a case where the prosecutor's lead role in the criminal investigation of the case meant that he was likely to be a necessary witness at trial); U.S. Const. amend. VI. (guaranteeing a criminal defendant "compulsory process for obtaining witnesses in his favor").

As was the prosecutor in *Prantil*, Ms. Boeckmann is in possession of vital information concerning various aspects of the Oliva Investigation, including information available from no other source. While substitute testimony exists for certain of these aspects, "[b]oth the quality and quantity of the alternate sources of evidence are proper subjects for comparison with that sought directly from the participating prosecutor." 764 F.2d at 552 (finding that substitute testimony from an FBI agent who was present for only some, though not all, of the relevant discussions was insufficient). The fact that Mr. McPartland sought to involve the EDNY (and Ms. Boeckmann in particular) in various aspects of the Oliva Investigation serves as key rebuttal evidence to the

government's baseless claim that the investigation was, in one form or another, an improper subterfuge.

Moreover, even if portions of her involvement can be attested to by other witnesses, no one but Ms. Boeckmann can testify from personal knowledge about all of the various aspects of relevant narrative—from beginning (when Oliva was removed from the Task Force, leading to her angry confrontation with Burke) to the end (when Oliva pled guilty and the events that followed). The defendants are therefore entitled to preserve their right to call her as a witness, if deemed advisable based on the manner in which proof of the Oliva Investigation has come in at trial. *See id.* at 551–52 (in rejecting the government's argument that the defendant himself testify in order to exhaust all other sources of testimony, the court ruled that "the defendants' obligation to resort to alternative means of adducing factual testimony is not absolute"). Under these circumstances— caused entirely by the government's own, eleventh-hour decision to bring in Ms. Boeckmann as trial counsel when it was well aware of her personal connections to the Oliva Investigation—Ms. Boeckmann should be disqualified under the advocate-witness rule. N.Y. R. Prof'l Conduct § 3.7 (prohibiting a lawyer from serving as an advocate and a witness).

Finally, courts to address this issue have required the government to demonstrate the impediments of substituting a prosecutor. *See Prantil*, 764 F.2d at 551–52; *Johnston*, 690 F.2d at 645 (The "trial court must consider whether substituting prosecutors would disqualify the prosecutor with the most familiarity with the case, and require duplicative work[.]"); *Tesen*, 739 N.W.2d at 695 (finding that disqualification of a prosecutor was appropriate where the State made no showing of hardship). The government has not even attempted to do so here—nor could it, given that three other, highly experienced prosecutors will be representing the government at trial.

## V. Evidence of the Salacious Details of Loeb's Theft and Assault Must be Excluded

Pre-trial discovery and the 3500 material produced by the government suggest that the government may attempt to bolster its case against the defendants by seeking to admit evidence concerning salacious details of Loeb's theft and assault. Such evidence must be excluded.

The indictment in this case alleges that "[o]n or about December 14, 2012," Loeb:

> "was arrested on suspicion of burglarizing motor vehicles, including a motor vehicle . . . issued to and possessed by Burke. Thereafter, [Loeb] was transported to the Fourth Precinct of the SCPD, placed inside of an interview room, and handcuffed to a permanent fixture inside of the room. . . . Later that day, Burke and other members of the SCPD entered the interview room and assaulted [Loeb]."

Doc. No. 1 at ¶¶ 4–5. The government, however, has previously represented that it intends to introduce evidence that goes well beyond these allegations, by calling witnesses who "will detail the assault" of Loeb at trial. *See* Bail Ltr. at 3. Such "detail" may include that Loeb stole sensitive items from Burke, such as sex toys, condoms, Viagra, and pornography (which was incorrectly rumored to be child pornography, and a graphic picture of which was included in pre-trial discovery), *see, e.g.*, Gov't Exs. 3500-DB-10 at 18; 3500-BD-5 at 2; 3500-MK-6 at 7–8, 20–21; that Burke "violently" assaulted Loeb while he was handcuffed, by punching Loeb in the head and body and threatened to kill Loeb with a "hot shot" of heroin, *see, e.g.*, Gov't Exs. 3500-KB-9 at 35–36; 3500-AL-8 at 2; and that one of the SCPD officers who participated in the assault (Michael Malone) secretly urinated in Loeb's coffee while another (Leto) allegedly told Loeb that his mother (who owned the home in which Loeb was found with the stolen property) could also be arrested for possessing stolen property and could be raped in jail, *see, e.g.*, Gov't Exs. 3500-KB-2 at 3; 3500-AL-8 at 3. Because such evidence is irrelevant under Rules 401 and 402, and unfairly prejudicial under Rule 403, it must be excluded at trial.

### A.       The Evidence Is Irrelevant Under Rules 401 and 402

This trial is not about whether Burke assaulted Loeb.  Burke has already pleaded guilty to that crime, *see United States v. Burke*, 15 Cr. 627, Doc. No. 21 (E.D.N.Y. Feb. 26, 2016); *id.*, Doc No. 40 (E.D.N.Y. Nov. 11, 2016), and the defense does not intend to dispute this at trial.  This trial instead concerns whether the defendants acted intentionally and corruptly to obstruct the federal investigation into Loeb's assault.  But the details of Loeb's theft and assault have no logical bearing on that question.  For example, while evidence that Loeb stole Burke's sex toys and pornography may bear on Burke's motive to assault Loeb—given the sensitivity of the stolen items—there is no probative connection between the spoils of Loeb's theft and the charges in this case.  Likewise, while the nature and severity of Loeb's assault may have been relevant in a trial of Burke or the other assaulting officers concerning whether the assault occurred, the salacious details surrounding the assault do not permissibly inform the question of whether the defendants obstructed the federal investigation into the assault.  Because this evidence does not have "any tendency to make a fact more or less probable than it would be without the evidence," much less a "fact [that] is of consequence in determining [this] action," *see* Fed. R. Evid. 401, details of Loeb's theft and assault should be excluded as irrelevant at trial.  *See* Fed. R. Evid. 402.

### B.       The Evidence Is Unfairly Prejudicial Under Rule 403

Even if the Court were to conclude that the evidence is relevant, such relevance would be minimal and substantially outweighed by the danger of unfair prejudice.  That is because the evidence at issue here—sex-related materials, spiking coffee with urine, and unfounded threats of violence—easily meets this standard and should be excluded.

For example, the Second Circuit has "repeatedly recognized the inflammatory quality and impact of evidence of a pornographic nature."  *See United States v. Nosov*, 221 F. Supp. 2d 445, 450 (S.D.N.Y. 2002) (citing *United States v. Harvey*, 991 F. 2d 981 (2d Cir. 1993) and *Borello*,

776 F. 2d 46). "Even in cases dealing with or related to pornography and, hence, making the introduction of evidence of pornographic material arguably more relevant, the Second Circuit has been reluctant to permit the introduction of such evidence." *Id.* at 451; *see id.* at 449–50 (holding that evidence of the pornographic nature of a witness's business was properly excluded because it had "relatively little bearing" on the witness's testimony and "would be tremendously inflammatory and prejudicial"). As noted above, Loeb's theft of Burke's sex toys, condoms, Viagra, and pornography bears no logical relationship to the charges at issue in this trial. Yet that evidence, if admitted, could have a wildly prejudicial effect on the jury. This is precisely the sort of inflammatory evidence that Rule 403 was meant to exclude from a trial.

Similarly, the Second Circuit has explicitly held that "the potential for unfair prejudice [from the admission of death threats] is so great that Rule 403's balancing test permits admission of death threat evidence only if there is *clear need for the evidence* and it serves *an important purpose*." *United States v. Morgan*, 786 F.3d 227, 229 (2d Cir. 2015) (emphasis added). Thus, "[o]rdinarily, unrelated death-threat testimony is kept from a jury." *United States v. Panebianco*, 543 F.2d 447, 455 (2d Cir. 1976); *accord United States v. Qamar*, 671 F.2d 732, 736 (2d Cir. 1982) ("[T]he government must have an important purpose for the evidence in order to satisfy the Rule 403 balancing test[,]" and "[t]rial courts applying standard Rule 403 analysis may, therefore, exclude death threats more frequently than other evidence."). Here, the threats made by Burke and Leto during their assault of Loeb bear no logical relation to the charged acts of obstruction against the defendants, and therefore cannot meet the high bar for admission of such threats.

Because admission of the highly inflammatory details of Loeb's theft and arrest would create a serious risk that the jury would judge the defendants on an improper basis—including by blaming the defendants for the salaciousness of a theft and assault that they are not even alleged

to have been involved in—the evidence must be excluded under Rule 403. *See Gilliam*, 994 F.2d at 103 (noting that, where prior conviction is an element of a crime, the "introduction of the underlying facts of the prior conviction would be far more prejudicial than probative where the defendant is willing to stipulate to the simple fact of the prior conviction"); *Estate of Mauricio Jaquez v. Flores*, No. 10 CIV. 2881 (KBF), 2016 WL 1084145, at \*7 (S.D.N.Y. Mar. 17, 2016) (admitting photographs of decedent's initial injuries that were relevant to the issue of the reasonableness of force used by the defendant, but excluding photographs of decedent's fatal injuries as irrelevant and unduly prejudicial because jurors could be influenced by wounds not at issue in the trial).

## VI. Evidence of How Lawyers for Various Police Witnesses Were Recommended, How Information Was Shared Among the Lawyers, and the Terms by Which the Unions Paid Their Fees Must Be Excluded

The government's conspiracy theories in this case run far and wide. Indeed, the government has expressly stated in motion papers, or suggested through its witness interviews, that it plans to offer proof at trial that, as a part of the alleged conspiracy, the following conduct occurred:

1. Burke's then-counsel, Joseph Conway, created a "list of approved attorneys" and police witnesses were "require[ed] . . . through the Suffolk County Policy Benevolent Association ("PBA") and the Suffolk County Detectives Association ("SDA") [to] obtain[] legal representation from . . . [that list] . . . with the expectation that the assigned lawyers would share information with Burke's attorney" (*see* Gov't Memo. of Law in Opp. to Def.s' Pre-trial Mots., ECF No. 58 (Dec. 6, 2018), at 6);

2. Individuals "debrief[ed] each of the police witnesses and/or their attorneys about what they saw, heard and knew and what was discussed with FBI agents and/or prosecutors" (*id.*); and

3. One or more police unions required officers to execute a promissory note (or similar arrangement) prior to the advancement of legal fees, conditioning advancement on a

promise to repay fees in the event the officer was "convicted or [pled] guilty to a crime," and one or more witnesses "perceived" this as coercive (*see* Gov't Ex. 3500-KB-9 at 77–78).

This evidence must be excluded under Rules 401, 402, and 403. At bottom, the alleged conduct—which did not involve either of the defendants—was not in any respect unlawful, and thus is entirely ill-suited as proof of conspiratorial conduct. Moreover, there is no admissible testimony in support of the government's theory that this was conspiratorial conduct, as its "proof" is premised entirely on the subjective and unsupported "perception" of one or more police officers that there was something improper or implicitly coercive about this conduct. Finally, permitting the government to tread into esoteric areas involving how attorneys represent clients in connection with criminal investigations and the advancement and recoupment of legal fees will create a trial within a trial of little to no probative value, and which carries with it the substantial risks of misleading and confusing the jury, unfairly prejudicing the defendants, and wasting time on the needless presentation of evidence.

### A. The Proffered Evidence Has No Relevance Under Rules 401 and 402

*First*, the government's proposed evidence has no conceivable relevance because its theory that this conduct was a part of an unlawful conspiracy is fatally flawed. Indeed, it reveals the government's lack of understanding of the defense function or the right of entities to condition payment of legal fees on a requirement of repayment under certain circumstances. As the Court is aware, it is legal, ethical, and commonplace for defense lawyers to recommend lawyers for other witnesses, to share information with those lawyers, and to attempt to gather as much information as possible as to the nature and status of the government's investigation.

Moreover, it is legal, ethical and commonplace for organizations—such as unions or corporations—to: (i) pay for their members' or employees' legal fees in connection with matters

relating to their membership or employment; (ii) provide a list of "pre-approved" attorneys to undertake that representation; and (iii) require repayment of previously paid fees and/or to cease payment of fees when it is determined that the member or employee has committed a crime or other specified wrong. *See Paying for Daniel Webster: Critiquing the Contract Model of Advancement of Legal Fees in Criminal Proceedings,* 7 Hastings Bus. L. J. 275, 278–81 (2011) (noting that the "MBCA [Model Business Corporation Act], the Delaware statute, and at least forty states [including New York] require officers and directors requesting advancement to execute an undertaking to repay the advance in the event that indemnification is not warranted," and noting that a "determination of guilt" is a basis for a person to become ineligible for indemnification) (internal notes and citations omitted); *see also Schlossberg v. Schwartz*, 2014 WL 1976650, *4 (Sup. Ct. N.Y. Co. 2014) (pursuant to New York Business Corporation Law ("BCL") Section 721, "there will be no indemnification and no right of 'retention' of advanced monies: if a judgment or other final adjudication adverse to the director or officer establishes that his acts were committed in bad faith or were the result of active and deliberate dishonesty and were material to the cause of action so adjudicated.").

Given that these activities are legal, ethical, and commonplace, there is simply no conceivable basis for the government to brand such behavior as unlawful conduct in furtherance of the conspiracy. Indeed, according to the government's theory, every entity that follows these legally-sanctioned indemnification provisions and requires a promise to pay fees back in the event of a finding of dishonesty or wrongdoing is arguably engaging in obstruction of justice. This is a patently untenable theory. Moreover, presenting this evidence to the jury will, at bottom, invite the jury to improperly draw a negative inference (or worse) from the use of these legitimate

arrangements. For this reason alone, under Rules 401 and 402, the evidence is irrelevant and thus inadmissible.

*Second*, the proposed evidence should be precluded as irrelevant because—based on our review of the 3500 material—the government does not claim that the defendants were involved in any of the activities the government seeks to prove in this regard. In fact, we are unaware of a single witness who will testify that either of the defendants directed or participated in the recommendation or selection of lawyers for these witnesses, the sharing of information among those lawyers, or the payment (or recoupment) of attorney's fees by the unions. Thus, the government's anticipated proof on these issues relates solely to the conduct of other alleged conspirators, without the knowledge or participation of the defendants. The irrelevance of this material is clear when one considers that this case has absolutely nothing to do with the *defendants'* use of lawyers or fee arrangements to obstruct justice, and that the conduct to which the government refers was legal, proper, and commonplace.

*Third*, this evidence should not be admitted because there is no admissible proof in support of the government's unsubstantiated theory of wrongdoing. Based on our review of the 3500 material, there is not a single lawyer who will testify that there was anything improper about their selection as counsel, their referral of lawyers for other police personnel, or their representation of their clients. Nor, it appears, is there any union official who will testify that there was anything nefarious or improper about the legal fee arrangement or the requirement of a promissory note (or similar arrangement) as a condition for having fees paid. Rather, the government will try to prove this alleged aspect of the conspiracy based solely on the subjective perception of one or more witnesses. For example, Bombace was asked in the grand jury whether it was his "impression" from union official's statements that fees would be withheld if he implicated others in the

assault.  Gov't Ex. 3500-KB-9 at 78, 85.  Bombace replied: "[t]hat's what the insinuation was."  *Id.*  Obviously, such "impression" and "insinuation" testimony—when not grounded in conduct that can fairly support the inference—is plainly inadmissible.  In the absence of any admissible proof, the government's theory in this regard should be precluded at trial.

For these reasons, the proffered evidence should be excluded under Rules 401 and 402.

### B.     The Proffered Evidence Should Also Be Excluded Under Rule 403

Should the Court find that the proffered evidence has any relevance and that there is admissible testimony in support of the government's theory (both propositions with which we disagree), any such relevance is slight at best and is substantially outweighed by each and every one of the dangers delineated in Rule 403.  We discuss each factor below.

#### 1.     Unfair Prejudice

Any alleged probative value of the government's proffered evidence is substantially outweighed by the risk of unfair prejudice to the defendants.  *First*, the proffered evidence regarding Mr. Conway's recommendation of counsel and the ensuing communications with counsel will undoubtedly lead the jury to draw a host of unfair and prejudicial conclusions, including that Burke's counsel's recommendation of lawyers for other officers or his desire to share information with those lawyers was actually an improper (indeed, criminal) effort to obstruct justice, that the lawyers who participated in this arrangement may also have been knowing participants in this criminal effort, and that the defendants—both of whom are lawyers—are more likely to be guilty given that these other lawyers were willing to engage in what the jury will be led to believe was an illegal arrangement to further the goals of the conspiracy.

Each of these conclusions poses a very real and substantial risk to the defendants' ability to obtain a fair trial, and none can effectively be addressed by a curative instruction.  In fact, if the

jury is led to draw even one of these improper inferences from this evidence, the defendants will have been deprived of a fair trial. Given the substantial risk for unfair prejudice when balanced against the slight (if any) probative value of the proffered evidence, Rule 403 compels the conclusion that the proposed evidence should be excluded.

*Second*, the evidence relating to the use of a promissory note or similar arrangement by the unions carries with it an equally great risk of unfair prejudice. The jury will inexorably draw the conclusion that such clawback provisions are improper and that they were merely a mechanism by which the union intended to improperly control the officers' testimony. Indeed, the jury may well conclude that this provision was tailor-made by the unions to enable Burke (through his lawyer) to obstruct the Loeb investigation, and that the defendants had a hand in it—despite the complete lack of evidence to support that theory.

Accordingly, the risk of substantial prejudice to the defendants substantially outweighs any arguable probative value of the evidence the government seeks to offer. For this reason as well, it should be precluded.

## 2. Confusing the Issues and Misleading the Jury

It goes without saying that topics such as an attorney's permissible defense of a client in a criminal investigation, how such lawyers interact with each other, and indemnification and clawback provisions, are all specialized areas of legal practice that are well beyond the experience of the typical juror. The submission of unnecessary evidence on these esoteric topics with little or no probative value has the obvious tendency to confuse the issues and mislead the jury. Indeed, all of the government's proffered evidence rests on false legal premises as to the nature of this conduct—false premises that the government will likely exploit rather than explain.

While these legal principles and practices may be well-known to the Court, they will not be to a jury. Submitting this information to the jury will require significant evidence from the defense to counter the negative inferences the government will seek to draw from this evidence. This would include calling an expert as part of the defense case, to attempt to eliminate any confusion and unfair prejudice that has been caused. Of course, this may or may not clear up the confusion, as the jury will be asked to understand and resolve these complex areas of the law and legal practice. This confusion will only be magnified by the fact that none of this evidence is relevant to determining whether the defendants conspired to obstruct justice since they are not even alleged to have engaged in the conduct in question—thus leaving the jury to wonder why it is being introduced at the trial of these defendants in the first place.

### 3. Undue Delay and Wasting of Time

Likewise, the evidence the government seeks to offer will unduly delay the trial, and will be a waste of time, particularly in light of the limited (if any) relevance of the proffered evidence. To rebut the government's evidence, the defense (as noted above) may well have to call an expert, one or more of the many defense lawyers who represented police witnesses (to establish that nothing untoward happened), and one or more union officials (to rebut the notion that the promissory note or similar arrangements were in any way improper). Such a detour from the alleged conduct that is actually at issue in this case will be a needless waste of time, especially under the facts of this case.

### 4. Needless Presenting of Cumulative Evidence

The proffered evidence should also be excluded under Rule 403 because, to the extent it is offered as additional evidence that other people conspired to obstruct the investigation into the Loeb assault, this evidence is needlessly cumulative. The defendants concede that Burke and others conspired to obstruct justice, and this will be clear to the jury. Thus, there is simply no need

for the government to reach this far afield to establish the alleged breadth of the conspiracy, especially in light of the fact that those attenuated areas do not even involve the defendants.

For all of these reasons, evidence of how lawyers for various witnesses were recommended, how information was shared among the lawyers, and the terms by which the unions paid their fees, should be excluded.

## VII. Evidence Concerning the Defendants' Alcohol Consumption Must be Excluded

The government has interviewed witnesses about the defendants' alcohol consumption, despite the fact that none of the 3500 material connects their alcohol consumption to the charges in this case. For example, one witness stated to the government that Mr. Spota was "an alcoholic father figure" to Burke; another that Mr. Spota is a "heavy drinker"; and another that Mr. Spota is an alcoholic who, the witness speculated, may drive drunk. *See* Gov't Exs. 3500-JM-3 at 3; 3500-RS-12 at 2; 3500-DS-10 at 7. Similarly, Mr. McPartland is accused of being a "heavy drinker[]." *See, e.g.*, Gov't Ex. 3500-DS-1 at 4. Notably, the government raised this topic with witnesses earlier this month, shortly after it became clear that the government's star witness (Hickey) would be subject to questioning at trial about his own drinking habits. *See* Gov't Exs. 3500-RS-12 at 2; 3500-DS-10 at 7.

Unless the defendants testify (in which event, the admissibility of this evidence can be considered at that time), their alcohol consumption will not make any fact "of consequence" more or less probable and thus it is irrelevant. The defendants' alleged alcohol consumption has no bearing on any element of the charged crimes. Moreover, such evidence would unfairly impugn the defendants before the jury. For these reasons, the evidence must be excluded under either Rule 401 or 403. *See, e.g.*, *Nesbitt v. Sears, Roebuck and Co.*, 415 F. Supp. 2d 530, 540 (E.D. Pa. 2005) (excluding evidence of plaintiff's alcohol use as irrelevant to the issue of damages under Rules

49

401 and 402 and unfairly prejudicial under Rule 403, given that there was no evident link between the plaintiff's drinking and the relevant accident and because it might create "the image that plaintiff is a habitual drunkard"); *see also, e.g.*, *Smith v. Cty. of Barry*, No. 1:15-CV-131, 2016 WL 10321585, at *2 (W.D. Mich. Sept. 26, 2016) (excluding evidence of prior drug and alcohol abuse under Rule 403 because the evidence was "minimally relevant, if at all" and "there [was] a high likelihood that the jury may view Plaintiff negatively and may be improperly swayed by such evidence"); *Knox v. Ferrer*, No. 5:07-CV-6 (DCB), 2008 WL 4446532, at *2 (S.D. Miss. Sept. 25, 2008) (excluding evidence of alcohol consumption under Rules 402 and 403 because "the defendants have failed to produce evidence that [the plaintiff's] consumption of alcohol [was] relevant to any issue in this case" and "any probative value of the evidence would be substantially outweighed by its prejudicial effect").[2]

## VIII.   The Government Should Be Ordered to Comply with Defendants' *Brady/Giglio* Requests

The defendants have been requesting disclosure of all *Brady* and *Giglio* material since our initial letter request to the government on November 20, 2017.  While the government was slow to respond, we appreciate that in the past few months it has produced a large volume of materials covered by *Brady* and *Giglio*, among other disclosures.  However, there remain specific, and highly relevant, disclosures that have still not been made, which were set forth in a targeted letter to the government on October 14, 2019.  In that letter, we again requested that the government provide certain specific *Brady* and *Giglio* information as to government witnesses generally, and

---

[2] The government produced an initial (and, in many respects, inadequate) exhibit list on October 18 and a substantially more detailed version on October 21.  Because the defendants received the latter, revised list just three days before the due date of these motions, and because the defense has not received many of the proposed exhibits, we respectfully reserve the right to supplement our motions *in limine* prior to the time that the government's exhibits are offered at trial.

also certain specific information as to Hickey.  The request included, among other items, that the

government provide the following information as to witnesses in general:

1. Any statements made by the government that could be construed as threatening or pressuring the witness, if the witness did not provide information different from what he or she had previously provided; and

2. Any statements by the government that could be construed as offering a benefit of any kind for becoming a cooperating witness.

As to Hickey in particular, we asked that the government provide the following information:

1. The substance of any attorney proffer made by counsel on Hickey's behalf;

2. All statements by the government to Hickey and/or his counsel relating to the government's potential interest in investigating or prosecuting Mr. McPartland or Mr. Spota;

3. All statements and other information that Hickey and/or his counsel provided to the government relating to his hospitalizations in 2013 and 2015, including the date(s) when that information was provided to the government;

4. All statements and other information that Hickey and/or his counsel provided to the government relating to his consumption of alcohol, including the date(s) when that information was provided to the government; and

5. All statements and other information Hickey and/or his counsel provided to the government relating to his extra-marital affairs, including the dates of those affairs and whether they occurred while on duty.

We requested that the government respond to all of the above requests by October 18, 2019,

but it has not done so.  Accordingly, we respectfully request that the government be ordered to

produce any material or other information in its possession, custody, or control that is responsive

to our letter.

The information requested above plainly constitutes *Brady/Giglio* material, for the reasons set forth below. As to witnesses generally:

(1) Any threats or pressure brought to bear on a witness to change his recollection is quintessential *Giglio* material. *See, e.g.*, *United States v. Scheer*, 168 F.3d 445 (11th Cir. 1999) (reversing conviction due to government's failure to disclose government's threat to witness).

(2) The same is true as to any benefit offered to a witness in exchange for cooperation. Indeed, that was decided in *Giglio* itself. *See Giglio v. United States*, 405 U.S. 150, 155 (1972) (reversing conviction due to government's failure to disclose promise of non-prosecution).

As to Hickey in particular:

(1) Any information conveyed in Hickey's attorney's proffers, to the extent that information differs from any of his subsequent statements to the government or trial testimony, is plainly *Giglio* material, as the Second Circuit held in *United States v. Triumph Capital Grp., Inc.*, 544 F.3d 149, 157 (2d Cir. 2008) (reversing conviction based on government's failure to produce attorney proffer notes that could have been argued as being at variance with trial testimony). Indeed, based on counsel's experience (in the Southern District of New York at least), this material is routinely produced. Here, the government has advised defense counsel that it does not consider attorney proffer notes to be required to be disclosed. However, based on *Triumph*, this statement is incorrect. The government has also stated that such proffer notes do not exist, but the requirement of disclosure remains even if the attorney's proffer was not reduced to writing, to the extent that it was inconsistent in any way with Hickey's later statements. *See United States v. Rodriguez*, 496 F.3d 221, 226 (2d Cir. 2007) ("The obligation to disclose information covered by the *Brady* and *Giglio* rules exists without regard to whether that information has been recorded in

tangible form."). Accordingly, the government should be required to turn over the substance of any prior attorney proffers on behalf of Hickey, whether reduced to writing or not.

(2) To the extent that the government ever advised Hickey or his counsel that it was interested in information regarding Mr. Spota or Mr. McPartland, or that—for example—in order to be "signed up" to a cooperation agreement, Hickey would have to provide information about specific people or that information about others already implicated was no longer useful, that would plainly have presented a motive to embellish or fabricate, and would have to be disclosed (whether recorded in writing or not).

(3) As to statements concerning his two hospitalizations, the 3500 material is remarkably sparse. Concerning his hospitalization in 2013, it appears there is one handwritten notation contained in interview notes dated April 17, 2018. Those notes state: "HOSP – 2013; Drunk [two words illegible]." *See* Gov't Ex. 3500-JH-34 at 1. As to Hickey's 2015 hospitalization, there are a mere two sentences. On December 4, 2015, Hickey advised the government that "[o]n October 26, 2015 Hickey returned home following a hospital stay for a minor stroke." *See* Gov't Ex. 3500-JH-7 at 8. And the government's handwritten notes of a September 23, 2019 interview reflect that "the dates of his hospitalization were from October 22, 2015 to October 26, 2015 . . . . There were no other notes taken at that time." *See* Gov't Ex. 3500-JH-36 at 2.

We have to assume that the government has spoken to Hickey about his hospitalizations in a more fulsome manner than that reflected above, but that it has chosen not to document those conversations. However, even those oral conversations must be disclosed, because information pertaining to those hospitalizations—including when he told the government about the hospitalizations—will be highly relevant on cross-examination of Hickey. Indeed, the government has acknowledged that Hickey did not sign a medical records release until January 2019 (long after

the defense requests to the government for this information).  It is hard to imagine that the government obtained Hickey's medical records at that time, but has never spoken to him about their contents since.  Assuming that any such conversations have taken place, they plainly constitute *Giglio* material and should be promptly disclosed.

(4) As to statements concerning Hickey's drinking, the 3500 material appears to contain only the one reference noted above: "Drunk."  We must assume again that the government has spoken to Hickey about his drinking at greater length than that—particularly in light of the extraordinary quantities of alcohol he consumed for at least several months prior to his 2013 hospitalization—but has chosen not to document those conversations.  As noted above, those oral conversations must be disclosed, because information pertaining to his drinking—including when he told the government about it—will be highly relevant on cross-examination.  Thus, it plainly constitutes *Giglio* material.

(5) The government disclosed in a *Brady/Giglio* letter dated October 9, 2019 that "Hickey engaged in several extra-marital affairs."  However, it provided no additional detail, and stated that it intends to move to preclude this area of inquiry.  The additional information we have requested on this topic is critical in order to assist the defense and the Court in determining the admissibility of this information when Hickey testifies.  Obviously, this additional information is critical because the admissibility of extra-marital affairs may well turn on details such as:  How long ago did these affairs occur?  How many affairs were there and were they overlapping?  How long did they last?  Did Hickey lie about the affairs to others?  Were they with co-workers?  Did they take place on work time?  Without this information, the defense is left to argue admissibility with one hand tied behind its back.  Accordingly, this is critical *Giglio* material that should be promptly disclosed.

## <u>Conclusion</u>

For the foregoing reasons, the defendants respectfully request that the Court grant their motions *in limine* to exclude evidence.

Dated:  October 24, 2019
New York, New York

Respectfully submitted,

_____
Larry H. Krantz
Lisa A. Cahill
KRANTZ & BERMAN LLP
747 Third Avenue, 32nd Floor
New York, New York 10017
(212) 661-0009

Bradley R. Gershel
BALLARD SPAHR LLP
1675 Broadway, 19th Floor
New York, New York 10019
(212) 223-0200

*Counsel for Christopher McPartland*

_____
Alan Vinegrad
Erin Monju
Sarah LeMaster
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
(212) 841-1022

*Counsel for Thomas J. Spota*