NB:LTG/JLG/MRM
F. #2018R00279

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                     17-CR-587 (JMA)

CHRISTOPHER MCPARTLAND and
THOMAS J. SPOTA,

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## MEMORANDUM IN OPPOSITION TO
## THE DEFENDANTS' MOTIONS *IN LIMINE*

RICHARD P. DONOGHUE
United States Attorney
Eastern District of New York
610 Federal Plaza
Central Islip, New York 11722

Nicole Boeckmann
Lara Treinis Gatz
Justina L. Geraci
Michael R. Maffei
Assistant U.S. Attorneys
    (Of Counsel)

## PRELIMINARY STATEMENT

The government respectfully submits this response in opposition to the defendants' motions *in limine.* The defendants' request: (I) Testimony Be Limited to Witnesses' Personal Knowledge Obtained Through Their Five Senses; (II) Exclusion of Evidence of Burke's Alleged Misconduct; (III) Exclusion of Evidence of the Defendants' Other Prosecutorial Conduct; (IV) Exclusion of Evidence of the Oliva Investigation and Wiretap; (V) Exclusion of Evidence of the Details of Loeb's Theft and Assault; (VI) Exclusion of Evidence of How Lawyers for Various Police Witnesses Were Recommended, How Information Was Shared Among the Lawyers, and the Terms by Which the Unions Paid Their Fees; (VII) Exclusion of Evidence Concerning the Defendants' Alcohol Consumption; and (VIII) Compliance with Brady/Giglio Requests. Below, the government addresses the defendants' arguments point by point.

<u>SECTION I</u>

<u>THIS COURT CANNOT LIMIT LAY WITNESS TESTIMONY IN A VACUUM</u>

First, the defendants ask this Court to severely limit anticipated witness testimony, however, at best, this motion is premature. The defendants base their motion on the substance of the witnesses' statements as reflected in memoranda documenting their interviews and/or in their grand jury testimony, none of which purports or attempts to properly lay the legal foundation for the in-court admission of the statements. And at worst, this motion seeks to limit certain material - probative and relevant anticipated witness testimony - based on the defendants' own vociferous mischaracterizations of the statements of those witnesses during their meetings with the government.

As a threshold matter, the government respectfully submits that this motion is premature. To gag every lay witness in this case from offering an opinion, inference, characterization or belief which is "informed by reasoning processes familiar to the average person in everyday life," <u>see</u> United States v. Garcia, 413 F.3d 201, 216 (2d Cir. 2005), without affording those witnesses any opportunity to state, on the record, the bases of these assertions, is draconian. The government has not yet been permitted to lay proper foundation for any witness's opinion or belief testimony; and relatedly, neither has the Court had an opportunity to "focus on the 'reasoning process' by which a witness reached his proffered opinion." <u>Id</u>. at 215. Therefore, the government submits that this motion should be denied without prejudice at this time, such that any objections to witness testimony will be treated on a question-by-question basis during the course of their trial testimony.

However, should the Court determine that the defenses' motion should be evaluated on its merits at this time; it is simply inaccurate to claim, as the defense does, that all testimony concerning a witness's "beliefs, assumptions, and characterizations" in this case is legally excludable.  Def. Mem. at 5.

Law

Rule 701 of the Federal Rules of Evidence provides, in relevant part, that "[lay witness] testimony in the form of an opinion[1] is limited to one that is: (a) rationally based on the witness's perception; [and] (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue." Fed. R. Evid. 701.  In order to comply with these requirements, the witness testimony must initially fulfill the personal knowledge requirement of Rule 602, which is incorporated in Rule 701(a).  See Securities and Exchange Commission v. Singer, 786 F.Supp. 1158, 1166 (S.D.N.Y. 1992) (citation omitted).

Rule 602, of course, provides that "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.  [Such evidence] may consist of the witness's own testimony." Fed. R. Evid. 602.  However, Rule 602 does *not* require the witness's personal knowledge to rise to the level of certainty to be admissible.  See Singer, 786 F.Supp. at 1167 (citing United States v. Reitano, 862 F.2d 982, 987 (2d Cir. 1988); United States v. Evans, 484 F.2d 1178, 1181 (2d Cir. 1973)).  "Testimony is admissible even though the witness is not positive about what he perceived,

---

[1]     This also includes witness testimony in the form of an inference.  See FRE 701, Advisory Committee Notes to the 2011 Amendments ("[A]ny 'inference' is covered by the broader term 'opinion.'  Courts have not made substantive decisions on the basis of any distinction between an opinion and an inference.").

provided the witness had an opportunity to observe and obtained some impressions based on his observations." Id. (citations omitted). Indeed, the Second Circuit has held that: "[p]ersonal knowledge of a fact 'is not an absolute' to Rule 602's foundational requirement, which 'may consist of what the witness thinks he knows from personal perception.'" United States v. Cuti, 720 F.3d 453, 458-59 (2d Cir. 2013) (citing Fed. R. Evid. 602 Advisory Comm. Note).

In Singer, for example, the Court permitted the testimony of a witness who only *believed*, without any recollection of the circumstances under which it happened, that he had disclosed a material fact to the defendant, because the totality of his statements indicated that he did actually have personal knowledge of that disclosure: "There is no question that [the witness] had an opportunity to observe the facts upon which he bases his testimony, insofar as those facts include his own behavior … and the observable interactions between himself and [the defendant] which formed the basis of their relationship." Singer, 786 F.Supp. at 1167. The Singer Court held that "[t]estimony can be admissible under Rule 602 even if the witness has only a broad general recollection of the subject matter." Id. (citations omitted).

"Notably, moreover, a witness's conclusion based on personal observations over time may constitute personal knowledge despite the witness's inability to recall the specific incidents upon which he based his conclusions." *Singer*, 786 F.Supp. at 1167. See also Disability Advocates, Inc. v. Paterson, 2008 WL 5378365, at *14 (E.D.N.Y., Dec. 22, 2008) ("Lay opinion testimony is also admissible when the inference is a conclusion drawn from a series of personal observations over time."). A witness's inability to provide the specific circumstances of a conversation or action does not render inadmissible that witness's

conclusion that the conversation or action did occur.[2]  The test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge.  New York ex rel. Spitzer v. Saint Francis Hosp., 94 F.Supp.2d 423, 425 (S.D.N.Y. 2000).

Argument

At this stage, the Court should not take the drastic step of precluding otherwise potentially admissible testimony based on the defenses' mischaracterization of it as "speculation … suspicion, rumor, [and] gossip."  Def. Mem. at 5, 9.  The defense's attempt to parse a witness's "beliefs and characterizations" from that witness's "personal knowledge" obtained through his or her "five senses" (Def. Mem. at 7) is a clear misreading of both the case law and the Rules of Evidence.  If a witness has formed an opinion, inference, belief or conclusion, drawn from a series of personal observations over time, the witness may be permitted to testify as to that.  This includes the witness's opinion concerning the meaning of statements made to that witness.  United States v. Tsekhanovich, 507 F.3d 127, 129 (2d Cir. 2007) (distinguishing United States v. Kaplan, 490 F.3d 110, based on length of relationship with defendant, and permitting testimony from witness that witness believed that the defendant "knew exactly what he was getting into."); United States v. Simels, 654 F.3d 161, 168 (2d Cir. 2011) (no error in permitting witness to give his opinion about what defendant's recorded statements meant).

---

[2]     As with relevancy, defects in recollection do not render testimony inadmissible as personal knowledge/opinion but rather, are factors for consideration by the jury.  Singer, 786 F.Supp. at 1168.

For the forgoing reasons, the defendants' pretrial motion to preclude trial witnesses from testifying as to their opinions, inferences, and beliefs should be denied in its entirety.

SECTIONS II & III
BURKE'S MISCONDUCT & OTHER PROSECUTORIAL CONDUCT

The defense moves to preclude evidence of (1) Burke's various acts of misconduct and (2) the defendant's other prosecutorial conduct, claiming the evidence is both irrelevant (FRE 401) and unfairly prejudicial (FRE 403). For the reasons set forth below, the Court should deny this request, as the proffered evidence is highly relevant, admissible, inextricably interwoven with the charged offenses, necessary to complete the story of the crimes on trial, integral to explain the actions of co-conspirators and goes directly to state of mind of several police officer witnesses.

Relevant Background

The evidence will prove that defendant Spota has been a close friend, ally, mentor and father figure to Burke for over 40 years. In 2001, after defendant Spota was elected District Attorney ("DA"), Spota selected then Police Officer Burke to work for him at the DA's office, supervising the detective investigators assigned to the DA's office. Spota made this selection fully aware of Burke's extensive internal affairs file. At that time, defendant McPartland was an Assistant District Attorney ("ADA") working for defendant Spota. Between 2002 and 2012, Burke and the defendants worked together on a daily basis and became the closest of friends.

Thereafter, in 2011, Burke sought the position of Chief of Department of the Suffolk County Police Department ("SCPD"). When news of Burke's potential elevation to Chief of Department became public, an anonymous letter was sent to the SCPD hiring

committee and others detailing Burke's Internal Affairs history and other problematic behaviors. Defendant Spota immediately and publically defended Burke by issuing a carefully crafted and lengthy letter refuting each and every allegation detailed in the anonymous letter. The evidence at trial will prove that defendant Spota's letter contained intentionally misleading and inaccurate information. Ultimately, Burke got the job as Chief of the Department due in no small part to defendant Spota's intervention.

Law

It is well-settled that where an indictment contains a conspiracy charge, "[a]n act that is alleged to have been done in furtherance of the alleged conspiracy" is considered "part of the very act charged." United States v. Diaz, 176 F.3d 52, 79 (2d Cir. 1999); see United States v. Thai, 29 F.3d 785, 812 (2d Cir. 1994) (in conspiracy cases, "uncharged acts may be admissible as direct evidence of the conspiracy itself"). The Second Circuit has recognized that "a conspiracy, by its very nature, is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel. United States v. Hawkins, 547 F.3d 66, 70 (2d Cir. 2008). Thus, as conspiracies are secretive in nature, the government is permitted to establish the existence of the conspiracy from the circumstances of the case and the conduct of the parties involved. Id. Simply put, in the context of conspiracy cases, actions often speak louder than words. See Modern Federal Jury Instructions, Instr. 19-4.

Evidence of uncharged criminal conduct or other bad acts is relevant and not considered "other crimes" evidence under Rule 404(b) if the uncharged conduct "arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete

the story of the crime on trial." United States v. Gonzalez, 110 F.3d 936, 941-42 (2d Cir. 1997). On this basis, "the trial court may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the Indictment. Background evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed." Id. at 941; see also United States v. Inserra, 34 F.3d 83, 89 (2d Cir. 1994) (evidence of other bad acts may be admitted "to provide the jury with the complete story of the crimes charged by demonstrating the context of certain events relevant to the charged offense").

Evidence of uncharged criminal conduct or other bad acts may be also be introduced to explain a witness's state of mind. United States v. Bellomo, 176 F.3d 580, 587 (2d Cir. 1999). However this type of evidence is not considered hearsay because the testimony goes to witness's state of mind not to the truth of any fact. Id.

Finally, to the extent that the defendants claim unfair prejudice in the introduction of such evidence, the Court may give a limiting instruction to the jury to alleviate such concerns. See United States v. Abu-Jihaad, 630 F.3d 102, 133 (2d Cir. 2010) (upholding a Rule 403 determination where the district court minimized the risk of unfair prejudice through limiting instructions); United States v. Mercado, 573 F.3d 138, 142 (2d Cir. 2009) (same).

Argument

The defense moves to preclude introduction of evidence of Burke's various acts of misconduct and the defendants other acts of prosecutorial conduct on relevance grounds and the alleged prejudicial effect the introduction of this evidence may have on the defendants.

While the defense magnanimously concedes that Burke's assault of Loeb, and the cover-up in which Burke participated, are relevant to the charges in this matter, the defense objects to the introduction of every other act of misconduct in which Burke engaged, including, but not limited to Burke's: (1) many relationships with women; (2) abuse of his official position to surveil girlfriends and enemies, and to run background checks on people for personal reasons; (3) retaliating against his enemies; (4) use of sexist and racist language; and (5) driving while under the influence of alcohol. Likewise, the defense objects to the introduction of examples of the defendants' politically motivated prosecutorial decision-making, including, but not limited to: (6) the "Babylon Five" prosecution; (7) the Steve Levy "investigation;" (8) the Robert Macedonio prosecution; (9) the "kidnapping" of witnesses; and (10) the selective enforcement of laws against enemies and in favor of friends.

First, the government does not intend to elicit testimony from witnesses regarding Burke's many relationships with women, his use of racist and sexist language and his general practice of driving while under the influence of alcohol (see 1, 4 and 5, *supra*).[3] However, to the extent that the defense inquires into these topics during the cross-examination of police witness co-conspirators (*e.g.*, asking witnesses if they have used racist and sexist language, driven under the influence of alcohol or cheated on their significant others), the government intends to redirect those witnesses on these topics, as the defense will have opened the door to such inquiry.

---

[3]     The government does intend to elicit evidence that both McPartland and Burke were driving under the influence of alcohol on December 31, 2011, if the Court permits the introduction of the car accident the government noticed as 404(b) evidence. Moreover, a witness is expected to testify that the night Burke's car was burglarized by Loeb, Burke drove home under the influence of alcohol and, as a result, failed to lock his vehicle.

Moreover, the government does not intend to offer evidence the following evidence to suggest that the defendants' pursued politically motivated prosecutions or used improper tactics: the "Babylon Five" prosecution, the Robert Macedonio prosecution or the "kidnapping" of witnesses (which was reported by many credible witnesses, including defense attorneys)(see 6, 8 and 9, *supra*).  However, the government reserves the right to elicit this evidence if, at trial, it becomes relevant to some fact at issue or to cross-examine the defendants on these topics if they choose to testify.

Nonetheless, the defendants' request for preclusion of evidence of Burke's abuse of his official position; Burke's acts of punishing of his enemies, done with the knowledge and assistance of the defendants; the Steve Levy investigation; and selective enforcement of laws in favor of friends and against enemies, should be denied (see 2, 3, 7 and 10, *supra*) as this evidence is highly relevant, admissible, inextricably interwoven with the charged offenses, necessary to complete the story of the crimes on trial and integral to both explain the actions of co-conspirators and to show the effect of these acts on their state of mind of various witnesses.

Retaliating Against Enemies

The government intends to introduce evidence that Burke took actions to hurt his "enemies," real and perceived, and that the defendants knew about this conduct, supported this conduct and on some occasions assisted in this conduct.  It is critical for the jury to know and understand that Burke was ruthless, vengeful and vindictive in his dealings with anyone who crossed him.  The evidence will show that that all police officer witnesses knew this and knew that Burke was not someone they could say "no" to without certain designation as an "enemy." Every police witness will testify that he knew how Burke dealt with his "enemies" and, as a result, was deeply afraid.  Moreover, these police witnesses will state in no uncertain terms that

they knew, by word and by deed, that Burke, Spota and McPartland marched in lockstep – meaning to cross one was to cross all - and to cross all was certain career suicide and potential investigation and prosecution. This knowledge will be offered to explain a critical question, namely; why some of the police witnesses participated in the vast cover-up of the assault. In other words, their fear of Burke and his relationship with Spota and McPartland is a large part of the motive to participate in the conspiracy. This testimony is inextricably interwoven with the charged offenses, necessary to complete the story of the crimes on trial and integral to explain the actions of co-conspirators. Moreover, this evidence will help establish the existence of the conspiracy and establish the nature of the relationship between Burke and the defendants, which is key to showing their membership in the conspiracy. To that end, there will be evidence elicited at trial that Burke had the following "enemies" and that he took action against them with the assistance of the defendants.

Steve Levy

Witnesses will testify that in 2011, Steve Levy, the former County Executive of Suffolk County, was targeted by Burke and the defendants because he was believed to be unfriendly to the police and uncontrollable by defendant Spota. A police officer co-conspirator will testify that together Burke, Spota and McPartland targeted Levy for prosecution

A witness will testify that, in the aftermath, Burke proudly bragged about this coup, often introducing defendant McPartland to police officers as "the man who killed Steve Levy."

Pat Cuff

The evidence will prove that Pat Cuff, the Police Lieutenant assigned to Internal Affairs who investigated Burke in 1993, was targeted by Burke in retaliation for Cuff's post-investigative findings that Burke consorting with Lowrita Rickenbacker, a known felon and prostitute, had sexual intercourse with her in his police car and failed to secure his weapon after Rickenbacker "took" Burke's car with his weapon inside and did not return. This prompted Burke to ask another police officer for assistance in retrieving the car, which they did.

Then, in 2005, Burke, with Spota and McPartland's assistance, took retaliation. Cuff's son was arrested in possession of Cuff's service weapon, which Cuff had failed to secure. While Cuff's son was initially charged by the arresting officers with a misdemeanor, at the arraignment, an ADA came to Court and advised that the charges were likely to be upgraded to a felony. At that time, defendant Spota was the District Attorney and defendant Chris McPartland was an Assistant District Attorney. Later that day, a police officer co-conspirator found Cuff in his office crying. The co-conspirator officer called Burke who to report what he observed. Burke gleefully bragged about how they "crushed" Cuff and then asked the officer to repeat the story to "Tommy," defendant Spota and "Chris," defendant McPartland. The witness repeated the story to Burke and the defendants who all laughed and agreed they had really "fucked Pat Cuff." Again, this event is in the forefront of many of the police witnesses'

minds when deciding whether or not to participate in the cover up. These acts are not crimes. They are not offered to show that the defendants are "bad people." These acts are offered to show why the police witnesses feared the defendants and made the choices they made.

The Cuff retaliation did not end there. In 2012, when Burke became Chief of Department, he immediately demoted Cuff as low as the law would allow to the rank of Captain, (at the time Cuff was a Chief but had some civil service protection). This act essentially ran Cuff out of the department. In a final act of retaliation, Burke requested that some "friendly" officers attend Cuff's retirement party so that "attendance" could be taken and retaliation could be taken against any Cuff sympathizers. Text messages from Burke ordering this taking of attendance will be offered in evidence.

<u>John Oliva</u>

Burke also considered John Oliva an "enemy," and was "dealt" with by Burke with the assistance of the defendants. <u>See</u> section IV of this brief, *infra*. The evidence will prove that in 2013, it was determined that Oliva was leaking information to Newsday, thus, Burke asked McPartland for help in "fucking Oliva." The Oliva wire-tap ensued and was treated as a fact-finding tool for Burke and the defendants. Many of the police witnesses who will testify perceived the investigation and prosecution of Oliva to be a warning to all police officers – if you cross Burke, you cross the defendants and there will be consequences. The clearest evidence of the relevance and truth of this belief is defendant McPartland's threat to his co-conspirator – keep your mouth shut – remember what happened to John Oliva.

<u>Abuse of Official Position for Personal Reasons and The Selective</u>
<u>Enforcement of Laws Against Enemies and in Favor of Friends</u>

Both Burke's abuse of his official position by utilizing police resources to deal with personal problems and the defendants' selective enforcement of laws against enemies and in favor of friends is relevant, admissible, inextricably interwoven with the charged offenses, necessary to complete the story of the crimes on trial and integral to explain the actions of co-conspirators and their state of mind.

One of the main police officer co-conspirators will testify that Burke's willingness and ability to utilize police department resources to aid in his own personal agendas made him very powerful and, thus, someone to be feared if you were a perceived enemy. Burke's action in having a GPS tracking device surreptitiously placed on a police officer's automobile, and the use of police resources to investigate perceived rivals for his girlfriend affection and to investigate contractors with whom she was having issues are all part of how Burke operated, and it deeply affected the people with whom he surrounded himself. This evidence is relevant not only to explain why the co-conspirators willingly helped Burke cover up the assault; it goes directly to their state of mind, which is crucial for the jury to understand. How Burke operated is inextricably interwoven with the charged offenses and necessary to complete the story of the crimes on trial. If they jury does not learn about the pervasive atmosphere of fear and dread that surrounded Burke and his actions, they will not understand why everyone went to such great lengths to "protect Jimmy."

Several of the co-conspirator police witnesses will testify that they knew and understood that the defendants and Burke selectively enforced laws to help their friends and

punish their enemies. The witnesses will testify that, as powerful as Burke was as Chief of the Police Department, he was infinitely more powerful with the backing of the defendants. For example, one of the police witnesses, who was part of the inner-circle of Burke and the defendants, will testify that Cuff's son was treated one way (threatened with a felony) because Cuff was an "enemy," while if one of Burke's "people" had a son in the same situation, the case would have been dropped. That evidence will prove that this is exactly how powerful Burke was with the support of the defendants and how this affected the state of mind of the co-conspirators.

While the evidence the government intends to offer is clearly relevant, the defendants complain that it is overly prejudicial. The evidence is much more probative than prejudicial, and thus, any prejudice may be ameliorated with an appropriate limiting instruction. Also, much of this evidence casts Burke in a negative light, and, as the defendants have indicated that they intend to distance themselves from Burke at the trial (the defense is that Burked lied to them about the assault), the evidence is not prejudicial at all.

In sum, the defendants' request for preclusion of evidence of Burke's abuse of his official position; Burke's acts of punishing of his enemies, done with the knowledge and assistance of the defendants; the Steve Levy investigation; and selective enforcement of laws in favor of friends and against enemies, should be denied, as this evidence is highly relevant, admissible, inextricably interwoven with the charged offenses, necessary to complete the story of the crimes on trial and integral to both explain the actions of co-conspirators and to show the effect of these acts on their state of mind. The government is required to prove beyond a reasonable doubt that a conspiracy existed between the defendants and James Burke. This

evidence is essential to establishing the nature of their relationship, which is key to showing their membership in the conspiracy.

SECTION IV
THE OLIVA INVESTIGATION

The evidence the government seeks to offer related to the investigation and wire-tap of John Oliva (the "Oliva Investigation") is clearly relevant and admissible. As set forth below, the evidence related to the Oliva Investigation does not constitute "other acts evidence" within the meaning of Federal rule of Evidence 404(b). Even if considered as other acts evidence under 404(b), the evidence of the Oliva Investigation is nonetheless admissible.

Further, as the government has previously indicated, it will not seek to offer evidence of the clear failures to properly minimize calls during the wire, nor will the government seek to illicit evidence that that wire-tap itself was illegal. Instead, it will seek to offer evidence that: the defendants knew Oliva to be an enemy of James Burke, the defendants were more personally involved in the Oliva Investigation than normal investigations, investigators believed that the investigation was unnecessary and expressed the same to the defendants, defendant Spota expressed a desire to investigate a member of the news media who was publishing articles unfavorable to Burke, defendant McPartland referenced what happened to John Oliva as an example of what happened to people who crossed the defendants and Burke, and members of the SCPD perceived the investigation of Oliva as an example of how the defendants treated enemies of Burke. See Government's 404b Motion, filed October 18, 2019.

Relevant Background

In their opposition to this evidence, the defendants recount a version of the events that belie the truth of the investigation. From the outset, it is uncontested that John Oliva broke

16

the law. That is not at issue. However, the evidence the government seeks to admit relates to the manner in which the investigation of John Oliva was conducted, how it differed from other prosecutions conducted by the SCDAO, and the reasons why it was conducted differently. This evidence all relates to the defendants' perception of Oliva as an enemy of the defendants' close friend and co-conspirator, James Burke. Indeed, witnesses will testify that Burke used the phrase "we need to kill this guy" [4] in reference to John Oliva. Notably, Burke used this same phrase when introducing defendant McPartland, referring to him as "the guy who killed Steve Levy."

The Oliva Investigation began in January 2014, as soon as the defendants and Burke believed the federal investigation of Burke's assault of Loeb was completed. In early January 2014, Burke was informed that Oliva was identified as the source of leaks to Newsday per a departmental audit. When provided with this information, Burke told his right hand man, Chief of Detectives William Madigan, lets "Fuck Oliva" and that they needed to "go up" [5] on Oliva's phone in order to identify Oliva's alleged co-conspirators, ad to reach out to defendant McPartland who could get up on Oliva's phone. Shortly thereafter, a meeting occurred which was attended by defendant Spota, defendant McPartland, several members of the SCDAO, Madigan, and other members of the SCPD, including Charles Lohmann, John Cahill and David Tricamo. Burke attended the meeting via teleconference. During this meeting, while discussing obtaining a wire-tap of Oliva's phone, defendant Spota proposed that they investigate Newsday

---

[4]     Witnesses will explain that "killing a guy," did not mean literally killing him, but ruining his career.

[5]     To "go up" on a phone is shorthand term for wire-tapping a telephone.

reporter Tania Lopez, rather than Oliva. Spota was described by a member of the SCPD in attendance as leading the charge in inflating the severity of Oliva's conduct. Finally, William Madigan provided a list of names of individuals whose call records should be analyzed which coincidently included people who were widely known to be enemies of James Burke and were unrelated to the leak investigation.

Thereafter, during the course of the investigation, defendant McPartland told wire-tap monitors to focus on any calls involving the individuals referenced by Madigan at the January 2014 meeting. A new wire room was established to monitor the Oliva wire-tap and the defendants chose to establish this room directly across from the office of defendant McPartland, a location that had never before been used to monitor a wire-tap. Additionally, during the wire-tap of Oliva's phone, defendant Spota personally listened to calls in the wire room wile the interception of calls was occurring. According to a member of the SCDAO who participated in wire-tap investigations at the SCDAO for over a decade, Spota had never done this before. Furthermore, during the wire-tap, defendant McPartland would call James Burke from the wire room and discuss the content of calls with him, another unusual occurrence. Following the completion of the wire-tap investigation; defendant McPartland specifically referenced the Oliva Investigation as an example of the consequences of crossing the defendants and Burke.

The Oliva Investigation is yet another instance of McPartland and Spota helping to protect Burke and advancing Burke's career. At trial, the jury will hear of other such instances, including, but not limited to; in 2002, Spota vouched for Burke in order to have Burke appointed as the commanding officer of the DA's Squad, which worked closely with the SCDAO; in 2011, when concerns were raised about Burke becoming Chief of Department for the SCPD, Spota again vouched for Burke (see Sections II & III, *supra*); in December 2011,

when Burke crashed into McPartland's county-owned vehicle, McPartland intentionally failed to report the accident to protect Burke; and in 2014, when faced with a barrage of negative Newsday articles about Burke, McPartland helped to craft a response to Newsday on Burke's behalf, urging Newsday not to publish a certain article or credit certain sources.

<u>Argument</u>

The evidence of the Oliva Investigation is clearly admissible as direct evidence of the charged conspiracy. The defendants' protestations to the contrary begin by asserting that it is not direct evidence of the conspiracy nor is it inextricably interwoven with the crimes on trial, however, these claims are belied by the facts and common sense. The defendants claim that because the Oliva Investigation took place in 2014, it could not possibly be interwoven with federal investigations of James Burke occurring in 2013 and 2015, which they are alleged to have obstructed. This is simply untrue.

At no time did the conspiracy to protect Burke and obstruct the federal investigation cease, indeed, at any moment, individuals with knowledge of Burke's assault of Loeb could have elected to come forward with information implicating Burke. "An act that is alleged to have been done in furtherance of the alleged conspiracy, however, is not an 'other' act within the meaning of Rule 404(b); rather, it is part of the very act charged." <u>United States v. Concepcion</u>, 983 F.2d 369, 392 (2d Cir. 1992), *cert denied*, 510 U.S. 856 (1993) (internal citations omitted). In <u>Concepcion</u>, the trial court admitted testimony by a witness that the defendant had offered to murder a rival of the witness (unrelated to the murder on trial) in order to demonstrate membership in a conspiracy and as evidence of the lengths to which the defendant would go to protect the criminal organization. In that instance, the Second Circuit upheld the admission of such testimony finding that it "was admissible to prove material facts

other than [the defendant]'s propensity to commit a crime and hence was not other-act evidence within the meaning of Rule 404(b)." Id. Similarly, the evidence of the Oliva Investigation is direct evidence of the conspiracy and is not subject to 404(b) scrutiny. The Oliva Investigation explains the relationship of the co-conspirators, *i.e.* Spota and McPartland undertaking a wire-tap of Burke's enemy at Burke's behest and the lengths they will go to assist Burke. Further, the Oliva Investigation was used as a tool of the conspiracy when defendant McPartland later employed it as an overt threat to ensure witnesses against Burke maintained their silence.

Again, even through the prism of FRE 404(b), the evidence of the Oliva Investigation is clearly admissible. As set forth in the government's original 404(b) motion related to the Oliva Investigation, the Second Circuit follows an inclusionary rule, "allowing the admission of such evidence for any purpose other than to show a defendant's criminal propensity, as long as the evidence is relevant and satisfies the probative-prejudice balancing test of Rule 403 of the Federal Rules of Evidence." United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000) (citing United States v. Inserra, 34 F.3d 83, 89 (2d Cir. 1994)); see also, United States v. Mickens, 926 F.2d 1323, 1328 (2d Cir. 1991). A district court has wide discretion in making this determination. United States v. Inserra, 34 F.3d at 89.

Here, the government is not seeking to offer evidence of the Oliva Investigation to prove criminal propensity. Instead, the government is offering evidence of the Oliva Investigation to; provide context and background to the conspiracy and offenses on trial, *i.e.* that witnesses in 2015 were afraid of the consequences of speaking against Burke; explain the depth of the relationship between the co-conspirators, *i.e.* that the defendants showed a greater interest in investigation of Burke's enemy than any other investigation; and to demonstrate the intentions of the defendants during the course of the conspiracy, *i.e.* to provide assistance and

protection to Burke when he requests it. All of these non-propensity purposes are valid bases

for the admission of evidence under FRE 404(b). See United States v. Pipola, 83 F.3d 556, 566

(2d Cir. 1996) (holding no error to admit evidence of uncharged crimes to establish background,

complete the story of the charged crimes and enable the jury to understand the relationship of

the co-conspirators); United States v. Curley, 639 F.3d 50, 57 (2d Cir. 2011) (stating that a

district court may admit evidence that serves a non-propensity purpose including state of

mind/intent of defendant and fear of a witness) (citing United States v. Edwards, 342 F.3d 168,

176, 180 (2d Cir. 2003). Critically, evidence of prior bad acts may even be admitted, pursuant

to 404(b) to establish the state of mind of someone other than a defendant. See United States

v. Curley, 639 F.3d at 58-59.

   While the defendants allege that there are several reasons that evidence of the

Oliva Investigation is unfairly prejudicial, not one of those reasons is valid in the context of this

case. As a starting point for this inquiry, the Second Circuit has stated repeatedly that Rule 403

favors the admission of evidence where the other act evidence "did not involve conduct more

serious that the charged crime[s]." United States v. Williams, 205 F.3d 23, 33-34 (2d Cir. 2000).

The defendants claim that Oliva Investigation's use of a wire-tap is inherently inflammatory

and therefore unduly prejudicial. The legal authority upon which the defense relies for this

assertion is an out of context quote of two words from dissenting opinion in a 1928 decision in

which wire-tapping was referred to as a "dirty business." This misses the point. The

government's evidence is not evidence gleaned from the wire-tap itself, but instead all of the

circumstances surrounding the Oliva Investigation, including the decision to seek a wire-tap

and the circumstances surrounding the monitoring of the wire-tap.[6]  Whatever slight prejudice may attach to this evidence from the societal perceptions of a wire-tap, as cited by the defendants, does not substantially outweigh the tremendous probative value of the evidence.  A limiting instruction in which the Court advises the jury that the wire-tap was judicially authorized should assuage any such concerns.

Similarly, the defendants' claims that the evidence of the Oliva Investigation will result in a waste of time and juror confusion is unavailing.    Contrary to the defendants' contentions, the evidence is not overly complex, nor will it "blur the lines of lawful and unlawful conduct."   Def. Mot. at 34. The evidence is simple and straightforward.   It will comprise of the testimony of witnesses, who will also be testifying about other topics.   They will offer testimony concerning what the defendants said and did during the course of the Oliva Investigation and the way the Oliva Investigation was used as a tool to further the goals of the conspiracy.   There is no need for the jury to delve into issues of whether or not the wire-tap was lawful or not, as the government is not going to suggest the investigation was illegal. Instead, the jury can simply evaluate the defendants' actions to aid Burke during a lawful investigation. Likewise, the defendants' concerns regarding defendant Spota's desire to investigate Tania Lopez is not overly complex.   Indeed, the evidence is very straightforward.   Witnesses will testify that Spota proposed the investigation of a member of the media who was publishing articles that were derogatory towards Burke, however, members of the SCDAO told him he could not legally do so.   This evidence reveals the core of the defendants' relationship with

---

[6]       Again, the government will not seek to illicit testimony or imply to the jury that the wire-tap was illegally obtained or monitored.

James Burke, which is critical to explaining why two prosecutors charged with upholding the law would conspire with Burke to obstruct justice.

A jury will easily be able to understand the simple, straightforward purposes of the evidence of the Oliva Investigation, which at its core demonstrates that when someone crosses James Burke, he crosses the defendants. When Burke wanted enemies investigated, the defendants agreed and took a much greater interest in those cases than they did in the average case in which Burke was not involved.

In sum, the evidence of the Oliva Investigation is direct evidence of the nature of the charged conspiracy, the relationship of the co-conspirators, and the defendants' intentions to aid Burke to take down his enemies. While the government submits this is not other acts evidence, an analysis of 404(b) reveals that this evidence is likewise admissible as other act evidence in any event.

<u>Disqualification of AUSA Boeckmann</u>

Next, the defendants seek to disqualify Assistant United States Attorney ("AUSA") Nicole Boeckmann from serving as a member of the trial team in the event the Court allows evidence of the Oliva Investigation at trial. This motion is utterly without merit and completely disingenuous.

The defendants claim that they may call AUSA Boeckmann as a witness, yet they do not point to any facts about which she would testify germane to the issues at trial. They claim that AUSA Boeckmann is in possession of "vital information," yet they do not state what that information is. Indeed, the defense merely provides a general allegation that AUSA Boeckmann would be a key rebuttal witness because "Mr. McPartland sought to involve the

EDNY (and Ms. Boeckmann in particular) in various aspects of the Oliva Investigation." Def. Mem. at 37. However, this claim is logically flawed and demonstrably baseless.

Here, AUSA Boeckmann's involvement in the Oliva Investigation was limited to attendance at one meeting in June of 2014, also attended by three members of the SCDAO (the defendants and Emily Constant[7]), three members of the United States Attorney's Office for the Eastern District of New York ("USAO-EDNY"), as well as one member of the Federal Bureau of Investigation ("FBI"). The meeting was arranged by defendant Spota with then U.S. Attorney Loretta Lynch for the purpose of informing the USAO-EDNY about information gleaned from the Oliva wire-tap. Following the meeting, defendant McPartland exchanged emails with AUSA Boeckmann to arrange for FBI presence at the takedown of Oliva.[8] From those facts, the defendants conclude that because defendant McPartland sought to involve the USAO-EDNY in the Oliva Investigation in June of 2014, almost five months into the investigation and two and a half months into the wire-tap, that everything done by the defendants and the SCDAO during the Oliva Investigation was known and approved by the USAO-EDNY, including AUSA Boeckmann. They then claim they may call AUSA Boeckmann to confirm this. However, they offer no factual basis to allow the Court to reach this conclusion. Indeed, following the June 2014 meeting, attended by various other individuals in addition to the defendants and AUSA Boeckmann, the USAO-EDNY declined to take over

_____

[7]     Constant is on the witness list and will be testifying at the trial.

[8]     AUSA Boeckmann also attended a 2012 meeting between then Chief of Department James Burke and other members of the SCPD and USAO-EDNY regarding the removal of SCPD officers from the Federal Bureau of Investigation, Long Island Gang Task Force. This meeting was also attended by several members of the USAO-EDNY, FBI and SCPD.

the investigation of Oliva, as the defendants requested at the meeting, evidencing the truth - that nothing was approved of or know by the USAO-EDNY.

In support of this argument, the defendants rely almost exclusively on a Ninth Circuit perjury case in which the trial prosecutor was also the prosecutor who cross-examined the defendant in the grand jury and the subject of that grand jury testimony was the basis of the trial convictions for perjury. Def. Mem. at 36-38, repeatedly citing to <u>United States v. Prantil</u>, 764 F.2d 548 (9th Cir. 1985). The instant situation is factually inapposite and far removed from the facts of <u>Prantil</u>. Indeed, AUSA Boeckmann was not a witness to any direct evidence of the charged crimes, nor does the defense allege that. Further, AUSA Boeckmann was not directly involved in any of the events that would be discussed at trial in connection with the Oliva Investigation evidence. At most, AUSA Boeckmann was one of several individuals at meeting that disclosed some information obtained from the wire-tap. Neither that meeting, nor the subsequent email exchanges are of any moment as they speak for themselves and do not approach any issues relevant at trial.

Likewise, the defendants have failed to demonstrate a "compelling and legitimate reason" to call AUSA Boeckmann as a witness at trial, as is required in the Second Circuit. <u>United States v. Regan</u>, 103 F.3d 1072, 1083 (2d Cir. 1997). At trial, the defendants are free to call any other attendee of the meeting to discuss what transpired. <u>Id</u>.; <u>see also</u>, <u>United States v. Regan</u>, 897 F.Supp. 748, 758 (S.D.N.Y. 1995) (holding no compelling need exists to call prosecutor when other witness are available to testify to the same matters in question). Further, it is well settled that disqualification of an attorney is "a drastic remedy to the unsworn witness problem." <u>United States v. Locascio</u>, 6 F.3d 924, 934 (2d Cir. 1993). Indeed, the mere fact that an AUSA may be present for statements made by a defendant which are subsequently

discussed at trial is not a basis for disqualification nor does it make the attorney an unsworn witness. See United States v. Regan, 103 F.3d at 1083; see also, United States v. Bin Laden, 2001 WL 30061 at *10 (Jan 2, 2001 S.D.N.Y.) and United States v. Sanchez, 2004 WL 315266 at *2, (Feb 18, 2004 S.D.N.Y.). Here, the government does not anticipate in any way eliciting the statements made by defendant McPartland to AUSA Boeckmann, thus, there is no risk that AUSA Boeckmann will act as an "unsworn witness." Therefore, the defendants' motion to disqualify AUSA Boeckmann should be denied.

SECTION V
DETAILS OF LOEB'S THEFT AND ASSAULT

The defendants' next move the Court to exclude what they describe as "salacious details" of Christopher Loeb's theft from James Burke and the assault he suffered at the hands of Burke and others. The defendants' seek to exclude these "salacious details" under Federal Rules of Evidence 401, 402 and 403. As set forth below, the defendants' motion should be denied as the evidence the government seeks to offer at trial is highly relevant to the crimes charged and further creates no risk of unfair prejudice to either of the defendants.

Relevant Background

At trial, in connection with Count Four of the indictment, which charges the defendants with being accessories after the fact to James Burke's assault of Christopher Loeb, in violation of 18 U.S.C. § 3, the government must prove that James Burke actually deprived Christopher Loeb of a civil right under 18 U.S.C. § 242. Because the government must prove beyond a reasonable doubt that the deprivation of civil rights occurred, the government at trial intends to offer evidence that will establish James Burke's motive to commit the civil rights violation as well as evidence of the actions of Burke and others in violating Loeb's civil rights,

*i.e.* assaulting and threatening him while in police custody. The evidence of Burke's motive to commit the assault will included the embarrassing nature of the items that Loeb stole from Burke's police vehicle, which included dildos and Viagra. At trial, witnesses will also testify that there was a pornographic DVD[9] located in Loeb's room (which Loeb removed from Burke's bag). Further, witnesses will testify that Burke arrived at the Loeb residence prior to the assault and took his personal items from the scene prior to going to the 4th Precinct to confront, and ultimately, assaulting Loeb.[10] Once inside the 4th Precinct, Burke, along with detectives of the Criminal Intelligence Unit, assaulted Loeb, by striking him, threatening him[11] and urinating in a beverage that was provided to Loeb. Witnesses will explain that while Burke was inside the interrogation room with Loeb, Loeb taunted Burke about the pornography and sex toys calling Burke a "pervert." It was this remark that sent Burke into a rage. He responded by assaulting and threatening Loeb. It is impossible for the jury to understand the full nature of the assault if reference to these items is precluded, as they are what prompted the assault.

---

[9]     The DVD contained adult pornography, and there is nothing inherently criminal or inflammatory about adult pornography. Indeed, the cases cited by defendants' on this point deal with the pornographic videos of charged defendants and which videos did not relate to the substance or conduct of the offenses charged. Here, the DVD is not alleged to belong to the defendants and indeed is highly relevant, as Loeb taunted Burke about it creating motive for the assault, which is charged conduct the government must prove.

[10]     Notably, Burke did not wait around at the Loeb residence to see if his gun belt, which contained handcuffs and ammunition, were located. Once he retrieved the duffel bag that contained the sex toys, he left.

[11]     The cases cited by the defendants in an effort to exclude the threats made to Loeb miss the mark as each case deals with threats made by a charged defendant that were unrelated to the charges at trial. Here, the threats were not made by the defendants and are part of the criminal conduct that government must prove, *i.e.* the violation of Loeb's civil rights.

Moreover, in the wake of Burke's assault on Loeb, rumors began to circulate within the SCPD and the news media about the assault and the items stolen from Burke. A witness involved in the search of Loeb's residence will explain that in light of the personal nature of the items found in the bag, specifically, the two dildos, the witness was concerned about retribution from Burke if he disclosed what he had found. As such, the witness failed to disclose to the special prosecutor and federal investigators, that he found these items within the duffel bag. Further, the evidence at trial will show that the motivation for the cover up was to protect Burke, not only from criminal prosecution, but also from embarrassment. If Burke was publicly humiliated, so was defendant Spota. Defendant Spota was an elected official who repeatedly publicly endorsed Burke and was directly responsible for several of his promotions within the police department. Accordingly, this evidence establishes a motive for the defendants to conspire to conceal every aspect of this assault, including that Burke possessed pornography and dildos.

Law

Contrary to the defendants' contentions, the evidence that the government seeks to offer is clearly relevant under Federal Rule of Evidence 401, which provides: "Evidence is relevant if: (a) it has a tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." The Second Circuit has repeatedly pointed out that the threshold for evidence to be deemed relevant is "very low." United States v. White, 692 F.3d 235, 246 (2012) (quoting United States v. Al-Moayad, 545 F.3d 139, 176 (2d Cir. 2008). "To be relevant, evidence need not be sufficient by itself to prove a fact in issue, much less to prove it beyond a reasonable doubt." United States v. Abu-Jihaad, 630 F.3d 102, 132 (2d Cir. 2010), *cert denied*, 564 U.S. 1040 (2011).

<u>Argument</u>

The evidence that government will offer at trial regarding the items stolen from Burke are clearly relevant as they provide Burke's motive for assaulting Loeb as well as served to explain why a member of the SCPD did not volunteer all he knew to federal authorities when interviewed. Next, the details of the assault itself are highly relevant as they are direct evidence of an element of a charge that the government must prove beyond a reasonable doubt, *i.e.* Burke's violation of Loeb's civil rights.

Further, the details of the assault and the items stolen from Burke are extremely relevant as they became the subject of reporting by several news agencies, including by Newsday reporter Tania Lopez. This reporting prompted the defendants to take actions to defend Burke and investigate Lopez during the time of the charged conspiracy to obstruct justice. The evidence at trial will show that defendant McPartland assisted in drafting correspondence to Newsday seeking to prevent the publication of an article by Lopez about Burke's actions regarding Loeb. Further, evidence at trial will show that defendant Spota expressed a desire to wire-tap Lopez, who reported regularly about Burke and the allegations against him. Clearly, the contents of Lopez's reporting, which is generally consistent with the details of the assault and the items stolen from Burke, is highly relevant.

Turning to the probative value of the evidence, FRE 403 authorizes the exclusion of relevant evidence when its "probative value is substantially outweighed by the danger of …unfair prejudice[.]" Here, the probative value of the evidence of Burke and other's assaultive conduct is overwhelming as it is direct evidence of an element of a crime that the government must prove beyond a reasonable doubt. Similarly, the evidence of the items stolen from Burke is incredibly probative as it serves to establish Burke's motive to violate Loeb's civil rights. In

addition, as outlined above, the media reporting of allegations of the assaultive conducts and the items stolen from Burke prompted the defendants to participate in actions directed at protecting Burke and targeting the reporter of the information for prosecution. This evidence is highly probative of the defendants' state of mind and intent during the time of the charged conspiracy.

The challenged evidence creates no danger of unfair prejudice to either defendant. While the evidence of the assaultive conduct lays bare the criminal conduct of Burke and the evidence of the items stolen exposes potentially embarrassing aspects of Burke's personal life, it in no way impugns the character of either of the defendants. The defendants merely make a conclusory claim that the evidence "could have a wildly prejudicial effect on the jury." Def. Mem. at 41. The defendants summarily speculate that James Burke's criminal conduct and personal items could cause "wild" prejudice. The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from the proof of the specific offense charged." Old Chief v. United States, 519 U.S. 172, 180 (1997). It defies logic to say that because Christopher Loeb stole James Burke's dildos or because a SCPD detective urinated in Loeb's drink, a jury would be so inflamed that that would wrongfully convict the defendants. It may paint Burke in a bad light, but in no way would prejudice a jury against defendant McPartland or defendant Spota.

Here, there is virtually no risk of unfair prejudice as the assault and items stolen do not impute any negative act or character trait to the defendants' themselves. However, the evidence has overwhelming probative value as it provides the motive for Burke's actions, the details of the charged civil rights violation and provides context and background for certain

actions taken by the defendants during the course of the conspiracy. It also serves to explain the actions of several witnesses. Most importantly, it demonstrates the specific information that the defendants' obstructive acts prevented from being communicated to investigators, *i.e.* the details of the assault. Clearly, the probative value of the challenged evidence substantially outweighs the slight, if any, risk of prejudice.

Finally, the defendants claim, in their motion, that they do "not intend to dispute" that Burke assaulted Loeb at trial. While falling well short of a stipulation, this claim is insufficient to affect the probative value of the evidence the government seeks to offer at trial. The Supreme Court has stated, unequivocally, that stipulations are not the same as the evidence of what happened, stating, "[a] convincing tale can be told with economy, but when economy becomes a break in the natural sequence of narrative evidence, an assurance that the missing link is there is never more than second best." Old Chief, 519 U.S. at 189.

Therefore, because the evidence of the assault and the theft by Loeb has no unfair prejudicial effect, and because its probative value is extremely high, the defendants' motion to exclude such evidence should be denied.

SECTION VI
EVIDENCE OF BEHAVIOR OF DEFENSE LAWYERS
AND UNION PAYMENTS TO DEFENSE LAWYERS

The defendants also seek to preclude the government from introducing any evidence concerning certain aspects of the acquisition of legal representation by SCPD detectives who had involvement or possible exposure in the Loeb assault, including: (1) the recommendation of specific attorneys by Burke's then-counsel, Joseph Conway; (2) the sharing of information between and among those attorneys; and (3) the terms under which the Police Benevolent Association ("PBA") and the Suffolk Detectives Association ("SDA") agreed to

pay these legal fees. This evidence is directly relevant to, and part and parcel of, the narrative of the obstruction charge contained in Count Three of the Indictment, and cannot legally be precluded.

Law

Direct evidence of the crimes charged in the indictment is considered relevant and admissible, without reference to FRE 404(b). United States v. Kahale, 789 F.Supp.2d 359, 381-82 (E.D.N.Y. 2009) (citing United States v. Towne, 870 F.2d 880, 886 (2d Cir.1989), cert. denied, 490 U.S. 1101 (1989)). "To be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency." United States v. Williams, 585 F.3d 703, 707 (2d Cir. 2009) (internal citation omitted). "Thus, evidence is often admissible to provide background for the events alleged in the indictment or to enable the jury to understand the complete story of the crimes charged." Id. at 707-08 (noting that "the prosecution is entitled to present a complete narrative of the crime that 'satisf[ies] jurors' expectations about what proper proof should be'") (quoting Old Chief v. United States, 519 U.S. 172, 188-89 (1997)). Evidence of uncharged criminal activity is relevant and admissible under FRE 402, without any reference to FRE 404(b) "if [the evidence] arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." Towne, 870 F.2d at 886 (internal citations and quotations omitted).

Argument

As a threshold matter, much of the evidence discussed herein is not unlawful – it is simply factual background. For example, as the government has previously noted, the

government intends to elicit testimony from Joseph Conway, then-counsel to the defendants' primary co-conspirator, James Burke, concerning, among other things, the process by which counsel was selected for each of the SCPD detectives who had possible exposure with respect to the Loeb assault. In doing so, the government is not suggesting in any way that Mr. Conway's actions were illegal or improper. Rather, this is simply part of the narrative of the case. Mr. Conway is expected to testify, in substance and in part, that, following his retention as counsel for Burke, the PBA and SDA requested from him a list of attorneys with federal practice experience, who would then be assigned to represent each of the detectives. Mr. Conway is further expected to testify that he compiled and provided this list, and that those counsel were thereafter assigned as expected. Additionally, Mr. Conway is expected to testify that, in connection with his vigorous representation of his client (Burke), and in consultation with Burke, he regularly reached out to each of these counsel (all of whom he had known well, from previous legal engagements), to engage them in a possible joint defense arrangement, and, most importantly, to attempt to obtain information from each of them with respect to whether or not their respective client intended to cooperate with the federal investigation – information which Mr. Conway then passed along to his client, Burke. This testimony is useful background, because it provides context and corroboration for conversations between Burke and others on this topic, discussed further below, which will be elicited from other witnesses.

Similarly, the government intends to elicit testimony with respect to actions and positions taken by the PBA and SDA unions which are not unlawful, but which are necessary to complete the narrative. Such testimony will include, for example, the fact that the detectives were called to general meetings during which it was made clear to them that, if they were to admit to any liability with respect to the Loeb matter, the union would no longer pay their legal

fees.  Additionally, the testimony on this topic would include the fact that the SCPD detectives were debriefed by members of the union concerning not only the Loeb incident itself, but also what they had said to the FBI and/or the federal prosecutors about the incident.  This evidence helps to complete the narrative of events and provide context to the anticipated trial testimony of the detectives.

Most importantly, this evidence, while being presented objectively through some witnesses (such as through Mr. Conway) corroborates, explains and informs the actions of other witnesses, such as the SCPD detectives.  Specifically, these witnesses are expected to testify not only about the facts and circumstances of the meetings they had with the SDA/PBA, but also about their understanding of the import of those meetings and what was told to them, and how that, in turn, impacted their behavior, including their decisions to keep quiet about the truth of the Loeb incident; and about who would be informed if they did not do so.  Some of these witnesses will also testify about conversations they had directly with Burke, during which Burke represented that his attorney, Mr. Conway, was controlling the other attorney appointments, and making sure that each of the appointed counsel funneled him information about what their respective clients were saying.  These witnesses are expected to testify about how these interactions affected their decisions and actions.

As previously noted, a lay witness's relevant fact testimony is admissible so long as "evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."  FRE 602.  Here, these detectives have personal knowledge of the statements of Burke and of certain members of the SDA and PBA, because they participated in the conversations and meetings about which they are expected to testify.  See <u>United States v. Skelly</u>, 442 F.3d 94, 100 (2d Cir. 2006) (upholding admission of witness's testimony regarding

meaning of conversations where witnesses "had first-hand knowledge of the conversations").

Under Evidence Rule 701, opinion testimony of a lay witness is admissible when it is "(a) rationally based on the witness's perception; [and] (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue."  The detectives' testimony with respect to their understanding about how attorneys were recommended, how information was shared among attorneys, and the terms under which the unions would foot the bill for their attorneys is all rationally based on their meetings and conversations with the leaders of the SDA and PBA and, in some instances, with Burke, and will be helpful to clearly understand their testimony concerning the pressure that they felt from the top down, which forced them, at least temporarily, into silence.  See United States v. Aiello, 864 F.2d 257, 265 (2d Cir. 1988) (upholding admission of lay opinion testimony that clarified "ambiguous references to events that [were] clear only to the conversants" (alteration omitted)).

The government is not, as the defense suggests, asking the jury to "understand and resolve…complex areas of the law and legal practice."  Def. Mem at 48.  Rather, the government is simply presenting relevant testimony as part of the narrative of the case.

SECTION VII
EVIDENCE CONCERNING ALCOHOL CONSUMPTION

The defendants next move the Court to exclude evidence of "the defendants' alcohol consumption" pursuant to Federal Rules of Evidence 401 and 403.  The relief sought by the defendants is vague and overbroad as the defendants do not specify what is meant by the phrase "alcohol consumption."  At trial, the government does not intend to offer evidence that the defendants regularly consumed excessive quantities of alcohol nor will the government seek, in its case in chief, to elicit testimony that the defendants were "alcoholics" or "heavy

drinkers" or details of the quantities of alcohol consumed by the defendants. However, at trial the government will offer evidence and testimony explaining that the defendants regularly associated with one another, as well as others, including co-conspirator James Burke, in social settings. These social settings in which the defendants associated frequently included bars and restaurants where people drank together. These social settings frequently served as the locale for meetings amongst the defendants, co-conspirators and/or witnesses at bars and restaurants. Indeed, numerous witnesses will testify that the defendants and Burke frequently met for drinks at a bar called Butterfields in Hauppauge, New York. Such evidence should not be precluded, as it is clearly relevant and probative and is in no way unfairly prejudicial.

Law

As outlined above, Federal Rule of Evidence 401 provides the test for determining if evidence is relevant. Rule 401 provides in relevant part that: "Evidence is relevant if: (a) it has a tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." The Second Circuit has repeatedly pointed out that the threshold for evidence to be deemed relevant is "very low." United States v. White, 692 F.3d 235, 246 (2012) (quoting United States v. Al-Moayad, 545 F.3d 139, 176 (2d Cir. 2008). "To be relevant, evidence need not be sufficient by itself to prove a fact in issue, much less to prove it beyond a reasonable doubt." United States v. Abu-Jihaad, 630 F.3d 102, 132 (2d Cir. 2010), cert denied, 564 U.S. 1040 (2011). To pass the threshold inquiry of relevance, evidence need not directly establish a fact in issue. "[S]o long as a chain of inferences leads the trier of fact to conclude that the proffered submission affects the mix of material information, the evidence cannot be excluded at the threshold relevance inquiry." United States v. Quattrone, 441 F.3d 153, 188 (2d Cir. 2006).

Federal Rule of Evidence 403 provides that a court: "may exclude relevant evidence if its probative value is substantially outweighed by a danger of …unfair prejudice[.]" Even evidence that may portray a defendant in an "unsavory light" is not sufficiently prejudicial to exclude otherwise probative evidence. See United States v. Blackburn, 992 F.2d 666, 669 (7th Cir. 1993) (upholding determination that evidence of defendant frequenting a bar and tipping an exotic dancer supplied background narrative material linking the defendant to a witness and corroborated governments theory of the case).

Argument

Here, where the defendants are charged with conspiracy to obstruct justice, evidence of the defendants, Burke and others meeting for drinks and socializing at bars and restaurants is highly relevant and extremely probative, as such evidence clearly establishes the nature of the relationships between the defendants, their co-conspirators and several witnesses. It goes without saying that people tend to socialize with people whom they like and trust. To put it more simply, people tend to socialize with their friends. Common sense tells us that the frequency with which people socialize with their friends is an indicator of the strength of the friendship between those people. Evidence that tends to prove that friendship and mutual trust existed between the defendants and their co-conspirators and/or witnesses is clearly relevant. Furthermore, evidence that the defendants and their co-conspirators would regularly spend time together outside of work, and often socialized in bars demonstrates the depth and nature of the relationship between the defendants and their co-conspirators. It is unquestionably probative for the jury to understand the full extent of the defendants' personal and professional relationships with their co-conspirators, as the government is required to prove beyond a

reasonable doubt that the defendants entered into a conspiracy to obstruct justice with James Burke and others.

At the same time, this evidence is not unfairly prejudicial. Every day millions of people consume alcohol with friends and socialize at establishments where alcohol is consumed. There is nothing prejudicial about such evidence. Indeed, courts regularly admit evidence of criminal conduct and bad acts, which this evidence clearly is not, if it will help to explain the mutual trust that existed between co-conspirators. See United States v. Rosa, 11 F.3d 315, 334 (2d Cir. 1993), cert denied, 511 U.S. 1042 (1994); see also, United States v. Pipola, 83 F.3d 556, 566 (2d Cir. 1996); and United States v. Pascarella, 84 F.3d 61, 72 (2d Cir. 1996). The evidence the government seeks to offer to illustrate the relationships between the defendants and their co-conspirators falls far short of being a "bad act."

Additionally, to attempt to sanitize the nature of the relationships between the defendants and their co-conspirators and to give the jury the impression that no alcohol was consumed when the defendants and their co-conspirators met and/or socialized at bars would blatantly mislead the jury. Therefore, because evidence of the nature of the social relationships of the defendants with their co-conspirators has extreme probative value, is highly relevant and there is no risk of unfair prejudice, the defendants' motion to exclude such evidence should be denied.

## SECTION VIII
## BRADY AND GIGLIO REQUESTS

The government is aware of its obligations pursuant to Brady v. United States, 379 U.S. 742 (1970) and Giglio v. United States, 405 U.S. 150 (1972). We have complied with our obligations. For example, the defense requests, "any information relayed in Hickey's

attorney proffer." While this is not <u>Brady</u> or <u>Giglio</u> material, the government advised the defense in an email dated October 24, 2019, that the government has no information responsive to this request. Similarly, the government gave notice that one of its witnesses engaged in several extra-marital affairs. Notice was given so that the defendants have the opportunity to cross-examine the witness about whether he lied to his wife to conceal the affairs, the only possible relevance of these occurrences. No further information about the affairs was elicited from the witness and the defendants' questions in that regard are irrelevant. The length of time the affairs occurred, with whom he had the affairs and whether they were overlapping seem designed to embarrass the witness not glean helpful impeachment material. In any event, the government is aware of its <u>Brady</u> and <u>Giglio</u> obligations, and has provided all such material to the defense. Accordingly, the Court should deny the defense request for additional information.

<u>CONCLUSION</u>

For the foregoing reasons, the government respectfully submits that the defendants' motions should be denied in their entirety.

Dated:  Central Islip, New York
        October 29, 2019

                                        Respectfully submitted,

                                        RICHARD P. DONOGHUE
                                        United States Attorney
                                        Eastern District of New York
                                By:     _/s/_____
                                        Nicole Boeckmann
                                        Lara Treinis Gatz
                                        Justina L. Geraci
                                        Michael R. Maffei
                                        Assistant U.S. Attorneys

cc:   Clerk of the Court (JMA) (filed under seal)
      All Defense Counsel (By Email)