UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br><br>- against -<br><br>CHRISTOPHER MCPARTLAND and<br>THOMAS J. SPOTA,<br><br>                Defendants. | No. 2:17-cr-0587 (JMA) |

**SENTENCING MEMORANDUM ON BEHALF OF CHRISTOPHER McPARTLAND**

KRANTZ & BERMAN LLP
747 Third Avenue, 32nd Floor
New York, NY 10017
(212) 661-0009

BALLARD SPAHR LLP
1675 Broadway, 19th Floor
New York, NY 10019
(212) 223-0200

*Counsel for Mr. McPartland*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... ii

I.      PRELIMINARY STATEMENT ................................................................................1

II.     THE APPLICABLE LAW .......................................................................................3

III.    APPLICATION OF THE SECTION 3553(A) FACTORS ......................................6

        A.      Chris's History and Characteristics ...........................................................6

                (i)      Early Years Through College. ...........................................................7

                (ii)     Law School ........................................................................................10

                (iii)    Chris's Career ...................................................................................11

                (iv)     Chris's Marriage and His Three Daughters .................................14

                (v)      Chris's Care for His Mother ............................................................17

                (vi)     Chris's Care for His Father. ............................................................18

                (vii)    Chris's Friends and Extended Family. ............................................19

        B.      The Nature and Circumstances of the Offense .......................................21

        C.      The Need for the Sentence Imposed to Reflect the Seriousness of the
                Offense, to Promote Respect for the Law, and to Provide Just
                Punishment for the Offense .......................................................................24

                (i)      The Collateral Consequences Chris Has Already Endured and
                         Will Forever Endure. ........................................................................25

        D.      The Need to Afford Adequate Deterrence to Criminal Conduct and to
                Protect the Public from Further Crimes of the Defendant .....................29

                (i)      General Deterrence. ..........................................................................29

                (ii)     Specific Deterrence. ..........................................................................30

        E.      The Kinds of Sentences Available .............................................................31

        F.      The Need to Avoid Unwarranted Sentencing Disparities........................32

        G.      The Global Pandemic, Coupled with Chris's Medical Condition,
                Reinforces the Necessity for a Non-Custodial Sentence ........................33

IV.   ADDITIONAL SENTENCING FACTORS...................................................................36

    A.   The Court Should Not Impose a Fine ...................................................................36

V.   CONCLUSION.............................................................................................................37

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Gall v. United States,*
    522 U.S. 38 (2007)................................................................4, 5

*Kimbrough v. United States,*
    522 U.S. 85 (2007)...................................................................5

*Koon v. United States,*
    518 U.S. 81 (1996).................................................................36

*Nelson v. United States,*
    555 U.S. 350 (2009)................................................................4

*Pepper v. United States,*
    562 U.S. 476 (2011)................................................................4

*United States v. Adelson,*
    441 F. Supp. 2d 506 (S.D.N.Y. 2006)......................................6

*United States v. Booker,*
    543 U.S. 220 (2005)............................................................3, 5

*United States v. Cavera,*
    550 F.3d 180 (2d Cir. 2008)...........................................3, 4, 5, 6

*United States v. Cirino,*
    No. 19-CR-862 (S.D.N.Y. 2020) ............................................5

*United States v. Collado,*
    No. 07-CR-1144, 2008 U.S. Dist. LEXIS 44010 (S.D.N.Y. June 5, 2008)..............................5

*United States v. Connolly,*
    No. 16-CR-370 (S.D.N.Y. Oct. 24, 2019) .............................32

*United States v. Dorvee,*
    616 F.3d 174 (2d Cir. 2010)....................................................4

*United States v. Emmenegger,*
    329 F. Supp. 2d 416 (S.D.N.Y. 2004)....................................30

*United States v. Gaind,*
    829 F. Supp. 669 (S.D.N.Y. 1993) ........................................30

*United States v. Germosen*,
    473 F. Supp. 2d 221 (D. Mass. 2007) .................................................................30

*United States v. Hernandez*,
    No. 18-CR-834, 2020 U.S. Dist. LEXIS 58739 (S.D.N.Y. Apr. 2, 2020) .............33

*United States v. Johnson*,
    567 F.3d 40 (2d Cir. 2009) .....................................................................................5

*United States v. Nesbeth*,
    188 F. Supp. 3d 179 (E.D.N.Y. 2016) ..................................................................24

*United States v. Pena*,
    No. 15-CR-551, 2020 U.S. Dist. LEXIS 85431 (S.D.N.Y. May 8, 2020) .............34

*United States v. Preacely*,
    628 F.3d 72 (2d Cir. 2010) .....................................................................................5

*United States v. Sawicz*,
    No. 08-CR-287, 2020 U.S. Dist. LEXIS 64418 (E.D.N.Y. Apr. 10, 2020) ..........34

*United States v. Scparta*,
    No. 18-CR-578, 2020 U.S. Dist. LEXIS 68935 (S.D.N.Y. Apr. 19, 2020) ...........34

*United States v. Stewart*,
    590 F.3d 93 (2d Cir. 2009) .......................................................................23, 24, 30

*United States v. Stone*,
    No. 19-CR-18 (D.D.C. Feb. 11, 2020) ....................................................................5

*United States v. Thavaraja*,
    740 F.3d 253 (2d Cir. 2014) ..................................................................................24

*United States v. Ulbricht*,
    858 F.3d 71 (2d Cir. 2017) .....................................................................................5

## I.   <u>PRELIMINARY STATEMENT</u>

This sentencing memorandum is submitted with humility and from our hearts.  We have represented Christopher McPartland ("Chris") since late 2015 and, in those five years, have worked closely with him and have come to know him deeply.  We have seen firsthand that he is a kind, honest, warm and decent man, who has shown great grace under the excruciating uncertainty and pressure that this case has wrought.  He has earned our utmost respect, fondness and admiration.  For those reasons, we are deeply pained by his current tragic predicament.  Indeed, this is as heart-breaking a sentencing submission as we have ever been tasked to write.

This is also an especially challenging sentencing submission because we, as lawyers, have been fighting against the government's narrative for five years, and we have believed in our cause.  We have believed in Chris.  And we have viewed the government's proof against him as unreliable, because it hinged almost entirely on the credibility of one witness – James Hickey – who was the only trial witness to claim to have observed obstructive conduct on Chris's part.  To us, this seems too slender and shaky a reed on which to upend and destroy Chris's life.  We say this not to be defiant in the face of the jury's verdict, but to be candid with the Court, and to ask it to weigh with great caution some of the more extreme aspects of Hickey's trial testimony – particularly those aspects that were alleged at trial but had not surfaced in four years of government interviews.

For purposes of sentencing we must of course accept the jury's verdict and this Court's factual findings in its post-trial motions.  And we do.  But even accepting those facts as true, we respectfully submit that there are significant mitigating factors here that warrant a non-custodial sentence for Chris or, in the alternative, a sentence of home confinement, and in either case coupled with community service.  Such a sentence is warranted for four principal reasons:

**First**, this is Chris's first and only offense, and his life has otherwise been filled with good deeds, achievement, love of and devotion to family, hard work and public service. The letters submitted from family and friends speak of a man of empathy and compassion, and our own experience powerfully reinforces that view. He has been a devoted father to his three daughters whom he adores, a devoted husband to his wonderful wife of 29 years, and a devoted extended family member who has been a rock of care and caretaking to others in times of need. He had many financial hardships growing up, but was resilient and found a way to pay for his own education. At this critical moment in his life, that prior hard work, good deeds and acts of love and kindness should weigh heavily in the sentencing determination, and favor a non-custodial sentence.

**Second**, Chris's role in the offenses of conviction – even viewed in the light most favorable to the government – was circumscribed. He did not participate in the assault of Christopher Loeb. He never lied to the government, or anyone else, about the events that transpired on that day. He never spoke to the officers (other than James Burke) who had been involved in the assault. Nor did he, at any point, garner any personal benefit from the offenses. Rather, his unlawful conduct – as argued by the government – consisted of a handful of conversations he had with Hickey and Burke, wherein he crossed the line from friend to co-conspirator, by providing advice that assisted in Burke's obstruction, and by pushing Hickey to make sure his officers towed Burke's party line. This circumscribed role also supports a non-custodial sentence.

**Third**, Chris has already suffered – and will continue to endure forever – devastating collateral consequences as a result of this case. Starting with his receipt of a target letter in December 2015, which letter was leaked to the press, continuing through years of investigation

and ultimately his conviction in December 2019, on through to his official disbarment this very week, Chris has lost almost everything: his reputation; his feeling of self-worth; his job; his ability to practice law; his ability to earn a living, and his life savings.  Since 2018, he has been reduced to working as a sales clerk in a liquor store (the only place he has been able to find work), and presently earns $16 per hour.  The fallout has been life changing and catastrophic, and he has endured this brutal punishment for five years.  All that remains are Chris's deep-seated values, the love and support of his family and loyal friends, his faith, and his fervent hope for mercy from this Court.  These factors also favor a non-custodial sentence.

**Fourth,** the global pandemic would make any period of incarceration especially onerous. Even if assigned to a BOP Camp facility, Chris would be forced to isolate – essentially in solitary confinement – for weeks before being transferred to the Camp.  Even after that, he would face a grave risk of contracting the coronavirus, since the prisons (even the camp facilities) are breeding grounds for spread, particularly with the new strains that are emerging regularly.  Given his underlying condition of hypertension, such exposure could well be life threatening.

We respectfully submit that a review of all of these factors weighs heavily in favor of leniency for Chris.  Accordingly, we urge the Court to impose a sentence of time-served, or, in the alternative, a sentence of home confinement, in either case coupled with community service. We submit that such a sentence will properly achieve the objectives of federal sentencing, and will provide mercy and justice in this tragic case.

## II.     THE APPLICABLE LAW

Sentencing procedure, post *United States v. Booker*, 543 U.S. 220 (2005), is well settled. This Court enjoys "very wide latitude" to determine the appropriate sentence, including having the freedom to impose a non-Guidelines sentence where appropriate.  *United States v. Cavera*,

550 F.3d 180, 188 (2d Cir. 2008).  Individualized justice, the unquestioned aim of the federal criminal justice system, means the "punishment should fit the offender and not merely the crime."  *Pepper v. United States*, 562 U.S. 476, 477 (2011) (internal quotations and citation omitted).

The sentencing starting point, as the Court well knows, is a calculation of the defendant's advisory Guidelines range.[1]  *Gall v. United States*, 552 U.S. 38, 49 (2007).  But the Court must not presume that this range offers a reasonable and appropriate sentence.  *Nelson v. United States*, 555 U.S. 350, 352 (2009); *Cavera*, 550 F.3d at 189, 190.  The Court must go further.  It is required to consider the several additional sentencing factors laid out in 18 U.S.C. § 3553(a) "to determine whether a non-Guidelines sentence is warranted."  *United States v. Dorvee*, 616 F.3d 174, 180 (2d Cir. 2010) (citing *Gall v. United States*, 552 U.S. 38, 50 (2007)).  These factors, which "provide the sentencing judge with a set of criteria for potential variances," *Dorvee*, 616 F.3d at 182, include the following relevant factors in this case:

    (1)    the nature and circumstances of the offenses and the history and characteristics of the defendant;

    (2)    the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and to provide just punishment for the offense;

    (3)    the need to afford adequate deterrence to criminal conduct; and to protect the public from further crimes of the defendant;

    (4)    the kinds of sentences available; and

    (5)    and the need to avoid unwarranted sentencing disparities.

---

[1]    Mr. McPartland's objections to the U.S. Probation Department's Presentence Report ("PSR"), including the recommended Guidelines range contained therein, are set forth in Exhibit A to this memorandum.

*See* 18 U.S.C. § 3553(a)(1)-(2)(C), (3).

The Court shall "undertake an individualized assessment based on the facts presented," steering toward an informed judgment.  *Gall*, 522 U.S. at 50; *United States v. Johnson*, 567 F.3d 40, 51 (2d Cir. 2009); *Cavera*, 550 F.3d at 189.  Congress's "overarching" statutory command to district courts on due consideration of these sentencing factors is found in the so-called parsimony clause of 18 U.S.C. § 3553 – that the sentence imposed be "sufficient, but not greater than necessary" to achieve the statutory goals of sentencing.  *United States v. Collado*, No. 07-CR-1144, 2008 U.S. Dist. LEXIS 44010, at *9 (S.D.N.Y. June 5, 2008) (citing 18 U.S.C. § 3553(a)(2)).

The U.S. Department of Justice has addressed the weight to be afforded the Guidelines calculation recently.  In a filing last year, the government addressed the relative role of the Guidelines calculation in the Court's determination of an appropriate sentence:

> "[T]he sentencing range . . . as set forth in the Guidelines" is *but one* of those [18 U.S.C. § 3553(a)] factors.  As the United States Supreme Court has stated, while a sentencing court must "give respectful consideration to the Guidelines, it is well-settled that *Booker* permits the court to tailor the sentence in light of other statutory concerns as well." *Kimbrough v. United States*, 522 U.S. 85, 101 (2007).  In fact, the Supreme Court has stated that a sentencing court "may not presume that the Guidelines range is reasonable but must make an individual assessment based on the facts presented." *Gall v. United States*, 522 U.S. 38, 50 (2007).

Gov't Supp. and Am. Sent. Mem., *United States v. Stone*, No. 19-CR-18, ECF No. 286 at 3 (D.D.C. Feb. 11, 2020) (emphasis added).

It thus bears emphasis that this Court has "broad latitude" to impose a non-Guidelines sentence.  *United States v. Ulbricht*, 858 F.3d 71, 123 (2d Cir. 2017); *see also United States v. Preacely*, 628 F.3d 72, 79 (2d Cir. 2010) ("we have held that it is 'emphatically clear that the Guidelines are guidelines – that is, they are truly advisory'") (quoting *United States v. Cavera*,

550 F.3d 180, 189 (2d Cir. 2008)).  And it need not find "extraordinary circumstances" to do so. *Cavera* at 190.  It must, however, consider "the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance."  *Id.* at 189.

## III.    APPLICATION OF THE SECTION 3553(A) FACTORS

Set forth below are the relevant section 3553(a) factors, as they apply here.  For the following reasons, those factors warrant a non-custodial sentence or, in the alternative, a sentence of home confinement, both coupled with community service.

### A.    Chris's History and Characteristics

We start with the history and characteristics of the defendant because, in order to apply all of the section 3553 factors fairly, the Court must first understand Chris as a person.  As Judge Rakoff has written:

> [S]urely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance.  This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary factor, "the history and characteristics of the defendant."

*United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006).

We respectfully submit that who Chris is, as a human being, stands in stark contrast to the shallow caricature the government portrayed at trial.  He is a good man who – other than the events leading to his conviction – has led an honorable and law-abiding life devoted to public service, education, hard work, faith and family.  Chris has chosen to speak to the Court directly as well, not as to the merits of the case (for obvious reasons), but as to the devastating impact of

the case on his life and the life of his family members.  We believe that letter is another window into Chris's nature.[2]

(i)      **Early Years Through College**

Chris was born in Queens, New York, on November 26, 1965, to Ronald and Thecla McPartland.  Chris has one brother, Terence, who is four years older.

Although Chris enjoyed a loving relationship with his mother and her large extended family, his childhood, teen and college years were not easy ones.  There were hardships at certain junctures, some atypical.  We share these with the Court because they were formative experiences in Chris's life, and give early evidence of his inherent empathetic and conscientious nature.  They also provide the backdrop to the family life Chris, and his wife Edie, determined to create for their own three daughters.  *See Pepper*, 562 U.S. at 480 (having the "fullest information possible concerning the defendant's life and characteristics" is "[h]ighly relevant – if not essential – to [the] selection of an appropriate sentence") (internal quotations and citation omitted).

Chris's father was the only child of hard-working Irish immigrants.  His mother, in contrast, was the twelfth of 14 children born to Hungarian/German parents.  Ronald and Thecla were as different as night and day.  Thecla was warm and loving – a reflection of her rambunctious, happy, childhood surrounded by many loving siblings (as Chris would be surrounded by many loving aunts, uncles and first cousins in turn).  In contrast, Ronald – who died in 2015 – was harsh, critical, and had an especially contentious relationship with Chris's

---

[2]      Chris's letter to the Court is attached hereto as Exhibit B.  Letters from members of Chris's family and friends are collected at Exhibit C and assembled in alphabetical order.

older brother, Terence.  That strained relationship put a cloud over the McPartland family for years.

Ronald had a career in the auto industry,[3] but as his career suffered many setbacks, he turned increasingly to alcohol.  His drinking problems exacerbated an already difficult situation. Thecla, who is still alive, always provided warmth, love and good humor to her sons, and Chris's relationship with her was the most formative one in his young life.  She, and her large family, supplied the affection and support vital to building confidence in Chris, in the face of his father's harshness and frequent criticisms.  Chris was (and is) especially close with his mother.

Ronald's relationship with his first born and more free-spirited son, Terence, was especially strained and created much tension in the family home.  Terence enrolled at Georgetown University in 1979 but dropped out in his junior year, joining an ashram in Claymont, West Virginia, associated with a late Russian philosopher.  As far as Terence's parents and younger brother were concerned, the ashram was a cult; Terence was effectively lost to them.  Although only a teenager at Walt Whitman High School in Huntington, Long Island, Chris's parents tasked him with making repeated solo trips to Washington, D.C. to try and find his brother.  Chris's teenage travels in search of his older brother were frightening and required him to assume adult responsibilities before he had the maturity to do so. While Chris was ultimately able to track down Terence, his mission was to no avail.  His brother reported that he "could not leave" the Claymount compound and remained there, estranged from his family, for several more years.

---

[3]     Chris and his older brother were both born in Queens but in 1966 the family moved to Detroit, Michigan, where his father worked for the Ford Motor Company and where they would remain for nine years.  The family moved to Long Island in 1975 when Ronald McPartland was given the opportunity to take over a Ford truck dealership in Huntington.

Terence ultimately did leave Claymont and later married and had children.  The painful estrangement from the McPartland family continued, however, through to the present, leaving Chris (later in life) as the only caregiver to their parents.  Chris has spoken to his brother only once in the last five years and his three daughters have no relationship with Terence's two children.

Notwithstanding the strain of his brother's estrangement while he was a teenager, Chris excelled academically in high school, worked summers in construction at his uncle's firm, and participated in a summer exchange program at the Sorbonne, where he studied in French.  As his brother had before him, he applied to and was accepted at Georgetown.

Ronald lost his job in Chris's junior year of college, while Chris was on a study abroad program at Trinity College in Dublin, Ireland.  His parents told him that he would need to support himself as they no longer had the means to do so.  This was a devastating and frightening blow.  Chris struggled financially and felt the sting of relative poverty alongside his wealthier classmates.  It was Chris, then barely 20 years of age, who secured a loan so that he could continue his studies there, a loan that he later repaid in full.  His father's financial situation did not improve and Chris paid his own way his senior year at Georgetown, through additional loans.

Chris's financial and family struggles only ignited his resolve and creativity.  Having worked his freshman and sophomore years at a Georgetown catering company, where he learned to cook, he launched his own catering company, working 80-hour weeks his senior year, in addition to carrying a full academic load.  While his classmates were enjoying their senior years, Chris was working non-stop.  The business was successful, and Chris was able to pay his college costs and graduate on time in May 1987, with a dual major in history and French.

### (ii)   Law School

Chris entered Hofstra University's Maurice A. Deane School of Law in September 1987. Save for his first year, when he devoted himself exclusively to his studies, Chris worked throughout law school – as a bilingual tour guide at the United Nations (using his fluency in French, which he had studied in high school), and as a clerk/paralegal for a Bay Shore solo practitioner.  As with his last two years at Georgetown, Chris paid for his own law school education (loans were again a major part of the financial equation), graduating in 1990.[4]

Chris's wife, Edie, whom Chris met and started dating while at Georgetown, writes that his law school graduation was an "incredibly proud moment for his parents and [for her].  He worked hard as every law school student does.  He supported himself through student loans and part time jobs.  Throughout the entire three years his father remained unemployed without a job and no means to contribute towards the finances of the education.  So for Chris, this degree was extremely special and [a] very personal hard won achievement."  *See* Ex. C at 35.

Chris caught the trial bug early in his legal studies, spurred by his participation in a year-long criminal justice clinic run by Professor Douglas Colbert.  Professor Colbert has written a letter to the Court detailing the impression Chris made on him during that clinic and beyond:

> Mr. McPartland's work ethic, intelligence, dedication and commitment to ethical representation impressed me immediately and made him an easy selection to be among the eight students chosen. . . . Mr. McPartland excelled as a clinic student . . . . He provided the highest level of client representation while gaining the admiration and respect of his colleagues, supervising faculty and judges.  He came to class prepared and ready to challenge speakers, including myself, if any of us made what he considered a sweeping generalization or an inadequate opposing argument. . . . I often follow my former students' careers, and took great satisfaction in seeing Mr. McPartland's promotion and rise within

---

[4]      It was not until November 2017, a month after return of the indictment in this case, that Mr. McPartland made his last student loan payment.

> the Suffolk DA's Office. I had heard from defense-minded
> colleagues that Chris was a tough but fair prosecutor, someone
> who demonstrated compassion and open-mindedness when
> appropriate but who certainly knew his way around the courtroom
> and could obtain the conviction and lengthy sentence when
> warranted.

*Id.* at 3.

Edie recalls the highlight from that clinic – Chris's successful defense of a homeless man,

who had been prosecuted for trespassing when he sought refuge, on a freezing cold winter night,

in an abandoned building in Long Beach:

> He successfully developed a defense strategy for the defendant that
> actually caught the attention of the New York Times, Newsday and
> the Associated Press on the plight of homelessness in Long Beach
> at that time and the District Attorney requested . . . the case be
> dropped. I personally remember Chris putting himself outside in
> the extreme cold temperatures to experience the peril this man
> experienced, looking for the defendant in abandon[ed] buildings,
> under road underpasses, along the beach so he could interview him
> and help prepare his defense. I remember his hours of research,
> writing, preparing a challeng[ing] argument against trespassing
> into an abandon[ed] building when there was no other shelter to
> seek for the man's survival. This is an example of my husband's
> sense of fairness, empathy and drive for justice.

*Id.* at 35.

As a Suffolk County resident and given his passion for trial work, Chris coveted one job

more than any other on graduating in 1990 – becoming an Assistant District Attorney in the

County. He applied, was hired and, after a six-month budget freeze was lifted, was sworn in

under James M. Catterson on August 16, 1991.

### (iii)   Chris's Career

Chris spent 27 years in the Suffolk County District Attorney's Office ("SCDAO"), rising

steadily through the ranks under two District Attorneys to a role as one of the Office's three

Division Chiefs. He resigned in 2017, because of this case. In his final position, as the Division

Chief of Investigations from 2010 to 2017, Chris supervised over 30 Assistant District Attorneys assigned to the Narcotics, Special Investigations and Government Corruption Bureaus.

While the government's case at trial suggested that Chris ascended through the ranks as a result of his relationships with Tom Spota and Burke, and that his working hours were devoted to nothing other than the protection of Burke, the reality belies this cartoonish impression.  Chris *earned* every promotion he was awarded in the office (including several in the ten plus years he worked there under District Attorney Catterson) through hard work and a 24/7 level of devotion to his job.  Emily Constant writes that she "can unequivocally represent to Your Honor that Chris was the hardest working prosecutor I met in my 38 year career."  *Id.* at 7.  He *earned* every promotion he received by developing valuable expertise in the challenging and complex area of wiretaps.  Chris found a natural calling in this specialty, where excellent writing skills, intelligence, tenacity and focus were essentials.  This subject matter expertise in a critically valuable law enforcement area made Chris essential in turn.  Ms. Constant further writes that he "developed a state-wide reputation as an expert in electronic surveillance, organized crime enterprises and long-term investigations."  *Id.* at 6.  Indeed, Mr. Spota, whose close friend Chris had prosecuted in the Catterson era, and was of a different political party than was Chris, kept Chris upon coming into office.  Mr. Spota came to appreciate Chris's work, and promoted him repeatedly.

Edward Heilig, a former colleague of Chris's in the SCDAO, has written the Court the following:

> The man I met was an intelligent, caring and thoughtful prosecutor who, through hard work and discipline, elevated himself within the D.A.'s Office.  Chris became very knowledgeable in wiretap investigations and conducted many successful prosecutions of members of organized crime and gangs.  All of this good work was done under the highest ethical and professional standards,

> something that Mr. McPartland demanded from all who worked on
> an investigation with him, including police detectives and fellow
> prosecutors.

*Id.* at 20.

Recognizing Chris's reputation for mastery of wiretap laws, and the quality of his work, the United States Attorney's Office, Eastern District of New York ("EDNY") cross-designated him as a "Special Assistant U.S. Attorney" in numerous organized crime investigations in Suffolk County.  As a result, Chris was front and center in many of the SCDAO's most successful partnerships with the EDNY, resulting, for example, in the successful prosecutions of over a dozen high ranking members of the Lucchese, Colombo, Bonanno and Gambino crime families.  In January 2011, he was awarded a commendation for these efforts from then-FBI Director Robert S. Mueller III.  Ex. D.

It is more than tragic that Chris was ultimately prosecuted by the very office with which he previously enjoyed such a meaningful and successful relationship.  Indeed, it is a measure of the depth of Chris's prior relationship with that office that a former Chief of the Long Island Division has written a sentencing letter on Chris's behalf.  George Stamboulidis, a former federal prosecutor and well-regarded Chief of that Division, has known Chris for over 25 years in his capacities as an Assistant United States Attorney, as a monitor for the Town of Brookhaven and, later, as a defense lawyer.  He writes the Court attesting to Chris's "character as a professional, ethical, dedicated and effective prosecutor."  Ex. C at 60.  Mr. Stamboulidis describes him as "a person who has earned the respect of many based on his long career and positive contributions to the community."  *Id.*  This letter speaks volumes about the high regard in which Chris was held by the most esteemed members of the bar.

In 2013, the New York State District Attorneys Association bestowed on Chris its highest award, named after former Manhattan District Attorney Robert M. Morgenthau, and given annually to the state prosecutor who, befitting Mr. Morgenthau, demonstrated exemplary dedication and professionalism.  As his body language accepting the first annual "Thomas J. Spota Prosecutor of the Year" award suggested (the Court may recall the video introduced at trial), Chris does not enjoy the spotlight and has little need for plaques and accolades.  But that prestigious award was meaningful to him – it is named after one of Chris's heroes, given to him at a ceremony in Mr. Morgenthau's presence and where then-Attorney General of the United States, Eric Holder, spoke to the assembled crowd and recognized Chris's contributions.

We expect the Court will appreciate the excruciating position in which Chris finds himself – a career prosecutor, who was devoted to his work and took pride in his deserved reputation for fair mindedness, will stand before Your Honor at sentencing as a disbarred lawyer and for felony offenses.  It is a devastating collapse and fall from grace for someone who took such great pride in his work and who genuinely loved his chosen profession.

### (iv)    Chris's Marriage and His Three Daughters

Chris and Edie began dating in 1984 while undergraduates at Georgetown.  They married in 1992.  They have lived in the close-knit community of Northport, Long Island, since 1996 and in the same modest family home there since 2003.  Edie has a nursing degree from Georgetown and has been working with the Suffolk County Visiting Nurse Service and Hospice of Suffolk since 1999, first as a visiting nurse and for the last several years as the Staff Development Coordinator.

Thanks to his wife, Chris now has seven siblings, practically speaking, in the form of his seven sisters-in-law and brothers-in-law, and thirteen adored nieces and nephews.  The Court

will find at Exhibit C several letters from the Fensters, a large and close-knit family; those letters describe an unusually tight-knit family and the central role Chris has played in it.  For example, the Fensters credit Chris with tenaciously and tirelessly assisting the family patriarch, Edie's father, when he was diagnosed with stage IV lung cancer.  *See* Ex. C at 13.  It was Chris whom they credit with leading their father to a clinical trial at Johns Hopkins, which gave him nearly two additional years with his family.

The McPartlands' nearly 30-year-old marriage is a strong one.  Just as Chris was by his wife's side every step of the way through her battle with breast cancer (during some of the critical times underlying this case), she has been by his side every step of the way through the federal investigation, prosecution and conviction.  The last five years have been extremely difficult ones, but it is a testament to both McPartlands and their love that their bond has strengthened, not frayed.

The McPartlands have raised their three daughters in Northport – Deirdre (24 years old) Bridget (22) and Aileen (17) – where all five have been active contributing members of the community.[5]  All are currently living at home due to the circumstances wrought by the global pandemic.  Chris and Edie are both devout Catholics, and have always been active in their local church in Northport, as the letters submitted from their priest, Father Peter Garry, and fellow parishioners attest.  *See id.* at 15, 17, 26, 52, 54, 63 (letters from Father Peter Garry and fellow

---

[5]    While community involvement is a thread through many of the letters, we call the Court's specific attention to a letter from Dave Scott.  Ex. C at 57.  Mr. Scott is a Northport social studies teacher and school district leader.  He knows Mr. McPartland extremely well from their work together over *many years* and through *three* different community initiatives.  He does not describe token volunteer opportunities here or there, but rather meaningful "roll up your sleeves" engagement.  *Id.*  Mr. Scott's letter makes quite clear that Mr. McPartland's commitment to his community has been real, involving a considerable investment of time and energy.

parishioners Fritz Garreeht, Mary Kelly, Christopher Sarisky, Jeremy Scileppi and Brian Trodden).

Their oldest daughter Deirdre was scheduled to graduate from a six-year doctorate program in physical therapy at Quinnipiac College this spring, but had a delayed, virtual graduation in September of 2020. Her ability to take her board exams and begin full time employment have also been delayed for reasons relating to the pandemic. In December of 2020, she was married, and she and her husband reside with the McPartlands in Northport.

Middle daughter Bridget graduated from Pace University in May 2020 with a finance degree. She was scheduled to start work at a Manhattan-based financial firm in September, but that offer was withdrawn on account of pandemic-driven budget cuts. She now works for a national beverage company.

Youngest daughter Aileen is a senior at Northport High School. She will attend Catholic University in Washington, D.C. on a substantial scholarship next year.

All three daughters are athletes and their involvement in a local volleyball travel club largely defined their respective teenage years, and those of their parents. As the Court will read in letters from Philip Opinante, Marianne Healy and others, Chris is a devoted and supportive father to each of his daughters. *See id.* at 18, 45. For roughly the last decade, he has spent virtually every weekend from November to April on the road traveling with one daughter or another to volleyball tournaments. Catholic University recruited his youngest daughter Aileen and she will be playing volleyball there next year on a partial scholarship. Edie writes that "[t]his became his pride and joy to spend this time with [his daughters] at practices and on the road. Our girls have a very deep bond with Chris . . . Chris knew this was time he would never get back and didn't want to miss any of it." *Id.* at 36.

As noted above, Chris's own experiences as a child and adult shaped the father he resolved to be, and indeed is, for his own girls.  Where his father was critical, he is supportive; where his father was distant, he is close, warm and nurturing.  Edie, in her letter to the Court, speaks in detail to the close relationships her husband enjoys with his daughters, forged not only through their "volleyball decade" but in the early years, on weekends alone with their father, when Mrs. McPartland worked 12-hour shifts so that she could be home with her daughters during the week:

> He didn't stay home and sit them in front of the TV and wait for mommy to get home.  He would take them to museums such as the Guggenheim, American Museum of [Natural] History, The Metropolitan Museum of Art, Long Island Children's Museum, Duck's [b]aseball games, and the [a]quariums. . . . I would hold my breath until I got home to find everyone safe and sound and hear all the fun they had that day.  Chris wanted to impart his sense of curiosity, imagination, and experiences with art and history to our girls.

*Id.*

### (v)    Chris's Care for His Mother

In addition to caring for his wife and three daughters, Chris is a devoted son to his 85-year-old mother.  Thecla lives in the same Huntington, Long Island, home in which Chris grew up, and her social life is intertwined weekly with the McPartlands, or at least was before the pandemic.  In addition to caring for her physical and mental well-being on a weekly basis, Chris handles all his mother's financial matters.  She is devoted in turn to Chris, her daughter-in-law and her three granddaughters.

Thecla McPartland's life has not been an easy one, given her husband's alcoholism and severe medical problems, but through it all, her one rock has been her son, Chris.  The last few years have therefore been especially painful for her, and have taken a physical toll.  Any

prolonged separation from Chris will be excruciating for his mother, and may well be more than she can withstand.  Edie writes that he "is all she has (along with myself and her granddaughters).  Her other son . . . has never returned."  *Id.* at 37.

      **(vi)**    **Chris's Care for His Father**

Chris and his mother were also left to care for Ronald over the last 20 plus years of his life, while he reeled from one medical crisis to another, his alcoholism worsened and his personality became even more difficult.  In 1991, just after Chris's graduation from law school, Ronald, unemployed, was diagnosed with cancer of the larynx.  His larynx was surgically removed and replaced with a so-called TEP device, a surgically-created connection between the trachea and esophagus.  From 1991 until his death in 2015, Ronald lived in medical procedure hell, including undergoing 12 different surgeries.  It was Chris who primarily cared for him in those very difficult years and who managed the difficult economics of his father's situation, negotiating payment plans with hospitals and the like.  His neighbor and close friend, David Kelly, writes in his letter to the Court that "Chris' father battled severe illness for many years and was in and out of hospitals.  Chris was always there, driving his dad in and out of Manhattan to get him the best medical care possible.  Chris did a lot of research and became a real patient advocate for his dad."  *Id.* at 24.

These were very hard years for Chris, who was simultaneously raising a family of his own and building a career at the SCDAO.  His wife, Edie, lived with him through these dark years, and witnessed first-hand Chris's grace, tenderness, compassion and selflessness through very trying circumstances.  His ability to put family, love of his mother and forgiveness first, not descending into bitterness and anger at his at times abusive father and the brother who had

abandoned him, define Chris's character.  He did not recoil from his father, though he had many

reasons to do so.  He embraced him.  Edie writes the following:

> [My father-in-law] started out in his life with a lot of hope and
> promise.  He was a smart man, also full of humor and wit.  But he
> was also by nature a difficult man, selfish, harsh to his sons and
> wife and over time developed an alcohol problem.  He was abusive
> to Chris' mother and to Chris as well.  His brother left the home at
> the age of 18 years old and never returned.  Chris was left with the
> brunt of trying to keep his parents together, helping them
> financially.  His father developed laryngeal cancer just after Chris
> graduated from law school and just before we married.  He was
> unemployed with no medical insurance and had a major operation
> to remove the cancer and was left without a voice box and a stoma
> in his neck to breathe through. . . . This is obviously a very
> disfiguring operation.  He was left with extraordinary medical bills
> and again the unemploy[ment].  Despite the years of abuse [from]
> his father, Chris stood by his father and mother [and] helped them
> through the medical and financial crises which consumed years of
> his time.  It caused him great emotional distress and sadness which
> to this day he lives with. . . . [B]ecause of Chris' sense of family
> and deep loyalty and ability to forgive, he never strayed away
> [from] caring for his father and mother.  He never will.

*Id.* at 37.

### (vii)   Chris's Friends and Extended Family

Friends have written movingly on Chris's behalf.  His former SCDAO colleague, Robert

Ewald, writes, "I fully understand that the trial presented an image of Chris; but in the scheme of

life, that image was one dimensional."  *Id.* at 9.  Your Honor has letters from his family, friends,

neighbors and former colleagues which speak more eloquently to that character than we ever

could.  It is very easy, however, for us to draw broad brushes from those letters, given how

consistent they are in describing certain attributes of Chris, whether the letter be from a young

woman in her mid-20s, a close Georgetown friend, or his wife.  The takeaway from the letters is

that Chris is eminently deserving of this Court's compassion and leniency.

This is just some of what has been written about Chris:

- "I know of many other instances of Chris volunteering and helping others in need and I am sure that you will hear about many of them in other letters.  That is what he does – that is who he is."  *Id.* at 20.

- "No matter what the situation, I've always known I could count on Chris for help.  He is the type of solid, dependable friend everyone should be so lucky to have. . . . When our kids were young, I faced my share of risk as a police officer in New York City, from many years on patrol to being blocks away when the WTC came crashing down.  Once I got to know Chris, I didn't worry so much about what would happen to my family if something happened to me.  I knew that Chris would be there for my family if I couldn't be. . . . I don't know what more one could say in praise of someone other than that." *Id.* at 23.

- "I only gave him one name [when his brother moved to New York], and told him, if anything happens, and you need help, this is the man to call."  *Id.* at 22.

- "If I can be even half as kind, supportive, and upstanding as him, I'll be grateful."  *Id.* at 31.

- "He would give you the last dollar in this [sic] wallet and not think twice about it. . . . He is the rock and foundation for so many, has touched the lives of those around him and has so much more to give."  *Id.* at 39.

- "Chris truly lives his life with love in his heart, charity and empathy for his fellow man. . . . He is a good man through and through – I know it, his family knows it, my family knows it, his children know it and his friends know it."  *Id.* at 35.

- "Chris has always been one of those people to embrace everyone and make his home your home."  *Id.* at 1.

At this critical moment in his life, Chris deserves great consideration for the good deeds he has done and the good life he has led.  He is a man who has been a rock for his wife, family and his loved ones for his entire adult life.  A man who worked diligently in the same office for 27 years.  He is steady as they come, a man who, for the love of his mother and loyalty to family, cared single-handedly for his father, in very trying conditions, over many years because it was the right thing to do.  He is the individual at any gathering who will seek out the elderly widow

for conversation and who will talk to the children as a peer.  The individual with the freshman

dorm room everyone gravitated to – whether "geeks, nerds, preps or jocks."  If someone needed

the name of someone to rely on, the name given was Chris McPartland.

At this tragic and life-changing moment in his life, we ask that the Court take these

qualities and good deeds into consideration in fashioning a just sentence.

**B.      The Nature and Circumstances of the Offense**

The government's theory of the case, accepted as it must be for purposes of sentencing,

was that Chris engaged in multiple conversations with Burke and Hickey, in which he crossed

the line from friend and confidante of Burke into obstructive conduct, designed to prevent the

prosecution of Burke.  We do not minimize the seriousness of this conduct, particularly in light

of Chris's position in the SCDAO at the time.  Nonetheless, it is important at sentencing to

consider the narrow nature of the offense conduct, in assessing culpability and fair punishment.

Chris is not accused of participating in the Loeb assault or of lying to the government or

anyone else about his knowledge of it.  Nor is he accused of directly telling the officers involved

in the assault to lie about it.  Detectives Kenneth Bombace and Anthony Leto testified that they

never spoke to Chris about the Loeb assault or its cover-up, were never threatened by Chris or

told by him to lie or otherwise directed by him in any way in connection with the alleged

conspiracy.  *See* Trial Tr. 774:15-775:13, 787:19-22 (Nov. 20, 2019) (testimony of Bombace);

*id.* at 1296:16-1297:12 (Nov. 25, 2019) (testimony of Leto).  In fact, Bombace and Leto both

testified that they were *never* threatened by Hickey to lie, much less that Hickey ever passed on

any supposed threats from Chris.  *Id.* 788:4-5 (Nov. 19, 2019) (testimony of Bombace), *id.*

1301:16-24 (Nov. 25, 2019) (testimony of Leto).  When the third officer involved, Michael

Malone, testified before the grand jury, he said nothing at all about Chris.

All three officers testified remarkably consistently under oath (whether at trial or, with respect to Malone, in the grand jury) that it was Burke instead who, in a March 2013 meeting, guided them in terms of the false account they would share with the Special Prosecutor and beyond. *See id.* at 657-61, 783 (Nov. 19, 2019) (testimony of Bombace); 1218-21 (Nov. 21, 2019) (testimony of Leto), 1296:8-15, 1299:4 (Nov. 25, 2019) (testimony of Leto); GJ Tr.  41-42, 46-48 (Oct. 20, 2015) (testimony of Malone); GJ Tr. at 2-3, 17-18 (Nov. 17, 2015) (testimony of Malone).  Leto, when asked "[w]ho decided the final version of the story," responded succinctly: "The chief."  Trial Tr. 1221:3 (Nov. 21, 2019).  Hickey testified that in the case of Leto's false testimony at the suppression hearing, it was Burke who, again, led Leto into lies.  *Id.* at 1805:24-1806:1 (Dec. 2, 2019) (noting an October 2013 calendar entry reflecting that "Anthony Leto was being prepped by Burke on what to say at the trial, pretrial suppression hearings"); *see also* Plea Tr. at 14, *United States v. Burke*, 15-CR-627 (E.D.N.Y. Feb. 26, 2016) (government asserting that police officers would testify that *Burke* "had an individual testify falsely under oath at a hearing in Suffolk County pursuant to a conspiracy to obstruct the investigation of the incident [i]n December 2012").

According to the PSR, "Burke organized and led the activities of other SCPD officers involved in the incident." PSR ¶ 40; *see also id.* ¶¶ 7 ("Burke instilled fear in countless members of the department because of his reputation as a spiteful, vindictive chief who demanded absolute and blind loyalty.  Those who were not perceived as loyal to him suffered severe consequences, including loss of preferred assignments and becoming targets of retaliation"); 15 ("Through the threat of retaliation, Burke implied that failure to abide by this false narrative would result in negative consequences for anyone who did not do so"); *see also* Trial Tr. 1560:7-9 (Nov. 26,

22

2019) (testimony of Hickey that the Intelligence Squad detectives "would do anything and everything that the king, Burke, would ask them to do").

Hickey's testimony likewise described Burke as far and away the principal wrongdoer.  It was Burke who gave to Hickey the job of keeping the detectives in line at various critical points over the lifetime of the conspiracy, allegedly with the heavy-handed line that he was dependent on Hickey "to keep him alive."  *See id*. at 1609, 1620, 1623, 1625, 1632, 1634; 1799-800 (Dec. 2, 2019).  It was Burke's refrain that Hickey allegedly gave to the officers time and time again. *Id.* at 1758:24-1759:2 ("I told Malone and Leto the same thing that Chief Burke always said, which was two questions, two answers.  Did you beat him?  Did you see anyone beat him?  No. No.  Period.  The end").  It was Burke who threatened Hickey explicitly.  *E.g.*, *id.* at 1625, 1697 (Nov. 26, 2019); 1715, 1848-49 (Dec. 2, 2019).  It was Burke who suggested that Leto testify at the Loeb suppression hearing and who directed Hickey to tell him so.  *Id.* at 1646, 1649 (Nov. 26, 2019).  It was Burke who allegedly prepared Leto for that testimony.  *Id.* at 1805:24-1806:1 (Dec. 2, 2019) (Hickey addressing an October 2013 entry in his calendar reflecting that "Anthony Leto was being prepped by Burke on what to say at the trial, pretrial suppression hearings").  It was Burke who selected two SCPD officers for the FBI gang task force to allegedly surveil comings and goings at the EDNY's Central Islip office.  *Id.* at 1627:7-20 (Nov. 26, 2019).

Not only was the offense conduct narrow, but Chris derived no personal benefit or financial gain from the offenses of conviction.  Rather, as described by Hickey, the purpose of the entire endeavor was to keep Burke out of jail.  *Id.* at 1592:5-7, 1595:3.  Thus, this entire tragic episode, accepting the government's view of the evidence, was at worst the result of Chris's misguided and at times blind loyalty to Burke – a larger than life figure who had a

special gift for persuading others to protect him. These mitigating factors do not justify engaging

in obstruction, and we do not suggest otherwise. But it should matter in the sentencing calculus

that Chris's role in the offense was circumscribed, and that he did not act out of greed or self-

interest. *See United States v. Stewart*, 590 F.3d 93, 140-41 (2d Cir. 2009) (no error in Court's

consideration of the defendant's motivation – neither for money nor the use of violence for

political ends – as rationale in part for a non-Guidelines sentence). We respectfully ask the

Court to take these factors into consideration in fashioning a just sentence.

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense

While the offenses of conviction are serious, we respectfully submit that a non-custodial

sentence, or a sentence of home confinement, both coupled with community service, would

adequately promote respect for the law and provide just punishment. The principal reason for

this is that the well-known collateral consequences that Chris has already suffered, and will

forever endure (detailed in brutal candor in his letter to the Court), are utterly catastrophic for

him and his family. This is adequate punishment in and of itself, as well as providing a clear and

direct message that the law must be respected or the consequences will be catastrophic. A

sentence of incarceration is simply not necessary to satisfy any statutory goal of sentencing and

would therefore, we respectfully submit, violate the parsimony clause.

The law in this Circuit is clear that the Court may consider collateral consequences in

determining what is a "just punishment" under the Section 3553 factors. The Second Circuit so

held in *United States v. Stewart*, wherein the sentencing court took into account the fact that the

offense of conviction meant the end of the defendant's career:

> [T]he conviction itself "already visits substantial punishment on
> the defendant." The district court is specifically required by section

24

> 3553(a) to consider the "just punishment for the offense."  It is
> difficult to see how a court can properly calibrate a "just
> punishment" if it does not consider the collateral effects of a
> particular sentence.  Upon careful review of the record and the
> reasons given by the court, we are convinced that the court did so
> appropriately.

590 F.3d at 141 (citations omitted); *accord United States v. Thavaraja*, 740 F.3d 253, 262-63 (2d

Cir. 2014) (court may consider collateral consequences at sentencing); *United States v. Nesbeth*,

188 F. Supp. 3d 179, 187 (E.D.N.Y. 2016) (same).   The collateral consequences in this case are

extreme.

### (i)      The Collateral Consequences Chris Has Already Endured and Will Forever Endure

**First**, it is plain to anyone who knows the McPartlands that the last five years have been

a living hell owing to the pressure of this case and the brutal treatment he has received in the

press.  It started with the leak of his target letter to the press in December 2015, was followed by

repeated leaks to the press for two years pre-indictment, and culminated in his highly publicized

indictment in 2017, and his equally publicized trial and conviction in 2019.  *See* Ex. E (a

selection of news stories published both before and after the indictment).  The Court has several

letters speaking to the painful treatment Chris has been subjected to in the press during these five

years, Chris's own letter included.  David Kelly, the McPartlands' neighbor and close friend,

writes especially movingly about the impact:

> For [Mr. McPartland's] mom, his wife, and his daughters, seeing
> the news media portrayal of the son, husband, and father they
> know and love is incredibly difficult.  They all put on a brave face,
> but I can only imagine what it is like for Aileen to go to school
> every day when everyone reads and sees the news accounts about
> her dad.  Northport is a small, tight knit community and Chris is
> well known here.

Ex. C at 24.  Edie McPartland writes that her husband "has neighbors and friends who know him well and support him but others in our community shun him."  *Id.* at 38.

**Second,** Chris's career has been destroyed and his finances devastated.  As a result of the return of the indictment commencing this case, he was forced to resign from the SCDAO in 2017, after 27 years of service to his community.  Since that time, he has been unable to find work in the only profession he has known: practicing law.  Indeed, with the Appellate Division, Second Judicial Department's decision this week, ordering Chris stricken from the bar, he will never be able to practice law again.  Ex. F.  To help support his family, he was relegated to taking the only job he could find: working as a clerk in a local liquor store for $16 per hour.  He was able to get this job because the owner of the store is an old friend.  He has held that job for the past three years, and works six to seven days a week, under what can only be described as humiliating circumstances, given that many local customers are well aware of his fall from grace, and the reasons why he is working as a sales clerk.[6]

As the Court well knows, being a lawyer is not just having a job.  It is having an identity.  By virtue of the conviction, Chris has been stripped of that identity.  The Second Judicial Department's decision this week (Ex. F) is brutal in its clarity.  To be in the SCDAO for 27 years and to be forced to resign is not to lose a job, it is to lose a home and a life.  These collateral consequences are perhaps the most devastating penalties that could be imposed on anyone.  As Chris's close college friend, Matt Brown, has written to the Court:  "I have a lot of friends who went to law school and know hundreds more through my career.  I cannot think of anyone who loved his or her work more . . ."  Ex. C at 1.  Professor Colbert writes:

---

[6]      Because he could not complete his 30 years of service, Chris's pension rights were also significantly reduced.

> Mr. McPartland already has lost two of his most cherished life-
> long accomplishments, his otherwise excellent reputation and his
> ability to practice law. . . . I do not live in Suffolk County but am
> told that his case received front-page and headlined coverage in the
> media, which no doubt presented him as the public servant who
> violated the public trust.  To someone who has worked 30 years to
> earn colleagues['] respect within the bar for administering fair and
> equal justice, I cannot begin to measure the loss that follows
> convictions such as these that do great damage to the individual's
> professional reputation.  Nor can I imagine the day-to-day personal
> pain and loss of standing in the community that Mr. McPartland
> sustained when he is portrayed as a criminal in the neighborhood
> where he and his family live and where his children attend school.
> Beyond reputation, Mr. McPartland's felony conviction likely
> requires that he lose his license to practice law and earn a living to
> support his two children and family.  Having worked so hard
> during his years of devoted public service as a prosecuting
> attorney, Mr. McPartland must now begin a public life as a
> convicted felon and probably without his law license.

*Id.* at 3.

Chris's closest high school friend, Christopher Sarisky, writes that "[t]he man has lost his career.  What little economic gain he had from a career as a public servant has been wiped out. . . . His family has suffered a public humiliation from a very lengthy public proceeding.  He has effectively been serving a sentence from the day this proceeding began."  *Id.* at 53.

With the Second Judicial Department's decision this week, Chris has lost forever the single most important thing in his life after his family – a 25+ year career he dedicated himself to, heart and soul.  As he explains in his letter to the Court, the knowledge that this son of Irish immigrants is now moving backwards, after a history of generational advances over the centuries, is a psychic blow from which he may never recover.  *See* Ex. B.

Moreover, in terms of financial consequences, Suffolk County in March 2020 sued Messrs. McPartland, Burke and Spota in New York State Supreme Court (Suffolk County) under the so-called "faithless servant" doctrine.  *See County of Suffolk v. James Burke, et al.*, Index No.

604504/2020 (Sup. Ct. Suffolk Cty. 2020).  The complaint seeks recovery of "the entire compensation" paid out by the County to Chris from December 2012 to November 2017, in addition to punitive damages and attorneys' fees.  *See id.*, NYSCEF Doc. No. 1 at ¶ 93.  Having had no employment these last three years save working as a store clerk, having been a public servant for 27 years before that, and having a family and elderly mother still to support, Chris is in no position to hire counsel to defend that action and is representing himself *pro se*.  This litigation and its potential economic ramifications for his family obviously weigh heavily on Chris, and cause daily stress and anxiety.

Chris has no reservoir of savings to deal with any of these financial crises.  His entire professional career has been in the public sector – a job he loved.  Indeed, his brother-in-law, Mike Minsch, observes in his letter to the Court that "Chris is not motivated by money or power.  He has driven a minivan or a Ford wagon for as long as I can remember.  He lives in a modest house in a modest neighborhood on Long Island."   Ex. C at 41.  But a career in public service means that Chris never acquired the wealth that private sector employment might have supplied him.  Ms. Constant writes that she did not hesitate to loan Chris money for legal fees, early on in the federal investigation, because she knew all too well the challenges Chris and his family were facing:

> I saw … his battered mini van and his worn suits.  I know first-
> hand the difficulties of supporting a family on Long Island while
> working in the public sector, going years without raises, even
> going backwards because of multiple lag payrolls, while expenses
> soared.

Ex. C at 7.  The little in savings Chris was able to accumulate over his career is now gone.  At 55 years of age and with no ability to practice law in the future, his post-sentencing income prospects are dismal.  In short, Chris and his wife – with another daughter still to put through

college – are looking at many years of financial challenges ahead of them.  David Kelly puts the impact on his close friend bluntly:  "The financial impact has been massive."  *Id.* at 24.

There is also the pain that this case has already caused Chris, not only on his own account but because it resulted in brutal pain for his wife and daughters.  Chris writes of "reporters approaching my daughters, visiting my home at all hours of the day and night and visiting my place of work.  These five years of negative publicity have had a brutal impact on my family members, who have suffered along with me."  Ex. B at 1.  No day was as difficult as the day the jury returned its verdicts of conviction.  Guidance counselors removed Chris's teenage daughter Aileen from her classroom to break the news to her privately, searing a memory she will likely carry all her days.  Chris picked up his mother and brought her to his home, where he broke the news to her in person.  He has described that to us as the hardest conversation he has had in his life.  For Aileen, there were other dark days no parent would wish on a child – when a USAO Investigator showed up at the family home at 6:30 a.m. to serve a grand jury subpoena on her father, and the day her father had to explain to her that an indictment had been returned against him and he needed to self-surrender.  We know that in sentencing Chris, the Court will give consideration to the many ways in which Chris and his family have already endured punishments of various forms, and will forever.  We respectfully ask the Court to take these brutal collateral consequences – described so poignantly in Chris's own letter – into account in fashioning a just sentence.

### D.      The Need to Afford Adequate Deterrence to Criminal Conduct and to Protect the Public from Further Crimes of the Defendant

#### (i)      General Deterrence

The investigation and prosecution of this case over the past five years has generated massive publicity in Suffolk County.  As the Court knows, *Newsday* and local television stations

covered the trial (and significant pretrial developments) on nearly a daily basis.  The *New York Times* and other metropolitan news outlets also covered the case.  There can be little doubt that the general public is aware of the case, the fact that Chris lost his position in the SCDAO, and that he was convicted.  The general public is necessarily aware that, as a result of this case, Chris's lengthy and prominent career in public service came to a premature end, and that his reputation is in tatters. The general public is also aware, through press coverage, that as a result of his conviction, he stood to lose his law license, and has been sued to return years' worth of salary.  The general public will undoubtedly soon learn, through press coverage, of his disbarment.

We respectfully submit that the public's knowledge of these tragic collateral consequences of conviction will provide adequate general deterrence, *i.e.,* the general public will plainly get the message that obstruction crimes do not pay, and can lead to personal and professional ruination.  Under these circumstances, a custodial sentence is not required for purposes of general deterrence.

### (ii)   Specific Deterrence

Under the unique facts of this case, there is also no need to impose a custodial sentence so as to achieve specific deterrence, *i.e.,* there is virtually no risk that Chris might engage in additional criminal conduct in the future.  Indeed, there could hardly be more *sui generis* crimes than the ones for which Chris has been convicted.  Under even the government's theory of the case, these offenses were committed from a position of power that Chris no longer holds, for the alleged benefit of a single individual, Burke, who can no longer be protected from prosecution.  These unique circumstances are simply not capable of repetition, most obviously because Chris has been stripped of the position which allegedly allowed him to commit those crimes.  *See Stewart,*

590 F.3d at 141, 147 (no error in district court's consideration of probability interpreter would be unable to continue that career, and lawyer would lose her license, in imposing non-Guidelines sentences; neither defendant would have the opportunity to repeat the crimes) (remanding for resentencing on other grounds); *United States v. Emmenegger*, 329 F. Supp. 2d 416, 428 (S.D.N.Y. 2004) (protecting the public from further crimes is less of a consideration where the career which gave rise to the crime is over "and [the defendant's] potential to commit this particular type of crime has been eliminated"); *United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993) ("the destruction of the defendant's business has already achieved to a significant extent some although not all of the objectives otherwise required to be sought through the sentencing process").  In short, this is plainly not a case in which the Court needs to incarcerate Chris in order to protect the public or deter future criminal conduct by Chris.  *See also United States v. Germosen*, 473 F. Supp. 2d 221, 227 (D. Mass. 2007) ("There is a demonstrable difference in the recidivism rates of real first offenders as compared to other defendants in Criminal History Category I.  Minimal or no prior involvement with the criminal justice system is a powerful predictor of a reduced likelihood of recidivism") (citations omitted).

### E.  The Kinds of Sentences Available

There is no legal impediment to imposition of a non-custodial sentence.  There are no mandatory minimums and the Court has the statutory authority to impose on Chris a non-Guidelines sentence of time served with supervised release of one to five years on felony counts 1, 2 or 3, or to no more than five years of supervised release on misdemeanor count 4.  18 U.S.C. § 3561(a), (c)(1), (c)(2); *see also* PSR ¶ 107; PSR Addendum at 2 (reclassifying count 4 as a misdemeanor).  Discretionary terms of supervised release can include community service and home confinement during non-working hours.  18 U.S.C. § 3563(b)(12), (b)(19).

31

### G.        The Need to Avoid Unwarranted Sentencing Disparities

A non-custodial sentence or a sentence of home confinement would also avoid

unwarranted sentencing disparities with other participants in this offense.

The only other defendant sentenced to date is Burke, who was sentenced by Judge

Wexler to 46 months incarceration.[7]  Obviously, Chris's culpability is *far* lower than was

Burke's.  Unlike Chris, it was Burke's own conduct, *i.e.*, the assault of Loeb, that formed *the*

*very basis* of the charged conspiracy.  Moreover, unlike Chris, Burke personally benefited from

the cover-up of the assault in that its very purpose was to save his career.  Further, it was Burke

who recruited, managed and led his direct subordinates in the course of the conspiracy.  Chris is

clearly far less culpable, and he deserves a punishment that is several orders of magnitude lower

than was Burke's.

Other direct participants in the assault and other co-conspirators are either awaiting

sentence or were never charged.  Bombace, who admitted slapping Loeb in the face and to

pushing him back down on the chair while Burke was assaulting Loeb, and who lied to the

Special Prosecutor, was immunized.  Trial Tr. 646, 649 (Nov. 20, 2019), 783 (Nov. 21, 2019);

3500-KB-1.  Malone, who admitted he "smack[ed]" or "swat[ted]" Loeb "two or three times"

and urinated into his coffee cup was immunized.  GJ Tr. 18, 23, 30-32 (Oct. 20, 2015).  Leto,

who admitted he hit Loeb for "maybe around a minute," grabbing him by the neck and causing

Loeb to scream out in pain, and who perjured himself at the Loeb suppression hearing, will be

---

[7]        According to BOP records and media reports, Burke served only approximately 36
months of that sentence in jail.  He was arrested and detained without bail in December 2015 but,
in November 2018, was released to a halfway house to complete his sentence.  Burke was
released from BOP custody altogether on April 11, 2019.  *See* BOP Inmate Locator for James
Charles Burke, *at* https://www.bop.gov/inmateloc/; Nicole Fuller, *Former Suffolk Police Chief
James Burke released from federal prison*, NEWSDAY (Nov. 26, 2018).

sentenced as a cooperating witness.  *See* Trial Tr. 1191:12, 1102:14-15, 1210:7-8 (Nov. 21, 2019) (testimony of Leto).  And Hickey, who was the point-person tasked by Burke to make sure that the officers he (Hickey) supervised (Bombace, Leto and Malone) would hold to Burke's lie and obstruct justice, will be sentenced as a cooperating witness.[8]

In light of the sentence imposed on Burke, the time he actually served in prison, and the fact that several other participants were immunized or otherwise not charged, a non-custodial sentence or one of home confinement would be in keeping with section 3553(a)(6)'s requirement that sentencing disparities be minimized.  *See generally* Sent. Tr. at 87:10-88:6, *United States v. Connolly*, No. 16-CR-370 (S.D.N.Y. Oct. 24, 2019) (in giving the defendants non-custodial sentences, the court disregarded the Guidelines recommendation of imprisonment in part because the recommendation was "out of line with similarly situated defendants who have committed the same crime," none of whom would serve any time in prison).

### H.     The Global Pandemic, Coupled with Chris's Medical Condition, Reinforces the Necessity for a Non-Custodial Sentence

In determining the appropriate sentence, we respectfully request that the Court factor in the serious health crisis that COVID-19 poses to the federal prison population.  *See United States v. Hernandez*, No. 18-CR-834, 2020 U.S. Dist. LEXIS 58739, at *303 (S.D.N.Y. Apr. 2, 2020) ("The COVID-19 pandemic is extraordinary and unprecedented in modern times in this nation. It presents a clear and present danger to free society for reasons that need no elaboration.").  Moreover, the pandemic has resulted in especially harsh conditions of confinement, as inmates are placed in solitary confinement for weeks of "isolation" to begin their period of incarceration.

---

[8]     Moreover, as per the order of the Court, the government provided defense counsel with a list of alleged co-conspirators prior to trial.  That list included multiple additional individuals who have never been charged in this case.

This level of punishment is unwarranted here, under the extraordinary circumstances in which we are living.

As the Court is no doubt aware, a prison is the ideal environment for pandemics to grow and spread: "[O]vercrowded jail, prison, and immigration detention facilities [ ] force people together in close quarters without access to proper hygiene or medical care, sometimes living barracks-style in gyms or other open spaces, breathing the same recycled air for up to 23 hours per day." Joint Statement from Elected Prosecutors on COVID-19 and Addressing the Rights and Needs of Those in Custody (March 25, 2020) ("Joint Statement"), at 1.

It thus goes without saying that the pandemic has altered the level of punishment that people experience in federal prisons. It has been widely recognized that once an inmate or staff at a prison facility tests positive for the virus, it is likely to spread, and spread quickly. That trend is unnervingly on display throughout the country. Simply stated, since the inception of the pandemic, the punitive aspect of prison life has grown much harsher, and the risk of serious illness is ever-present.

Given the current global health crisis, and consistent with the actions taken at the state and federal levels in response to COVID-19, a non-custodial sentence is warranted. Chris is a non-violent, first-time offender and poses no risk to the safety of his community. Moreover, Chris suffers from high blood pressure, which increases his risk of becoming severely ill from COVID-19. *See* PSR ¶ 85 (reflecting information from Mrs. McPartland that her husband suffers from hypertension and high cholesterol); Center for Disease Control and Prevention ("CDC"), *People with Certain Medical Conditions* (Sept. 11, 2020), *at* cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html. More specifically, according to the CDC, hypertension has "been associated with increased

illness severity and adverse outcomes" among patients with COVID-19 and, in the context of the pandemic, courts have granted compassionate release of individuals based on their hypertension, in combination with other factors.[9]  Given the operational challenges that the COVID-19 crisis is presenting for the BOP, it makes little sense to add a first-time, non-violent offender such as Chris to the current prison population.

Finally, the Court should also be aware, if it is not already, of one especially onerous feature of the Bureau of Prisons COVID-19 Modified Operations plan.  Federal Bureau of Prisons, *BOP Modified Operations*, *at* bop.gov/coronavirus/covid19_status.jsp.  Any new inmate voluntarily surrendering – even if he has tested negative for the virus and is asymptomatic – is placed in quarantine for *at least* 14 days.  We have been advised by a BOP expert that, even for BOP Camp inmates, "quarantine" typically means solitary confinement in the Special Housing Unit (or "SHU") and that it usually lasts much longer than 14 days – indeed, has lasted as long as 73 days.  According to data being tracked by the Federal Defenders of New York, many courts in the Eastern and Southern Districts have imposed lesser sentences in light of this unique problem caused by the pandemic, finding that the impact of COVID-19 is an appropriate factor to consider under Section 3553.  For example, according to that data, in *United States v. Cirino*, Judge Rakoff stated in imposing sentence: "[I]t is fair to say that conditions in the prison system

---

[9]      *See United States v. Sawicz*, No. 08-CR-287, 2020 U.S. Dist. LEXIS 64418, at *2 (E.D.N.Y. Apr. 10, 2020) (granting release where the defendant suffered from hypertension and was incarcerated at a prison with a "COVID-19 outbreak"); *United States v. Pena*, No. 15-CR-551, 2020 U.S. Dist. LEXIS 85431, at *3-4 (S.D.N.Y. May 8, 2020) (granting release where the sixty-year-old defendant suffered from hypertension and hyperlipdermia, and was incarcerated at "the most heavily populated BOP facility . . . [with forty-three] confirmed cases of COVID-19"); *United States v. Scparta*, No. 18-CR-578, 2020 U.S. Dist. LEXIS 68935, at *9 (S.D.N.Y. Apr. 19, 2020) (granting release where the defendant suffered from hypertension, sleep apnea, high blood pressure, and high cholesterol and was incarcerated at "the site of one of the worst outbreaks of COVID-19 in any federal prison").

now result in a harshness that is not the norm and that ought to be recognized by the court as a mitigating factor.  In effect, you are serving harder time every day you are in the federal prisons."  No. 19-CR-323 (S.D.N.Y. 2020).  Many other courts are reported a having applied this reasoning.[10]

We respectfully submit that subjecting Chris, a non-violent first time offender, to such horrendous conditions would be far more punitive a sentence than is necessary to satisfy the statutory sentencing objectives, particularly under the "parsimony" clause.

## VI.     ADDITIONAL SENTENCING FACTORS

### A.     The Court Should Not Impose a Fine

We ask the Court to impose no fine.  Under the advisory guidelines, "[t]he court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine."  § 5E1.2(a).  The circumstances of this case have already derailed Chris's life and forced him to deplete most of his savings – it was these very circumstances upon which the Court appointed counsel for Chris.  Indeed, the Probation Department acknowledges that "[b]ased on [Chris's] financial profile, he appears unable to pay a

---

[10]     *See*, *e.g.*, *United States v. Hendryx*, No. 18-CR-752 (E.D.N.Y. May 20, 2020) (Vitiliano, J.); *United States v. Latney*, No. 18-CR-606 (E.D.N.Y. Oct. 5, 2020) (Seybert, J.); *United States v. Bravo-Mendez*, No. 18-CR-666 (E.D.N.Y. Aug 28, 2020) (Irizarry, J.); *United States v. Capalbo*, No. 02-CR-1237 (S.D.N.Y. May 6, 2020) (Preska, J.); *United States v. Rivera*, No. 16-CR-66 (S.D.N.Y. May 11, 2020) (Torres, J.); *United States v. Pierson*, No. 14-CR-855 (S.D.N.Y. April 30, 2020) (Swain, J.); *United States v. Goliszeski*, No. 18-CR-522 (S.D.N.Y. July 2, 2020) (Nathan, J.); *United States v. Morgan*, No. 19-CR-209 (S.D.N.Y. May 5, 2020) (Berman, J.); *United States v. Garcia*, No. 18-CR-31 (S.D.N.Y. July 23, 2020) (Preska, J.); *United States v. Paulino*, No. 19-CR-607 (S.D.N.Y. Oct. 21, 2020) (Nathan, J.); *United States v. Gonzalez*, No. 19-CR-467 (S.D.N.Y. Oct. 28, 2020) (Castel, J.); *United States v. Camacho*, No. 19-CR-389 (S.D.N.Y. Nov. 19, 2020) (Nathan, J.); *United States v. Stern*, No. 20-CR-465 (S.D.N.Y. Nov. 30, 2020) (Nathan, J.).

fine . . ."  PSR ¶ 102.  Chris's strained economic situation, we submit, would render any imposition of a fine "greater than necessary" to achieve statutory sentencing purposes.

## VI.    CONCLUSION

The United States Supreme Court has observed that "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."  *Koon v. United States*, 518 U.S. 81, 113 (1996).  We respectfully submit that given his otherwise unblemished life, the catastrophic collateral consequences he has already suffered and will continue to endure, the sentences given and to be given to other defendants, and the unduly harsh conditions of confinement created by the pandemic, a non-custodial sentence is warranted and appropriate. We ask the Court to temper justice with mercy and impose such a sentence.

Dated:  March 5, 2021                                   Respectfully submitted,

_____
Larry H. Krantz
Lisa Cahill
KRANTZ & BERMAN LLP
747 Third Avenue, 32nd Floor
New York, NY 10017
(212) 661-0009

Bradley R. Gershel
BALLARD SPAHR LLP
1675 Broadway, 19th Floor
New York, NY 10019
(212) 223-0200

*Counsel for Mr. McPartland*