# Exhibit A

<u>Exhibit A To Sentencing Memorandum</u>

**THE PRESENTENCE REPORT'S GUIDELINES CALCULATION AND MR. <u>McPARTLAND'S OBJECTIONS TO IT</u>**

In applying the advisory Sentencing Guidelines (as of November 1, 2018), the Probation Department has calculated a total offense level of 25, for an incarceration range of 51 to 71 months (in excess of the 46-month sentence imposed on James Burke):

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2J1.2(a)) | 14 |
| Enhancement for "Substantial Interference With Administration of Justice" (§ 2J1.2(b)(2)) | +3 |
| Enhancement for Offense "Extensive in Scope" (§ 2J1.2(b)(3)(C)) | +2 |
| Adjustment for Aggravating Role (§ 3B1.1(a)) | +4 |
| Adjustment for Abuse of Position of Trust (§ 3B1.3) | <u>+2</u> |
| TOTAL OFFENSE LEVEL: | 25 |

We set forth our factual objections to the Pre-Sentence Report ("PSR") below.  We also object to three of the four proposed Guidelines increases – many of which are overlapping – which increase Mr. McPartland's offense level from 14 to 23, more than tripling his advisory sentence exposure (from a range of 15 to 21 months to 46 to 57 months).  For the reasons below, with the exception of the "abuse of trust" enhancement, each of the PSR's proposed increases lacks adequate support in the record.  Accordingly, Mr. McPartland's total offense level should be 16, resulting in an advisory Guidelines range of 21 to 27 months.

**A.  <u>Factual Objections to the PSR</u>**

**1.  The PSR's Assertion That Mr. McPartland Had "Control" Over SCPD Personnel Decisions**

*Page 5, Para. 8, The Offense Conduct* – Mr. McPartland objects to the assertion that he had "control" over Suffolk County Police Department ("SCPD") personnel decisions.  The SCPD and the Suffolk County District Attorney's Office ("SCDAO") were distinct agencies, with distinct leadership overseeing each organization's own personnel decisions.  Mr. McPartland had no input into which officers served on the SCDAO's Detectives Squad and which operated within and as part of the SCDAO, and as a general matter he had no authority over SCPD personnel decisions.  Nor did Mr. McPartland use his "position[] and influence to promote . . . supporters and punish . . . detractors."

2. **The PSR Assertion that the GCB's Initial Handling of the Loeb Investigation was Suspicious and Untoward**

*Page 6, Paras. 10 & 11, The Offense Conduct* – Mr. McPartland objects to the assertions that SCDAO's Government Corruption Bureau ("GCB") handled the prosecution of Loeb in order to "control[]" the case and that it "was, by all accounts, unusual" to have the GCB assigned to handle the prosecution. As Spiros Moustakas testified at trial, the GCB did, in fact, at times "handle matters of a minor nature as a courtesy to a government official or a judge or an important person of some kind." Tr. 1026:13-17 (Nov. 21, 2019). Moustakas further acknowledged at trial that Burke was an "important person within Suffolk County law enforcement." *Id.* at 1027:1-3. In any event, and of the most significance, as Moustakas testified, he was assigned to handle the prosecution *before* the assault of Loeb took place, and thus, this could not possibly have been a part of any obstruction. *Id.* at 1022:11-1023:10. Indeed, the assault on Loeb was plainly not pre-meditated by Burke, but rather was a spontaneous result of Loeb calling him a "pervert" when Burke went into the interrogation room. *Id.* at 1195, 1196. Finally, there is no suggestion that Mr. McPartland asked Moustakas to do anything improper in connection with the handling of the case, or that Moustakas did so. Moustakas acknowledged this in his testimony. *Id.* at 1023, 1027-28, 1030-32. As such, there is simply no basis for a finding that the assignment of the case to GCB was in furtherance of the subsequently formed conspiracy.

3. **The PSR Assertion that the Request and Order Assigning the Special Prosecutor Was Intentionally Narrow to Further the Obstruction**

*Page 6, Para. 12, The Offense Conduct* – Mr. McPartland objects to the assertions that the request and order for the Special Prosecutor "intentionally" omitted the assault allegation and "effectively prevent[ed]" the special prosecutor from investigating that allegation, much less that he had any involvement in that alleged omission. As both Emily Constant and former SCDAO Appeals Chief, Michael Miller, testified at trial, regardless of the wording of the request and order, those documents necessarily provided the special prosecutor with authority to investigate the assault allegation because, in order to respond to a motion to suppress Loeb's confession as involuntary due to the alleged assault, the special prosecutor would be required to investigate whether the assault had in fact occurred. Tr. 2562:25–2564:9 (Dec. 5, 2019) (testimony of Constant); *id.* at 2756:6–17 (testimony of Miller). Further, as Miller testified, while in his opinion the request and order did not authorize the Special Prosecutor to investigate the alleged assault as an independent crime, the scope of the special prosecutor's authority could easily have been expanded to include such an investigation at the request of the Special Prosecutor. *Id.* at 2756:18–22, 2764:17–2765:17. Moreover, there is no allegation that Miller was corrupt or was pressured in any way to ignore allegations of misconduct against Burke.

4. **The PSR Assertion re the Crafting of Burke's False Narrative**

*Page 7, Paras. 13 & 15* – Mr. McPartland objects to the assertion that in February 2013, "McPartland, Burke and Hickey met on several occasions to craft a false narrative for Burke to use to explain what occurred on December 14, 2012, to the special prosecutor. McPartland took the lead in honing the false narrative and shaping it with Burke to make the lies as believable as

2

possible." PSR at ¶ 13.  Mr. McPartland also objects to the similar allegation that "[m]uch of the final false narrative [given by Burke and others] was originally discussed and agreed upon between Burke and McPartland in the earlier part of the conspiracy."  *Id.* ¶ 15.

We have previously requested a sentencing hearing on these allegations, based on the fact that they were asserted by Hickey for the first time at trial, and were not contained in his prior 17 documented interviews with the government, spanning four years.  *See* ECF No. 233.  Nor were these allegations contained in Hickey's notes, his attorney's notes or his calendar.  The Court denied our request for a hearing, and credited Hickey's testimony in this regard.  *See* ECF No. 245.  We do not seek to reargue this motion, but note our objection and request for a hearing for the record.

### 5.  The PSR Assertion that Mr. McPartland "Prepared Burke to Testify" at the Suppression Hearing

*Page 8, Para. 16* – Mr. McPartland objects to the assertion that he "prepared Burke to testify [at the suppression hearing], at which time they practiced the finalized version of the false narrative . . ."  PSR at ¶ 16.  This allegation was also challenged in our motion for a sentencing hearing, which the Court denied.  We do not seek to reargue this motion, but note our objection and request for a hearing for the record.

### 6.  The PSR Assertion That The Oliva Wire Was Illegitimate

*Page 8, Para. 17, The Offense Conduct* – Mr. McPartland objects to the assertion that the SCDAO's "investigati[on of] the leak of confidential officer safety-type crime patterns" in January 2014 was a "cover story" for the wiretap of John Oliva's phone.  SCDA's decision to authorize the wiretap was spurred by the leak to *Newsday* of confidential police information concerning a robbery spree – a leak that imperiled the lives of officers who were in the field surveilling the robbery suspects at the time that *Newsday* published the story, and caused (quite understandably) an uproar among SCPD members and the police unions.  In addition, the suggestion that the January 2014 leak was a cover story for the wiretap is belied by the fact that the SCDAO informed the Federal Bureau of Investigation (the same agency that investigated Burke in 2013 for allegedly assaulting Loeb) of the wiretap before it even commenced, and even invited them to participate in monitoring the wiretap.  And the suggestion that the wiretap was somehow not legitimate is belied by the fact that Oliva was eventually arrested, confessed, resigned from the SCPD, and pleaded guilty to committing a crime arising out of his leaks to *Newsday*.  Moreover, the government has stipulated that the wiretap of Oliva was *not* unlawful.

### 7.  The PSR Assertion That Mr. McPartland Exerted Pressure on Police Officers to Lie and Commit Perjury

*Page 12, Para. 33.*  The PSR asserts that Mr. McPartland, together with others, put pressure on police officers "to lie about what occurred, going so far as to induce one [police officer] to commit perjury."  PSR ¶ 33; Addendum, p. 8.  While it is true that Burke and Hickey engaged in this conduct, there is no evidence that Mr. McPartland participated in it.  Detectives Kenneth Bombace and Anthony Leto testified that they never spoke to Mr. McPartland about the

3

Loeb assault or its cover-up, were never threatened by Mr. McPartland or told by him to lie or otherwise directed by him in any way in connection with the alleged conspiracy. *See* Trial Tr. 774:15-775:13, 787:19-22 (Nov. 20, 2019) (testimony of Bombace); *id.* at 1296:16-1297:12 (Nov. 25, 2019) (testimony of Leto). In fact, Bombace and Leto both testified that they were *never* threatened by Hickey to lie, much less that Hickey ever passed on any supposed threats from Mr. McPartland. *Id*. 788:4-5 (Nov. 19, 2019) (testimony of Bombace), *id.* 1301:16-24 (Nov. 25, 2019) (testimony of Leto). When the third officer involved, Michael Malone, testified before the grand jury, he said nothing at all about Mr. McPartland.

Moreover, while Leto perjured himself during an October 2013 suppression hearing, there is no evidence that Mr. McPartland pressured him to do so. Rather, it was Burke who gave Leto his instructions. *See* Tr. 1805-06 (Dec. 2, 2019) (Hickey noting an October 2013 calendar entry reflecting that "Leto was being prepped by Burke on what to say at the trial, pretrial suppression hearings"). Leto testified that he never spoke with Mr. McPartland and he certainly never told him to lie. Tr. 1296-97 (Nov. 25, 2019). Similarly, the evidence makes plain that the decision to not call Burke as a witness at the suppression hearing was based *solely* on the advice of Burke's defense counsel, and that Mr. McPartland played no role whatsoever in this respect. Tr. 3059:21-3060:6.

## B. <u>Legal Objections to the Guidelines Calculation</u>

### 1. **"Substantial Interference with the Administration of Justice"**

Sentencing Guidelines Part J, covering offenses involving the administration of justice, sets forth certain "specific offense characteristics reflect[ing] the *more serious* forms of obstruction" and provides for corresponding increases in the offense level. U.S.S.G. § 2J1.2 cmt. (backg'd) (emphasis added). One of these characteristics is an offense which "resulted in substantial interference with the administration of justice." *Id.* § 2J1.2(b)(2)); *see United States v. Jones*, 900 F.2d 512, 522 (2d Cir. 1990), *cert. denied*, 498 U.S. 846 (1990) (observing that the enhancement is intended to cover "egregious conduct"); *United States v. Oxendine*, 237 F. App'x 852, 855 (4th Cir. 2007) ("the enhancement is designed to punish more severely those instances of obstruction of justice which cause greater disruption in the administration of justice"). The Guidelines' use of the phrase "resulted in" imposes a *causation* requirement. *United States v. McSherry*, 226 F.3d 153, 157-58 (2d Cir. 2000); *United States v. Samayoa*, 827 F. App'x 967, 970 (11th Cir. 2020); *United States v. Waterman*, 755 F.3d 171, 175 (3d Cir. 2014).

An application note to the enhancement offers a non-exhaustive list[1] of "substantial interference" examples – "a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based upon perjury, false testimony, or other false evidence; or the unnecessary expenditure of substantial governmental or court resources." § 2J1.2, cmt.1. The government has the burden of proving facts, by a preponderance of the evidence, sufficient to support this and other enhancements. *United States v. Kent*, 821 F.3d 362,

---

[1]      *See United States v. Escalera*, 957 F.3d 122, 139 (2d Cir. 2020) ("We have held that the commentary's 'listing of acts warranting this enhancement is not exclusive,' and recognized that 'other acts – if similarly or even more disruptive of the administration of justice – could serve as bases' for the enhancement") (quoting *United States v. Amer*, 110 F.3d 873, 885 (2d Cir. 1997)).

368 (2d Cir. 2016).  Where the causal connection between the defendant's conduct and the alleged "substantial interference" is lacking, the enhancement is inapplicable.  *See Jones*, 900 F.2d at 521-22 (vacating sentence based on erroneous enhancement where the record showed that the government already had the information the defendant concealed, there was a dearth of evidence of unnecessary government expenditures, and the instances of perjury "do not constitute the type of egregious conduct envisioned by the Guidelines as substantial interference with the administration of justice"); *United States v. Weissman*, 22 F. Supp. 2d 187, 194 (S.D.N.Y. 1998) ("If the government is to succeed on this claimed enhancement, upon which it bears the burden of proof by a preponderance of the evidence, this Court must be in a position, on the whole record, to make specific findings that Weissman's conduct resulted in 'substantial expenditure of governmental resources'") (citation omitted).

Here, the PSR at ¶ 47 applies this enhancement because "[t]he defendant substantially interfered with the administration of justice by covering up the assault of the victim and then engaging in the coercion of his subordinates to lie under oath to exclude his conduct in same." *See also* Addendum at 10 (same).  The flaw in this reasoning is that there is no evidence establishing that Mr. McPartland's conduct had any *actual* effect on the government's investigation.  To the contrary, the conspiracy to obstruct that was formed among Burke, Bombace, Leto, Malone and Hickey plainly existed *wholly independent* of any conduct by Mr. McPartland.  It was formed at the time of, and/or shortly after, the assault on Loeb – an event as to which Mr. McPartland had no role.  Moreover, it was Burke who determined the "cover story" to be used, even accepting as true Hickey's testimony that Mr. McPartland in 2013 discussed this with him and gave him advice.  And as to the obstruction in 2015, Hickey gave no indication in his testimony that he ever passed on to any of the police officers any supposed threats from Mr. McPartland.  Nor did Leto or Bombace testify to receiving any such alleged McPartland threats via Hickey or anyone else.  *See* Factual Objection 7 above.

In the absence of any proven *actual effect* of Mr. McPartland's conduct on the obstruction of justice that took place, the enhancement for "substantial interference" is inapplicable.  *See, e.g.*, *United States v. Jackson,* 67 F.3d 1359, 1370 (8th Cir. 1995) (in finding error in imposition of substantial interference enhancement, the court observed, "The problem is one of nexus. . . . [T]he person whose deeds created the need for the investigation was not [the defendant]. . . . We believe the source of the leak, not [the defendant], bears the responsibility for the government's substantial investigative expenditures").

## 2.  Offense "Extensive in Scope"

The PSR recommends a two-level increase under U.S.S.G. § 2J1.2(b)(3)(C) because Mr. McPartland's alleged obstructive criminal conduct was "extensive in scope."[2]  PSR ¶ 48.  This

---

[2]     The PSR does *not* assert that Mr. McPartland's conduct was "extensive in . . . planning or preparation," two other prongs of U.S.S.G. § 2J1.2(b)(3)(C).  The government's response overstates the basis for the PSR's proposed enhancement by referencing those two words.  Gov't Letter to Probation Department, dated Aug. 28, 2020 ("Gov't Letter") at 16 ("The defendants' elaborate scheme to corrupt and obstruct two related federal grand jury investigations, through witness intimidation and the creation and perpetration of false narratives/evidence . . . was 'extensive in planning [and] preparation'") (citation omitted).

enhancement is inapplicable because, even accepting Hickey's testimony as true, there is nothing "extensive in scope" about his depiction of Mr. McPartland's limited conversations with only two of the co-conspirators – Burke and Hickey – in connection with the alleged collective goal of ensuring that the witnesses to Burke's assault of Loeb remained silent.  Indeed, the alleged criminal conduct was simple and narrowly confined: helping Burke craft a basic narrative that he "popped his head into the room," and encouraging Hickey to make sure that those under his command towed Burke's party line and protected him.  It is hard to imagine a simpler and more narrow effort to obstruct justice.  Indeed, since some degree of obstructive conduct is always required to be convicted of obstruction of justice and the other offenses of conviction, for the "extensive in scope" enhancement to apply there must be something materially above the ordinary conduct required for conviction.  No such particularly "extensive" conduct is present here, as to Mr. McPartland.  For this reason, the "extensive in scope" enhancement should not be applied.

### 3.  "Aggravating Role"

The PSR recommends a four-level increase under § 3B1.1(a) because Mr. McPartland was allegedly "an organizer or leader in the instant conspiracy, and the criminal activity involved five or more participants or was otherwise extensive."  PSR ¶ 50.  This enhancement is egregious overreaching on the part of the government.

As set out in the background commentary to § 3B1.1, the section "provides a range of adjustments to increase the offense level based upon . . . the degree to which the defendant was responsible for committing the offense.  This adjustment is included primarily because of concerns about relative responsibility."  § 3B1.1, cmt. (backg'd); *see also United States v. Herrera*, 878 F.2d 997, 1000 (7th Cir. 1989) ("Organizers and leaders of criminal activity play an important role in the planning, developing, directing, and success of the criminal activity.  Thus, organizers and leaders generally are deemed more culpable than mere managers or supervisors.").  Typically, role enhancements are imposed where the defendant exercised a significant degree of control and decision-making authority over the criminal activity, such as where he directs the operation by recruiting others, directing the minutia of the enterprise, or organizing others for the purpose of carrying out the crime.  *United States v. Caballero*, 672 F. App'x 72 (2d Cir. 2016) (affirming enhancement where the defendant supervised key aspects of obtaining and distributing heroin, instructed co-conspirators and managed key logistics of the enterprise).  This is simply not the case with respect to Mr. McPartland's participation in the offenses of conviction, and thus the enhancement is not warranted.

The government's purported "proof" in support of this enhancement is the following:

> These three – Spota, McPartland, and Burke – were regularly
> referred to as the "they" during trial testimony; those who exerted
> power, influence, and control over the SCPD detectives and
> officers who were being tasked with towing the line, and

---

We submit that, whatever the basis for the § 2J1.2(b)(3)(C) enhancement – the ground relied on by the PSR ("scope"), the grounds relied on by the government ("planning or preparation") or all three – the record is insufficient to support the enhancement.

> remaining silent.  McPartland was one of the "they" who, according to Lt. Hickey, selected Leto to take the fall for Burke and testify falsely.  This trio was regularly referred to as "The Administration" during trial – the ones running Suffolk county and the obstruction scheme, and directing [] Hickey to convey to the detectives under his command what to do and what to say. McPartland, in fact, was one of the architects of the false narrative, which the detectives were instructed to memorize and repeat. . . . The evidence clearly established that the defendants played a crucial role in the planning, coordination, and implementation of this criminal scheme, involving at least the three of them[,] Spota, McPartland and Burke, as well as Hickey, Madigan and the four Criminal Intelligence Detectives under Hickey's direct command – amounting to well over five participants.

Gov't Letter, at 17.  This argument is an overreach and unfair for several reasons.

**First**, the trial testimony as to the use of the term "they" was entirely ambiguous, and Hickey's use of a commonplace pronoun to describe others can hardly establish managerial responsibility over the offenses of conviction.  *See*, *e.g.*, Tr. 1546 (Hickey's testimony that "they" referred to themselves as "[t]he administration"); *id.* at 1597 (Hickey's testimony that "they" directed him to "keep my guys in line and quiet"); *id.* at 1651 (Hickey's testimony that "they" made the decision to monitor the Loeb proceedings).  Indeed, the names of the individuals who allegedly comprised "they" were never used when Hickey spoke to the other officers.  This is far too slender a reed upon which to base a "managerial role" enhancement.

**Second**, the reference to "the administration" was equally vague and non-specific, and fails to support the enhancement, particularly since it is a given that Mr. McPartland was in fact a legitimate part of "the administration" of the SCDAO.  Indeed, the "fact that a defendant holds a supervisory position in the workplace is not sufficient grounds for an adjustment without a showing that the defendant actually supervised the criminal activity."  Sent. Op. and Ord., *United States v. Beckford*, No. 05-CR-944 (S.D.N.Y. May. 17, 2006), ECF No. 11 at 9; *see also United States v. DeGovanni*, 104 F.3d 43, 46 (3d Cir. 1997) ("[T]o be a supervisor, there must be some degree of control over others involved in the commission of the offense.  More specifically, the Guidelines direct that a defendant's role in the criminal activity is the operative issue.") (citations omitted); *United States v. Prigmore*, No. CR. 93-10276, 2020 U.S. App. LEXIS 29238, at *8 (D. Mass. Aug. 7, 1996) ("A distinction must be drawn between corporate control and criminal control.  Only the latter allows enhancement for role in the offense.").  Here, there is simply no evidence that Mr. McPartland was a "supervisor" of the criminal activity, as opposed to simply being a supervisor in the SCDAO.  That is plainly insufficient to establish a managerial role enhancement.

**Third**, Mr. McPartland's alleged role as one of the "architects of the false narrative," even accepting Hickey's testimony as true, was nothing more than listening to Burke and "nod[ding] his head" yes or no if he (Mr. McPartland) thought the cover story was or was not a good idea.  Tr. 1598:18 (Nov. 26, 2019) (testimony of Hickey).  Such advice hardly constitutes a "managerial role."

**Fourth**, the government's allegation, as set forth in its letter quoted above, that Mr. McPartland played a "crucial role" in the criminal scheme is beside the point, as that is not the standard for imposing a "managerial role" enhancement.  Rather, the question is whether he played a *supervisory* role in the scheme and is therefore more culpable than the other participants who were not supervisors.  That is plainly not the case here.

**Fifth,** when one looks at the government's list of alleged coconspirators – including Burke, Bombace, Malone, Leto, and Hickey – it is abundantly clear that Mr. McPartland's relative "level of responsibility" is at the low end of the spectrum.  Burke not only led the conspiracy, but was the prime assaulter of Loeb, and was obstructing justice to save his own career.  Leto had also assaulted Loeb, lied under oath at the suppression hearing, and was obstructing justice not only to protect Burke, but to protect himself.  Hickey was the supervising officer of Leto, Bombace and Malone, and Burke tasked him with being the key point person as to the cover-up.  Hickey's involvement was quite extensive, and included spending days with his subordinate officers trying to keep them in line.  Hickey referred to this at trial as "backyard therapy."  *Id.* at 1632:16, 1634:11-1635:5.

In contrast, Mr. McPartland did not participate in the assault, did not violate Loeb's civil rights, had only a handful of conversations with Hickey and Burke in which obstruction is alleged to have even been discussed, gained nothing from the offense, and was not the formal or informal supervisor of *any* of the other co-conspirators.  As such, he was not a manager or leader, and the enhancement is inapplicable.

**Finally**, the government's allegation that Mr. McPartland was *involved in* selection of Leto "to take the fall for Burke and testify falsely" not only fails to constitute "organizer or leader" material, but ignores other evidence indicating how minimal that involvement was.  Hickey testified merely that "Burke suggested Tony Leto would be the best [to testify at the suppression hearing], and McPartland agreed."  *Id.* at 1646.  In fact, according to Hickey and Leto, by that time the special prosecutor himself had already determined that Leto would testify at the hearing.  *Id.* at 1650; *see also* 3500-AL-17 ("He [Leto] was told by a Suffolk County Police Sergeant that he was going to be testifying at a suppression hearing in the Loeb matter").  Mr. McPartland had nothing to do with the fact of Leto's testimony at all.  According to Leto's testimony, Mr. McPartland never spoke to him about that testimony, and certainly never threatened him to testify falsely.  Indeed, during the time period of the suppression hearing (October 2013) in the Loeb case, both Mr. McPartland's father and wife were hospitalized at key times.  Thus, that hearing was not at all front and center on his mind.  *See* Tr. 2678:4-16 (Dec. 5, 2019) (Constant's testimony that from August through December 2013, Mr. McPartland was out of the office for long periods of time on account of a personal matter).

For all of these reasons, a "managerial role" enhancement should not be applied.