UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA


- against -

CHRISTOPHER MCPARTLAND and
THOMAS J. SPOTA,

                                        Defendants.

No. 2:17-cr-0587 (JMA)


**REPLY SENTENCING MEMORANDUM
ON BEHALF OF CHRISTOPHER McPARTLAND**


KRANTZ & BERMAN LLP
747 Third Avenue, 32nd Floor
New York, NY 10017
(212) 661-0009

BALLARD SPAHR LLP
1675 Broadway, 19th Floor
New York, NY 10019
(212) 223-0200

*Counsel for Mr. McPartland*

**TABLE OF CONTENTS**

I.  PRELIMINARY STATEMENT ...................................................................................1

II. ARGUMENT ...........................................................................................................2

    A.  The Government Urges the Court to Sentence Chris Based on
        Unconstitutional Factors ..................................................................................2

    B.  The Government Exaggerates the Facts Proven at Trial ........................................5

        1.  The Claim that there were "Hundreds" of Phone Calls in
            Furtherance of the Conspiracy ...................................................................6

        2.  The Claims that Burke Told Chris About the Assault In His
            "Early Morning Phone Call" With Him, and That Spiros
            Moustakas was Assigned to "Exert Control" Over the Matter ..................6

        3.  The Claim that Chris "Coerced" Leto to "Commit Perjury" ......................7

    C.  The Government Asks the Court to Punish Chris for Conduct that
        Was Not Criminal and Was Otherwise Irrelevant .................................................10

        1.  The Oliva Wire Was Concededly Lawful, and Took Place
            While the Federal Investigation was Dormant...........................................10

        2.  The Pat Cuff Allegations .........................................................................11

        3.  The Car Accident ....................................................................................12

    D.  The Government Downplays the Role of Burke, In Order to Inflate
        Chris's Culpability ..........................................................................................13

    E.  The Government Ignores Chris's Good Deeds and the Catastrophic
        Collateral Consequences of His Conviction, Which Have Only
        Increased Since Our Original Sentencing Submission ...........................................14

    F.  The Government's Request for an Upward Departure is Baseless.........................16

    G.  The Government's Guidelines Arguments, to the Extent Opposed,
        Are In Error......................................................................................................18

III. CONCLUSION .......................................................................................................20

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Cotto v. Herbert*,
    331 F.3d 217 (2d Cir. 2003)...............................................................................3

*Izaguirre v. Lee*,
    856 F. Supp. 2d 551 (E.D.N.Y. 2012) ...........................................................4

*Kyles v. Whitley*,
    514 U.S. 419 (1995)........................................................................................4

*Ramirez v. United States*,
    185 F. Supp. 2d 246 (E.D.N.Y. 2001) ...........................................................4

*United States v. Banol-Ramos*,
    516 F. Appx. 43 (2d Cir. 2013)....................................................................17

*United States v. Barresi*,
    316 F.3d 69 (2d Cir. 2002).............................................................................4

*United States v. Martinucci*,
    561 F.3d 533 (2d Cir. 2009)...........................................................................4

*United States v. Stratton*,
    820 F.2d 562 (2d Cir. 1987)...........................................................................4

*United States v. Volpe*,
    224 F.3d 72 (2d Cir. 2000)...........................................................................17

*United States v. Whitten*,
    610 F.3d 168 (2d Cir. 2010)...........................................................................4

*Wasman v. United States*,
    468 U.S. 559 (1984)........................................................................................4

**Statutes**

18 U.S.C. § 3553(a) ...................................................................................................2

U.S.S.G. § 1.A.4(b)..................................................................................................16

U.S.S.G. § 2J1.2......................................................................................................16

U.S.S.G. § 5K2.0 ..............................................................................................16, 17

## I.   <u>PRELIMINARY STATEMENT</u>

The government's sentencing memorandum is rooted in hyperbole and overheated rhetoric, rather than precision and fidelity to the record.  It reflects an unwarranted zeal to inflict an excessively harsh punishment on Chris McPartland ("Chris").  Toward that end, the government exaggerates the facts and at times even draws them out of thin air.  As the *coup de grace*, the government requests an upward departure so extreme as to be unconscionable.

To achieve its desired end, the government resorts to egregiously overstating the offense conduct and painting Chris as a caricature of corruption, rather than the fundamentally decent human being that he actually is**.**  It also asks the Court to rely on unlawful and irrelevant considerations in imposing sentence.  In all, the government (a) seeks to punish Chris for exercising his constitutional right to go to trial and have his counsel cross-examine witnesses; (b) makes key accusations against him that have no evidentiary basis; (c) understates the culpability of James Burke, by far the most culpable co-conspirator, in order to elevate Chris's culpability; (d) urges the Court to enhance Chris's sentence based on conduct that is neither criminal nor relevant to sentencing; (e) ignores a lifetime of good works by Chris and the devastating collateral consequences he has already suffered and will continue to suffer forever; and (f) seeks an unjustifiable upward departure that results in a sentence more than twice the 46 months imposed on the unquestioned leader of the conspiracy, James Burke, who not only obstructed justice himself (and ordered others under his command to do so), *but actually assaulted Christopher Loeb.*

When the smoke is cleared from the government's submission, and the trial record is focused on with precision, what Chris stands convicted of is not a five-year obstruction spree.  Rather, even accepting for purposes of sentencing the testimony of James Hickey, the trial proof

showed – at most – that Chris engaged in conversations with Hickey and Burke wherein he encouraged the obstruction conspiracy in which Burke and the other officers were already engaged, gave Burke advice on it, and encouraged Hickey to warn those under his command to tow the party line and keep their mouths shut.

We do not for a moment minimize the seriousness of the conduct of conviction, especially coming from an Assistant District Attorney.  But to frame the case as a five-year effort by Chris, starting with the "first phone call" wherein Burke "admitted the assault," leading to "hundreds of phone calls" in furtherance of a scheme to obstruct justice, followed by "coerc[ing] a police officer to commit perjury," Gov't Mem. at 7, 15 & 18, is hyperbolic and unfair.

We respectfully submit that when the trial proof is focused on with restraint, objectivity and precision – and the totality of Chris's life and the collateral consequences he has suffered properly considered – a sentence of home confinement, coupled with community service, is "sufficient, but not greater than necessary," to meet the ends of sentencing.  18 U.S.C. §3553(a) (the so-called "Parsimony Clause").

II.     **ARGUMENT**

### A.  The Government Urges the Court to Sentence Chris Based on Unconstitutional Factors

The government exhorts the Court to commit an error of constitutional dimension.  It asks that Chris be sentenced more harshly because he exercised rights protected by the Sixth Amendment of the U.S. Constitution – his right to a jury trial and to cross-examine witnesses against him.  U.S. Const. amend. VI; see also *Cotto v. Herbert*, 331 F.3d 217, 245 (2d Cir. 2003) ("cross-examination of testifying witnesses is mandated by the Sixth Amendment's Confrontation Clause").

Instances of this argument are littered throughout the government's sentencing memorandum.  For example, the government lumps into the category of "offense conduct" the fact that the defendants "continued to deny any involvement in the very cover-up they spearheaded, until a jury told them otherwise."  Gov't Mem. at 8.  The government also urges a harsher punishment because Chris's counsel attacked the credibility of witnesses against him, by "accusing them of lying, or of having mental health issues, or characterizing them as womanizing alcoholics."  *Id.* at 22.  Of course, each of those lines of cross-examination *was based on the government's own disclosures and on facts conceded by the witness, and thus entirely proper.*  Nonetheless, the government doubles down on this position when it cites, as the "definitive" reason that that Chris deserves a sentence *more than double that of Burke's*, the fact that "Burke immediately took responsibility for his actions and pleaded guilty*," id.* at 21, and did not "attack the credibility of witnesses against him," *id.* at 22.  "Burke knew they were telling the truth and he didn't pretend otherwise. Conversely, to date, the defendants in this matter . . . have spent years viciously attacking and disparaging the government's key witnesses."  *Id.*

These are all jaw-dropping positions for the Department of Justice to take.  They reflect a blind spot for the Constitution, and seem borne out of a desire to punish Chris for having had the temerity to go to trial and to allow his counsel to challenge the credibility of the government's star witness.  But whatever its motivation, the government's position is a bald request for the Court to sentence Chris based on unconstitutional considerations.

A "sentence is unconstitutionally vindictive if it imposes greater punishment because the defendant exercised a constitutional right, such as the right to jury trial."  *Izaguirre v. Lee*, 856 F. Supp. 2d 551, 572 (E.D.N.Y. 2012) (citing *Wasman v. United States*, 468 U.S. 559, 567-68 (1984)).  And while the sentencing court is permitted to *reward* a defendant who has pleaded

guilty, it may *not* impose a harsher sentence on account of a defendant exercising his constitutional right to go to trial, or to cross-examine witnesses against him. *See United States v. Whitten*, 610 F.3d 168, 195 (2d Cir. 2010) (the defendant may receive "leniency" for accepting responsibility, but may not receive "a harsher sentence for failure to plead"); *United States v. Barresi*, 316 F.3d 69, 75 (2d Cir. 2002) (absence of acts bespeaking regret not a basis to find "lack of remorse"); *see also United States v. Stratton*, 820 F.2d 562, 564 (2d Cir. 1987) (court may not increase sentence based on the defendant's unwillingness to cooperate with the government).

Under these bedrock principles, Chris had every right to put the government to its weighty burden of proof, demand that he be tried by a jury of his peers and allow his counsel to cross-examine – appropriately – all the witnesses against him. *See Ramirez v. United States*, 185 F. Supp. 2d 246, 257 (E.D.N.Y. 2001) (observing that a basic purpose of cross-examination is to attempt to show that a witness has lied on the stand). The government's suggestion to the contrary, and its request for what is in effect a "trial penalty" of several years, is flatly unconstitutional.[1] Moreover, the government is off base when it describes the credibility attacks against Hickey as "vicious," and suggests that Chris should be punished more harshly for them. These attacks came entirely from counsel, in the context of litigating the case. Indeed, the

---

[1]     The government cites *United States v. Martinucci*, 561 F.3d 533, 535 (2d Cir. 2009), for the proposition that "lack of remorse" is a "pertinent sentencing factor." But in *Martinucci*, the defendant himself made a statement at sentencing, (a) claiming that his guilty plea had been coerced, (b) asserting his factual innocence to a sexual abuse charge, and (c) challenging the credibility of the victim witness. In that context, the Second Circuit upheld the district's consideration of various sentencing factors, including a lack of remorse. *Id*. In contrast, here the only conduct the government relies on to show lack of remorse is the mere fact that Chris pleaded not guilty and tested the government's proof at trial. Those facts provide no lawful basis for a sentencing enhancement.

defense fought for years to obtain basic *Brady/Giglio* material as to Hickey, and when it was finally produced, used it appropriately at trial, as was its right and its obligation.  The filings made by the defense in order to obtain that disclosure were not "vicious."  They were essential defense efforts to obtain information to which it was entitled.  Likewise, the cross-examination of Hickey was entirely proper, and based on facts bearing on credibility *that were concededly true*: Hickey *had* been found by a court to have committed perjury, *had* been hospitalized for alcoholism in 2013, *had* been hospitalized for hallucinations and an altered mental status in 2015, and *had* admitted to overlapping affairs. These were entirely proper areas of cross-examination, approved by the Court, for which Chris may not be punished (any more than he may be punished for having gone to trial).

Further, with respect to sentencing, it is worth noting that the government is acting in a dual role in this case: it is both a prosecutor *and* a victim of the obstruction conspiracy, since it was an EDNY investigation that was obstructed.  There is always a risk that this dual role will -- even unknowingly -- affect a prosecutor's objectivity.  Here, we respectfully submit that the Court should consider this risk when analyzing: (i) the umbrage the government has taken at Chris's decision to exercise his constitutional rights; (ii) its suggestion that Chris was somehow more culpable than was Burke; and (iii) its request for an upward departure that appears to seek retribution, rather than a fair and impartial punishment.

### B.  The Government Exaggerates the Facts Proven at Trial

To support its draconian sentencing recommendation, the government materially overstates the offense conduct proven at trial.  The government's sentencing memorandum is replete with examples of this, but we address below the most salient exaggerations of the record.

### 1. The Claim that there were "Hundreds" of Phone Calls Involving Obstructive Conduct

To punctuate the severity of the offenses of conviction, the government states that "the defendants and their co-conspirators . . . engaged in hundreds of telephone conversations over a five year period, during which they strategized and discussed, in substance, Burke's assault of the prisoner, Christopher Loeb, Loeb's allegations against Burke; the state suppression hearing being conducted as part of the prosecution of Loeb; and the viability of the federal investigation."  Gov't Mem. at 7.   This allegation overstates the record.

It was not disputed at trial that the EDNY investigation of James Burke and others was the "talk of the town" for years, whether by phone or otherwise.  But conversations on that *subject* are not unlawful, and provide no basis for an enhanced sentence.  Moreover, to the extent that the government is suggesting that these "hundreds" of conversations were proven at trial to have involved *obstructive conduct,* by Chris or others, that is just not the case.  Toll records do not provide the *substance* of any conversation, and without testimony as to that substance, the government may not simply leap to the conclusion that any particular call *had to have been obstructive in nature.*  To assert otherwise is sheer speculation, and has no place at sentencing.

### 2. The Claims that Burke Told Chris About the Assault In His "Early Morning Phone Call" With Him, and That Spiros Moustakas was Assigned to "Exert Control" Over the Matter

In yet another overstated accusation, the government alleges that: "McPartland exerted control over the Loeb matter from the moment he learned of it, following his early-morning call from Burke in which Burke admitted to the assault."  Gov't Mem. at 14-15.  That allegation is equally unsupported by the record.

The government cites Tr. 904-10 and 912-16 in support of this proposition.  *But nowhere in those pages, or anywhere else in the trial transcript, was evidence presented that "Burke*

*admitted to the assault"* in that conversation.  Indeed, as the government is well aware, the trial testimony was clear that at the time of the early-morning call with Burke, *and* at the time that Spiro Moustakas was assigned to the case, *the assault had not yet even taken place*.  Moustakas acknowledged this directly in his testimony.  Tr. 1025.

Thus, neither the early morning call from Burke, nor the assignment of Moustakas, *could possibly have been obstructive in nature*.  Yet, the government stubbornly made this misleading argument to the jury, just as it now makes it to the Court.  In fact, in its sentencing memo, the government goes further and argues that the reason for the assignment of Moustakas was "[t]he concern [that], if left unchecked, Loeb might cause serious problems for Burke."  Gov't Mem. at 15.  This argument lacks any foundation.  The government fails to explain *how* assigning Moustakas to handle the case – before the assault had even taken place – *could possibly have served to protect Burke or "check" Loeb*.  Nor does it explain how keeping Moustakas on the case – given his acknowledged independence and lack of involvement in the conspiracy – could possibly have protected Burke, *as there is no reason to believe that Moustakas would have protected him*.  Likewise, the government does not explain how asking for a purportedly "absurd bail," *id.*, could have been part of a cover-up, since a detained defendant can inform his attorney of an alleged assault just as easily as can one out on bail.

That these arguments are contrary to the record and logic is deeply troubling, and supports the conclusion that the government is overreaching.  The arguments should be rejected.

### 3.   The Claim that Chris "Coerced" Leto to "Commit Perjury"

The government also claims that "perhaps the most grievous and reprehensible act of the defendants was the enormous pressure exerted on former SCPD Detective Tony Leto to lie under oath in a court of law during a criminal proceeding, in order to protect Burke.  In other words,

the two most powerful prosecutors in the country essentially coerced a police officer to commit perjury." Gov't Mem. at 18. Yet again, this allegation is based on hyperbole, rather than record support.

**First,** Leto himself testified that Chris never spoke with him *at all* about the Loeb case and certainly never told him to lie, let alone "coerced" him to do so. Tr. 1296-97. In fact, Leto testified that he had two separate meetings on a particular day in March 2013, in preparation for his meeting with the Special Prosecutor. The first was at a ball field with Ken Bombace, James Hickey and Mike Malone. Tr. 1217. Leto testified that he was told that Burke's proposed narrative was that he was never at the precinct. Leto testified that in that meeting: "We all agreed that was not a good idea." Tr. 1218:5.

The second meeting that day was with Leto, Bombace, Malone and Burke at Police Headquarters. Tr. 1218. According to Leto, *it was at the second meeting with Burke in which the false narrative was arrived at and honed.* As Leto testified:

> Q: And can you tell us what happens when you have the meeting with Chief Burke in his office?
>
> A: We sit down at a table and start discussing about what we'll say happened, you know, in the room with Christopher Loeb. Did the Chief come in the room? Was the door open? Was the Chief even there? Was he even in the precinct? You know, just throwing ideas around. And it was kind of these are the ideas that he was throwing out there.
>
>         * * *
>
> Q: Who decided the final version of the story?
>
> A: The chief.
>
> Q: And that's Chief Burke?
>
> A: Yes.

Tr. 1218, 1221.

**Second,** as to the suppression hearing in October 2013, it was the Special Prosecutor alone, not Hickey, not Burke and certainly not Chris, who determined which witnesses would testify at that hearing.  While the Special Prosecutor, Peter Crusco, did not testify at trial, this is clear from his 3500 material.  Crusco stated in his interview that he never discussed the suppression hearing with Chris, and that he alone made the decision as to who would testify at that hearing.  *See* 3500-PC-1, at 1-2; *see also* 3500-PC-7, at 2 ("CRUSCO did not remember anyone in the hearing attempt to influence him").  According to Crusco, he decided not to call Burke as a witness because "it would have been a circus."  3500-PC-7, at 2.  *See also* 35600-PC-11, at 4-5 (reflecting that Crusco was not going to call Burke to testify at the hearing and was instead going to rely on the testimony of the police officers).

**Third,** Burke's attorney, Joseph Conway, testified that Chris had no involvement whatsoever in the decision as to who would testify at the suppression hearing.  Tr. 3060.

All of this testimony rebuts the government's claim that Chris "coerced" Leto to lie at the suppression hearing.  In fact, the only other witness supplying evidence as to the decision of who would be called to testify at the suppression hearing was Hickey.  But that testimony was far too limited to support the government's allegation that Chris "coerced" Leto to commit perjury.

Hickey testified that, in discussing who would be the witness at the suppression hearing if Burke did not testify, "Burke suggested Tony Leto would be the best, and McPartland agreed."  Tr. 1646.  That is all Hickey said on the subject.  Hickey did *not* testify that Chris ever spoke to Leto about his testimony, coached Leto to lie, discussed the fact that Leto's testimony would be false, or ever spoke to the Special Prosecutor on the subject.  Hickey also concurred that it was *Burke* who prepared Leto on what to say at the suppression hearing.  Tr. 1805-1806 (testimony

of Hickey that "Anthony Leto was being prepped by Burke on what to say at the trial, pretrial suppression hearings").

Based on the record, the government's allegation that Chris "coerced" Leto to "commit perjury" is unsupported, and should be rejected.

### C.  The Government Asks the Court to Punish Chris for Conduct that Was Not Criminal and Was Otherwise Irrelevant

In its zeal to seek excessive punishment, the government also asks the Court to enhance Chris's sentence based on various allegations that do not even rise to the level of criminal conduct, and are otherwise irrelevant.  These arguments are misguided and should be rejected.

### 1.  The Oliva Wire Was Concededly Lawful, and Took Place While the Federal Investigation was Dormant

The government urges a harsher sentence for Chris by virtue of his having participated in the Oliva wire "in order to spy for Burke and [to] send a clear message to Burke's detractors." Gov't Mem. at 15.  The government goes so far as to claim that one of the purposes of the Oliva wire was to "gain information concerning . . . the federal investigation into Burke's assault of Loeb."  *Id.* at 26.  These allegations are, yet again, unsupported by the record.  And because they involve conduct that was not unlawful or otherwise relevant, they provide no possible basis for a harsher punishment.

**First**, prior to the start of the trial, the government *stipulated* that it would *not* argue that the Oliva wiretap was "improperly obtained, improperly monitored or improperly extended." Gov't Ltr. dated Oct. 18, 2019 (ECF No. 129), at 2.  Having taken that position and obtained a favorable evidentiary ruling from the Court on that basis, the government may not reverse course now and argue that the Oliva wire *was unlawful*.

**Second**, it is not disputed that the wire was fully justified because Oliva's conduct jeopardized the lives of his fellow officers. *E.g.*, Tr. 814-15 (testimony of Bombace); Tr. 2621 (testimony of Constant). The Oliva wire was also authorized by multiple court orders, premised on the conclusion that other means of investigating the leaks were inadequate and thus this particular investigative technique was necessary. Further, the FBI was "written into" the wire and Chris specifically notified the FBI, *and the USAO-EDNY,* as to the existence of the wire. DX 13; *see also* Tr. 1044, 2632-33. Thus, the notion that its purpose was to "spy" on the feds is untenable. Finally, Oliva ultimately pled guilty to a misdemeanor as a result of his conduct, yet again establishing the legitimacy of the wire. Tr. 1666.

**Third**, the government concedes that the federal investigation was "dormant" between the close of "Burke I" and the start of "Burke II." Gov't Mem. at 7. The trial evidence showed that "Burke I" was closed by December 2013, as was communicated to Joseph Conway. Tr. 2991:7-92:17. The record is equally clear that "Burke II" was not known of until sometime in June 2015. *E.g.*, Tr. 1280, 1678-80.

The Oliva wire commenced in March 2014 and ended in July 2014. Tr. 946:8-9. *Since the wire was conducted in between Burke I and Burke II, the allegation that it was used to keep tabs on the Loeb investigation defies reason.*

### 2. The Pat Cuff Allegations

The government claims, as yet another basis for a sentencing enhancement, that Chris should be punished because he allegedly assisted Burke in getting retribution against Officer Pat Cuff, who had been involved in an Internal Affairs Investigation of Burke decades ago. According to the government, "Cuff . . . testified that . . . the defendants sent an Assistant District Attorney from their office to court, to threaten to upgrade the charge [against Cuff's son]

to a felony." Gov't Mem. at 24-25.  This statement – unsupported by any citation to the trial record – is incorrect.  Cuff never so testified.  Nor was there any evidence suggesting that the handling of the case against Cuff's son was unlawful in any way.  In fact, Cuff's son had been arrested for possessing and brandishing *two* of his father's police weapons – a clear criminal violation.  Tr. 1888, 2073.  Cuff acknowledged that his son, who ultimately was allowed to resolve the case with a misdemeanor plea, was guilty.  Tr. 2304.  And as to Chris's involvement, Cuff merely testified that the Assistant District Attorney who covered his son's arraignment stated that she was with the Special Investigations Bureau, and Cuff believed Chris headed that Bureau.  Tr. 2283-84.  Cuff did not testify to any knowledge, or even belief, that Chris was aware of the case against his son, let alone that Chris directed the ADA in how to handle the court appearance.  In fact, on cross-examination, Cuff conceded he had no knowledge of whether Chris was personally involved in his son's case at all.  Tr. 2295.

Hickey, who was not an employee of the District Attorney's Office, merely testified speculatively that he "knew" the defendants were responsible for the supposed threat "because they're the only two that could do it." Tr. 1890.  This testimony, flimsy on its face, was debunked on cross-examination by Hickey's acknowledgement that he had not participated in any discussions with anyone at the District Attorney's Office about the case, how it should be charged or how it ultimately pled out.  Tr. 2072.

Since the Cuff incident involved no unlawful or improper conduct on Chris's part, the incident provides no basis for an enhanced sentence.

### 3.  The Car Accident

The government also argues that Chris should be sentenced more harshly because of a fender bender that Chris had with Burke that *ten years ago*, in 2011.  According to the

government, Burke (but not Chris) was intoxicated, and skidded into Chris's car on a snowy

night.  Burke then paid for the repairs himself, using a private party.

This allegation was excluded from trial, in part because the government failed to explain

what about this incident was unlawful.  The government fares no better here – making no

allegation of illegality or other impropriety relevant to sentencing.  It does not claim that Chris

was driving while intoxicated (which he was not), nor does it allege any illegality in a private

party paying to repair a county vehicle.  In the absence of any such claim, this petty and lawful

incident is not a valid sentencing consideration.

### D.  The Government Downplays the Role of Burke, In Order to Inflate Chris's Culpability

The government also seeks to justify its over-the-top sentencing recommendation by re-

writing history as to the culpability of James Burke.  In its sentencing memo for Burke, the

government argued that Burke: (1) "spearhead[ed]" the obstruction conspiracy, *United States v.*

*Burke,* 15-cr-627 (LDW), ECF No. 35, at 1; (2) "violently shook [Loeb's] head, punched him in

the head and body and attempted to knee and kick [Loeb]," while threatening to kill him, *id.* at 3;

(3) subsequently "summoned the witnesses to his office . . . for the purpose of getting their

'stories straight,'" *id.* at 4; (4) threatened Leto shortly before the suppression hearing to ensure

that he committed "perjury," *id.* at 5; and (6) throughout Burke II (in 2015) directly threatened

those under his command with retribution if they cooperated with the authorities, *id.* at 6.

Now that Burke has been sentenced, the government has no need to detail his culpability.

So it shifts gears and argues that he was actually *less* culpable than was Chris.  To justify this

argument, the government resorts to prosecutorial double-talk.  It ignores the fact that Burke was

the one who cruelly assaulted Loeb in the first place – violating his civil rights – and focuses

instead on the fact that Burke committed the crime of obstruction out of "self-preservation – to

save himself from prosecution and to save his lofty job." Gov't Mem. at 22. Somehow, the government transforms this fact into an argument that Chris is actually *more* culpable than Burke, because Chris's motivation to engage in obstruction was more "opaque" and "nefarious," namely, to "maintain [his] power" and because he thought he was "above the law." *Id.*

This argument throws reason to the wind. It is self-evident that Burke was the most culpable member of the obstruction conspiracy. He was the Chief of Police and assaulted a shackled prisoner, threatened to kill him, ordered those with him to lie about it, lied about it himself, tasked Hickey with keeping the other officers in line, ordered Leto to commit perjury, and engaged in all of these acts of obstruction to save himself. In contrast, Chris had nothing to do with the assault of Loeb, never spoke to Leto, Bombace or Malone about the case *at all*, never lied to anyone about the case, and did not act to protect himself. Indeed, the record fails to establish that Chris would have had *any* negative career repercussions had Burke been charged with Loeb's assault.

Given these facts, the suggestion that Burke was less culpable than was Chris is an argument of convenience only. It is obviously unfair and should be rejected as unsupported by the record or reason.

### E. The Government Ignores Chris's Good Deeds and the Catastrophic Collateral Consequences of His Conviction, Which Have Only Increased Since Our Original Sentencing Submission

In its effort to punish Chris excessively, the government wholly ignores all that Chris has accomplished in his personal and professional life, as well as the catastrophic and painful collateral consequences he has already endured for the past five years. We detailed these factors in our sentencing submission (they are even more eloquently reflected in the many letters submitted on Chris's behalf), and they include his disbarment, the loss of his career, his public

humiliation and the fact that he is currently working as a clerk in a liquor store in order to help support his family.  We will not restate those factors in detail here.  But it is worth noting that those catastrophic consequences have only *increased* since our original submission.

On February 26, 2021, this Court unsealed a large volume of documents in the case from the pre-trial phase.  These documents contained a host of allegations against Chris, all of which had been excluded at trial, and none of which had been tested by the adversary process.  The allegations ranged from rank speculation to assertions based on double and triple hearsay.  Nonetheless, upon unsealing, they were picked up by the press as gospel, resulting in a whole new round of painful and inaccurate news stories as to Chris.  This even became front-page news in the Newsday Sunday paper, dated May 2, 2021.

Perhaps the most painful and damaging accusation of all of this was the assertion, based on sheer speculation contained in interview notes from James Hickey, that Chris had threatened to disclose an official's homosexual relationship in order to secure his cooperation.  Not surprisingly, this salacious accusation was trumpeted in Newsday, leading to immeasurable pain and humiliation for Chris.

It did not matter that the accusation had no foundation to it.  Indeed, we submit with this reply memorandum as Exhibit A, a letter from attorney Anthony LaPinta, who represented the official in question during the relevant investigation, confirming that no such threat was ever made, and that Chris handled himself appropriately and professionally throughout the case.  We even attempted to have Newsday print a comment from the undersigned counsel, in the Sunday story, to the effect that the alleged victim of the supposed threat, through his attorney, *had denied that it ever occurred.*  However, Newsday refused to print that quote, leaving Chris once again pummeled in the press and humiliated by the story.

This is yet another example of the collateral consequences that Chris has had to endure by virtue of this case.  As we argued in our sentencing submission, it is fully appropriate for the Court to take these tragic and devastating collateral consequences into account in fashioning a just sentence.

### F.  The Government's Request for an Upward Departure is Baseless

Despite the fact that Chris stands convicted, his lengthy career finished, his reputation destroyed, his family brought to the brink financially and otherwise, and the Probation Department nearly quadrupling his Guidelines offense level through a series of recommended enhancements and adjustments, the government contends that even the high end of the Probation Department's determined Guidelines range would be too lenient a custodial sentence for him. Citing Section 5K2.0 of the Guidelines, the government requests that the Court upwardly depart to a custodial sentence of eight years.  Gov't Mem. at 16-17.  The government offers no plausible rationale for its eight-year target.  And as noted, such a sentence would, irrationally and unfairly, be more than twice the length of the 46-month sentence imposed on Burke.

The government's argument for such an upward departure is legally and factually inadequate, given the high burden the Sentencing Commission has established for such departures, characterizing them as "highly infrequent" and reserved for "rare," "atypical," "unusual" and "exceptional" cases.  U.S.S.G. §§ 1.A.4(b), 5K2.0 comment. (n. 3(B)(i)), 5K2.0 comment. (backg'd.).  Even the Probation Department, which saw fit to level four enhancements and adjustments against Chris, did not identify any grounds for an upward departure.  PSR ¶ 116. The government's upward departure request is baseless and should be rejected.

Section 5K2.0 provides that an upward departure may be warranted if there is an aggravating circumstance "of a kind" or "to a degree" not adequately taken into consideration by

the Guidelines range.  U.S.S.G. § 5K2.0(a)(1)(B); *see also id.*, comment. (n. 3) (the section reflects "generally … two kinds of departures").  The government does not explicitly rely on either provision, but the only fair inference is that the government is relying on the "to a degree" prong of Section 5K2.0, since all of the factors the government relies upon are considered in the Guidelines calculation.  This argument must fail as a matter of law, as the factors the government cites are all *adequately* accounted for in the Guidelines calculation urged by the government, in both kind and degree.

For example, the Probation Department's proposed two-level enhancement under section 2J1.2(b)(3)(C) for conduct "extensive in scope," if sustained over our objection, already increases Chris' guidelines calculation for the precise same reasons as the government gives for the upward departure.  *See also* U.S.S.G. § 2J1.2 comment. (backg'd.) ("The specific offense characteristics [of which conduct "extensive in scope" is one] reflect the more serious forms of obstruction").  Indeed, the government's defense of that proposed enhancement is tellingly almost identical to its arguments in favor of an upward departure, referencing "[t]he defendants' elaborate scheme to corrupt and obstruct two related federal grand jury investigations, through witness intimidation and the creation and perpetration of a detailed false narrative meant to be adopted by each of the various witnesses . . . . "  Gov't Mem. at 11.  An upward departure in addition to imposing such an enhancement, both for essentially the same conduct, would be both unnecessary and impermissible double-counting.  See *United States v. Banol-Ramos*, 516 F. Appx. 43, 47 (2d Cir. 2013) ("'Impermissible double counting occurs when one part of the guidelines is applied to increase a defendant's sentence to reflect the kind of harm that has already been fully accounted for by another part of the guidelines'") (quoting *United States v. Volpe*, 224 F.3d 72, 76 (2d Cir. 2000)).

The Sentencing Commission has made clear that this variety of upward departure "will occur rarely and only in exceptional cases."  U.S.S.G. § 5K2.0 comment. (n. 3(B)(i)).  This is not such an exceptional case.  The Probation Department has already recommended 11 levels worth of arguably overlapping enhancements and adjustments, increasing the possible custodial minimum guidelines range from 15 months to 57 months.  It could not possibly be argued that the proposed Guidelines range has gone soft on Chris and his conduct, requiring a correction in the form of an upward departure.  Indeed, the record strongly supports a *downward variance*.  In short, the government's request for an upward departure has no legal or factual basis, and would unquestionably violate the Parsimony Clause.  It should be rejected.

### G.  The Government's Guidelines Arguments, to the Extent Opposed, Are In Error

As to the government's specific Guidelines arguments, we respectfully submit that the enhancements for an "aggravating role," an offense that is "extensive in scope, planning or preparation," and one that involves "substantial interference with the administration of justice," are inapplicable.

As to the proposed enhancement for an "aggravating role," the government relies principally on Hickey's testimony concerning the amorphous use of the terms "they" and "the Administration."  Gov't Mem. at 13.  But the use of these terms can hardly prove a managerial role in the offenses of conviction, as they are far too vague to have any substantive meaning.  Moreover, to the extent the government asserts that Chris's role in the conspiracy was "crucial," *id.*, this is insufficient to establish a leadership role.  Looked at objectively, the leader of the obstruction conspiracy was plainly Burke, as the government argued in its sentencing memorandum in his case (referring to Burke as "spearheading" the conspiracy).  And while it is true that there may be more than one "leader," Chris's involvement was far too limited to put

18

him fairly in that category.  Indeed, based on the trial record and even crediting Hickey's full testimony, Chris's entire involvement was limited to a handful of conversations with Hickey and Burke, wherein he allegedly spoke in language that encouraged and counseled Burke and Hickey as to how they should engage in obstructive conduct.  That is insufficient evidence to warrant an aggravating role enhancement.

As to the enhancement for an offense that is "extensive in scope, planning or preparation," the government relies principally on the argument that Chris participated in the "creation and perpetration of a detailed false narrative."  *Id.* at 11.  Of course, this is an allegation that James Hickey made only after four years of cooperation.  We have previously requested a sentencing hearing on the question of how Hickey came to make this allegation *after failing to include it in 17 interviews with the government over the course of his cooperation.*  The Court denied that application.  ECF No. 245.

But even without a hearing, the facts relied upon are simply insufficient to establish the required extensiveness.  Hickey testified to *one* conversation wherein Burke allegedly vetted with Chris options as to what he should say about the assault.  Allegedly, Chris "would nod his head yes, nod his head no."  Tr. 1598.  There was absolutely nothing complex or extensive about the conversation described, or as to any other alleged conduct by Chris.  Indeed, the only "fact" that allegedly needed to be decided was whether Burke would say he was never there, or would say that he "popped his head" inside the room.  Tr. 1596.  That elementary and simple discussion provides an insufficient basis upon which to find that the offense was "extensive in scope, planning or preparation."  The enhancement should be denied.

As to "substantial interference with the administration of justice," Chris's conduct is insufficient to support the enhancement, for the reasons set forth in our initial sentencing memorandum.

III.   **CONCLUSION**

For all of these reasons, we respectfully submit that the government's sentencing arguments should be rejected, and that a non-custodial sentence, coupled with home confinement, is warranted and appropriate.


Dated:  May 18, 2021

Respectfully submitted,

_____
Larry H. Krantz
Lisa Cahill
KRANTZ & BERMAN LLP
747 Third Avenue, 32nd Floor
New York, NY 10017
(212) 661-0009

Bradley R. Gershel
BALLARD SPAHR LLP
1675 Broadway, 19th Floor
New York, NY 10019
(212) 223-0200

*Counsel for Mr. McPartland*

# EXHIBIT A

# REYNOLDS, CARONIA, GIANELLI & LA PINTA, P.C.
## - ATTORNEYS AT LAW -

200 VANDERBILT MOTOR PARKWAY
SUITE C-17
HAUPPAUGE, NEW YORK 11788

300 OLD COUNTRY ROAD
SUITE 341
MINEOLA, NEW YORK 11501
(Correspondence to Hauppauge Office)

ANTHONY M. LA PINTA
JAMES T. REYNOLDS
PETER R. CARONIA (Ret.)
PAUL GIANELLI (Ret.)

MICHAEL E. FEHRINGER
KYLE O. WOOD

TEL: 631-231-1199
FAX: 631-300-4380

www.rcgllaw.com
www.lapintalaw.com

OF COUNSEL:

CHRISTOPHER J. PURCELL

May 27, 2021

Larry H. Krantz, Esq.
Krantz & Berman, LLP
747 Third Ave., 32nd Floor
New York, New York 10017

Re: **Christopher McPartland**

Dear Larry:

I write at your request, to set forth my personal knowledge of the allegation made in Newsday on May 2, 2021, to the effect that Chris McPartland threatened to reveal an official's homosexuality in order to secure his cooperation in an investigation.

I represented the official in that investigation. I can state to a certainty that no such threat was ever made in my presence, nor did I ever hear of such a threat. To the contrary, Mr. McPartland conducted himself professionally and appropriately. I have also reached out to the official (my former client), and he has confirmed to me directly, twice, that no such threat was ever made by Mr. McPartland or anyone else. He has also told me that Mr. McPartland, and the other law enforcement officers, behaved professionally and appropriately in their dealings with him.

I give you permission to submit this letter to Judge Azrack in connection with sentencing.

Respectfully,

**ANTHONY M. LA PINTA**

AML:mm