UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

For Online Publication Only

-------------------------------------------------------------------X

UNITED STATES OF AMERICA,

        -against-

**ORDER**
17-CR-587 (JMA)

CHRISTOPHER MCPARTLAND, and
THOMAS J. SPOTA,

          Defendants.

-------------------------------------------------------------------X

FILED
CLERK

4:36 pm, Aug 04, 2021

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**AZRACK, United States District Judge:**

       In their sentencing submissions, Defendants Thomas Spota and Christopher McPartland object to the application of three sentencing enhancements. Defendants also raise various objections to their respective Presentence Reports ("PSR"). Below, the Court addresses Defendants' objections to their PSRs and to the three specific enhancements at issue.

       In making my factual findings below, I have considered all the trial testimony, which I, of course, witnessed first-hand. Additionally, I have considered all other materials relevant to sentencing, including: (1) Defendants' PRSs dated June 16, 2020 and June 22, 2020; (2) the Addenda to the PSRs dated September 29, 2020; (3) the Second Addendum to Spota's PSR dated May 18, 2021; (4) Defendants' sentencing submissions dated March 5, 2021; (5) the Government's sentencing submission dated April 16, 2021; and (6) the sentencing submissions Defendants submitted in reply to the Government's submission on May 14, 2021 and May 28, 2021; (7) all materials and arguments cited in, and attached to, the parties' sentencing submissions, including Defendants' objections to the PSRs; and (8) the arguments advanced at the June 30, 2021 conference before me.

The facts that are set out in the PSR and that are invoked to justify the sentencing enhancements are premised, in large part, on the testimony of James Hickey, whose credibility Defendants challenge. For numerous critical conversations involving Defendants, Hickey was the only witness at trial with direct knowledge of the substance of those conversations. After considering all of Defendants' arguments concerning Hickey's testimony and credibility, I find Hickey's testimony to be credible and reliable as to: (1) all of the relevant points set out in the PSRs that I adopt below; and (2) all the additional points of his testimony cited in the discussion below.

## A. **Defendants' Objections to the PSRs**

Unless otherwise noted below, I am adopting the PSRs, as amended, and find that the points set out therein are supported by credible, reliable, and accurate evidence. To the extent any paragraphs in the PSRs warrant further amendment or clarification, those paragraphs are addressed below.

### i. **Paragraph 8**

With respect to the PSR's discussion of the December 2011 letter that Spota sent to cover-up Burke's prior misconduct, I add the fact that McPartland was also involved in preparing this letter. (See Tr. 1555–56, 2786–2791.)

With respect to the question of McPartland's involvement in personnel decisions at the Suffolk County Police Department ("SCPD"), there is no direct evidence that McPartland had "input" into specific personnel decisions at the SCPD. Nevertheless, I still adopt the amended PSR's position concerning McPartland's "input" because there is sufficient credible circumstantial evidence on this issue. This circumstantial evidence includes: (1) McPartland's extremely close relationship with Burke; (2) the fact that McPartland, Spota, and Burke collectively referred to

themselves as the "Administration," (Tr. 1545–46); and (3) Detective Kenneth Bombace's account of an incident in which Hickey was fearful that Detective Cliff Lent would be transferred out of the Intelligence Unit after Lent angered McPartland by giving valuable intelligence to a member of the Long Island Gang Task Force, (3500-KB-4).

The PSR also states that Defendants "used their position and influence to promote their supporters and punish their detractors." This sentence encompasses multiple incidents, including the Oliva wire and prosecution, the prosecution of Pat Cuff's son, and the elevation of Burke to Chief of Department. Later in the PSR, at Paragraphs 17 and 25, there is a discussion of the Oliva wiretap and prosecution. Defendants' objections to those paragraphs are addressed infra.

Although the PSR does not discuss the prosecution of Pat Cuff's son in any detail, I make the following findings about this incident, which is both relevant to Paragraph 8 and has been contested by the parties in their sentencing submissions. I credit the testimony of Cuff and Hickey on this issue and find it sufficient to conclude that Spota, McPartland, and Burke were involved in the decision to have an ADA from the Special Investigations Bureau appear in court and inform the court and the defendant that the case was going to be presented to the grand jury and be prosecuted as a felony. (Tr. 2283–86.) At the time, Cuff was the commanding officer of the Third Precinct. (Tr. 2283.) There is sufficient circumstantial evidence for me to conclude that Spota, McPartland, and Burke were already aware of, and involved in, this prosecution given that the defendant was the son of Cuff, a high-ranking police officer and known enemy of Burke. This finding is further supported by Madigan's grand jury testimony. (See Sept. 7, 2016 Grand Jury Tr. for W. Madigan at 86–88 (Burke told Madigan that he had a hand in the decision-making concerning the prosecution of Cuff's son and admitted that an ally of Burke might be able to plead to a misdemeanor or get the charge dismissed outright).) Hickey's account of the reactions of

Spota, McPartland, and Burke is further circumstantial evidence of their involvement in the ADA's appearance in court. (Tr. 1889–91.) Moreover, nothing in Hickey's account of his conversation with Defendants and Burke suggests that what occurred in court during the arraignment of Cuff's son was a surprise to either McPartland or Spota.

Admittedly, Cuff's son—who was clearly guilty of taking his father's weapons and brandishing them in public—was still, ultimately, able to plead to a misdemeanor and qualified as a youthful offender, which resulted in the conviction ultimately being vacated and sealed. (Tr. 2284, 2303) Nevertheless, I find that Defendants and Burke took this opportunity to retaliate against Cuff. I find that, if Cuff had been an ally rather than an identified enemy, his son likely would have been spared the threat of the charges being upgraded to a felony and may have seen the charges dismissed outright.

### ii. Paragraph 10

Paragraph 10 states, inter alia, that "[i]t is notable that prior to initiating the cover-up, Burke admitted to McPartland, Spota, Hickey, Dennis Sullivan (District Commander of the SCPD), and Sanjiv Panchel (an associate of Burke and a contractor with the SCDAO), that he assaulted Loeb." I adopt this paragraph of the PSRs in its entirety for the reasons explained below.

I find that by, at the very least, January 2013, Burke had admitted the assault to both Spota and McPartland.[1] Numerous points in the record support this finding.

First, I credit Hickey's testimony that "We openly talked about . . . [t]he fact that Burke

---

[1] Burke may very well have admitted the assault to both Defendants earlier, particularly to McPartland, with whom Burke spoke during the evening of December 14, 2012 and again early the next morning. (Tr. 2197; GX502.)

beat the hell out of him and we had to cover it up."[2]  (Tr. 1575–76, 1658.)

Second, in January 2013, concerns about a federal investigation arose because Rob Trotta, who had a relationship with "the Feds," was inquiring at the Fourth Precinct about the assault and warning officers that the FBI was going to investigate this incident.  (Tr. 1211–12, 1562, 1572–75.)  This was discussed amongst Hickey, Burke, Spota, and McPartland.  (Tr. 1573–75.)  During these conversations, they discussed "the need to keep Burke out of jail" and that the intel detectives needed to "hold tight, . . . keep to their story, don't say anything."  (Tr. 1575-78, 1595.)  Both Defendants continued to make similar statements to Hickey into 2015.  I credit Hickey's testimony about those statements, which began in January 2013 and are powerful circumstantial evidence that, by January 2013, Burke had already admitted the assault to both Spota and McPartland.[3]

Third, my finding concerning the timing of Burke's admission to Defendants is also supported by the credible testimony of both Hickey and Panchal, who testified that Burke told them within days of the incident about the assault.  (Tr. 1568-69 (testimony of Hickey that Burke boasted to him about the assault on December 14, 2012); Tr. 1147–48 (testimony of Panchal that, within a week of the incident, Burke told Panchal that he "bopped" Loeb on the head and demonstrated this action to Panchal by making a "downward striking motion with his . . . fist").)

Fourth, Hickey's other testimony concerning the June 4, 2015 meeting indicates that Burke's admission at the June 4, 2015 meeting—"Can you believe that the feds are going to try to put me in jail for tapping some junkie thief on the top of his head?—was not the first time he

---

[2]  On cross examination, Hickey provided some testimony that seemingly qualified this statement, at least as to Spota. (Tr. 2064–65.)  However, even assuming arguendo that Hickey only heard Burke explicitly admit the assault to Spota on June 4, 2015, there is ample circumstantial evidence which shows that Burke also separately admitted the assault, outside of Hickey's presence, to both Spota and McPartland well before the June 4, 2015 meeting.

[3]  Even if Burke's explicit admission of an assault to Defendants did not occur until later, the statements made by Defendants to Hickey in early 2013 and thereafter establish that, even absent an explicit admission by Burke, Defendants already had enough information to know that they needed to silence the detectives and that they needed the detectives to stick to a false "story," stay "in line," and "tow[] the line."  (Tr. 1575–78, 1591–97.)

admitted the assault to Defendants. If this had been Burke's first admission to them, it would have been an abrupt reversal from the purportedly repeated and emphatic denials that Defendants assert Burke had been making to them. However, Hickey's credible account of the June 4, 2015 meeting does not indicate that Spota and McPartland expressed shock or surprise at Burke's admission. And, nothing in the statements of Spota and McPartland at the June 4, 2015 meeting suggests that this was the first time that they were hearing Burke admit to assaulting Loeb. (See Tr. 1713 (in response to Burke's admission, Spota simply stated "I told you you should have never left here. None of this would have ever happened.").

### iii. Paragraph 11

Paragraph 11 of the PSR is adopted as amended below:

Initially, the GCB Section of the SCDAO, supervised by McPartland, handled the prosecution of Loeb, as then it could be controlled by Spota, Burke, and McPartland. McPartland assigned ADA Spiros Moustakas from the GCB to handle the prosecution, which was, by all accounts, unusual as GCB, as the name suggests, handles corruption prosecutions. Although it was well-known that Spota and McPartland each had a close personal relationship with Burke, no request for a special prosecutor was made at that time. Indeed, McPartland personally instructed Moustakas to ask for $500,000 bail in a late-night telephone call prior to the arraignment. Approximately two months later, Loeb alleged that his confession was involuntary because he had been beaten by Burke. Spota, realizing the optics of the situation, requested a special prosecutor. The Nassau County District Attorney's Office was not asked to assist; rather, Spota, and those acting at his direction, contacted Executive Assistant District Attorney Jack Ryan from the Queens District Attorney's Office to request that Ryan provide someone to act as a special prosecutor in the Loeb prosecution. Notably, Spota and Jack Ryan enjoyed a enjoyed a good relationship, and Spota was "'very friendly with the Queens DA's office.'" Ryan agreed to assist and assigned ADA Peter Crusco to the matter. Spota and McPartland were pleased with the selection of Crusco as the prosecutor.

Evidence supporting the revisions above is found in Hickey's testimony, (Tr. 1603–04), and Crusco's 3500 material, (see 3500-PC-4 at 1–2; 3500-PC-11 at 6.)

As for the Nassau County D.A., Kathleen Rice, there was testimony that Spota and Rice did not have a collegial or working relationship and that the Nassau County D.A. rarely agreed to

act as a special prosecutor for Suffolk. (Tr. 2609–10, 2984–85.) The evidence, however, also established that no attempt was even made to see if Nassau would take the case. Instead, the special prosecutor referral was made to the Queens D.A.'s office, which was friendlier to Spota and the Suffolk D.A.'s office. Additionally, Rice was viewed as tough on police officers, which was a further reason for Spota to not even attempt to send the case to the Nassau County D.A. (See Tr. 1272–75, 2700–01 (Rice had prosecuted and obtained a conviction of the Deputy Commissioner of the Nassau County Police Department); Tr. 2984 (testimony by Conway that, with respect to the prosecutions related to corruption by law enforcement, Rice "was known as a tough prosecutor").)

### iv. Paragraph 12.

The PSR states that the request for the appointment of the special prosecutor was done "at the direction of Spota and others" and "intentionally omitted the allegations made by Loeb against Burke, granting Crusco the authority to prosecute Loeb only, effectively preventing him from investigating assault allegations against Burke." I adopt this paragraph in the PSR and add the following points below to further clarify the language used in the PSR.

The wording of the appointment order permitted Crusco to investigate the allegations against Burke and the detectives in the course of responding to a suppression motion. (Tr. 2762–63). However, in order to investigate and prosecute any assault by Burke or the other officers as an independent crime, Crusco would have had to "come back" to the Suffolk County D.A. and request that a new or amended appointment order be submitted to the court in order to expand Crusco's authority. (Tr. 2764–65.) It is also notable that Crusco had asked McPartland, in a February 15, 2013 email, that the order be drafted "as broad as possible to cover all the possibilities." (GX911; Tr. 3097–99.)

As for the content of the court filings prepared by ADA Michael Miller, there was no possibility that any of these filings would reference the alleged assault (or give Crusco independent authority to investigate and prosecute the alleged assault) because Miller was never told about the assault allegations. (Tr. 2755.) There was conflicting evidence at trial as to whether both Spota and Constant spoke directly to Miller about these filings or whether only Constant spoke to Miller. (See Tr. 2437, 2444 (Constant's testimony that "I think Mr. Spota called [the Appeals Unit] first"); Tr. 2753.)) I credit Constant's testimony on this point. In any event, whoever spoke directly with Miller, I find that Spota—either personally or acting through Constant—ensured that Miller was not informed of the alleged assault.

### v. Paragraphs 13, 15, and 16

In adopting Paragraphs 13, 15, and 16 of the PSR, I note that, in denying Defendants' post-trial motion, I found Hickey's testimony concerning the first "coaching session" in February/March 2013 involving McPartland and Burke to be credible. (ECF No. 244 at 19.) McPartland also previously sought a Fatico hearing to further explore this issue. (ECF No. 245.) In my order denying the Fatico hearing, I explained that, in considering Hickey's testimony for purposes of sentencing, I would consider all potentially relevant materials. (Id.) I have done so and, after considering those materials as well as Defendants' sentencing submissions, I find that Hickey's testimony concerning these two coaching sessions is credible.

### vi. Paragraph 17

Paragraph 17 of the PSR is adopted as amended below:

Following the October 2013 publication of an unflattering article in Newsday outing Burke's IA file, Spota and McPartland assigned Madigan to conduct an investigation to uncover who leaked the file. John Oliva, formerly a detective in the FBI Gang Task Force, was an enemy of Burke, and was suspected of leaking the information. In January 2014, a story appeared in Newsday based on confidential police information concerning a robbery spree. Oliva was also suspected of leaking

this information. McPartland proposed wiretapping Oliva's cellular telephone, and obtained the approval of Spota. Testimony at trial established that, in order to justify the wire-tap, McPartland devised a cover story, approved by Spota, who was present when the story was concocted, to authorize the wire-tap by stating that they were investigating the leak of confidential officer safety-type crime patterns to the media, despite the fact the wire had, in truth, multiple purposes, including investigating the leaks to Lopez related to officer safety, investigating Oliva (who was considered an enemy) so that he could be retaliated against, and gathering other information for Burke. The gathering of information for Burke included: (1) "who the feds are talking to"; and (2) any other additional information helpful to Burke, (see Tr. 942-46; Tr. 960–967 (discussions on the wire concerning Burke's affair and Tania Lopez going to speak to Lowrita Rickenbacker); Tr. 1659-1664).

Oliva's cell phone calls were intercepted for four months. Ultimately Oliva was charged with a crime, convicted of a misdemeanor, and forced to retire as a result of his actual involvement in the leaks. No member of the SCPD had ever been investigated for a leak to the media before Oliva, nor has any member been so investigated since. In addition to the underlying evidence about the Oliva wire and prosecution, I find that that McPartland's reference to Oliva at the June 4, 2015 meeting is, given the context of that comment, itself further proof that Defendants themselves viewed the Oliva wire and prosecution as both extraordinary and retaliatory.

### vii. Paragraph 25

Paragraph 25 of the PSR is adopted as amended below:

Beginning in October 2015, several of the detectives and officers involved in the arrest and assault of Loeb (as either participants or witnesses) were compelled to testify before a federal grand jury regarding the December 2012 incident, and were forced to reveal not only the details of the assault itself, but also information about the cover up by Burke and others. In grand jury testimony, their (and others') subsequent proffers with the USAO EDNY, and trial testimony, officers expressed their credible and reasonable belief that, if they had told the truth from the onset, they could have lost their jobs and that they and their families also could have been targeted by Burke and his powerful friends and allies, including Spota and McPartland. (See, e.g., Tr. 741–42 (Bombace testimony that he feared being targeted if he was perceived to be an enemy of Burke, Spota, and McPartland); Tr. 1184–85, 1237-38 (Leto testimony that he wanted to make sure that "the Chief, Mr. Spota, everybody knows that I'm not ratting out" because of fear for "myself, my job, my family"). Hickey also credibly and reasonably believed that Burke, McPartland, and Spota were "going to throw [the intel detectives] under the bus" and "keep Burke out of it." (Tr. 1649.) The accounts provided by these detectives and officers also included information regarding Det. John Oliva, and the lengths to which Burke, Spota, and McPartland went to destroy his career, which created a culture of fear within the SCPD.

## B.  The Three Challenged Sentencing Enhancements

### i.  Aggravating Role Enhancement (U.S.S.G. § 3B1.1(a))

Under U.S.S.G. § 3B1.1(a)), a four-level increase is applied "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive."  According to the commentary to U.S.S.G. § 3B1.1(a):

> In distinguishing a leadership and organizational role from one of mere management or supervision, titles such as "kingpin" or "boss" are not controlling. Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy.

U.S.S.G. § 3B1.1(a) cmt. n. 4: see also United States v. Si Lu Tian, 339 F.3d 143, 156 (2d Cir. 2003) (looking to "the degree of discretion exercised by [the defendant], the nature and degree of his participation in planning or organizing the offense, and the degree of control and authority exercised over the other members of the conspiracy").  The commentary to U.S.S.G. § 3B1.1(a)) also explains that:

> This adjustment is included primarily because of concerns about relative responsibility.  However, it is also likely that persons who exercise a supervisory or managerial role in the commission of an offense tend to profit more from it and present a greater danger to the public and/or are more likely to recidivate.  The Commission's intent is that this adjustment should increase with both the size of the organization and the degree of the defendant's responsibility.

U.S.S.G. § 3B1.1(a) cmt. background.

I find that both Spota and McPartland were "organizer[s] or leader[s] of a criminal activity that involved five or more participants."  The "five or more participants" threshold is easily

satisfied. While Burke was clearly one leader of the criminal activity, a criminal activity can have multiple leaders and organizers. See U.S.S.G. § 3B1.1(a) cmt. 4; Si Lu Tian, 339 F.3d at 156–58.

Spota's position as District Attorney and McPartland's high-level position in the D.A.'s office are relevant to, but not dispositive of, this enhancement. The same analysis applies to the fact that Spota, McPartland, and Burke were collectively referred to as "the Administration." (Tr. 1545–46.) These facts, while not dispositive, are, however, still probative on this enhancement, particularly given the other evidence in the record.

There is both direct and circumstantial evidence that Spota and McPartland played roles in planning, organizing, and leading the offense. Beginning in January 2013, Spota and McPartland—like Burke—treated Hickey as the "middle manager" below them in this obstruction conspiracy. Through their repeated communications with Hickey, McPartland and Spota requested updates on the intel detectives, provided directions to Hickey, and placed pressure on him that they intended would flow down to the intel detectives under Hickey's command. (See Tr. 1591–97 (Spota would ask Hickey if his guys were "okay" and "towing the line" and McPartland would say we need to "keep the guys quiet and in line"); see also Tr. 1599–1600, 1608–11, 1625, 1629–30, 1672, 1675.) Hickey was told by Spota and McPartland to report back any changes to the detectives' situation and was asked "how are your guys doing" and if they were "okay" (Tr. 1593, 1600.) Hickey would then ask his men if they were "good" and "holding tight," and would report back how they were doing, including when they indicated they were worried and nervous. (Tr. 1601.)

When the federal investigation was reopened in 2015, Defendants' pressure tactics turned, at the June 4, 2015 meeting, into explicit threats directed at Hickey and the intel detectives. Notably, at the June 4, 2015 meeting, Spota did not issue his threat against Bombace at Burke's

behest.   Rather, Spota, took the initiative in making this threat.   (Tr. 1846–47; <u>see also id.</u> (McPartland interjected at this meeting that "we'll take immediate steps to discredit" anyone who was cooperating).

Spota was not only the long-tenured and powerful District Attorney, but he clearly presided over the June 4, 2015 meeting, which was held in his office.   Hickey's credible account of this meeting reveals that Spota was in charge of the meeting and was a leader and organizer of this obstruction scheme.   During this meeting, Spota took the lead in interrogating Hickey, asked Hickey who he thought was cooperating, and forcefully told Hickey that he better find out fast if someone is talking.   (Tr. 1693-94, 1708-1709.)   Spota also threatened Bombace during this meeting.

At both the June 4, 2015 meeting and at other times, McPartland also gave various directions and commands to Hickey.   (<u>See</u> Tr. 1629–30 (at the June 4, 2015 meeting, McPartland directed Hickey to "give your guys a Lieutenant Hickey interrogation, one-on-one, find out if anyone's talking"); Tr. 1615–17 (on June 25, 2013, McPartland directed Hickey to question his detectives about the federal subpoenas, which Hickey did); Tr. 1669–70 (McPartland directed Hickey to take the detectives' temperatures after Suffolk County detectives were told to leave a federal proffer session in 2014); Tr. 1724 (McPartland—in an effort to allay the detectives' fears and keep them quiet—directed Hickey, at the August 17, 2015 meeting, to tell his detectives that the federal subpoenas may be a fishing expedition just to "see if anything sticks").)

Not surprisingly, Hickey never issued any commands or directives to Spota, McPartland, or Burke.

Defendants' leadership roles in the conspiracy are further evidenced by comments Defendants made to Hickey in December 2013.   After learning that the <u>Burke I</u> federal

investigation had been closed, Spota told Hickey, "They did great," and McPartland said to Hickey, "Good job, lieutenant." (Tr. 1657.) These are the type of congratulatory comments that one would expect a superior to give to a subordinate. Similarly, when McPartland suspected, on August 17, 2015, that Bombace was going to cooperate, he berated Hickey like a subordinate, telling him that it was his fault that Bombace was ratting because Hickey "didn't control him." (Tr. 1722.)

Defendants' leadership roles in the conspiracy are also further highlighted by the fact that, in discussing the investigation and cover-up with the intel detectives, Hickey repeatedly used the term "they"—which I find he intended, and the detectives understood, to refer to Spota, McPartland, and Burke. (See, e.g., Tr. 676–78 ("They're sending Tony in to testify in the State case"); Tr. 756 (telling Bombace that "[t]hey're going to want to know everything"); Tr. 1243 (Leto's testimony that Hickey informed him that "they" chose Leto to testify and that "they kind of didn't trust Kenny because his brother-in-law worked in the U.S. Attorney's Office, and that Mike they felt was too shaky"); see also Tr. 726, 729, 1241–44, 1335, 1623–25.)

Also relevant to this enhancement is the decision by Spota, McPartland, and Burke to designate Madigan as the liaison to the special prosecutor and to direct him to report back what he learned as liason. (Tr. 1606.) Madigan subsequently reported back to Spota and others on numerous occasions, including throughout the suppression hearing.

With respect to McPartland, the two coaching sessions he and Burke engaged in during the spring of 2013 and the fall of 2013 are also highly relevant to this enhancement. (Tr. 1595–99, 1643–46). McPartland and Burke crafted and refined the false narrative together during these two meetings. During one of these meetings, both McPartland and Burke also directed Hickey to "make sure [his guys] are . . . staying on the reservation [and] staying in line" (Tr. 1599.) And,

during the second meeting in the fall of 2013, McPartland and Burke decided that Leto should testify at the hearing.[4]  (Tr. 1646–47.)

In addition to the points above, the actions and conduct of Spota and McPartland early in the conspiracy further confirm their status as leaders of the obstruction scheme.  McPartland decided to initially have his Government Corruption Bureau handle the Loeb case.  Throughout January 2013 and into early February 2013, both McPartland and Spota ensured that the District Attorney's Office kept the case and that it remained in McPartland's Government Corruption Bureau.  During this time period, Defendants had already begun to tell Hickey that they needed "to keep Burke out of jail" and that the intel detectives needed to "hold tight, . . . keep to their story, don't say anything."[5]  (Tr. 1575-78.)  Then on February 8, 2012, Moustakas informed Defendants of defense counsel's allegations and discovery demands concerning Burke.  That development forced the hand of Spota—who had already known for weeks that Burke was a burglary victim in the Loeb case—and led him to seek assignment of a special prosecutor.  (Tr. 901–16, 919–20.)  Spota then proceeded to arrange for the appointment of the Queens D.A. as the special prosecutor and ensured that the court filings concerning the appointment of the special prosecutor were drafted in a manner that furthered the cover-up.  (See Tr. 2437, 2444 (Constant's

---

[4]  There is no direct evidence indicating that this decision by Burke and McPartland was relayed to Crusco, who is not alleged to be a co-conspirator.  (See 3500-PC-7 ("CRUSCO did not remember anyone in the hearing attempt to influence him.").)  There is, however, circumstantial evidence which credibly indicates that, in some manner, someone relayed the determination that Leto should testify to Crusco, who, coincidentally, ultimately ended up calling Leto to testify.  (See Tr. 1243 (Leto's testimony that Hickey informed him that "they" chose Leto to testify and that "they kind of didn't trust Kenny because his brother-in-law worked in the U.S. Attorney's Office, and that Mike they felt was too shaky"); see also Tr. 2986 (Conway's testimony that "[i]t was a decision that we made given the ongoing investigation that [Burke] was not going to be a witness in any hearings"), Tr. 3066 (Conway's testimony that he told Crusco that he did not want Burke testifying at the suppression hearing).)

[5]  As explained earlier, I find that, as of January 2013, Burke had already admitted the assault to both Spota and McPartland.  Moreover, even if Burke's explicit admission to Defendants did not occur until later in 2013, the statements made to Hickey in January 2013 establish that, even absent an explicit admission by Burke, Defendants already had enough information to know that they needed to silence the detectives and that they needed the detectives to stick to a false "story."

testimony that "I think Mr. Spota called [the Appeals Unit] first"); Tr. 2755 (Miller's testimony that he was never told by anyone about the alleged assault of Loeb); see also GX911 (Crusco email to McPartland asking the appointment order be drafted "as broad as possible to cover all the possibilities").)

The appointment order, as drafted by Miller, precluded the Queens D.A. from investigating and prosecuting the assault of Loeb as an independent crime. (Tr. 2764–65.) While the Queens D.A. could have subsequently "come back" and asked Spota for a new or amended court order expanding Crusco's authority to investigate and prosecute Burke (the chief of department who was close with Spota)—Defendants' decisions created this additional hurdle, which helped further the cover-up. (Tr. 2764–65.) Moreover, Spota made the decision to reach out to the Queens D.A.'s office, with which he had a good relationship, rather than to the Nassau D.A., which had a reputation of being tough on police officers and also had a poor relationship with Spota and his office. This is yet another decision by Spota that helped facilitate the cover-up.[6]

Defendants' arguments against the application of this enhancement are all unavailing.

First, Defendants insist that Burke's central role in the obstruction conspiracy and participation in the underlying assault precludes the application of this enhancement to Defendants. However, as explained earlier, there can be multiple leaders and organizers, and the evidence set

---

[6] One relevant factor in the analysis of this enhancement is "the degree of control and authority exercised over others." Although Hickey and his officers formally reported to Burke and not to Spota and McPartland, the evidence established that Spota and McPartland exercised de facto control and authority over Hickey, Madigan, and the intel detectives. I also note that, prior to the Queens D.A. taking over the Loeb case, Spota and McPartland exercised their formal control and authority over Moustakas (as well as, in Spota's case, over Constant and Miller) to further the cover-up. While the focus of this enhancement is on the control and authority exercised over the other participants in the crime, it is also notable that Spota and McPartland exercised authority and control over multiple prosecutors to further the cover-up in its early stages. Cf. U.S.S.G. § 3B1.1(a) cmt. application n. 3 (noting that, in considering whether an offense is "otherwise extensive," the court can look to whether the defendant "used the unknowing services of many outsiders.").

out above establishes that Defendants were leaders and organizers of this obstruction scheme, along with Burke.

Second, Spota points out that although Hickey testified that Spota made an explicit threat at the June 4, 2015 meeting, Hickey did not relay Spota's threat to the officers and the officers ended up cooperating within a few months despite the threat. Thus, Spota maintains that those facts weigh against this enhancement and indicate that Spota never exercised control and authority over Hickey and the other detectives. This argument fails on multiple grounds. The fact that the conspiracy ultimately unraveled not long after the June 4, 2015 meeting is not dispositive. Defendants' communications to Hickey in 2013 included implicit and explicit directives and applied pressure on Hickey—actions which succeeded in advancing the cover-up. Those actions alone confirm Defendants' control and authority over Hickey. The fact that the <u>Burke II</u> federal investigation was able to, ultimately, apply overwhelming countervailing pressure on Hickey and the other officers in 2015 is not determinative  Although it is true that Hickey did not relay the precise threats made by Defendants at the June 4 meeting, after this meeting, Hickey continued to instruct detectives to cover up the assault and continued to report back to Burke and McPartland what he had learned from speaking with his detectives. (<u>See</u> Tr. 1284–85 (Hickey telling Leto, in the fall of 2015, to "stick to the story"); Tr. 1758–59 (Hickey telling Leto and Malone, in the fall of 2015, to continue lying); Tr. 1722 (Hickey's account of the August 17, 2015 meeting with Burke and McPartland where he relayed what Bombace had told him).) It is also notable that Hickey himself did not cooperate until late 2015—this was months after the June 4 meeting where he and the detectives were threatened and only after Hickey learned that the detectives had already cooperated.

Spota's attempts to analogize this case to <u>United States v. Burgos</u>, 324 F.3d 88, 93 (2d Cir. 2003), are not persuasive. In <u>Burgos</u>, the defendant, who was involved in a stolen check cashing scheme, made an apparently solitary demand to a debtor that the defendant should be paid quickly and given an advance. <u>Id.</u> at 92. The Second Circuit found that those facts did not support an inference that the debtor was a subordinate to the defendant, particularly given that the debtor's "nonpayment 'suggest[ed] independence." <u>Id.</u> <u>Burgos</u> is easily distinguishable from the instant case. Here, beginning in early 2013, both Defendants, through multiple communications, successfully applied pressure on Hickey and issued directives to Hickey with which he complied. (<u>See</u>, <u>e.g.</u>, 1593, 1600–01, 1615–17.) Moreover, while Defendants did not formally supervise Hickey on any organizational chart, in the context of this scheme and the evidence at trial, Spota, a powerful and long-tenured D.A., and McPartland, a high-level prosecutor, exercised <u>de</u> <u>facto</u> authority and control over Hickey Their relationship to Hickey is simply not comparable to the relationship in <u>Burgos</u>. <u>See</u> <u>United States v. Melia</u>, 253 F. App'x 105, 107 (2d Cir. 2007) (distinguishing <u>Burgos</u> and characterizing the circumstances of that case as involving "two participants [who] worked together as co-equals in an operation to cash stolen checks and were free to act independently").

Additionally, contrary to Defendants' claims, this enhancement is not being applied to them simply because they played crucial and important roles in the obstruction scheme. And, McPartland's assertion that he, at most, simply gave Burke advice and encouraged the conspiracy does not comport with the facts set out above. McPartland's conduct exceeds merely giving advice to Burke and encouraging the conspiracy.

The Court also rejects Spota's argument that the application of the aggravating role enhancement is duplicative of the abuse of trust enhancement, which Spota asserts already

accounts for his role as District Attorney. Spota's conduct that supports application of the aggravating role enhancement goes beyond the mere fact that Spota abused his position of public trust and implicates different concerns. Moreover, the Sentencing Guidelines make clear that when a § 3B1.3 adjustment is "based upon an abuse of a position of trust," which is the case here, "it may be employed in addition to an adjustment under §3B1.1 (Aggravating Role)." U.S.S.G. § 3B1.3.

Finally, Spota asserts that one of the relevant factors for the § 3B1.1 enhancement—namely, "the claimed right to a larger share of the fruits of the crime"—weighs in Defendants' favor. Spota posits that only Burke and the detectives—who had criminal exposure for the underlying assault—received the fruits of obstruction conspiracy, which purportedly weighs against application of the enhancement. As an initial matter, this factor generally appears inapplicable to the instant conspiracy, which does not involve any tangible fruits of the crime, such as money or property, to which some of the conspirators could "claim" a "right to a larger share." Assuming arguendo that this factor nevertheless has some relevance to the type of obstruction scheme at issue here, this factor is not sufficient, under all the circumstances, to render the enhancement inapplicable to Defendants here. I find the other relevant factors at issue are more probative and are entitled to more weight in my ultimate analysis. Moreover, while Spota and McPartland did not have any potential criminal exposure on the underlying assault, the notion that they received little or nothing from this obstruction scheme is mistaken. Saving Burke, who was very close to both of them, provided substantial personal and professional benefits to Spota and McPartland. Additionally, Spota had previously stuck his neck out for Burke and vouched for him to be named chief of department in the face of, inter alia, the anonymous letter that had been

circulated about Burke in December 2011.  As such, Spota had a lot to lose, professionally and politically, if Burke was convicted of assaulting a prisoner.

### ii.  Enhancements for Substantial Interference with the Administration of Justice (U.S.S.G. § 2J1.2(b)(2)) and for the Offense Being Extensive in Scope, Planning, or Preparation (U.S.S.G. § 2J1.2(b)(3)(C)

For these two enhancements, the Court considers, as "relevant conduct," "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant."  U.S.S.G. 1B1.3(a)(1)(B).  Additionally, "relevant conduct" also includes the conduct of Defendants' co-conspirators which was "within the scope of jointly undertaken criminal activity," "in furtherance of that criminal activity," and "reasonably foreseeable in connection with that criminal activity."  Id.

Under U.S.S.G. § 2J1.2(b)(2)), a three-level enhancement applies "[i]f the offense resulted in substantial interference with the administration of justice."  The commentary to the Guidelines explains that "'[s]ubstantial interference with the administration of justice' includes a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based upon perjury, false testimony, or other false evidence; or the unnecessary expenditure of substantial governmental or court resources."  U.S.S.G. § 2J1.2(b)(2) cmt. application n. 1.  Moreover, "the commentary's 'listing of acts warranting this enhancement is not exclusive,' and [the Second Circuit has] recognized that 'other acts — if similarly or even more disruptive of the administration of justice — could serve as bases' for the enhancement."  United States v. Escalera, 957 F.3d 122, 139 (2d Cir. 2020) (quoting United States v. Amer, 110 F.3d 873, 885 (2d Cir. 1997)).

As explained below, this substantial interference enhancement applies to both Defendants. Here, the offense resulted in a premature or improper termination of a felony investigation, namely the Burke I investigation that was closed in late 2013.

Spota's objection to both this enhancement and the § 2J1.2(b)(3)(C) enhancement is premised on his arguments that I should, at most, only credit some of Hickey's testimony concerning the June 4, 2015 meeting and should not accept any of Hickey's testimony that Defendants engaged in criminal conduct throughout 2013. Spota insists that he did not engage in any criminal conduct prior to the June 4, 2015 meeting and did not join any conspiracy prior to that date. Accordingly, Spota maintains that he cannot possibly be held responsible for the termination of the Burke I investigation in 2013. However, I find that both Defendants became part of this conspiracy to cover up Burke's assault beginning, at the very least, in early 2013. I credit Hickey's testimony about his interactions and communications with Spota and McPartland beginning in January 2013 when Trotta's actions at the Fourth Precinct first raised the specter of a federal investigation. As set out in Hickey's testimony, the obstructive conduct of Defendants, Burke, and others continued thereafter, including after the intel detectives and others received federal subpoenas in June 2013. This obstruction in 2013 culminated in Leto perjuring himself during the suppression hearing in state court. The criminal actions of Defendants, Burke, and other conspirators in 2013 resulted in, inter alia: (1) Leto's perjured testimony at the suppression hearing; (2) Bombace lying to Crusco in his March 2013 interview, (Tr. 787); and (3) the detectives deciding to stay quiet during the federal grand jury investigation in accordance with the explicit and implicit directions they received from Burke and Hickey. Defendants were involved in this conspiracy beginning in at least January 2013. Defendants' actions (as well as the reasonably foreseeable actions of their co-conspirators that were both within the scope of the conspiracy and

in furtherance of the conspiracy), ultimately resulted in the termination of the Burke I federal investigation in December 2013.

McPartland attacks this enhancement from a different angle, stressing that § 2J1.2(b)(2)'s use of the phrase "resulted in" imposes a causation requirement. According to McPartland, this enhancement does not apply to him because there is no evidence that his own individual conduct "had any *actual* effect on the government's investigation." (McPartland PSR Objections at 5, ECF No. 266, Ex. A.)

While I assume that § 2J1.2(b)(2) requires a causal relationship between "the offense" and the "premature or improper termination of a felony investigation," McPartland's arguments are unpersuasive.[7]

McPartland's narrow focus on the causal effect of the acts he personally committed is misguided. I can also consider all relevant conduct of McPartland, including the relevant conduct of McPartland's co-conspirators, in determining whether "the offense resulted in substantial interference with the administration of justice."[8] U.S.S.G. § 2J1.2(b)(2) (emphasis added). I find that McPartland joined this conspiracy in early 2013 and there is no question that, collectively,

---

[7] The precise scope of the causation requirement is not clear. See United States v. McSherry, 226 F.3d 153, 158 (2d Cir. 2000) ("The dictionary defines the verb 'result' to be causational: 'to proceed, spring, or arise as a consequence, effect, or conclusion.' But it is not altogether clear from the dictionary how direct or proximate a resultant consequence must be; nor is it obvious how substantial must be the 'substantial interference with the administration of justice.'" (citation omitted)).

[8] In contrast to McPartland, Spota effectively concedes that, if he joined the conspiracy prior to the relevant conduct of his conspirators that resulted in the termination of the 2013 investigation, then that relevant conduct can be considered in determining the applicability of this enhancement. (Spota Sentencing Mem. at 45–46.) While Spota maintains that the evidence shows that he did not join the conspiracy prior to the June 4, 2015 meeting, I found to the contrary above.

McPartland's actions and the relevant conduct of his co-conspirators, including Burke, resulted in a premature termination of the Burke I felony investigation in 2013.[9]

Moreover, even putting aside the actions of his co-conspirators, the Court finds that McPartland's own actions did, in fact, have an actual effect on the Government's investigation.

McPartland asserts that Burke, Hickey, and the intel detectives decided to independently cover up the assault amongst themselves before McPartland became involved and implies that they would have continued to do so even absent his involvement. McPartland also claims that this enhancement does not apply because Hickey never relayed any of the specific threats made by McPartland at the June 4, 2015 to the intel detectives. These arguments are not persuasive. Beginning in early 2013, McPartland (along with both Spota and Burke) exerted pressure on Hickey. In turn, Hickey exerted pressure, in various ways, on the intel detectives, who stayed quiet in the face of the Burke I investigation and, in Leto's case, lied under oath at the suppression hearing. (See, e.g., Tr. 1244, 1302 (Leto's testimony that although Hickey did not "threaten" Leto, after Leto "very adamantly" voiced his "concerns" to Hickey about testifying, Hickey told Leto that "this is what we signed up for" and Leto felt he had no choice at that point); Tr. 1601 (Hickey's testimony that he would ask the detectives "[is] everybody holding tight"); Tr. 1285 (Leto's testimony that Hickey told him in the fall of 2015 to "stick to the story," which was the same message that Hickey had been sending throughout the cover-up); Tr. 1225, 1237 (Leto's testimony that, on multiple occasions, he—out of fear for his job, himself and his family—communicated with Hickey in order to let Hickey know that Leto did not "rat out" and that Leto did so because

---

[9] Here, McPartland did not engage in criminal conduct on his own. Rather, he was part of a conspiracy to threaten and corruptly persuade witnesses, which resulted in the premature termination of a felony investigation. McPartland does not cite to any authority suggesting that, in such circumstances, a sentencing court must, in determining this enhancement, parse out the precise causal effect of a particular conspirator's individual conduct on the termination of the investigation.

he wanted Hickey to pass that message up the chain to Burke and Spota). McPartland's repeated communications with Hickey pressured Hickey, who, in turn, pressured the detectives, and whose resulting conduct caused the termination of the <u>Burke I</u> investigation.

McPartland's actions also affected the investigation in other ways. A few additional examples are set out below. First, McPartland and Burke crafted the false narrative together during the first coaching session in early 2013. Burke then relayed this false narrative to the intel detectives, who stuck to this story until the obstruction conspiracy fell apart in 2015. McPartland argues that, even accepting Hickey's testimony, Burke "determined the 'cover story' to be used" and that McPartland merely discussed it with Burke and gave Burke advice on it. (McPartland PSR Objections at 5.) McPartland, however, cannot divorce himself from the causal consequences of this false narrative, which he himself helped craft in a meeting with Burke.[10] Second, Leto's perjurious testimony in state court was, undoubtedly, also a cause of the termination of the <u>Burke I</u> investigation.[11] As explained earlier, Burke and McPartland decided that Leto should testify and this message was relayed to Crusco, who ultimately called only Leto to testify. Yet again, McPartland's actions were a cause of the termination of the <u>Burke I</u> investigation. Relatedly, this conversation between Burke, McPartland, and Hickey led Hickey to tell Leto that "they" chose Leto to testify—which Leto interpreted to include Burke and Spota. I find that this statement, which was caused by McPartland, placed further pressure on Leto and contributed to his decision to testify falsely. Third, I find that, generally, the participation of both McPartland

---

[10] Moreover, relevant conduct includes "all acts . . . aided, abetted, [and] counseled . . . by the defendant." U.S.S.G. § B1.3(a)(1)(B).

[11] Additionally, irrespective of the effect Leto's perjured testimony had on the federal felony investigation, substantial interference with the administration of justice in connection with a proceeding in state court can also trigger this enhancement. <u>See</u> <u>United States v. Bontzolakes</u>, 585 F. App'x 794, 799 (2d Cir. 2014) (upholding application of this enhancement where the defendant "fled the country with her children a week before a custody hearing was scheduled to take place in family court").

and Spota in the conspiracy contributed to, and emboldened, Burke's obstructive conduct because Burke—who spoke directly to the detectives and to Hickey—knew he had the backing of the powerful District Attorney's Office.

Finally, as noted earlier, "the commentary's 'listing of acts warranting this enhancement is not exclusive,'" and "'other acts — if similarly or even more disruptive of the administration of justice — could serve as bases' for the enhancement." Escalera, 957 F.3d at 139 (quoting United Amer, 110 F.3d at 885). At the June 4, 2015 meeting, McPartland, a senior prosecutor, invoked the investigation and prosecution of John Oliva while Burke was making a threat against the detectives. This was a clear threat by McPartland that the detectives would be subject to retaliatory investigations and prosecutions if they told the truth. Although those retaliatory prosecutions and investigations never ultimately materialized, the fact that a senior prosecutor threatened to invoke and abuse his prosecutorial power in this shocking fashion resulted in a "substantial interference with the administration of justice." Such egregious conduct by a senior prosecutor—who plays a key role in the administration of justice—is categorially different than, for example, a threat made by an ordinary citizen against a witness that, for whatever reason, ultimately has no effect on a legal proceeding and, thus, may not trigger this enhancement.

For all the reasons above, I find the three-level substantial interference enhancement under § 2J1.2(b)(2)) applies to both Defendants.

The final enhancement in dispute is the two-level enhancement under U.S.S.G. § 2J1.2(b)(3)(C). This enhancement applies "[i]f the offense . . .was . . . extensive in scope, planning, or preparation." U.S.S.G. 2J1.2(b)(3)(C).

As with his objection to the § 2J1.2(b)(2) enhancement, Spota's objection to the § 2J1.2(b)(3)(C) enhancement is premised on his arguments that I should, at most, only credit

some of Hickey's testimony concerning the June 4, 2015 meeting and should not accept any of Hickey's testimony that Defendants engaged in criminal conduct throughout 2013. As explained earlier, I reject Spota's argument that he did not engage in any criminal conduct prior to the June 4, 2015 meeting.

The involvement of both Spota and McPartland in this conspiracy spanned, at the very least, from January 2013 through the end of the 2015. During that time, Spota, McPartland, and their numerous co-conspirators made efforts to obstruct two federal investigations and a related suppression hearing in state court. Even after the Burke I investigation was closed, Defendants made continued comments to Hickey during 2014. (See, e.g., Tr. 1672.) Then, after Defendants learned in June 2015 that the federal investigation had been reopened, their obstructive conduct intensified, with both Defendants making explicit threats during the June 4, 2015 meeting. McPartland proceeded to engage in further obstructive conduct at the August 17, 2015 meeting with Burke and Hickey. Also relevant to this enhancement is the fact that multiple detectives, along with Burke himself, were witnesses to the assault. Not only did the conspirators have to coordinate the stories of multiple witnesses, but Defendants, Burke, and Hickey engaged in repeated efforts to monitor, manage, and pressure the detectives during this years-long conspiracy. Cf. United States v. Petruk, 836 F.3d 974, 976–77 (8th Cir. 2016) ("Petruk's elaborate and complicated scheme to corrupt a prosecution with false evidence was "extensive in planning [and] preparation," like the "gathering together of lies and misrepresentations"). This conduct included, inter alia, the June 4, 2015 meeting where the conspirators attempted to determine which detectives might be cooperating and discussed how to prevent that cooperation.

McPartland contends that his personal participation was not extensive in scope, planning or preparation. As an initial matter, I am not confined to considering only the individual acts

committed by McPartland because this enhancement applies "[i]f the offense . . .was . . . extensive in scope, planning, or preparation." U.S.S.G. 2J1.2(b)(3)(C) (emphasis added). Thus, I look to all the relevant conduct of McPartland and his co-conspirators during this years-long conspiracy. The obstructive conduct of Defendants and their co-conspirators—the latter of which was all "within the scope of jointly undertaken criminal activity," "in furtherance of that criminal activity," and "reasonably foreseeable in connection with that criminal activity"—was, collectively, extensive in scope, planning, and preparation. Moreover, I find that McPartland's individual conduct was, standing alone, also extensive in scope, planning, and preparation. Not only did McPartland's two coaching sessions with Burke establish that he was intimately involved in the creation and perpetuation of the false narrative, but he also engaged in numerous other acts to further this years-long conspiracy. Those acts included: (1) ensuring that his Government Corruption Bureau handled the Loeb case until Spota was compelled to seek appointment of a special prosecutor; (2) exerting pressure on Hickey and issuing directives to him, on numerous occasions in 2013, 2014, and 2015; (3) determining, along with Burke, that Leto should testify in the related state court suppression hearing; and (4) attempting to identify who might be cooperating with the federal investigation.

In sum, the enhancement under U.S.S.G. 2J1.2(b)(3)(C) is clearly applicable to both Defendants.

## C. Defendants' Final Guidelines Calculations

For Counts One through Three, the Final Guidelines Calculations are the same for both Defendants. The Defendants' Base Offense Level is 14. The following enhancements apply to both Defendants. A two-level enhancement applies for abuse of a position of public trust pursuant to U.S.S.G. § 3B1.3. A four-level enhancement applies for the Defendants' leadership roles

pursuant to U.S.S.G. § 3B1.1(a). A three-level enhancement applies because Defendants' offense substantially interfered with the administration of justice pursuant to U.S.S.G. § 2J1.2(b)(2). A two-level enhancement applies because the offense was extensive in scope and planning pursuant to U.S.S.G. § 2J1.2(b)(3)(C). These four enhancements and the base offense level result in a final adjusted offense level of 25. Based on this adjusted offense level of 25 and a criminal history category of I, the guidelines imprisonment range for both Defendants is 57 to 71 months.

**SO ORDERED.**

Dated: August 4, 2021
Central Islip, New York

_____/s/ (JMA)_____
JOAN M. AZRACK
UNITED STATES DISTRICT JUDGE